# No. 21-14133-E

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

**MICHAEL HARDING,**

*Movant/appellant,*

v.

**UNITED STATES OF AMERICA,**

*Respondent/appellee.*

**On Appeal from the United States District Court
for the Southern District of Florida**

**APPELLANT MICHAEL HARDING'S MOTION
FOR A CERTIFICATE OF APPEALABILITY**

**RICHARD C. KLUGH, ESQ.
Counsel for Michael Harding
40 N.W. 3rd Street, PH 1
Miami, Florida 33128-1838
Tel. (305) 536-1191
Fax: (305)536-2170**

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

**Michael Harding v. United States, Case No. 21-14133-E**

Appellant, Michael Harding, files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Acosta Diana M.

Cohen, Michael B.

Funk, Daniel E.

Klugh, Richard C.

Lowenthal, Sheryl J.

Matthewman, Hon. William

Montaner, Marlene C.

Rassie, Ellen

Reid, Hon. Lisette M.

Rosenberg, Hon. Robin L.

Rubio, Lisa Tobin

White, Charles G.

White, Hon. Patrick A.

C-1 of 1

UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

CASE NO. 21-14133-E

MICHAEL HARDING,

　　Movant/appellant,

　　v.

UNITED STATES OF AMERICA,

　　Respondent/appellee.

_____/

## **MOTION FOR A CERTIFICATE OF APPEALABILITY**

Movant/appellant Michael Harding, through undersigned counsel, respectfully moves for a certificate of appealability (COA), pursuant to Fed. R. App. P. 22 and 11th Cir. Rule 22-1(b), and in support of the motion states:

This is an appeal from the denial of Mr. Harding's motion filed pursuant 28 U.S.C. § 2255 seeking to vacate his convictions and sentence imposed following a plea of guilty on three counts of distributing material involving sexual exploitation of minors in violation of 18 U.S.C. § 2252(a), one count of possession of material involving sexual exploitation of minors in violation of 18 U.S.C. § 2252(a)(4)(B) and pleas of no contest on one count of attempting to coerce and entice a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b) and one count of producing child

1

pornography in violation of 18 U.S.C. § 2251(a) and (c).

Mr. Harding is serving a life sentence imposed on the charge of attempting to coerce and entice a minor to engage in sexual activity and concurrent terms of imprisonment of 30 years on the charge of producing child pornography and 20 years on each of the charges of distributing material involving sexual exploitation of minors and the charge of possession of material involving sexual exploitation of minors. Pursuant to 28 U.S.C. 2253(c)(1), a movant must obtain a certificate of appealability (COA) to appeal the denial of relief under § 2255. The applicable standard is whether jurists of reason could disagree with the district court's resolution of the constitutional issues presented such that the issues warrant appellate review. *See Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

The Court should grant a certificate of appealability as to the following issues:

1.    Whether, contrary to *Lee v. United States*, 137 S.Ct. 1958 (2017), the district court applied the incorrect prejudice standard to support its decision to deny Mr. Harding's claim for relief predicated on his counsel's ineffective assistance arising from counsel's erroneous advice, affirmative misrepresentations, false assurances, and concealment of material facts regarding Mr. Harding's sentencing exposure that ultimately convinced him to forfeit his right to go to trial and to instead plead no contest to the attempted enticement charge that resulted in imposition of a life sentence.

2.    Whether defense counsel provided ineffective assistance by advising Mr.

2

Harding to enter pleas of guilty and no contest to the charges in the second superseding indictment where counsel, the government, and the court agreed during a status conference at which Mr. Harding was not present that his guidelines, even after a plea and a reduction for acceptance of responsibility, would exceed the offense level (level 43) threshold for a guideline-mandatory life imprisonment sentence, where counsel: (a) failed to inform Mr. Harding of what occurred at the status conference; (b) affirmatively misrepresented to Mr. Harding that a plea would result in lowering his guidelines; and (c) was aware, and failed to advise Mr. Harding, that the evidence that would be presented by the government without objection at sentencing in support of its demand for a life sentence was so overwhelming that the district court could not reasonably be anticipated to impose a below-guidelines sentence.

3.  Whether the district court erred in denying, without an evidentiary hearing, Mr. Harding's § 2255 claim that his trial counsel induced him to enter a no contest plea without litigating or correctly advising him regarding a valid case-dispositive motion to suppress evidence.

## MEMORANDUM OF LAW

### *Introduction*

Mr. Harding's case presents a unique, yet strikingly clear-cut, example of ineffective assistance of counsel. During the course of a status conference held days before Mr. Harding entered his plea following the advice of counsel whom he trusted, counsel, the government and the court unanimously agreed that Mr. Harding's

3

adjusted guideline offense level was 49, and that even if he was to plead guilty and receive a three-level reduction for acceptance of responsibility, his total offense level would be 46—still well above the level 43 threshold calling for a guideline sentence of life imprisonment. Crim-DE:127. Unsurprisingly, the district court then questioned counsel why, given those guidelines calculations calling for life imprisonment, Mr. Harding would plead guilty or no contest. Crim-DE:127:11-12. Counsel's answer was non-responsive and evasive. Crim-DE:127:12.

Counsel never disclosed to Mr. Harding what occurred at the status conference. Instead, he again told Mr. Harding as he had done several times during the pendency of the case, that if he pled, he would not receive a sentence of more than 30 years and could receive a downward variance from that number. Moreover, counsel incorrectly advised Mr. Harding that a plea would result in lowering his guidelines. Counsel used those assurances to convince Mr. Harding to abandon his firmly held desire to go to trial on Count 5 (the enticement count, which was the only charge carrying a maximum sentence of life imprisonment), even though he had a defense to that charge and the government itself was unsure of who the alleged victim was. Counsel similarly failed to pursue a case-dispositive motion to suppress evidence, contributing to the misadvice regarding the plea. Simply put, counsel advised and convinced Mr. Harding, who sought to avoid a life sentence, to plead despite knowing the guidelines

4

would be life, that the government would vigorously oppose anything but a life sentence, that Mr. Harding's wife would plead for a life sentence, and that the government would introduce overwhelming evidence at sentencing supporting its demand for the imposition of a life sentence. There was no benefit to entering a plea in this case. As counsel knew or certainly should have known, the same sentence would be imposed regardless of whether Mr. Harding pled guilty or was convicted at trial. No competent counsel would have advised Mr. Harding to plead and forfeit his right to a trial under these circumstances.

### Standards for Issuance of a Certificate of Appealability

Under 28 U.S.C. 2255(c)(2), if jurists of reason could disagree with the district court's resolution of the constitutional challenges presented in the §2255 motion, such that the issues warrant appellate review, the Court should grant a COA. *See Buck v. Davis*, 137 S.Ct. 759 (2017); *Miller-El v. Cockrell*, 537 U.S. 322, 337-38 (2003). The COA should issue if "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 494 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (some internal quotation marks omitted)); *see also Henry v Dep't of Corrections*, 197 F.3d 1361, 1364 (11th Cir. 1999).

5

A court "should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief." *Miller-El*, 537 U.S. at 337. Because a COA is always sought in the context where the petitioner has lost on the merits, the Supreme Court has emphasized, "We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338.

