# CASE NO. 21-14133-E

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff/Appellee*,

v.

MICHAEL HARDING,

*Defendant/Appellant.*

On Appeal from the United States District Court
for the Southern District of Florida

## APPELLANT'S INITIAL BRIEF

**RICHARD C. KLUGH, ESQ.**
**Counsel for Michael Harding**
**40 N.W. 3rd Street, PH 1**
**Miami, Florida 33128-1838**
**Tel. (305) 536-1191**
**Fax: (305)536-2170**

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

### Michael Harding v. United States, Case No. 21-14133-E

Appellant, Michael Harding, files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Acosta Diana M.

Cohen, Michael B.

Funk, Daniel E.

Klugh, Richard C.

Lowenthal, Sheryl J.

Matthewman, Hon. William

Montaner, Marlene C.

Rassie, Ellen

Reid, Hon. Lisette M.

Rosenberg, Hon. Robin L.

Rubio, Lisa Tobin

White, Charles G.

White, Hon. Patrick A.

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant respectfully submits that oral argument is necessary to the just resolution of this appeal and will significantly enhance the decision-making process.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF CITATIONS .........................................................................vi

STATEMENT OF JURISDICTION..........................................................ix

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE................................................................2

    Course of Proceedings and Disposition in the District Court ........................2

    Statement of Facts.........................................................................10

    Standard of Review........................................................................27

SUMMARY OF THE ARGUMENTS ....................................................28

    I. WHETHER THE DISTRICT COURT VIOLATED *CLISBY V. JONES*, 960 F.2D 925 (11TH CIR. 1992), BY FAILING TO ADDRESS SPECIFICALLY HARDING'S CLAIM THAT HIS PLEA WAS INVOLUNTARY BECAUSE HIS ATTORNEY DID NOT ADVISE HIM THAT HE COULD BE SUBJECT TO POST INCARCERATION CIVIL COMMITMENT .............................................28

    II. REGARDLESS OF ANY POTENTIAL *CLISBY* ERROR,
(A) WHETHER HARDING'S ATTORNEY RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO ADVISE HIM THAT HIS NOLO CONTENDERE PLEA COULD RESULT IN POST-INCARCERATION CIVIL CONFINEMENT, AND, IF SO, (B) WHETHER THAT INEFFECTIVE ASSISTANCE PREJUDICED HIM.......................................................................................29

ARGUMENTS AND CITATIONS OF AUTHORITY .........................................32

CONCLUSION ...................................................................................49

CERTIFICATE OF COMPLIANCE ..........................................................50

CERTIFICATE OF SERVICE ................................................................50

# <u>TABLE OF CITATIONS</u>

## Cases

*Bauder v. Department of Corrections State of Florida*,
  619 F.3d 1272 (11th Cir. 2010) ....................................................................... 29,37

*Clisby v. Jones*,
  960 F.2d 925 (11th Cir. 1992) .................................................. iv, 1, 9, 28, 32, 49

*Devine v. United States*,
  520 F.3d 1286 (11th Cir. 2008) ...............................................................27

*Dupree v. Warden*,
  715 F.3d 1295, 1299 (11th Cir. 2013) ...............................................32

*Hagins v. United States*,
  267 F.3d 1202, 1204 (11th Cir 2001) ...............................................27

*Hall v. Head*,
  310 F.3d 683, 691 (11th Cir. 2002) ...............................................42

*Hill v. Lockhart*,
  474 U.S. 52, 59 (1985) ................................................................. 43, 45

*Hill v. Lockhart*,
  474 U.S. 52, 62 (1985) ...............................................................39

*Jackson v. United States*,
  463 Fed.Appx. 833 (11th Cir. 2012) ................................. 29, 35, 37, 38

*Kimmelman v. Morrison*,
  477 U.S. 365, 374 (1986) ...............................................................42

*Lee v. United States*,
  582 U.S.___, 137 S. Ct. 1958, 1965 (2017) ....................... 8, 30, 35, 44

*Libretti v. United States*,
  516 U.S. 29, 50-51(1995) ...............................................................39

*Long v. United States*,
  626 F.3d 1167, 1170 (11th Cir. 2010). ....................................................32

*McMann v. Richardson*,
  397 U.S. 759, 771 (1970) ....................................................................42

*Padilla v. Kentucky*,
  559 U.S. 356 (2010) .................................................................. 29, 37

*Roe v. Flores -Ortega*,
  528 U.S. 470,481 (2000) ..................................................................46

*Roe v. Flores-Ortega*,
  528 U.S. 470, 482-83 (2000) ..............................................................44

*Roe v. Flores-Ortega*,
  528 U.S. at 483 ...........................................................................46

*Strickland v. Washington*,
  466 U.S. 668 (1984). .............................................................. 29, 38, 43

*Strickland v. Washington*,
  466 U.S. 668, 686 (1984) ...............................................................42

*United States v. Harding*,
  696 Fed.Appx. 955 (11th Cir. 2017) ....................................................5

*United States v. Irey*,
  612 F.3d 1160 (11th Cir. 2010) ........................................................19

*United States v. Lee*,
  603 F.3d 904 (11th Cir. 2010) ..................................................... 18, 30

**Statutes**

18 U.S.C. § 2422(b) ...........................................................................2, 3

18 U.S.C. § 2251 .............................................................................18

18 U.S.C. § 2251(a)(c) .........................................................................2

18 U.S.C. § 2251(a)(e) ................................................................3

18 U.S.C. § 2252(a)(2) ............................................................2, 3

18 U.S.C. § 2252(a)(4)(B) ......................................................2, 3

18 U.S.C. § 3231 ....................................................................... ix

18 U.S.C. § 4247(a)(6) ..............................................................36

18 U.S.C. § 4248 ................................................................ 36, 40

28 U.S.C. § 1291 ....................................................................... ix

28 U.S.C. § 2254 .......................................................................37

28 U.S.C. § 2255 ......................................................... 2, 6, 17, 38

Fla. Stat. § 394.910 ............................................................ 37, 40

Fla.Stat. § 394.910-931 ............................................................36

Fla. Stat. § 394.912(h) ..............................................................36

**Other Authorities**

U.S.S.G. § 3E1.1(a)(b) ...............................................................4

U.S.S.G. Chapter 5 Part A ..........................................................4

**Rules**

Fla. R. Cr. P. 3.172(9) ...............................................................41

Fla. R. Cr. P. 3.172 ............................................................ 29, 40

FRAP 32(a)(7)(B) .....................................................................50

## <u>STATEMENT OF JURISDICTION</u>

The district court had jurisdiction of this case pursuant to 18 U.S.C. § 3231 because the defendant was charged with an offense against the laws of the United States.  The court of appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which gives the courts of appeals jurisdiction over all final decisions of the district courts of the United States.

## STATEMENT OF THE ISSUES

### ISSUE I

WHETHER THE DISTRICT COURT VIOLATED *CLISBY V. JONES*, 960 F.2D 925 (11TH CIR. 1992), BY FAILING TO ADDRESS SPECIFICALLY HARDING'S CLAIM THAT HIS PLEA WAS INVOLUNTARY BECAUSE HIS ATTORNEY DID NOT ADVISE HIM THAT HE COULD BE SUBJECT TO POST INCARCERATION CIVIL COMMITMENT

### ISSUE II

REGARDLESS OF ANY POTENTIAL *CLISBY* ERROR, (A) WHETHER HARDING'S ATTORNEY RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO ADVISE HIM THAT HIS NOLO CONTENDERE PLEA COULD RESULT IN POST-INCARCERATION CIVIL CONFINEMENT, AND, IF SO, (B) WHETHER THAT INEFFECTIVE ASSISTANCE PREJUDICED HIM

1

## STATEMENT OF THE CASE

### Course of Proceedings and Disposition in the District Court

This is an appeal from the denial of Mr. Harding's motion filed pursuant 28 U.S.C. § 2255 seeking to vacate his convictions and sentence imposed following a plea of guilty on three counts of distributing material involving sexual exploitation of minors in violation of 18 U.S.C. § 2252(a), one count of possession of material involving sexual exploitation of minors in violation of 18 U.S.C. § 2252(a)(4)(B) and pleas of no contest on one count of attempting to coerce and entice a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b) and one count of producing child pornography in violation of 18 U.S.C. § 2251(a) and (c).