## Procedural Background

The first indictment returned on October 2015 charged Mr. Harding with three counts of distributing material involving sexual exploitation of a minor in violation of 18 U.S.C § 2252(a)(2) and one count of possession of material involving sexual exploitation of a minor in violation of 18 U.S.C. § 2252(a)(4)(B). *See* Crim-DE:12. A superseding indictment added a count of attempting to coerce or entice a minor to engage in sexual activity in violation of 18 U.S.C. 2422(b). *See* Crim-DE:16. Finally, on November 12, 2015, the government filed a six-count second superseding indictment charging Mr. Harding with three counts of distributing material involving sexual exploitation of minors, in violation of18 U.S.C. 2252(a)(2) (Counts 1-3), one count of possession of material involving sexual exploitation of minors, in violation

of 18 U.S.C. 2252(a)(4)(B) (Count 4), one count of attempting to coerce and entice a minor to engage in sexual activity in violation of 18 U.S.C. 2422(b) (Count 5), and one count of producing child pornography, in violation of 18 U.S.C. 2251(a) and (e) (Count 6). *See* Crim-DE:32.

Following Mr. Harding's arrest on federal charges, the State of Florida initiated its own investigation that culminated in filing a multiple count information charging sexual battery of a minor. The state charges carried a mandatory life sentence upon conviction. Crim-DE:127. On February 22, 2016, Mr. Harding pled guilty to Counts 1-4 and no contest to Counts 5 and 6 of the second superseding indictment. Crim-DE:128.

Mr. Harding's sentencing hearing was held on May 16 and May 23, 2016. Crim-DE:129, 129. At the beginning of the hearing, Mr. Harding's counsel informed the court that any factual objections to the presentence investigation report had been resolved and that Mr. Harding's counsel and the government both agreed that his total offense level was 43 and his guideline range dictated a sentence of life imprisonment. Crim-DE:129:8.[1]

---

[1]  According to the Presentence Investigation Report, Mr. Harding's calculated guideline range, after applying a 3-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a)(b), was actually 44. Pursuant to U.S.S.G. Chapter 5 Part A (comment n.2), in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43. Clearly, Mr.

During the sentencing hearing, the government called several witnesses, including Sheila LaGrega of the Port St. Lucie Police Department, FBI Special Agent Brian Rey, who headed the federal investigation, and the minor victims' mother, Ashley Harding.  Crim-DE:129, 130.

Ms. LaGrega testified in graphic detail concerning the specifics of the State of Florida's investigation of Mr. Harding, including recounting her interviews of the two minor stepdaughters he was alleged to have sexually abused.  Crim-DE:129:11-46.

Agent Rey detailed the course of the federal investigation, including his forensic analysis of Mr. Harding's phone and computer that contained videos and hundreds of images depicting child pornography as well as chat messages between Mr. Harding and other child pornography aficionados.  Crim-DE:129:50-69; Crim-DE:130:35-53.

Finally, Ashley Harding testified concerning her belief that Mr. Harding should receive a life sentence.   Crim-DE:130:55-97.   She recounted the details of conversations she had with her minor daughters concerning the abuse committed by Mr. Harding, and described sex toys that she had found in the home following Mr. Harding's arrest and the psychological trauma she and her two daughters had suffered

---

Harding received absolutely no guideline offense level reduction benefit from entering his pleas.  Had he gone to trial and been convicted of all the offenses he pled to, his guideline would still have been calculated at 43.

as a result of her daughters' sexual abuse. *Id*.

At the conclusion of the sentencing hearing, the district court sentenced Mr. Harding to life imprisonment on count five. Crim-DE:130:164-65; Crim-DE:114 (sentencing judgment).

Mr. Harding appealed his convictions and sentence, raising issues concerning the adequacy of the plea colloquy and the substantive reasonableness of the sentence imposed. His convictions and sentence were affirmed. *United States v. Harding*, 696 Fed.Appx. 955 (11th Cir. 2017).

On September 4, 2018, Mr. Harding filed his motion to vacate, set aside or correct his conviction and sentence pursuant to 28 U.S.C. 2255. DE:1. In his motion, he presented eight claims for relief:

1.    Counsel was ineffective for failing to move to suppress evidence obtained from AT&T, KIK (Messenger) Interactive, Inc., and Skype.

2.    Counsel was ineffective for failing to properly advise Mr. Harding of the application of the sentencing guidelines, including that he would be subject to mandatory registration as a sex offender and was facing a possible sentence of life imprisonment.

3.    Counsel was ineffective for failing to object to the plea colloquy conducted by the district court.

9

4.    Counsel was ineffective for failing to raise or file objections to the sentencing enhancements recommended in the presentence investigation report.

5.    During the plea colloquy, the district court failed to inform Mr. Harding that he would be required to register as a sex offender and was subject to possible involuntary civil commitment; and the court misadvised him on the mandatory minimum sentence for Count 6.

6.    There was no factual basis for the court to have accepted a no contest plea to Counts 5 and 6, given that there was no factual basis establishing that Mr. Harding took the required "substantial" step to commit those offenses; and counsel was ineffective for failing to object to the government's "vague reference to a minor daughter."

7.    Counsel was ineffective for failing to object to hearsay testimony and for failing to object to or move to exclude uncharged conduct.

8.    Counsel was ineffective for failing to disclose a conflict of interest impacting Mr. Harding's representation.

On July 27 and July 28, 2021 the magistrate judge conducted an evidentiary hearing only as to the grounds presented in claims 2 and 4, after denying an evidentiary hearing on the remaining claims, including claim 1 of the motion alleging

10

ineffectiveness in failing to pursue a motion to suppress evidence.  DE:72.  Based on a colloquy among the magistrate judge, Mr. Harding's counsel, and Mr. Harding during the hearing, the magistrate judge concluded that Mr. Harding had orally amended his motion, withdrew his request to vacate the guilty pleas and sentences on Counts 1-4, and was solely seeking to vacate the convictions and sentences on Counts 5 and 6.  DE:77:142-45.

On August 13, 2021, the magistrate judge filed his Report and Recommendation recommending that Mr. Harding's claims for relief be denied.  DE:72.  Mr. Harding timely filed his Objections to the Report.  DE:80.  On September 28, 2021, the district court entered its Order Adopting Magistrate Judge's Report, Denying Motion to Vacate Sentence, and Closing Case.  DE:84.

## Factual Background

## The Presentence Investigation Report (the PSI)

The PSI set forth the following details of the investigation of Mr. Harding and summary of his offense conduct. *See* PSI at ¶¶ 3-20. [**NOTE TO THE COURT**: *Please note that the content quoted and summarized below from the presentence report includes language and conduct that is extremely vile and is included only to substantiate that no judge reading these unobjected-to matters would have any normal reaction other than that the defendant who admitted them deserved to remain*

11

*incarcerated for the rest of his life.*]

On July 23, 2015, a homeland security investigations (HSI) special agent in Wilmington, Delaware signed into an undercover Kik Messenger user account as part of a child exploitation investigation. While in a Kik messenger chat room, the agent observed two images of child pornography posted earlier that day by an individual using the screen name "desthfromabove." Summonses served on Kik messenger and AT&T revealed that the IP address used to post the images was registered to Michael Harding in Port St. Lucie Florida.