Mr. Harding is serving a life sentence imposed on the charge of attempting to coerce and entice a minor to engage in sexual activity and concurrent terms of imprisonment of 30 years on the charge of producing child pornography and 20 years on each of the charges of distributing material involving sexual exploitation of minors and the charge of possession of material involving sexual exploitation of minors.

### Course of Proceedings

The first indictment returned in October 2015 charged Mr. Harding with three counts of distributing material involving sexual exploitation of a minor in violation of 18 U.S.C § 2252(a)(2) and one count of possession of material

2

involving sexual exploitation of a minor in violation of 18 U.S.C. § 2252(a)(4)(B). Cr.DE:12. A superseding indictment added a count of attempting to coerce or entice a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b). Cr.DE:16. Finally, on November 12, 2015, a grand jury returned a six-count second superseding indictment charging Mr. Harding with three counts of distributing material involving sexual exploitation of minors, in violation of 18 U.S.C. § 2252(a)(2) (Counts 1-3), one count of possession of material involving sexual exploitation of minors, in violation of 18 U.S.C. § 2252(a)(4)(B) (Count 4), one count of attempting to coerce and entice a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b) (Count 5), and one count of producing child pornography, in violation of 18 U.S.C. § 2251(a) and (e) (Count 6). Cr.DE:32. Counts 1-4 carried a 20-year statutory maximum sentence. The statutory maximums on Counts 5 and 6 were life and 30 years respectively.

Following Mr. Harding's arrest on federal charges, the State of Florida initiated its own investigation that culminated in filing a multiple count information charging sexual battery of a minor. The state charges carried a mandatory life sentence upon conviction. Cr.DE:127. On February 22, 2016, Mr. Harding entered straight up pleas of guilty to Counts 1-4 and no contest to Counts 5 and 6 of the second superseding indictment. Cr.DE:128.

Mr. Harding's sentencing hearing was held on May 16 and May 23, 2016. Cr.DE:129,130. At the beginning of the hearing, Mr. Harding's counsel informed the district court that any factual objections to the presentence investigation report had been resolved and that he as Mr. Harding's counsel and the government both agreed that his total offense level was 43 and his guideline range dictated a sentence of life imprisonment. Cr.DE:129:8.[1]

During the sentencing hearing, the government called several witnesses, including Det. Sheila LaGrega of the Port St. Lucie Police Department, FBI Special Agent Brian Rey, who headed the federal investigation, and the minor victims' mother, Ashley Harding. Cr.DE:129, 130.

Ms. LaGrega testified in graphic detail concerning evidence specific to the State of Florida's charges against Mr. Harding, including recounting her interviews of the two minor stepdaughters he was alleged to have sexually abused. Cr.DE:129:11-46. Agent Rey detailed the course of the federal investigation, including his

---

[1] According to the Presentence Investigation Report, Mr. Harding's calculated guideline range, after applying a 3-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a)(b), was actually 44. Pursuant to U.S.S.G. Chapter 5 Part A (comment n.2), in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43. Clearly, (and contrary to representations made by counsel that a plea would assist in lowering his guidelines) Mr. Harding received absolutely no guideline offense level reduction benefit from entering his pleas. Had he gone to trial and been convicted of all the offenses he pled to his guideline would still have been calculated at 43.

4

forensic analysis of Mr. Harding's phone and computer that contained videos and hundreds of images depicting child pornography as well as chat messages between Mr. Harding and other child pornography aficionados. Cr.DE:129:50-69; Cr.DE:130:35-53.

Finally, Ashley Harding testified and expressed her belief that Mr. Harding should receive nothing less than a life sentence. Cr.DE:130:55-97. She recounted the details of conversations she had with her minor daughters concerning the alleged sexual abuse committed by Mr. Harding, and described sex toys that she had found in the home following Mr. Harding's arrest and the psychological trauma she and her two daughters had suffered as a result of her daughters' sexual abuse. *Id*.

At the conclusion of the sentencing hearing, the district court sentenced Mr. Harding to life imprisonment on count five, concurrent terms of imprisonment of 240 months on counts one-four and 360 months on count six and a life term of supervised release. Cr.DE:130:164-65; Cr.DE:114 (sentencing judgment).

Mr. Harding appealed his convictions and sentence, raising issues concerning the adequacy of the plea colloquy (including the district court's failure to inform him that he would be required to register as a sex offender and would be subject to possible indefinite civil commitment) and the substantive reasonableness of the sentence imposed. His convictions and sentence were affirmed. *United States v. Harding*, 696 Fed.Appx. 955 (11th Cir. 2017).

5

On September 4, 2018, Mr. Harding filed his motion to vacate, set aside or correct his conviction and sentence pursuant to 28 U.S.C. § 2255. Civ-DE:1. In his motion, he presented eight claims for relief:

1. Counsel was ineffective for failing to move to suppress evidence obtained from AT&T, KIK (Messenger) Interactive, Inc., and Skype.

2. Counsel was ineffective for failing to properly advise Mr. Harding of the application of the sentencing guidelines, including that he would be subject to mandatory registration and possible involuntary civil commitment as a sex offender and was facing a possible sentence of life imprisonment.

3. Counsel was ineffective for failing to object to the plea colloquy conducted by the district court.

4. Counsel was ineffective for failing to raise or file objections to the sentencing enhancements recommended in the presentence investigation report.

5. During the plea colloquy, the district court failed to inform Mr. Harding that he would be required to register as a sex offender and was subject to possible involuntary civil commitment; and the court misadvised him on the mandatory minimum sentence for Count 6.

6. There was no factual basis for the court to have accepted a no contest plea to Counts 5 and 6, given that there was no factual basis establishing that Mr. Harding took the required "substantial" step to commit those offenses; and

counsel was ineffective for failing to object to the government's "vague reference to a minor daughter."

7. Counsel was ineffective for failing to object to hearsay testimony and for failing to object to or move to exclude uncharged conduct.

8. Counsel was ineffective for failing to disclose a conflict of interest impacting Mr. Harding's representation.

On July 27 and July 28, 2021 the magistrate judge conducted an evidentiary hearing only as to the grounds presented in claims 2 and 4. The magistrate judge had previously denied an evidentiary hearing on the remaining claims, including claim 1 of the motion alleging ineffectiveness in failing to pursue a motion to suppress evidence. Civ-DE:72. Based on a mid-hearing colloquy involving the magistrate judge, Mr. Harding's counsel, and Mr. Harding, the magistrate judge concluded that Mr. Harding had orally amended his motion, withdrew his request to vacate the guilty pleas and sentences on Counts 1-4, and was solely seeking to vacate the convictions and sentences on Counts 5 and 6. Civ-DE:77:142-45.

On August 13, 2021, the magistrate judge filed his Report and Recommendation recommending that Mr. Harding's claims for relief be denied. Civ-DE:72. Mr. Harding timely filed his Objections to the Report. Civ-DE:80. On September 28, 2021, the district court entered its Order Adopting Magistrate Judge's Report, Denying Motion to Vacate Sentence, and Closing Case. Civ-DE:84.

7

Mr. Harding then moved this Court to grant a certificate of appealability as to the following issues:

1. Whether, contrary to *Lee v. United States*, 137 S.Ct. 1958 (2017), the district court applied the incorrect prejudice standard to support its decision to deny Mr. Harding's claim for relief predicated on his counsel's ineffective assistance arising from counsel's erroneous advice, affirmative misrepresentations, false assurances, and concealment of material facts regarding Mr. Harding's sentencing exposure that ultimately convinced him to forfeit his right to go to trial and to instead plead no contest to the attempted enticement charge that resulted in imposition of a life sentence.

2. Whether defense counsel provided ineffective assistance by advising Mr. Harding to enter pleas of guilty and no contest to the charges in the second superseding indictment where counsel, the government, and the court agreed during a status conference at which Mr. Harding was not present that his guidelines, even after a plea and a reduction for acceptance of responsibility, would exceed the offense level (level 43) threshold for a guideline-mandatory life imprisonment sentence, and where counsel: (a) failed to inform Mr. Harding of what occurred at the status conference; (b) affirmatively misrepresented to Mr. Harding that

8

a plea would result in lowering his guidelines; and (c) was aware, and failed to advise Mr. Harding, that the evidence that would be presented by the government without objection at sentencing in support of its demand for a life sentence was so overwhelming that the district court could not reasonably be anticipated to impose a below-guidelines sentence.