On August 13, 2015, the HSI agent again signed into the undercover Kik messenger account and observed that "desthfromabove" had posted a video depicting child pornography in the chat room on August 4, 2015. The video was 37 seconds long and depicted an adult male rubbing his penis in the vagina and anus of a preschool aged prepubescent female. The HSI agent successfully downloaded the video. On August 17, 2015, the HSI agent once again signed into the undercover account and saw that another video containing child pornography had been posted by "desthfromabove." This video, which depicted a prepubescent female being anally penetrated by an adult male as he ejaculated, was also downloaded by the HSI agent.

On September 22, 2015, a federal search warrant was executed on Mr. Harding's residence. During the course of the search, a PNY thumb drive was found in a gun

case in the master bedroom closet. A forensic examination of the thumb drive revealed that it contained 606 still images and 102 videos depicting minors involved in sexually explicit conduct with other minors and adults. The pornography had been saved to the thumb drive as early as March 6, 2008. On another thumb drive found in the storage bin in the master bedroom closet, there were 23 deleted images of child pornography. A LG-D800 cellular telephone was found in a nightstand in the master bedroom. A forensic examination of the telephone yielded nine additional videos depicting minors engaged in sexually explicit conduct, including the videos uploaded to the Kik messenger chat room on July 26, 2015 and August 4, 2015. The cell phone also contained an app designed to protect users from being discovered by law enforcement.

During subsequent forensic examinations of the cell phone, FBI Special Agent Brian Rey found a number of chat conversations between Mr. Harding and other unidentified individuals discussing sexual activity with children. The chats indicated that Mr. Harding sent and received numerous images depicting child pornography. During one of the chat conversations, Mr. Harding indicated he had three daughters, whose ages were four months, five years, and nine years, and that he had engaged in sexual activity with the nine-year-old. Regarding the nine-year-old, he stated in one of the chats, "I only play with the oldest, she can't fit it completely, but we work with it," and "she sucks daddy's dick good and lets me do what I please." Mr. Harding

added "I can't complain, she lets me cum in her ass and pussy."  PSI ¶ 12.

Agent Rey also located a series of chat conversations that occurred from August 12 through September 10, 2015 between Mr. Harding and an individual using the screen name "daddydearaimee" who claimed he was the father of a seven-year-old daughter and a 12-year-old daughter.  "Daddydearaimee" sent Mr. Harding non-nude pictures of the two minor females and claimed that he had performed sex acts on both. Mr. Harding responded that he had also previously engaged in sexual acts with his nine-year-old stepdaughter and that he had taken a video of her performing oral sex on him.

Eventually, Mr. Harding initiated a conversation with "daddydearaimee" where they discussed exchanging their minor children for the purposes of engaging in sexual acts with the minors.  Mr. Harding sent "daddydearaimee" non-nude images of his nine-year-old stepdaughter and five-year-old stepdaughter.  One of the images showed his nine-year-old stepdaughter's face and he proposed swapping her for sex.  Mr. Harding and "daddydearaimee" discussed where they would meet and how Mr. Harding would explain to his wife why he was traveling alone with his nine-year-old stepdaughter.  According to the government, investigation into the identity of "daddydearaimee" was still continuing.

During an additional forensic examination of the cellular telephone, SA Rey

14

located a thumbnail image depicting C.W. (the older step-daughter) performing oral sex on Mr. Harding. The thumbnail image was created when a video of this event was recorded on November 17, 2014. In previously referenced chat conversations, Mr. Harding indicated he had videotaped his then eight-year-old stepdaughter performing oral sex on him and had deleted the video because he was afraid of getting caught. Additionally a sex toy was found in a gun case where the PNY thumb drive was found. The sex toy was later tested and found to contain C.W.'s DNA.

When Mr. Harding's wife, who is the mother of C.W. and her younger sister H.W., was interviewed, she told the investigators that she had questioned her daughters and C.W. told her that Mr. Harding would remove his clothes and request she remove her clothes and lay in bed. She also told the investigators that C.W. told her that Mr. Harding would also ask her to take off her clothes when they were sitting in the living room watching television. She also reported that C.W. told her that Mr. Harding had asked her to touch his penis and that he had touched her private area over her clothes; that C.W. told her Mr. Harding said, "[D]on't tell your mom, it's our secret" (PSI ¶ 15); and that H.W. had previously told her that Mr. Harding had taken a shower with her while naked when she was four years old.

During the investigation, C.W. and H.W. were interviewed numerous times by law enforcement agents. C.W. initially reported that in July 2015, Mr. Harding had

15

asked her to touch his penis, take off her clothes and lay with him in bed, but she had declined. C.W. indicated that in September 2015, Mr. Harding had taken off all of his clothes and showed her his penis while he masturbated. C.W. said that Mr. Harding told her not to tell her mother because it was their secret. She denied that anyone had asked to take a picture or movies of her while she was naked and that Mr. Harding had never asked her to put her hand on his penis.

In subsequent interviews, C.W. disclosed that when she was six or seven years of age, Mr. Harding started taking his clothes off in her presence while in the living room when her mother was napping. Sometimes he would ask her to take off her clothes and sometimes he would not. She indicated that on some occasions Mr. Harding would masturbate and ejaculate; on other occasions he would have her undress and put his fingers inside her anus and vagina and that it hurt. C.W. also disclosed that Mr. Harding had put his penis inside her mouth several times and had ejaculated; that he tried to put his penis inside her "privates" several times but had only been able to put it in a little bit; and that Mr. Harding also had her masturbate him several times, and had ejaculated on her hands. C.W. denied that Mr. Harding had placed any objects in her.

During an interview of H.W., she claimed that when she was four years of age she spent the night alone in a tent with Mr. Harding at their house and that, during the

16

night, he removed both of their clothing. She added that Mr. Harding had touched her on her vagina and anus and had also inserted the handles of a screwdriver and knife into her vagina and anus while taking pictures of her. H.W. described another incident when Mr. Harding came into her bedroom, removed her clothes, pushed her down on the bed and inserted the handle of a screwdriver into her vagina and anus while taking pictures of her. She described a third incident during which Mr. Harding came into the bathroom while she was taking a shower. He removed his clothing, entered the shower and told her to lie down face first in the bath tub. While she was in that position, he inserted his fingers into her vagina and anus. When they both sat facing each other in the bathtub, she saw fluid on her hands coming from his penis. PSI ¶¶ 3-20.

*The Sentencing Hearing*

Throughout the case, the government had steadfastly maintained that it would do everything within its power to ensure that Mr. Harding received a sentence of life imprisonment. Predictably, at sentencing the government presented live, graphic testimony corroborating and expanding upon the factual assertions in the PSI and highlighting matters that were not part of the federal charges but had been uncovered during the state of Florida's investigation of Mr. Harding.

Detective LaGrega testified that Mr. Harding's stepdaughter, C. W., had disclosed during the course of a number of interviews that on several occasions Mr.

17

Harding had taken off his clothes, directed her to take off her clothes and lay or sit next to him and touch his penis; and that he had touched her on her breast and butt and told her to put her mouth on his penis. The detective also described how, during the interviews, C. W. used a doll to demonstrate the way Mr. Harding had digitally penetrated her vaginally and anally, and that C.W. also disclosed how Mr. Harding had put his penis in her privates and that it was painful. Crim-DE:129:25-28.