3. Whether the district court erred in denying, without an evidentiary hearing, Mr. Harding's § 2255 claim that his trial counsel induced him to enter a no contest plea without litigating or correctly advising him regarding a valid case-dispositive motion to suppress evidence.

On June 10, 2022, this Court granted Mr. Harding a Certificate of Appealability as to the following issues:

(1) Whether the district court violated *Clisby v. Jones*, 960 F2d 925 (11th Cir. 1992), by failing to address specifically Harding's claim that his plea was involuntary because his attorney did not advise him that he could be subject to post-incarceration civil commitment.

(2) Regardless of any potential *Clisby* error, whether Harding's attorney rendered ineffective assistance by failing to advise him that his *nolo contendere* plea could result in post-incarceration civil confinement, and, if so, whether that ineffective assistance prejudiced him.

9

## OFFENSE CONDUCT

### The Presentence Investigation Report (the PSI)

The PSI set forth the following unobjected to facts detailing the investigation of Mr. Harding and summary of his offense conduct. *See* PSI at ¶¶ 3-20. [**NOTE TO THE COURT**: *Please note that the content quoted and summarized below from the presentence report includes language and conduct that is extremely vile and is included only to substantiate that no judge reading these unobjected-to matters would have any normal reaction other than that the defendant who admitted them deserved to remain incarcerated for the rest of his life.*]

On July 23, 2015, a homeland security investigations (HSI) special agent in Wilmington, Delaware signed into an undercover Kik Messenger user account as part of a child exploitation investigation. While in a Kik messenger chat room, the agent observed two images of child pornography posted earlier that day by an individual using the screen name "desthfromabove." Summonses served on Kik messenger and AT&T revealed that the IP address used to post the images was registered to Michael Harding in Port St. Lucie Florida.

On August 13, 2015, the HSI agent again signed into the undercover Kik messenger account and observed that "desthfromabove" had posted a video depicting child pornography in the chat room on August 4, 2015. The video was 37 seconds long and depicted an adult male rubbing his penis in the vagina and anus of a preschool

10

aged prepubescent female.  The HSI agent successfully downloaded the video.  On August 17, 2015, the HSI agent once again signed into the undercover account and saw that another video containing child pornography had been posted by "desthfromabove."  This video, which depicted a prepubescent female being anally penetrated by an adult male as he ejaculated, was also downloaded by the HSI agent.

On September 22, 2015, a federal search warrant was executed on Mr. Harding's residence.  During the course of the search, a PNY thumb drive was found in a gun case in the master bedroom closet. A forensic examination of the thumb drive revealed that it contained 606 still images and 102 videos depicting minors involved in sexually explicit conduct with other minors and adults.  The pornography had been saved to the thumb drive as early as March 6, 2008.  On another thumb drive found in the storage bin in the master bedroom closet, there were 23 deleted images of child pornography. A LG-D800 cellular telephone was found in a nightstand in the master bedroom.  A forensic examination of the telephone yielded nine additional videos depicting minors engaged in sexually explicit conduct, including the videos uploaded to the Kik messenger chat room on July 26, 2015 and August 4, 2015. The cell phone also contained an app designed to protect users from being discovered by law enforcement.

During subsequent forensic examinations of the cell phone, FBI Special Agent Brian Rey found a number of chat conversations between Mr. Harding and other

unidentified individuals discussing sexual activity with children. The chats indicated that Mr. Harding sent and received numerous images depicting child pornography. During one of the chat conversations, Mr. Harding indicated he had three daughters, whose ages were four months, five years, and nine years, and that he had engaged in sexual activity with the nine-year-old. Regarding the nine-year-old, he stated in one of the chats, "I only play with the oldest, she can't fit it completely, but we work with it," and "she sucks daddy's dick good and lets me do what I please." Mr. Harding added "I can't complain, she lets me cum in her ass and pussy." PSI ¶ 12.

Agent Rey also located a series of chat conversations that occurred from August 12 through September 10, 2015 between Mr. Harding and an individual using the screen name "daddydearaimee" who claimed he was the father of a seven-year-old daughter and a 12-year-old daughter. "Daddydearaimee" sent Mr. Harding non-nude pictures of the two minor females and claimed that he had performed sex acts on both. Mr. Harding responded that he had also previously engaged in sexual acts with his nine-year-old stepdaughter and that he had taken a video of her performing oral sex on him.

Eventually, Mr. Harding engaged in a chat conversation with "daddydearaimee" where they discussed exchanging their minor children for the purposes of engaging in sexual acts with the minors. Mr. Harding sent "daddydearaimee" non-nude images of his nine-year-old stepdaughter and five-year-old stepdaughter. One of the images

12

showed his nine-year-old stepdaughter's face and he proposed swapping her for sex. Mr. Harding and "daddydearaimee" discussed where they would meet and how Mr. Harding would explain to his wife why he was traveling alone with his nine-year-old stepdaughter. According to the government, investigation into the identity of "daddydearaimee" was still continuing.

During an additional forensic examination of the cellular telephone, SA Rey located a thumbnail image depicting C.W. (the older stepdaughter) performing oral sex on Mr. Harding. Special Agent Rey concluded that the thumbnail image was created when a video of this event was recorded on November 17, 2014. In previously referenced chat conversations, Mr. Harding indicated he had videotaped his then eight-year-old stepdaughter performing oral sex on him and had deleted the video because he was afraid of getting caught. Additionally, a sex toy was found in a gun case where the PNY thumb drive was found. The sex toy was later tested and found to contain C.W.'s DNA.

When Mr. Harding's wife, who is the mother of C.W. and her younger sister H.W., was interviewed, she told the investigators that she had questioned her daughters and C.W. told her that Mr. Harding would remove his clothes and request she remove her clothes and lay in bed. She also told the investigators that C.W. told her that Mr. Harding would also ask her to take off her clothes when they were sitting in the living room watching television. She also reported that C.W. told her that Mr. Harding had

13

asked her to touch his penis and that he had touched her private area over her clothes; that C.W. told her Mr. Harding said, "[D]on't tell your mom, it's our secret" (PSI ¶ 15); and that H.W. had previously told her that Mr. Harding had taken a shower with her while naked when she was four years old.

During the investigation, C.W. and H.W. were interviewed numerous times by law enforcement agents. C.W. initially reported that in July 2015, Mr. Harding had asked her to touch his penis, take off her clothes and lay with him in bed, but she had declined. C.W. indicated that in September 2015, Mr. Harding had taken off all of his clothes and showed her his penis while he masturbated. C.W. said that Mr. Harding told her not to tell her mother because it was their secret. She denied that anyone had asked to take a picture or movies of her while she was naked and that Mr. Harding had never asked her to put her hand on his penis.

In subsequent interviews, C.W. disclosed that when she was six or seven years of age, Mr. Harding started taking his clothes off in her presence while in the living room when her mother was napping. Sometimes he would ask her to take off her clothes and sometimes he would not. She indicated that on some occasions Mr. Harding would masturbate and ejaculate; on other occasions he would have her undress and put his fingers inside her anus and vagina and that it hurt. C.W. also disclosed that Mr. Harding had put his penis inside her mouth several times and had ejaculated; that he tried to put his penis inside her "privates" several times but had only been able to

14

put it in a little bit; and that Mr. Harding also had her masturbate him several times and had ejaculated on her hands. C.W. denied that Mr. Harding had placed any objects in her.

During an interview of H.W., she claimed that when she was four years of age she spent the night alone in a tent with Mr. Harding at their house and that, during the night, he removed both of their clothing. She added that Mr. Harding had touched her on her vagina and anus and had also inserted the handles of a screwdriver and knife into her vagina and anus while taking pictures of her. H.W. described another incident when Mr. Harding came into her bedroom, removed her clothes, pushed her down on the bed and inserted the handle of a screwdriver into her vagina and anus while taking pictures of her. She described a third incident during which Mr. Harding came into the bathroom while she was taking a shower. He removed his clothing, entered the shower and told her to lie down face first in the bathtub. While she was in that position, he inserted his fingers into her vagina and anus. When they both sat facing each other in the bathtub, she saw fluid on her hands coming from his penis. PSI ¶¶ 3-20.