Detective LaGrega informed the trial judge that during the course of her interviews with H.W., the younger stepdaughter, H. W. described three separate incidents of sexual abuse by drawing pictures. H.W. explained that she had been in a tent in the backyard alone with Mr. Harding where he had taken her clothes off and ordered her to lay down on the sleeping bag and touched her body. According to H.W., Harding inserted the handles of a screwdriver and a knife into her vagina and butt and tapped her chest with a hammer telling her that he needed to check her heart. Crim-DE:129:31-33.

At some point after Detective LaGrega interviewed the children, their mother, Ashley, brought her a screwdriver, two small vibrators, and a butt plug she had found. DNA testing revealed that DNA taken from the butt plug matched the standard obtained from C.W. Crim-DE:129:34.

HSI Special Agent Brian Rey detailed the forensic aspects of the investigation.

18

Through Agent Rey, the government introduced numerous videos and photos depicting child pornography and chat conversations recovered from Mr. Harding's electronic device.   Agent Rey also testified that a number of the videos/pictures were of previously identified victims and produced by known offenders such as Mastodon. Crim-DE:129:50-64.

Agent Rey also explained how he forensically retrieved a thumbnail photo from Mr. Harding's cell phone depicting C.W. performing oral sex on Mr. Harding and how the thumbnail was created when Mr. Harding took a since-deleted video memorializing that event.   Crim-DE:129:65-67.

### *The 28 U.S.C. § 2255 Evidentiary Hearing*

Mr. Harding began his testimony by explaining that the superseding indictment added an attempted enticement count charging a violation of 18 U.S.C. 2422(b) and that the charge carried a statutory maximum sentence of life imprisonment. DE:76:10-12; Pet. Ex. 1.   Mr. Harding recalled that he received a letter from his counsel, R. Fletcher Peacock, dated November 4, 2015 outlining his belief that there was a viable defense to the attempted enticement charge.   Pet. Ex. 4.   In the letter, Mr. Peacock explained that he felt that there was a lack of a substantial step having been taken in connection with the charged attempt and that the government could not prove the elements of the charge.   In support of his opinion. Mr. Peacock enclosed a copy of a

19

case, *United States v. Lee*, 603 F.3d 904 (11th Cir. 2010).  Pet. Ex. 3; DE:76:17

On November 16, 2015, Mr. Harding and Mr. Peacock met to discuss his case. During the meeting, Mr. Harding told Mr. Peacock that he believed his analysis regarding the attempted enticement charge (Count 5) was correct and that he wanted to proceed to trial on that count.  Although Mr. Harding was adamant about going to trial on the attempted enticement charge because he felt he did not commit the crime, Mr. Peacock explained that, in his opinion, Count 5 was no longer a concern and that the focus should now be on Count 6 (the production count charging a violation of 18 U.S.C. § 2251), since there was an identifiable victim (Mr. Harding's stepdaughter C.W.)  DE:76:17-19.  Moreover, by the date of this meeting, the State of Florida investigation had progressed to the point where warrants on capital sex battery charges had been issued.  DE:76:17.  Mr. Harding recalled that, during this meeting, Mr. Peacock explained that the guidelines were pretty high, somewhere around the 30-year range, and that range could fluctuate.  DE:76:22.

Mr. Harding and Mr. Peacock next met on December 8, 2015.  Mr. Peacock brought along a number of documents related to the state investigation.  Mr. Harding again told Mr. Peacock that he wanted to go to trial on the attempted enticement account.  DE:76:23-24.  When Mr. Peacock again told him that he should focus on Count 6, he responded by telling him that he wanted to go to trial on that count as well

and wanted to view the image supporting that charge. Mr. Peacock advised that was impossible due to the nature and subject matter of the evidence. DE:76:23. Mr. Harding also testified that at no point prior to entering his plea did Mr. Peacock explain that the 4B.1.5(B)(1) pattern enhancement might apply to his case. He only learned of that when he saw the PSI. DE:76:25.

Mr. Harding and Mr. Peacock next met on January 21, 2016. During that meeting, they initially discussed the sex toys that had been found during the investigation. DE:76:26-29. When the topic shifted to Mr. Harding's sentencing exposure, Mr. Peacock provided him with a copy of *United States v. Irey*, 612 F.3d 1160 (11th Cir. 2010). Pet. Ex. 6. Mr. Peacock assured Mr. Harding that Mr. Irey's offense conduct that resulted in a 30-year sentence was far more egregious in his opinion than Mr. Harding's. He went on to explain there would be absolutely no way the guidelines would justify anything more than 30 years for Mr. Harding; and certainly a life sentence was not possible. Based on Mr. Peacock's representations, Mr. Harding understood that the guidelines could not get to life imprisonment; and that life was not even on the table because of the guidelines. DE:76:26.

Mr. Peacock visited Mr. Harding following a calendar call on February 17, 2016. For the first time, he proposed the idea of a no contest plea to Counts 5 and 6. He explained that this would avoid any admissions that could impact the pending state

21

charges. DE:76:30-31. Mr. Harding was unconvinced. He reiterated that he still wanted to go to trial on the attempted enticement charge. Mr. Peacock responded by telling Mr. Harding that if he were convicted at trial he would be assured to receive the maximum penalty, but if he pled he would not be exposing himself to more than 30 years. *Id.*

Mr. Harding received a letter from Mr. Peacock dated February 18, 2016. Pet. Ex. 7. In his letter, Mr. Peacock explained that a plea would put Mr. Harding in a better light in front of the judge at sentencing and "we need all the help we can get to *lower your sentencing guidelines* and support a motion for downward variances." DE:76:33 emphasis added). The letter does not indicate what Mr. Harding's guideline range was, stating only that a plea would lower it. When he received this letter, Mr. Harding still believed that his guideline was approximately in the 30-year range and that the reference in the letter to the downward variance had to do with his earlier question of whether there was a way to lower the sentence below 30 years. DE:76:32-33

Mr. Harding received his next visit from counsel following a status conference held on February 19, 2016. Mr. Harding was not present at the status conference. During the visit, Mr. Peacock failed to advise Mr. Harding of anything that was discussed during that hearing. Significantly, he failed to tell Mr. Harding that the

government, the court, and counsel all agreed that his guideline level scored out at 46, even with a reduction for acceptance of responsibility. Mr. Peacock likewise failed to disclose the court's comments questioning why his client would agree to plead when the guidelines called for the imposition of a life sentence. Unaware of what had been discussed at the status conference, Mr. Harding accepted Mr. Peacock's advice and entered a plea. Mr. Peacock had convinced him that it was in his best interest to do so, that if he pled he would not receive a sentence higher than 30 years, and that with a downward variance his sentence could be something lower than that. DE:76:35-38.

Mr. Harding received his PSI on April 20, 2016 and was shocked when he learned the guidelines called for a life sentence. DE:76:40. He reiterated that had Mr. Peacock explained what had been discussed during the status conference there would have been no way that he would have taken a plea. Rather, he absolutely would have insisted, as he had all along, on going to trial. DE:76:45.