## The Sentencing Hearing

Throughout the case, the government had steadfastly maintained that it would do everything within its power to ensure that Mr. Harding received a sentence of life imprisonment. Predictably, at sentencing the government presented live, graphic testimony corroborating and expanding upon the factual assertions in the PSI and

15

highlighting matters that were not part of the federal charges but had been uncovered during the state of Florida's investigation and prosecution of Mr. Harding.

Detective LaGrega testified that Mr. Harding's stepdaughter, C. W., had disclosed during the course of a number of interviews that on several occasions Mr. Harding had taken off his clothes, directed her to take off her clothes and lay or sit next to him and touch his penis; and that he had touched her on her breast and butt and told her to put her mouth on his penis. The detective also described how, during the interviews, C. W. used a doll to demonstrate the way Mr. Harding had digitally penetrated her vaginally and anally, and that C.W. also disclosed how Mr. Harding had put his penis in her privates and that it was painful. Cr.DE:129:25-28.

Detective LaGrega informed the trial judge that during the course of her interviews with H.W., the younger stepdaughter, H. W. described three separate incidents of sexual abuse by drawing pictures. H.W. explained that she had been in a tent in the backyard alone with Mr. Harding where he had taken her clothes off and ordered her to lay down on the sleeping bag and touched her body. According to H.W., Harding inserted the handles of a screwdriver and a knife into her vagina and butt and tapped her chest with a hammer telling her that he needed to check her heart. Cr.DE:129:31-33.

At some point after Detective LaGrega interviewed the children, their mother, Ashley, brought her a screwdriver, two small vibrators, and a butt plug she had found.

16

DNA testing revealed that DNA taken from the butt plug matched the standard obtained from C.W.  Cr.DE:129:34.

HSI Special Agent Brian Rey detailed the forensic aspects of the investigation. Through Agent Rey, the government introduced numerous videos and photos depicting child pornography and chat conversations recovered from Mr. Harding's electronic device.  Agent Rey also testified that a number of the videos/pictures were of previously identified victims and produced by known offenders such as Mastodon. Cr.DE:129:50-64.

Agent Rey also explained how he forensically retrieved a thumbnail photo from Mr. Harding's cell phone depicting C.W. performing oral sex on Mr. Harding and how the thumbnail was created when Mr. Harding took a since-deleted video memorializing that event.  Cr.DE:129:65-67.

## The 28 U.S.C. § 2255 Evidentiary Hearing

Mr. Harding began his testimony by explaining that the superseding indictment added an attempted enticement count charging a violation of 18 U.S.C. 2422(b) and that the charge carried a statutory maximum sentence of life imprisonment.  DE:76:10-12; Pet. Ex. 1.  Mr. Harding recalled that he received a letter from his counsel, R. Fletcher Peacock, dated November 4, 2015 outlining his belief that there was a viable defense to the attempted enticement charge.  Pet. Ex. 4.  In the letter, Mr. Peacock explained that he felt that there was a lack of a substantial step having been taken in

17

connection with the charged attempt and that the government could not prove the elements of the charge. In support of his opinion. Mr. Peacock enclosed a copy of a case, *United States v. Lee*, 603 F.3d 904 (11th Cir. 2010). Pet. Ex. 3; DE:76:17.

On November 16, 2015, Mr. Harding and Mr. Peacock met to discuss his case. During the meeting, Mr. Harding told Mr. Peacock that he believed his analysis regarding the attempted enticement charge (Count 5) was correct and that he wanted to proceed to trial on that count. Although Mr. Harding was adamant about going to trial on the attempted enticement charge because he felt he did not commit the crime, Mr. Peacock explained that, in his opinion, Count 5 was no longer a concern and that the focus should now be on Count 6 of the recently returned second superseding indictment (the production count charging a violation of 18 U.S.C. § 2251), since there was an identifiable victim (Mr. Harding's stepdaughter C.W.) DE:76:17-19. Moreover, by the date of this meeting, the State of Florida investigation had progressed to the point where warrants on capital sex battery charges had been issued. DE:76:17. Mr. Harding recalled that, during this meeting, Mr. Peacock explained that the guidelines were pretty high, somewhere around the 30-year range, and that range could fluctuate. DE:76:22.

Mr. Harding and Mr. Peacock next met on December 8, 2015. Mr. Peacock brought along a number of documents related to the state investigation. Mr. Harding again told Mr. Peacock that he wanted to go to trial on the attempted enticement

18

count. DE:76:23-24. When Mr. Peacock again told him that he should focus on Count 6, he responded by telling him that he wanted to go to trial on that count as well and wanted to view the image supporting that charge. Mr. Peacock advised that was impossible due to the nature and subject matter of the evidence. DE:76:23. Mr. Harding also testified that at no point prior to entering his plea did Mr. Peacock explain that the 4B.1.5(B)(1) pattern enhancement might apply to his case. He only learned of that when he saw the PSI. DE:76:25.

Mr. Harding and Mr. Peacock next met on January 21, 2016. During that meeting, they initially discussed the sex toys that had been found during the investigation. DE:76:26-29. When the topic shifted to Mr. Harding's sentencing exposure, Mr. Peacock provided him with a copy of *United States v. Irey*, 612 F.3d 1160 (11th Cir. 2010). Pet. Ex. 6. Mr. Peacock assured Mr. Harding that Mr. Irey's offense conduct that resulted in a 30-year sentence was far more egregious in his opinion than Mr. Harding's. He went on to explain there would be absolutely no way the guidelines would justify anything more than 30 years for Mr. Harding; and certainly, a life sentence was not possible. Based on Mr. Peacock's representations, Mr. Harding understood that the guidelines could not get to life imprisonment; and that life was not even on the table because of the guidelines. DE:76:26.

Mr. Peacock visited Mr. Harding following a calendar call on February 17, 2016. For the first time, he proposed the idea of a no contest plea to Counts 5 and 6. He

19

explained that this would avoid any admissions that could impact the pending state charges. DE:76:30-31. Mr. Harding was unconvinced. He reiterated that he still wanted to go to trial on the attempted enticement charge. Mr. Peacock responded by telling Mr. Harding that if he were convicted at trial, he would be assured to receive the maximum penalty, but if he pled he would not be exposing himself to more than 30 years. *Id.*

Mr. Harding received a letter from Mr. Peacock dated February 18, 2016. Pet. Ex. 7. In his letter, Mr. Peacock explained that a plea would put Mr. Harding in a better light in front of the judge at sentencing and "we need all the help we can get to *lower your sentencing guidelines* and support a motion for downward variances." DE:76:33 (emphasis added). The letter does not indicate what Mr. Harding's guideline range was, stating only that a plea would lower it. When he received this letter, Mr. Harding still believed that his guideline was approximately in the 30-year range and that the reference in the letter to the downward variance had to do with his earlier question of whether there was a way to lower the sentence below 30 years. DE:76:32-33.

Mr. Harding received his next visit from counsel following a status conference held on February 19, 2016. Mr. Harding was not present at the status conference. During the visit, Mr. Peacock failed to advise Mr. Harding of anything that was discussed during that hearing. Significantly, he failed to tell Mr. Harding that the

20

government, the court, and counsel all agreed that his guideline level scored out at 46, even with a reduction for acceptance of responsibility. Mr. Peacock likewise failed to disclose the court's comments questioning why his client would agree to plead when the guidelines called for the imposition of a life sentence. Unaware of what had been discussed at the status conference, Mr. Harding accepted Mr. Peacock's advice and entered a plea. Mr. Peacock had convinced him that it was in his best interest to do so, that if he pled he would not receive a sentence higher than 30 years, and that with a downward variance his sentence could be something lower than that. DE:76:35-38. Mr. Harding received his PSI on April 20, 2016 and was shocked when he learned the guidelines called for a life sentence. DE:76:40. He reiterated that had Mr. Peacock explained what had been discussed during the status conference there would have been no way that he would have taken a plea. Rather, he absolutely would have insisted, as he had all along, on going to trial. DE:76:45.

When cross examined by the prosecutor, Mr. Harding acknowledged that, at his change of plea hearing, he knew the statutory maximum sentence for the attempted enticement charge was life, DE:76:51, and that during the hearing the court explained that consecutive sentences on each of the counts was possible. DE:76:76. However, he explained that Mr. Peacock had told him that his guidelines did not justify the imposition of consecutive sentences and that he trusted Mr. Peacock's repeated assertions that he would not receive a sentence of more than 30 years. DE:76:82.