When cross examined by the prosecutor, Mr. Harding acknowledged that, at his change of plea hearing, he knew the statutory maximum sentence for the attempted enticement charge was life, DE:76:51, and that during the hearing the court explained that consecutive sentences on each of the counts was possible. DE:76:76. However, he explained that Mr. Peacock had told him that his guidelines did not justify the imposition of consecutive sentences and that he trusted Mr. Peacock's repeated

assertions that he would not receive a sentence of more than 30 years. DE:76:82.

During his cross examination, Mr. Harding characterized Mr. Peacock's representations concerning a 30-year sentence as a professional opinion but answered in the negative when the magistrate judge interjected and asked if there were any assurances. DE:76:57. However, Mr. Harding maintained that he trusted Mr. Peacock when he told him he was not going to get more than 30 years. Even though he thought that 30 years was just an estimate, he still pled. DE:76:82, 84.

When questioned regarding the difference between an assurance versus a professional opinion, Mr. Harding explained that he understood that 30 years was the realistic outcome of his plea, no more than 30 years and potentially less with a downward variance. DE:76:94.

Mr. Harding also testified that Mr. Peacock told him that pleading guilty would limit the amount of bad things the judge would hear or see at sentencing. Sentencing would, therefore, be rather brief. Mr. Peacock never told him that the evidence supporting the state charges of capital sexual battery would be factored into the guideline calculations. DE:76:90-93.

Mr. Harding's counsel, Mr. Peacock, began his testimony by summarizing a number of topics concerning his representation of Mr. Harding. DE:77:11. He first described how he was appointed to represent Mr. Harding, how the discovery process

24

unfolded during the case, his participation in discovery conferences with the government, his review of some of the pornographic images, his receipt and review of documentary evidence furnished by the government, and the steps he took to review discovery with Mr. Harding; he also recounted how he reviewed the image discovered by Agent Rey that supported Count 6, the production count.  DE:77:10-17.

Mr. Peacock acknowledged that he had sent a letter to Mr. Harding setting forth his opinion that the government lacked sufficient evidence to prove the attempted enticement count.  DE:77:48-49.

On a number of occasions, Mr. Peacock tried to negotiate a plea agreement with the government.  Those efforts were rejected out of hand.  DE:77:32.  He then focused his efforts on convincing the district court to permit Mr. Harding to enter a plea to the second superseding indictment that would include a no contest plea to Counts 5 and 6, the attempted enticement and production counts. DE:77:34-35.  During the February 19 status conference, the trial judge decided to allow Mr. Harding to plead no contest plea to those counts.  DE:77:40.

Mr. Peacock testified, and his notes, Govt. Ex. 11, reflect, that during the November 16 meeting with Mr. Harding, he told him that his guidelines were 360 months to life.  His estimation of the guidelines changed because initially he did not think that Mr. Harding was subject to both the Chapter 2 and Chapter 4 pattern

enhancements. The case became stronger when evidence demonstrating actual sexual abuse of the stepdaughters was revealed and that evidence would have supported the application of both pattern enhancements. He believed, and his notes again reflect, that during the December 8th meeting with Mr. Harding, they discussed the fact that the guidelines would be life imprisonment. Moreover, his notes reflect that Mr. Harding was made aware that Mr. Harding's wife was pushing for a life sentence and that the state charges carried a mandatory life sentence. DE:77:52-53. However, his notes also bear a notation, "but RLR probably won't go that high." DE:77:55-56. He explained that "RLR" referred to Judge Rosenberg; and that he "truly didn't believe that Judge Rosenberg would—I thought that she'd be amenable to a motion for downward variance." DE:55. He added that Judge Rosenberg was relatively new to the bench, having been on the court for about a year, and stated, "I thought that she would be more receptive to that type of thing." *Id.* He testified that this was his opinion based on his experience and what he knew about the case, and that he conveyed this to Mr. Harding. *Id.* Although he did not recall his exact words, he explained that he would have told Mr. Harding that he saw Judge Rosenberg in a very favorable light sentencing-wise; that he thought she listened well at sentencing; that she would be sensitive regarding the arguments that would be made; and that "our best shot" was to try to get her to be sympathetic and come down from the life guidelines. DE:77:56.

26

Mr. Peacock testified that he did not believe that he ever told Mr. Harding that he would not get anything above a 30-year sentence; nor did he ever assure him that he would not get more than 30 years. DE:77:56-60. However, Mr. Peacock did recall giving Mr. Harding a copy of the *Irey* case and utilized it in connection with discussions about a 30-year sentence; and he probably told Mr. Harding that 30 years was a target number. DE:77:94.

Mr. Peacock conceded that he originally believed there was a legal defense to the attempted enticement charge based on the fact that Mr. Harding had not taken a substantial step toward the commission of the offense. DE:77:48, 70. His thinking later changed when the government provided evidence that, in his view, demonstrated that Mr. Harding had engaged in grooming his eldest stepdaughter. DE:77:59, 99.[2]

Mr. Peacock likewise conceded that he did not advise Mr. Harding of discussions during the February 19, 2016 status conference where he, the government and the judge herself acknowledged and agreed that his guidelines, even assuming a 3 level reduction for acceptance of responsibility, were well above the threshold

---

[2] Although at the February 19 status conference the government represented that Mr. Harding's stepdaughter, C.W., was the target of his enticement, three days later at the change of plea hearing they shifted positions and proffered that it was "daddydearaimee"'s daughter who was the target. Given that it was now "daddydearaimee"'s daughter who was the target, Mr. Harding's alleged grooming of C.W. was therefore irrelevant to Mr. Peacock's claimed change of opinion.

dictating the imposition of a life sentence. His excuse for not relaying this information was that "[w]e were all aware" of the sentence Mr. Harding was facing. DE:77:89. He offered no explanation for his assertion in his February 18 letter that a plea would help lower the guidelines. DE:77:87.

After Mr. Peacock concluded his testimony, two additional witnesses testified on behalf of Mr. Harding. His mother, Julie Harding, explained that she was actively involved in the case from the day of her son's arrest and spoke with Mr. Peacock about the case on numerous occasions, both in his office and on the phone. DE:77:105. Prior to the change of plea hearing, Mr. Peacock had assured her that the most amount of time Michael was facing was 30 years. After that, while they were preparing for sentencing, Mr. Peacock told her that Michael was facing 25-30 years and assured her he would never get a life sentence. DE:77:106-107. Mr. Peacock never told her what her son's guidelines actually were, or that even if Michael pled and received a reduction for acceptance of responsibility his guidelines would still be life. To the contrary, he told her that if Michael pled and accepted responsibility, the judge would be lenient and sentence him to no more than 30 years. DE:77:108. Finally, on the first day of sentencing, Mr. Peacock assured her in the presence of Judit Sohr that Michael would not be sentenced to more than 30 years. DE:77:108-109.

On cross examination, Ms. Harding conceded that she is philosophically

opposed to life sentences as punishment.  DE:77:113.

Judit Sohr testified and corroborated Ms. Harding's testimony that on the first day of sentencing Mr. Peacock said that Michael would receive no more than a 30-year sentence.  DE:77:126.

## ARGUMENT

The Sixth Amendment guarantees criminal defendants the assistance of counsel in defending against criminal charges.  *See Hall v. Head*, 310 F.3d 683, 691 (11th Cir. 2002) (citing *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The right to counsel "is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process."  *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).  Additionally, the right to counsel encompasses the right to "effective assistance of counsel."  *McMann v. Richardson*, 397 U.S. 759, 771 (1970).