21

During his cross examination, Mr. Harding characterized Mr. Peacock's representations concerning a 30-year sentence as a professional opinion but answered in the negative when the magistrate judge interjected and asked if there were any assurances. DE:76:57. However, Mr. Harding maintained that he trusted Mr. Peacock when he told him he was not going to get more than 30 years. Even though he thought that 30 years was just an estimate, he still pled. DE:76:82-84.

When questioned regarding the difference between an assurance versus a professional opinion, Mr. Harding explained that he understood that 30 years was the realistic outcome of his plea, no more than 30 years and potentially less with a downward variance. DE:76:94.

Mr. Harding also testified that Mr. Peacock told him that pleading guilty would limit the amount of bad things the judge would hear or see at sentencing. Sentencing would, therefore, be rather brief. Mr. Peacock never told him that the evidence supporting the state charges of capital sexual battery would be factored into the guideline calculations. DE:76:90-93.

Mr. Harding's counsel, Mr. Peacock, began his testimony by summarizing a number of topics concerning his representation of Mr. Harding. DE:77:11. He first described how he was appointed to represent Mr. Harding, how the discovery process unfolded during the case, his participation in discovery conferences with the government, his review of some of the pornographic images, his receipt and review of

documentary evidence furnished by the government, and the steps he took to review discovery with Mr. Harding; he also recounted how he reviewed the image discovered by Agent Rey that supported Count 6, the production count.  DE:77:10-17.

Mr. Peacock acknowledged that he had sent a letter to Mr. Harding setting forth his opinion that the government lacked sufficient evidence to prove the attempted enticement count.  DE:77:48-49.

On a number of occasions, Mr. Peacock tried to negotiate a plea agreement with the government.  Those efforts were rejected out of hand.  DE:77:32.  He then focused his efforts on convincing the district court to permit Mr. Harding to enter a plea to the second superseding indictment that would include a no contest plea to Counts 5 and 6, the attempted enticement and production counts. DE:77:34-35.  During the February 19 status conference, the trial judge decided to allow Mr. Harding to plead no contest plea to those counts.  DE:77:40.

Mr. Peacock testified, and his notes, Govt. Ex. 11, reflect, that during the November 16 meeting with Mr. Harding, he told him that his guidelines were 360 months to life.  His estimation of the guidelines changed because initially he did not think that Mr. Harding was subject to both the Chapter 2 and Chapter 4 pattern enhancements. The case became stronger when evidence demonstrating actual sexual abuse of the stepdaughters was revealed and that evidence would have supported the application of both pattern enhancements.  He believed, and his notes again reflect, that

23

during the December 8th meeting with Mr. Harding, they discussed the fact that the guidelines scored to life. Moreover, his notes reflect that Mr. Harding was made aware that Mr. Harding's wife was pushing for a life sentence and that the state charges carried a mandatory life sentence. DE:77:52-53. However, his notes also bear a notation, "but RLR probably won't go that high." DE:77:55-56. He explained that "RLR" referred to Judge Rosenberg; and that he "truly didn't believe that Judge Rosenberg would—I thought that she'd be amenable to a motion for downward variance." DE:77:55. He added that Judge Rosenberg was relatively new to the bench, having been on the court for about a year, and stated, "I thought that she would be more receptive to that type of thing." *Id.* He testified that this was his opinion based on his experience and what he knew about the case, and that he conveyed this to Mr. Harding. *Id.* Although he did not recall his exact words, he explained that he would have told Mr. Harding that he saw Judge Rosenberg in a very favorable light sentencing-wise; that he thought she listened well at sentencing; that she would be sensitive regarding the arguments that would be made; and that "our best shot" was to try to get her to be sympathetic and come down from the life guidelines. DE:77:56.

Mr. Peacock testified that he did not believe that he ever told Mr. Harding that he would not get anything above a 30-year sentence; nor did he ever assure him that he would not get more than 30 years. DE:77:56-60. However, Mr. Peacock did recall

giving Mr. Harding a copy of the *Irey* case and utilized it in connection with discussions about a 30-year sentence; and he probably told Mr. Harding that 30 years was a target number. DE:77:94.

Mr. Peacock conceded that he originally believed there was a legal defense to the attempted enticement charge based on the fact that Mr. Harding had not taken a substantial step toward the commission of the offense. DE:77:48, 70. His thinking later changed when the government provided evidence that, in his view, demonstrated that Mr. Harding had engaged in grooming his eldest stepdaughter. DE:77:59,99.[2]

Mr. Peacock likewise conceded that he did not advise Mr. Harding of discussions during the February 19, 2016 status conference where he, the government and the judge herself acknowledged and agreed that his guidelines, even assuming a 3 level reduction for acceptance of responsibility, were well above the threshold dictating the imposition of a life sentence. His excuse for not relaying this information was that "[w]e were all aware" of the sentence Mr. Harding was facing. DE:77:89. He offered no explanation for his assertion in his February 18 letter that a plea would help lower the guidelines. DE:77:87.

---

[2] Although at the February 19 status conference the government represented that Mr. Harding's stepdaughter, C.W., was the target of his enticement, three days later at the change of plea hearing they shifted positions and proffered that it was "daddydearaimee"'s daughter who was the target. Given that it was now "daddydearaimee"'s daughter who was the target, Mr. Harding's alleged grooming of C.W. was therefore irrelevant to Mr. Peacock's claimed change of opinion.

After Mr. Peacock concluded his testimony, two additional witnesses testified on behalf of Mr. Harding. His mother, Julie Harding, explained that she was actively involved in the case from the day of her son's arrest and spoke with Mr. Peacock about the case on numerous occasions, both in his office and on the phone. DE:77:105.

Prior to the change of plea hearing, Mr. Peacock had assured her that the most amount of time Michael was facing was 30 years. After that, while they were preparing for sentencing, Mr. Peacock told her that Michael was facing 25-30 years and assured her he would never get a life sentence. DE:77:106-107. Mr. Peacock never told her what her son's guidelines actually were, or that even if Michael pled and received a reduction for acceptance of responsibility his guidelines would still be life. To the contrary, he told her that if Michael pled and accepted responsibility, the judge would be lenient and sentence him to no more than 30 years. DE:77:108. Finally, on the first day of sentencing hearings, Mr. Peacock assured her in the presence of Judit Sohr that Michael would not be sentenced to more than 30 years. DE:77:108-109.

On cross examination, Ms. Harding conceded that she is philosophically opposed to life sentences as punishment. DE:77:113.

Judit Sohr testified and corroborated Ms. Harding's testimony that on the first day of sentencing Mr. Peacock said that Michael would receive no more than a 30-year sentence. DE:77:126.

## **STANDARD OF REVIEW**

Whether counsel rendered constitutionally ineffective assistance is a mixed question of law and fact that is reviewed *de novo*. *Hagins v. United States*, 267 F.3d 1202, 1204 (11th Cir 2001). Legal conclusions are reviewed *de novo* and findings of fact for clear error. *Devine v. United States*, 520 F.3d 1286 (11th Cir. 2008).

## SUMMARY OF THE ARGUMENTS

### ISSUE I

The district court violated *Clisby v. Jones*, 960 F.2d 925 (11th Cir. 1992) by failing to address specifically Mr. Harding's claim that his plea was involuntary because his attorney did not advise him that he could be subjected to post incarceration civil commitment. *Clisby* requires the district court to address each claim raised in a habeas petition and where, as in this case, the district court fails to do so, this Court will vacate the district court's judgment without prejudice and remand the case for consideration of all remaining claims. 960 F.2d at 938.

The specific claim raised by Mr. Harding in Ground Two of his petition was that his counsel failed to advise him that a plea would subject him to possible indefinite civil commitment. Civ.DE:1. In his report and recommendation, which was subsequently adopted by the district court, the magistrate judge failed to address this specific claim. Rather, the magistrate judge addressed a different claim, one that was not raised by Mr. Harding, i.e., that he had received affirmative misadvice from counsel regarding the possibility of being exposed to the additional sanction of indefinite civil commitment. Civ.DE:72:19-21. And, in recasting Mr. Harding's claim, the magistrate judge imposed an incorrect burden of proof with regard to both the performance prong and prejudice prong of his ineffective assistance of counsel claim. Pursuant to *Clisby*, remand is necessary so that the district court can properly

28

address the specific claim that was actually raised by Mr. Harding.