The Sixth Amendment also guarantees the accused the effective assistance of counsel in all critical stages of a criminal prosecution, including during the process of plea negotiations and in deciding whether to forego his right to trial and enter a plea. Counsel's obligations include providing an accurate assessment of the accused's sentencing exposure and informing him of all matters that may affect his decision of whether to plead or go to trial.

*Strickland v. Washington* held that relief is warranted upon a showing that: (1)

29

counsel's performance fell below an objective standard of reasonableness (the performance prong); and (2) there is a reasonable probability (sufficient to undermine confidence in the outcome) that, but for counsel's objectively unreasonable performance, the proceeding's results would have differed (the prejudice prong). *Strickland*, 466 U.S. at 688-89.  One year later, addressing the situation in which an attorney's erroneous advice lead the accused to plead guilty, the Supreme Court held that the prejudice standard required the defendant to show "a reasonable probability that, but for counsel's errors he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).  Subsequent cases have suggested that the defendant, consistent with *Strickland*, cannot establish prejudice solely by showing he would have gone to trial.  He must also show that he would likely have obtained a more favorable result in the end, or that his decision to reject a plea and proceed to trial must have been rational.  If that was ever the law, it most certainly is not now.

The Supreme Court has now made it clear that the traditional *Strickland* prejudice analysis does not apply where, as in Mr. Harding's case, counsel's constitutionally deficient performance resulted in a forfeiture of the accused's right to a trial.  *See Lee v. United States*, 137 S. Ct. 1958, 1965 (2017) ("When a defendant alleges his counsel's deficient performance led him to accept a guilty plea rather than

go to trial, we do not ask whether, had he gone to trial the result of that trial 'would have been different' than the result of the plea bargain. That is because, while we ordinarily 'apply a strong presumption of reliability to judicial proceedings,' 'we cannot accord' any such presumption 'to judicial proceedings that never took place.'" (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 482-83 (2000)).

In *Lee*, the accused, a non-U.S. citizen facing overwhelming evidence of guilt with no real defense to the drug related charges, opted to accept a plea that carried a lesser prison sentence than he would have faced at trial. His decision was motivated by his counsel's erroneous advice that the government would not deport him if he pleaded guilty. In denying his § 2255 motion, the district court, applying *Strickland*'s two-part test for ineffective assistance of counsel claims, concluded that Lee's counsel had performed deficiently by giving improper advice about the deportation consequences of the plea, but that "[i]n light of the overwhelming evidence of Lee's guilt," Lee "would have almost certainly been found guilty and received a significantly longer prison sentence and subsequent deportation had he gone to trial." *Lee*, 137 S.Ct. at 1964.

The Sixth Circuit, relying on *Hill v. Lockhart*, 474 U.S. 52, 59 (1985), affirmed the denial of relief on the basis that to establish he was prejudiced by counsel's errors Lee would be required to show a reasonable probability that, but for counsel's errors,

31

he would not have pleaded guilty and would have insisted on going to trial. *Lee*, 137 S.Ct. at 1964. Because the Sixth Circuit determined Lee had "no bona fide defense, not even a weak one," he "stood to gain nothing from going to trial but more prison time." *Id*. Relying on circuit precedent holding that "no rational defendant charged with a deportable offense and facing overwhelming evidence of guilt would proceed to trial rather than take a plea deal with a shorter prison sentence," the Sixth Circuit determined that Lee could not show prejudice. *Id*.

In *Lee*, the Supreme Court rejected the analysis of both the district court and the Sixth Circuit and explained why a different prejudice analysis must apply in this type of case. 137 S.Ct. at 1963. First, it observed that a claim of ineffective assistance of counsel will often involve a claim of attorney error during the course of a legal proceeding, for example that counsel failed to raise an objection at trial or to present an argument on appeal. Thus, under *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000), a defendant raising such a claim can demonstrate prejudice by showing "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 482 (quoting *Strickland*, 466 U.S. at 694; internal quotation marks omitted).

The *Lee* Court explained that where a defendant has pled guilty and forfeited his right to go to trial, the analysis is different and instead focuses on whether the

32

defendant was prejudiced by the "denial of the entire judicial proceeding … to which he had a right." 137 S.Ct. at 1965 (citing *Roe v. Flores-Ortega*, 528 U.S. at 483); *see id.* ("As we held in *Hill v. Lockhart*, when a defendant claims that his counsel's deficient performance deprived him of a trial by causing him to accept a plea, the defendant can show prejudice by demonstrating a 'reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.' 474 U.S., at 59, 106 S.Ct. 366.").

Second, the *Lee* Court rejected the government's request to adopt a per se rule embraced by the Sixth Circuit that a defendant with no viable defense cannot show prejudice from the denial of his right to trial. 137 S.Ct. at 1966. In doing so, the Court observed that when the consequences are from the defendant's perspective, similarly dire, even the smallest chance of success at trial may look attractive. *See id.* at 1966-67 ("For example, a defendant with no realistic defense to a charge carrying a 20–year sentence may nevertheless choose trial, if the prosecution's plea offer is 18 years. Here Lee alleges that avoiding deportation was the determinative factor for him; deportation after some time in prison was not meaningfully different from deportation after somewhat less time. He says he accordingly would have rejected any plea leading to deportation—even if it shaved off prison time—in favor of throwing a "Hail Mary" at trial.")

*Lee* was well-established law by the time Mr. Harding filed his § 2255 motion. Despite consistently urging that the *Lee* prejudice standard applied, in both his petition and objections, both the magistrate judge and the district court failed to acknowledge the *Lee* decision in any way. Instead, both the magistrate judge and the district court (by adopting the Report and Recommendation) applied a prejudice standard that *Lee* decided was patently incorrect.

Initially, in his Report and Recommendation, the magistrate judge applied the *Strickland* prejudice standard, noting that Movant "must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." DE72:17.

Then, in reliance on *Jackson v. United States*, 463 Fed.Appx. 833 (11th Cir. 2012), the magistrate judge engrafted an additional prejudice requirement: that the movant must show that rejecting the plea bargain would have been rational under the circumstances. DE:72:20.[3]

Finally, relying on *Dickey v. United States*, 437 Fed.Appx. 851, 852 (11th Cir.

---

[3] During the evidentiary hearing, the magistrate judge permitted the government to cross-examine Mr. Harding regarding the facts surrounding Counts 5 and 6, finding that such inquiry (despite the privilege against self-incrimination) was relevant on the issue of whether rejecting the plea bargain would have been rational under the circumstances. DE:76:64-67. This mid-hearing ruling confirms that the magistrate judge was relying on a prejudice standard deemed to be erroneous by *Lee v. United States*.

2011) (which was decided prior to *Lee v. United States*), the magistrate judge erroneously concluded that a movant cannot show prejudice from an attorney's misadvice if he was advised of the correct maximum sentence during the plea colloquy. To begin with, in addressing the prejudice prong, the *Dickey* Court applied what, in light of *Lee,* is a clearly incorrect analysis, stating that "the evidence against Dickey was both overwhelming and inflammatory, such that there was no realistic chance of acquittal at a trial. Dickey has failed to establish that but for any errors by counsel, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 852. As *Lee* has made clear, the likely lack of success at trial is not determinative with regard to whether the defendant would have rejected a plea and gone to trial had he been properly advised. In fact, in *Lee* that was precisely the case—even with overwhelming evidence and no realistic chance of acquittal, counsel's erroneous advice led the accused to forfeit his right to trial and his opportunity to throw a Hail Mary.