## ISSUE II

### A.

Mr. Harding's counsel rendered ineffective assistance by failing to advise him that his nolo contendere plea could result in post incarceration civil confinement.

To begin with, this Court has held on two occasions that it is ineffective assistance of counsel for an attorney to provide affirmative misadvice to his client concerning possible exposure to indefinite civil commitment or sex offender registration requirements as a consequence of pleading guilty. *Bauder v. Department of Corrections State of Florida*, 619 F.3d 1272 (11th Cir. 2010), *Jackson v. United States,* 463 Fed.Appx. 833 (11th Cir. 2012).

Although Mr. Harding's claim is predicated on a failure to advise rather than receiving misadvice, there is no longer a distinction between the two species of ineffective assistance. The Supreme Court in *Padilla v. Kentucky*, 559 U.S. 356 (2010) held that there is no relevant difference between an act of commission and an act of omission in addressing the performance prong of ineffective assistance of counsel claims under *Strickland v. Washington*, 466 U.S. 668 (1984).

Finally, in 2005 Fla. R. Cr. P. 3.172 was amended to provide that the trial judge has to warn a defendant that a plea to a sexually violent, or sexually motivated offense can subject him to involuntary civil commitment upon completion of the

29

sentence. Any marginally competent Florida criminal defense attorney should have been aware of the amended rule and fulfill his responsibility to advise his client of the prospect of the additional severe sanction of involuntary civil commitment resulting from a plea to a sexually violent or sexually motivated offense.

## B.

Mr. Harding was prejudiced by the ineffective assistance of counsel in failing to advise him that his plea of nolo contendere would expose him to the additional sanction of involuntary indefinite civil commitment. Because of counsel's constitutionally deficient advice he pled and was deprived of his right to a trial by jury — a right he would have insisted upon and availed himself of had counsel properly advised him. Prior decisional authority may have suggested that the defendant asserting an ineffective assistance of counsel claim cannot establish prejudice solely by showing he would have gone to trial. Those decisions also required a showing that he would likely have obtained a more favorable result, or that his decision to reject a plea and proceed to trial must have been rational. If that was ever the law, it most certainly is not now, and has not been since 2017. *United States v. Lee,* 582 U.S. __, 137 S.Ct. 1958 (2017). Under *Lee*, the analysis focuses on whether the defendant was prejudiced by the denial of the entire judicial proceeding to which he had a right i.e., a trial. Whether the defendant would have

30

obtained a better result at trial, or whether his decision to go to trial was rational, or whether the evidence against him was overwhelming are no longer relevant. The ultimate denial of the defendant's rights to a trial resulting from a plea entered on constitutionally deficient advice of counsel establishes prejudice.

## ARGUMENTS AND CITATIONS OF AUTHORITY

### ISSUE I

WHETHER THE DISTRICT COURT VIOLATED *CLISBY V. JONES*, 960 F.2D 925 (11TH CIR. 1992), BY FAILING TO ADDRESS SPECIFICALLY HARDING'S CLAIM THAT HIS PLEA WAS INVOLUNTARY BECAUSE HIS ATTORNEY DID NOT ADVISE HIM THAT HE COULD BE SUBJECT TO POST INCARCERATION CIVIL COMMITMENT

The answer to this question is unequivocally yes. In *Clisby v. Jones*, 960 F.2d 915 (11th Cir. 1992) this Court held that if the district court fails to address each claim raised in a habeas petition, we "will vacate the district court's judgment without prejudice and remand the case for consideration of all remaining claims." 960 F.2d at 938. Where a *Clisby* error has been raised, the role of this Court is to determine whether a district court failed to address a claim; the question of whether the underlying claim is meritorious is not part of the analysis and is not addressed. *Dupree v. Warden*, 715 F.3d 1295, 1299 (11th Cir. 2013). Moreover, the district court has an obligation "to develop a record sufficient to facilitate appellate review of all issues pertinent to an application for a COA and, by extension, the ultimate merit of any issues for which a COA is granted." *Long v. United States*, 626 F.3d 1167, 1170 (11th Cir. 2010).

To prevail under *Clisby*, the "petitioner must present a claim in clear and simple language such that the district court may understand it." *Dupree v. Warden*

32

at 1299.

In Ground Two of his petition Mr. Harding claimed that his counsel failed to advise him that a plea would subject him to possible indefinite civil commitment. Civ.DE:1. He went on to explain that counsel admittedly failed to advise and never advised him that as a direct consequence of pleading guilty he could be subjected to the risk of indefinite involuntary civil commitment. Civ.DE:1 Addendum.[3]

In its response to Mr. Harding's petition, the government noted that "In this case, Movant does not claim affirmative misadvice. Rather, he claims that counsel never advised Movant that pleading guilty could subject him to indefinite civil commitment Civ.DE:6:28-29.

In his report and recommendation, the magistrate judge failed to address the clear, specific claim raised by Mr. Harding, i.e., that his counsel failed to advise him that by pleading guilty or no contest he was exposing himself to the additional sanction of indefinite involuntary civil commitment. Instead, the magistrate judge addressed a different claim than the one raised by Mr. Harding and responded to by the government. Specifically, the magistrate judge inexplicably recast Mr. Harding's claim as one based on having received affirmative misadvice regarding the

---

[3] In Ground Five Mr. Harding alleged that the district court was equally derelict in failing to expressly inform him that he faced the possibility of indefinite civil commitment under Florida's Jimmy Ryce laws. Civ.DE:1; Civ.DE:1 Addendum.

possibility of the additional sanction of involuntary civil commitment.

In the report and recommendation, the magistrate judge concluded that Mr. Harding had the burden of proving (1) that he was affirmatively misadvised in this case [regarding his exposure to involuntary civil commitment as a result of his guilty and no contest pleas] and (2) whether rejecting the plea bargain would have been rational under the circumstances. Civ.DE:1. The magistrate judge then further concluded that "Movant has not met his burden as to the assertion that counsel affirmatively misadvised Movant on whether he would have to register as a sex offender. "Movant did not put on any testimony that he received any misadvice regarding any indefinite civil commitment or registration as a sex-offender. In fact, Movant testified that he was aware of some mandatory sex-offender reporting requirements because of his training as a police officer." Civ.DE:72:19-21. The magistrate judge completely ignored Mr. Harding's sworn, unrebutted allegations (and claim) in Ground Two of his Petition and Addendum that his counsel failed to advise him that his pleas of guilty and no contest would expose him to the additional sanction of indefinite civil commitment.

As we have shown, the magistrate judge failed to address this specific claim regarding the ineffective assistance of counsel in failing to advise Mr. Harding that his pleas of guilty and no contest subjected him to possible indefinite civil commitment. Beyond that, the magistrate judge also effectively avoided addressing

34

Mr. Harding's claim by applying an incorrect legal standard in assessing the claim. Relying on *Jackson v. United States*, 463 Fed.Appx. 833 (11th Cir. 2012). The magistrate judge incorrectly focused his analysis on whether Mr. Harding was affirmatively misadvised regarding his exposure to involuntary civil commitment as a result of his guilty and no contest plea; and whether rejecting the plea bargain would have been rational under the circumstances. After the Supreme Court's decision in *Lee v. United States*, 582 U.S. __, 137 S.Ct 1958 (2017) requiring a defendant to show that his rejection of a plea bargain and decision to go to trial was rational under their circumstances is no longer the law.[4]  Despite the fact that Mr. Harding cited to and relied on *Lee* in support of his claim, the magistrate totally ignored *Lee*-there is not even a passing reference to this controlling decisional authority in the report and recommendation. The same is true of the district court in its order adopting the report and recommendation. Civ.DE:84.

---

[4] As a practical matter there was no plea bargain to reject. As a result of counsel's ineffectiveness and in reliance on his constitutionally deficient advice, Mr. Harding essentially pled straight up to each of the six counts in the second superseding indictment. No charges were dropped, no limits were placed on guideline enhancements or sentencing exposure and given the history and factual circumstances of the case the imposition of a statutory maximum life sentence was inevitable.

**ISSUE II**

REGARDLESS OF ANY POTENTIAL *CLISBY* ERROR, (A) WHETHER HARDING'S ATTORNEY RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO ADVISE HIM THAT HIS NOLO CONTENDERE PLEA COULD RESULT IN POST-INCARCERATION CIVIL CONFINEMENT, AND, IF SO, (B) WHETHER THAT INEFFECTIVE ASSISTANCE PREJUDICED HIM

A.