In addition, the effectiveness of the plea colloquy conducted by the district court was undermined by at least two factors. First, the district court itself affirmatively misrepresented the potential impact of the guidelines on Mr. Harding's case. As it had done in numerous previous cases, the district court, consistent with standard bench book language, informed Mr. Harding:

> Neither the court nor anyone else will be able to determine with certainty
> the advisory guideline range for your case until after the Pre-Sentence

35

Report has been completed and you and the Government have had an opportunity to challenge the reported facts and the application of the guidelines recommended by the Probation Officer… If that sentence was higher than you expected, maybe even higher than what the guideline range is, higher than what your attorney has indicated may be a likely outcome, do you understand that that would not be a basis for you to seek to withdraw your guilty plea?

Crim-DE:128:20-21.

Although the above admonishment may have been sufficient in the usual case, it was not in Mr. Harding's. It was not only inaccurate but grossly misleading. The district court should have, but failed to, inform Mr. Harding that, at a status conference held three days before the plea, the district court, the government, and Mr. Harding's counsel unanimously agreed that even if Mr. Harding were to plead guilty and receive a three-level reduction for acceptance of responsibility, his guidelines would still be well above level 43, the threshold for a guideline life sentence.

The district court also should have asked Mr. Harding the same question that was asked of his counsel at the status conference and prompted an evasive response—essentially, why, given that his guidelines were indisputably life, would he want to plead guilty when it was clear the government would be aggressively seeking a life sentence? DE:127:11-12. Counsel's troubling response at the status conference was "I guess I am not prepared to give any definitive statement." DE:127:12.

The district court should also have directly addressed with Mr. Harding the

concerns raised at the status conference when she asked whether there was any risk in accepting a no contest plea from the defendant on Counts 5 and 6 when he might be innocent. At the status conference, the district court again received an evasive response from counsel, who stated, "[J]ust to make clear, Mr. Harding does intend to challenge those allegations in State Court. I take no position with regard to that, Your Honor. We just choose not to contest the government's proof on 5 and 6." DE:127:21. The district court's question effectively remained unanswered. However, as counsel well knew when he made this statement, Mr. Harding had consistently maintained he was not guilty, at a minimum, of the attempted enticement charges alleged in Count 5, and wanted to go to trial on that count.

The impact of the district court's misleading admonishment was compounded by Mr. Peacock's February 18, 2016 letter to Mr. Harding, where he advised him, "A plea will put you in a better light in front of the judge at sentencing and we need all the help we can get to lower your sentencing guidelines and support a motion for downward variances." Pet. Ex. 7. That was a blatant misrepresentation. As counsel well knew (and conceded at the status conference held hours later), there was no conceivable way to lower the guidelines to a level that would call for anything less than life imprisonment. Mr. Peacock wholly failed to exhibit the degree of candor owed to his client. Had he done so, he would have disclosed that there was no hope of lowering

the guidelines to a level other than life, that the government and his wife would aggressively pursue a life sentence, and that by pleading, he was purely at the mercy of the court.

The Court in *Lee v United States* made it clear that cases such as *United States v. Akinsade*, 686 F.3d 248, 253 (4th Cir. 2012), noting that a judge's warnings at a plea colloquy may undermine a claim that the defendant was prejudiced by his attorney's misadvice, should not apply where the misadvice undermines the judge's warnings themselves. *Lee*, 137 S.Ct. at 1968 n. 4. In this case, counsel's affirmative misrepresentations to Mr. Harding, including but not limited to those in his February 18 letter, had exactly that effect; and as we have explained, the district court's admonishments to Mr. Harding were misleading and omitted critical information Mr. Harding needed to make an informed decision whether to proceed with the plea.

Mr. Peacock's advice to Mr. Harding to plead where he, Mr. Peacock, knew that the guidelines far exceeded the life imprisonment threshold fell well below any objective standard of reasonableness. The magistrate judge effectively conceded as much when he characterized counsel's strategic decision as unorthodox and noted that other criminal defense attorneys might well have rejected that approach. DE:72:26.[4]

---

[4] The very word, unorthodox, embraces conduct that may fall well beyond the boundaries of an objective standard of reasonableness. Unorthodox connotes actions contrary to what is usual, traditional, or accepted; conduct not conforming to rules,

In this case, counsel's decision to advise his client to plead where the inevitable result would be the imposition of a life sentence is simply not strategic. A decision cannot be fairly characterized as strategic unless it is a conscious choice between two legitimate and rational alternatives. It must be borne of deliberation and not happenstance in attention or neglect. *See*, *e.g.*, *Wood v. Allen*, 558 U.S. 290, 307 (2010) (Stevens, J dissenting); *see also Moore v. Johnson*, 194 F.3d 586, 604, 615 (court not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate strategic decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all; "*Strickland* does not require deference to those decisions of counsel that, viewed in light of the facts known at the time of the purported decision, do not serve any conceivable strategic purpose.").

Count 5, the attempted inducement charge, was the only charge that carried a statutory maximum sentence of life imprisonment. From the moment he was indicted on that charge, Mr. Harding repeatedly declared he did not feel he was guilty and wanted to go to trial. Counsel, at least at first, wholeheartedly agreed. He sent Mr. Harding a letter explaining why he believed the government cannot prove an element of the offense, i.e., that a substantial step had been taken toward the commission of the offense, and he enclosed decisional authority supporting that view. Moreover, the

---

tradition, or modes of conduct; different from what is generally accepted.

government itself remained confused as to the identity of the alleged victim of the attempted enticement charge claiming, for example, at the February 19 status conference that it was Mr. Harding's stepdaughter, yet three days later claiming it was one of the daughters of " daddydearaimee." The government's confusion, coupled with the lack of evidence supporting a substantial step in furtherance of the attempt, demonstrate that Mr. Harding had a far better chance of success than the accused in *Lee,* who was left with nothing but an attempt to throw a Hail Mary.

Mr. Harding never relinquished his desire to go to trial on Count 5 until counsel advised that, by pleading, his guidelines could be lowered and he would not get more than a 30-year sentence. Counsel failed to disclose what was discussed at the February 19 status conference where he, the government, and the court unanimously agreed that even with a reduction for acceptance of responsibility his guidelines still far exceeded the level 43 life threshold.

By February 19, 2016, counsel knew that if Mr. Harding entered a plea he was virtually assured to receive a sentence of life imprisonment. To begin with, there was no conceivable guideline argument or potential adjustment that would result in a guideline level falling below the life threshold. He also knew full well that the government was aggressively pursuing a life sentence and that Mr. Harding's wife was demanding that quantum of punishment as well. That is not all.

Counsel knew, additionally, that at the sentencing hearing the government would present voluminous graphic video and photographic depictions of child pornography, an extraordinarily disturbing photo taken by Mr. Harding showing his then-eight-year-old stepdaughter performing oral sex on him, chat messages of Mr. Harding confirming, and in effect boasting, that he engaged in various sex acts with his then-eight-year-old stepdaughter, and the testimony of Detective LaGrega recounting her interviews of the minor stepdaughters in which they described the traumatic acts of sexual abuse committed by Mr. Harding.