Mr. Harding's counsel rendered ineffective assistance by failing to advise him that his nolo contendere plea could result in post incarceration indefinite civil confinement.[5]

This Court has not addressed the specific issue raised in its order granting a certificate of appealability in this case i.e., whether counsel's failure to advise his client that a plea of no contest or guilty to certain enumerated charges can subject

---

[5] As a result of his pleas and convictions in this case Mr. Harding faced the additional sanction of the initiation of federal or state proceedings to secure his involuntary indefinite civil commitment. See, 18 U.S.C. § 4248 Civil Commitment of a sexually dangerous person. (Authorizing and establishing procedures for the potentially lifetime commitment of a "sexually dangerous person" defined as "one who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others" 18 U.S.C. § 4247(a)(6). Involuntary Civil Commitment of Sexually Violent Predators Act (The Jimmy Ryce Act) Fla.Stat. 394.910-931. A sexually violent predator includes any person who has been convicted of a sexually violent offense including any criminal act that, …. has been determined beyond a reasonable doubt to have been sexually motivated.  Fla. Stat. 394.912(h).

him to indefinite civil commitment under federal and state law constitutes ineffective assistance of counsel. However, past precedent from this Court, the Supreme Court's decision in *Padilla v. Kentucky*, 559 U.S. 356 (2010) and the long-standing obligations imposed on Florida courts and attorneys to advise defendants of potential exposure to indefinite civil commitment as a result of pleading guilty must lead this Court to now hold that it is indeed ineffective assistance.

Well over a decade ago this Court held on two occasions that it is ineffective assistance of counsel for an attorney to provide affirmative misadvice to his client concerning possible exposure to indefinite civil commitment or sex offender registration requirements as a consequence of pleading guilty. *Bauder v. Department of Corrections State of Florida*, 619 F.3d 1272 (11th Cir. 2010), *Jackson v. United States*, 463 Fed.Appx. 833 (11th Cir. 2012).

In *Bauder*, the defendant filed for federal habeas relief pursuant to 28 U.S.C. § 2254 claiming that his counsel provided ineffective assistance by affirmatively telling him that pleading no contest to a charge of aggravated stalking under Florida law would not subject him to possible indefinite civil commitment pursuant to Fla. Stat. 394.910, et seq. (The Jimmy Ryce Act). This Court affirmed the district court's grant of habeas relief based on its ruling that Bauder's criminal defense attorney was ineffective by misadvising him regarding the possibility of being civilly committed as a result of pleading to a charge of aggravated stalking of a minor. Id. at 1275.

37

The accused in *Jackson v. United States* 463 Fed.Appx. 833 (11th Cir. 2012) filed for relief pursuant to 28 U.S.C. § 2255 seeking to vacate his conviction and sentence for conspiracy to commit several sex trafficking offenses. Following the district court's denial of the motion, this Court granted a certificate of appealability on the issue of "[w]hether the district court erred by denying the claim that Jackson's plea was not knowing and voluntary as counsel was ineffective for failing to advise him he would have to register as a sex offender if he pled guilty." In its opinion remanding for an evidentiary hearing on Jackson's claims, this Court acknowledged that if he could show that counsel in fact affirmatively misadvised him concerning the sex offender registration requirements, that would constitute ineffective assistance of counsel.

In *Padilla v. Kentucky*, 559 U.S. 356 (2010), the Supreme Court eliminated the affirmative misadvice versus failure to advise distinction that a number of courts had drawn in addressing ineffective assistance of counsel claims based on constitutionally deficient plea advice that ultimately exposed the accused to immigration consequences and other consequences. In Padilla, the Solicitor General urged the Court to conclude that *Strickland v. Washington* ineffective assistance of counsel analysis applied to Padilla's claim only to the extent he has alleged affirmative misadvice concerning the immigration consequences of his guilty plea— "counsel is not constitutionally required to provide advice on matters that will not

38

be decided in the criminal case…" though counsel is required to provide accurate advice if she chooses to discuss these matters. Brief for United States as Amicus Curiae. In rejecting that argument, the Court stated,

> "We … agree [with petitioner] that there is no relevant difference between an act of commission and an act of omission in this context. *Strickland*, 466 U.S. at 690 (The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance").

The *Padilla* Court went on to explain "A holding limited to affirmative misadvice would invite two absurd results. First, it would give counsel an incentive to remain silent on matters of great importance, even when answers are readily available. Silence under these circumstances would be fundamentally at odds with a critical obligation of counsel to advise the client of the advantages and disadvantages of a plea agreement." *Libretti v. United States*, 516 U.S. 29, 50-51(1995). When attorneys know that their clients face possible exile from this country and separation from their families, they should not be encouraged to say nothing at all. Second, it would deny a class of clients…the most rudimentary advice on deportation even when it is readily available. It is quintessentially the duty of counsel to provide her client with available advice about an issue like deportation and the failure to do so "clearly satisfies the first prong of the *Strickland* analysis" *Hill v. Lockhart*, 474 U.S. 52, 62 (1985) (White, J., concurring in judgment).

As an attorney admitted to practice in Florida, Mr. Harding's counsel should

have been aware of his client's exposure to indefinite civil commitment under Florida's Jimmy Ryce laws, Fla. Stat. 394.910 et.seq., and 18 U.S.C. § 4248 as a result of his guilty/no contest plea to the second superseding indictment; and he should have been aware of Florida law mandating admonitions to an accused prior to entering a plea to charges that carry the additional potential risk of indefinite civil commitment.

Following amendments added in 2005, Fla.R.Cr.P. 3.172 Acceptance of Guilty or Nolo Contendere Plea now provides in pertinent part,

> (c) Determination of Voluntariness…. [T]he trial judge must, when determining voluntariness, place the defendant under oath, address the defendant personally, and determine on the record that he or she understands:

> (9) Sexually Violent or Sexually Motivated Offenses.

> If the defendant pleads guilty or nolo contendere, and the offense to which the defendant is pleading is a sexually violent offense or a sexually motivated offense, or if the defendant has been previously convicted of such an offense, the plea may subject the defendant to involuntary civil commitment as a sexually violent predator upon completion of his or her sentence. It should not be necessary for the trial judge to determine whether the present or prior offenses were sexually motivated, as this admonition shall be given to all defendants in all cases.

Clearly, any marginally competent Florida criminal defense attorney should be aware of the plain, unambiguous provisions of the above Rule. In this case Mr. Harding's counsel appeared to be ignorant of the rule despite the fact that he

indicated he was aware of the pendency of parallel state court proceedings against Mr. Harding and the professed importance of those proceedings. Moreover, apparently aware of his own failures, he later attempted to shift the blame for his constitutionally deficient performance in failing to advise Mr. Harding about the possibility of involuntary indefinite civil commitment to the district court, arguing on appeal that it was the trial judge's duty to advise Mr. Harding about that risk and that the judge failed to do so.

There is no question that Mr. Harding's counsel failed to advise him that he was exposing himself to the risk of involuntary indefinite civil commitment as a result of entering his nolo contendere plea. Mr. Harding's sworn allegations detailing that failure are uncontested and unrebutted.  Civ.DE:1; Civ.DE:1 Addendum.  By the time Mr. Harding entered his plea in February 2016, this Court had decided *Bauder* and *Jackson*; the Supreme Court had decided *Padilla*; and Fla. R. Cr. P. 3.172(9) had been in effect for over 10 years. Any competent counsel would have been aware of these decisions and the rule and would have advised Mr. Harding that his nolo contendere plea exposed him to the risk of involuntary indefinite civil commitment. His failure to provide that advice is a glaring omission and clearly ineffective assistance of counsel.

41

**B**.

WHETHER MR. HARDING WAS PREJUDICED BY THE INEFFECTIVE ASSISTANCE OF HIS COUNSEL IN FAILING TO ADVISE HIM THAT HIS PLEA OF NOLO CONTENDERE WOULD EXPOSE HIM TO THE ADDITIONAL SANCTION OF INVOLUNTARY INDEFINITE CIVIL COMMITMENT

Mr. Harding was prejudiced by the ineffective assistance of counsel in failing to advise him that his plea of nolo contendere would expose him to the additional sanction of involuntary indefinite civil commitment. Because of counsel's constitutionally deficient advice (or knowing concealment of the possibility of this severe sanction) he pled nolo contendere and was deprived of his right to a trial by jury—a right he would have insisted upon and availed himself of had counsel properly advised him. The denial of his right to a jury trial as a result of his unknowing involuntary plea in reliance on counsel's constitutionally deficient advice establishes prejudice as a matter of law.