In explaining the reasons for imposing a life sentence, the district court detailed the evidence presented at sentencing, including the testimony of Detective LaGrega, who recounted her interviews of C.W. and H.W., DE:130:142-44; the testimony of Agent Rey, DE:130:144-46; the testimony of Ashley Harding; and the DNA match of C.W., with DNA found on a sex toy.

And, in discussing the nature and circumstances of the offense, the district court highlighted that: Mr. Harding on multiple occasions sexually abused his two stepchildren, C.W and H.W, who were in his care; that he also attempted to provide one of those children, C.W, to another pedophile to be sexually abused for the purpose of gaining access to innocent children the defendant intended to sexually abuse; that in various text messages, he graphically described the acts performed on C.W.; that on

41

multiple occasions he subjected his two stepdaughters to oral and anal sex acts that were sadistic both because of the nature of the acts and because the acts were performed on children of such a young age and such small frames; that Mr. Harding memorialized an act of sexual abuse when he videotaped C.W. performing oral sex on him; that he regretfully erased the video because he was afraid of getting caught; that Mr. Harding interacted with other pedophiles online and encouraged them to sexually abuse young children; that Mr. Harding's distribution of videos depicting child pornography victimized the children depicted in the videos; that this pornography ranged from offensive to patently disturbing, depicting school-age girls orally and vaginally penetrated with objects, fingers and penises; and that some of the images were purely sadistic.  The district court further observed that the data found on Mr. Harding's electronic devices indicate that he had been collecting child pornography since 2008, actively sexually abusing prepubescent children for years, and that there was no indication that he was going to stop.  DE:130:161.

Mr. Peacock knew that the virtual tsunami of extraordinarily inflammatory disturbing evidence would be introduced at sentencing, that he had no evidence or argument to effectively counter it, and that any rational court would accede to the government's and Mrs. Harding's demands for a life sentence.  By advising Mr. Harding to plead guilty, he was condemning him to the certainty of life imprisonment.

It was objectively unreasonable to pursue that course of action knowing a life sentence was a foregone conclusion. Realistically nothing could be gained. Aggressively pursuing a trial at least as to Count 5 was, under the circumstances, the singular objectively reasonable strategy. Yet, counsel completely ignored pursuing that course of action and never offered a legitimate reason for not doing so. Whatever excuses were given were unsupportable or nonsensical.

To the extent counsel believed that a no contest plea to Courts 5 and 6 was appropriate because it would protect Mr. Harding from incriminating himself in connection with the state court charges if he went to trial, that belief was unfounded. Under no circumstances could an adverse verdict in a federal trial be used as substantive evidence of guilt in a state court trial. Moreover, any evidence that could have been presented in a federal trial was already known by and/or in the possession of the state.

Counsel's reasoning that a plea would somehow limit the amount or nature of the evidence that the government would introduce at sentencing is beyond ill-conceived. The government consistently maintained the position that a life sentence was appropriate and never concealed their intention to introduce whatever evidence was necessary at sentencing to achieve that result. There was not any meaningful distinction between the evidence presented at sentencing and the evidence that would

have been presented at trial.  The government had announced that it would not call either of the two stepdaughters as witnesses if the case proceeded to trial.  However, since hearsay is admissible at sentencing, the government had free reign to present hearsay testimony of Detective LaGrega recounting her interviews of C.W. and H.W. At trial, where the rules of evidence apply, that would not have been the case.  Simply put, the trial judge would not have heard anything more damning at trial than what she heard at sentencing.

Had Mr. Harding been properly advised, he would have adhered to his long held desire to go to trial at least as to Count 5, the only charge carrying a maximum sentence of life imprisonment.  If he had gone to trial, the result could not have been worse and, given the government's confusion as to who was the victim of the attempted enticement and the lack of evidence of a substantial step, an acquittal on that count was certainly not out of the question.  There is no meaningful distinction between Mr. Harding's case and *Lee v. United States*.  Like Mr. Lee, he received constitutionally defective advice from counsel and, as a result, forfeited his right to trial.  Had the district court applied the correct prejudice analysis established in *Lee v. United States*, the result would be clear:  counsel's erroneous and affirmatively misleading advice caused Mr. Harding to forfeit his constitutional right to trial.  But for that advice he would have gone to trial.  Mr. Harding has shown that, and he need show no more.

This Court should now grant him the COA to which he is clearly entitled.

Finally, in Ground One of his § 2255 motion, Mr. Harding alleged that counsel rendered effective assistance by failing to properly and adequately investigate the facts, circumstances and law by failing to move for suppression and/or exclusion of evidence obtained from AT&T, KIK (Messenger) Interactive, Inc. and Skype, where the data provided by these companies was unlawfully obtained by the government through the issuance of administrative summonses rather than through a warrant application. DE:1. The magistrate judge failed to grant an evidentiary hearing on this claim and, in his Report and Recommendation, summarily disposed of it, finding that Mr. Harding's plea waived his pre-plea constitutional claim that counsel was ineffective for failing to further investigate or suppress the evidence obtained from his cell phone, KIK and Skype.  DE:72:18.

The magistrate judge's ruling, which was adopted by the district court, was erroneous.  There can be no waiver of pre-plea constitutional claims where, as here, the accused's counsel has rendered constitutionally ineffective assistance of counsel prior to the plea and where that ineffective assistance (as Mr. Harding properly alleged) has undermined the voluntariness of the plea.  *See Spriggs v. United States*, 703 Fed.Appx. 888, 891, 892 (11th Cir. 2017) (holding that in a § 2255 case, "a district court's inquiry into trial counsel's performance in advising a client to plead guilty cannot be unmoored

from the merits of an alleged Fourth Amendment violation"; "The district court's wholesale refusal to consider Mr. Spriggs' alleged Fourth Amendment violation cannot be squared with our precedent and the Supreme Court's recent decision in *Lee*. We therefore reverse and remand this case to the district court for further consideration.").

Based on all of the above, jurists of reason would find it debatable whether the district court was correct in denying the § 2255 motion. Accordingly, a COA should issue. *Slack*, 529 U.S. at 484.

## CONCLUSION

A certificate of appealability is warranted because Movant/appellant Michael Harding has made a substantial showing that the district court improperly denied the § 2255 claims in this extraordinary case involving the most severe non-capital sentence.

WHEREFORE, Movant appellant Michael Harding respectfully applies for a certificate of appealability.

Respectfully submitted,

  s/ Richard C. Klugh
Richard C. Klugh, Esq.
Attorney for Appellant
40 N.W. 3rd Street, PH 1
Miami, Florida 33128
Telephone No. (305) 536-1191
Facsimile No. (305) 536-2170

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this Application complies with the type-volume limitation of FED. R. APP. P. 32(a)(7).  According to the WordPerfect program on which it is written, the numbered pages of this motion contain 10,965 words.  This document complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared using WordPerfect in a proportionally spaced typeface with Times New Roman 14-point font.

 s/ Richard C. Klugh
Richard C. Klugh, Esq.

47