The Sixth Amendment guarantees criminal defendants the assistance of counsel in defending against criminal charges. *See Hall v. Head*, 310 F.3d 683, 691 (11th Cir. 2002) (citing *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The right to counsel "is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). Additionally, the right to counsel encompasses the right to "effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 (1970).

42

The Sixth Amendment also guarantees the accused the effective assistance of counsel in all critical stages of a criminal prosecution, including during the process of plea negotiations and in deciding whether to forego his right to trial and enter a plea. Counsel's obligations include providing an accurate assessment of the accused's total sentencing exposure and fully informing him of all legal consequences of entering a plea that may affect his decision of whether to plead or go to trial.

*Strickland v. Washington* held that relief is warranted on an ineffective assistance of counsel claim upon a showing that: (1) counsel's performance fell below an objective standard of reasonableness (the performance prong); and (2) there is a reasonable probability (sufficient to undermine confidence in the outcome) that, but for counsel's objectively unreasonable performance, the proceeding's results would have differed (the prejudice prong). *Strickland*, 466 U.S. at 688-89. One year later, addressing the situation in which an attorney's erroneous advice led the accused to plead guilty, the Supreme Court held that the prejudice standard required the defendant to show "a reasonable probability that, but for counsel's errors he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Subsequent cases have suggested that the defendant, consistent with *Strickland*, cannot establish prejudice solely by showing he would have gone to trial. He must also show that he would likely have obtained

43

a more favorable result in the end, or that his decision to reject a plea and proceed to trial must have been rational. If that was ever the law, it most certainly is not now, and has not been since 2017.

The Supreme Court has now made it clear that the traditional *Strickland* prejudice analysis does not apply where, as in Mr. Harding's case, counsel's constitutionally deficient performance resulted in a forfeiture of the accused's right to a trial. *See Lee v. United States*, 582 U.S. ___, 137 S. Ct. 1958, 1965 (2017) ("When a defendant alleges his counsel's deficient performance led him to accept a guilty plea rather than go to trial, we do not ask whether, had he gone to trial the result of that trial 'would have been different' than the result of the plea bargain. That is because, while we ordinarily 'apply a strong presumption of reliability to judicial proceedings,' 'we cannot accord' any such presumption 'to judicial proceedings that never took place.'" (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 482-83 (2000)).

In *Lee*, the accused, a non-U.S. citizen facing overwhelming evidence of guilt with no real defense to the drug related charges brought against him, opted to accept a plea that carried a lesser prison sentence than he would have faced at trial. His decision was motivated by his counsel's erroneous advice that the government would not deport him if he pleaded guilty. In denying his § 2255 motion, the district court, applying *Strickland*'s two-part test for ineffective assistance of counsel

44

claims, concluded that Lee's counsel had performed deficiently by giving improper advice about the deportation consequences of the plea, but that "[i]n light of the overwhelming evidence of Lee's guilt," Lee "would have almost certainly been found guilty and received a significantly longer prison sentence and subsequent deportation had he gone to trial." *Lee*, 137 S.Ct. at 1964.

In Lee's subsequent appeal, the Sixth Circuit, relying on *Hill v. Lockhart*, 474 U.S. 52, 59 (1985), affirmed the denial of relief concluding that to establish he was prejudiced by counsel's errors Lee would be required to show a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Lee*, 137 S.Ct. at 1964. Because the Sixth Circuit determined Lee had "no bona fide defense, not even a weak one," he "stood to gain nothing from going to trial but more prison time." *Id*. Relying on circuit precedent holding that "no rational defendant charged with a deportable offense and facing overwhelming evidence of guilt would proceed to trial rather than take a plea deal with a shorter prison sentence," the Sixth Circuit determined that Lee could not show prejudice. *Id*.

In *Lee*, the Supreme Court rejected the analysis of both the district court and the Sixth Circuit and explained why a different prejudice analysis must apply in this type of case. 137 S.Ct. at 1963. First, it observed that a claim of ineffective assistance of counsel will often involve a claim of attorney error during the course of a legal

proceeding, for example that counsel failed to raise an objection at trial or to present an argument on appeal. Thus, under *Roe v. Flores-Ortega*, 528 U.S. 470,481 (2000), a defendant raising such a claim can demonstrate prejudice by showing "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 482 (quoting *Strickland*, 466 U.S. at 694; internal quotation marks omitted).

However, the *Lee* Court explained that where a defendant has pled guilty and forfeited his right to go to trial, the analysis is different and instead focuses on whether the defendant was prejudiced by the "denial of the entire judicial proceeding … to which he had a right." 137 S.Ct. at 1965 (citing *Roe v. Flores-Ortega*, 528 U.S. at 483); *see id.* ("As we held in *Hill v. Lockhart*, when a defendant claims that his counsel's deficient performance deprived him of a trial by causing him to accept a plea, the defendant can show prejudice by demonstrating a 'reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.' 474 U.S., at 59, 106 S.Ct. 366.").

Most importantly, the *Lee* Court rejected the government's request to adopt the per se rule embraced by the Sixth Circuit that a defendant with no viable defense cannot show prejudice from the denial of his right to trial. 137 S.Ct. at 1966. In doing so, the Court observed that when the consequences are from the defendant's perspective, similarly dire, even the smallest chance of success at trial may look

attractive. *See id*. at 1966-67 ("For example, a defendant with no realistic defense to a charge carrying a 20–year sentence may nevertheless choose trial, if the prosecution's plea offer is 18 years. Here Lee alleges that avoiding deportation was the determinative factor for him; deportation after some time in prison was not meaningfully different from deportation after somewhat less time. He says he accordingly would have rejected any plea leading to deportation—even if it shaved off prison time—in favor of throwing a "Hail Mary" at trial.")

In his report and recommendation (which was subsequently adopted by the district court) the magistrate judge failed to address the Supreme Court's decision in *Lee* and instead employed a patently incorrect prejudice analysis focusing on whether Mr. Harding's rejection of a plea and decision to go to trial would have been rational under the circumstances. Under the prejudice analysis established in *Lee*, the inquiry focuses on whether the defendant was prejudiced by the denial of the judicial proceeding (trial) to which he had a right. Whether he would have obtained a better result by going to trial, whether his decision to forgo a plea and go to trial was rational or whether his prospects of success at trial may have been infinitesimally small are simply irrelevant.

Under *Lee*, Mr. Harding has established prejudice. He has shown that had counsel provided constitutionally effective assistance and fully advised Mr. Harding that his plea would have subjected him to the possibility of involuntary indefinite

47

civil commitment he would not have pled, but rather, exercised his constitutional right to trial by jury. Because of counsel's failures his plea was unknowing and involuntary and under *Lee* he suffered the ultimate prejudice — deprivation of his constitutional right to trial by jury.

## **CONCLUSION**

Based upon the foregoing argument and citations of authority, this Court should vacate the defendant's convictions and remand for further proceedings or alternatively, pursuant to *Clisby v. Jones,* 960 F.2d 925 (11th Cir. 1992) remand and instruct the district court to specifically address Mr. Harding's claim that his plea was involuntary because his counsel failed to advise him that he could be subject to post incarceration civil commitment.

<div style="margin-left:40%">

Respectfully submitted,

<u>s/ Richard C. Klugh</u>
Richard C. Klugh, Esq.
Attorney for Appellant
40 N.W. 3rd Street, PH1
Miami, Florida 33128
Telephone No. (305) 536-1191
Facsimile No. (305) 536-2170

</div>

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B), and that according to the program (WORD) on which it is prepared it contains <u>11,122</u> words.

Respectfully submitted,

<u>s/ Richard C. Klugh</u>
RICHARD C. KLUGH

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that a copy of the foregoing was served by mail this <u>2nd</u> day of February, 2023, upon Lisa Hirsch, Assistant United States Attorney, Appellate Division, 99 NE Fourth Street, Miami, Florida 33132-2111.

Respectfully submitted,

<u>s/ Richard C. Klugh</u>
RICHARD C. KLUGH

50