IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NO. **21-14133-JJ**

United States of America,

Appellee,

- versus -

Michael Harding,

Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
_____

SUPPLEMENTAL APPENDIX FOR THE UNITED STATES

Markenzy Lapointe
United States Attorney
Attorney for Appellee
99 N.E. 4th Street
Miami, Florida 33132-2111
305-961-9386

Lisa Tobin Rubio
Chief, Appellate Division

Jacob Koffsky
Assistant United States Attorney

Of Counsel

# INDEX OF SUPPLEMENTAL APPENDIX

**Docket/Tab #**

District Court Docket Sheet (18-CV-14359-RLR) …………………………    A

District Court Docket Sheet (15-CR-14057-RLR) …………………........    B

Notice of Appeal  ……………………………………………………… CVDE 85

Second Superseding Indictment  ………………………………………… CRDE 32

Judgement ……………………………………………………………… CRDE 114

Transcript of Status Conference
(Held on 1/20/2016)  …………………………………………………. CRDE 124

Transcript of Status Conference
(Held on 2/3/2016)  …………………………………………………. CRDE 125

Transcript of Status Conference
(Held on 2/17/2016)  ………………………………………………… CRDE 126

Status Conference Proceedings
(Held on 2/19/2016)  ………………………………………………… CRDE 127

Change of Plea Proceedings
(Held on 2/22/2016)  ………………………………………………… CRDE 128

Transcript of Sentencing Proceedings
(Held on 5/16/2016)  ………………………………………………… CRDE 129

Transcript of Sentencing Proceedings
(Held on 5/23/2016)  ………………………………………………… CRDE 130

Presentence Investigation Report[1] ……………………..………..…..    Sealed Exh.

Certificate of Service

---

[1]     The Presentence Investigation Report was sent to the Court in a sealed envelope along with the appendix filed by the government.

# TAB A

   CourtLink (Dockets)                Client: -None-       History      Help      More

**Document:**                    2:18cv14359, Harding V. United States Of America                    Actions 

## 2:18cv14359, Harding V. United States Of America

US District Court Docket

United States District Court, Florida Southern

(Ft Pierce)

**This case was retrieved on 03/14/2023**

### ▼Header

**Case Number:** 2:18cv14359
**Date Filed:** 09/04/2018
**Assigned To:** Judge Robin L. Rosenberg
**Referred To:** Magistrate Judge William Matthewman
**Nature of Suit:** Vacate Sentence (510)
**Cause:** Motion to Vacate Sentence
**Lead Docket:** None
**Other Docket:** 2114133E, USDC SD/FL, 15-14057-CR-ROSENBERG
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Closed
**Closed:** 09/27/2021
**Statute:** 28:2255
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Vacate Sentence

### ▼Participants

| Litigants | Attorneys |
|---|---|
| Michael Edwin Harding | Charles Garret White |
| 08543-104 \| Tucson-USP \| United States Penitentiary \| Inmate Mail/Parcels \| Post Office Box 24550 \| Tucson, AZ 85734 \| **Petitioner** | LEAD ATTORNEY;ATTORNEY TO BE NOTICED |
| | Charles G White PA |
| | 1031 Ives Dairy Road Suite 228 |
| | Miami, FL 33179 |
| | USA |
| | 305-914-0160 Fax: 305-914-0166 |
| | Email:Cgwhitelaw@netscape.Net |
| | |
| | Marlene C. Montaner |
| | LEAD ATTORNEY;ATTORNEY TO BE NOTICED |
| | |
| | Lawyer's Plaza - Suite 204 2250 Sw Third Avenue |
| | Miami, FL 33129 |
| | USA |
| | 305-469-0289 Email:Mcmatty@bellsouth.Net |
| | |
| | Michael Bruce Cohen |
| | LEAD ATTORNEY;ATTORNEY TO BE NOTICED |
| | [Terminated: 12/02/2019] |
| | Michael B. Cohen |
| | 6400 N Andrews Avenue Suite 505 |
| | Fort Lauderdale, FL 33309 |

Litigants                   Attorneys

USA
954-928-0059 Fax: 954-928-0829 Email:Mcohenlaw@aol.Com

Sheryl Joyce Lowenthal
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
[Terminated: 05/20/2019]

9130 S Dadeland Boulevard Suite 1511
Miami, FL 33156-7848
USA
305-670-3360 Fax: 305-670-1314
Email:SJlowenthal@appeals.Net
Noticing 2255 US Attorney
LEAD ATTORNEY;ATTORNEY TO BE NOTICED

United States of America
**Respondent**

,
Email:Usafls-2255@usdoj.Gov

Daniel E. Funk
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Attorney's Office
101 S. U.S. Highway 1
Fort Pierce, FL 34950
USA
305-905-7509 Fax: 772-466-1020 Email:Daniel.Funk@usdoj.Gov

Diana Margarita Acosta
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
United States Attorney's Office
101 South U.S. Hwy 1 Suite 3100
Fort Pierce, FL 34950
USA
772-293-0981 Fax: 772-466-1020
Email:Diana.Acosta@usdoj.Gov

## ▼Proceedings

**Retrieve Document(s)**

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Free | 1 | 09/04/2018 | MOTION (Complaint) to Vacate Sentence (2255). NOTE: All further docketing is to be done in the civil case. (Criminal Case # 15-14057-CR-ROSENBERG), filed by Michael Edwin Harding. (Attachments: # 1 Addendum to 2255 Petition)(cga)(Entered: 09/04/2018) | |
| ☐ | | 2 | 09/04/2018 | Clerks Notice of Judge Assignment to Judge Robin L. Rosenberg and Magistrate Judge Patrick A. White. Pursuant to Administrative Order 2003-19, this matter is referred to the Magistrate Judge for a ruling on all pre-trial, non-dispositive matters and for a Report and Recommendation on any dispositive matters. (cga) (Entered: 09/04/2018) | |
| ☐ | Online | 3 | 09/05/2018 | NOTICE of Attorney Appearance by Daniel E. Funk on behalf of United States Of America. Attorney Daniel E. Funk added to party United States Of America(pty:res). (Funk, Daniel) (Entered: 09/05/2018) | |
| ☐ | Online | 4 | 09/07/2018 | INITIAL ORDER OF INSTRUCTIONS TO PRO SE LITIGANT. Signed by Magistrate Judge Patrick A. White on 9/7/2018. See attached document for full details. (fbn) (Entered: 09/07/2018) | |
| ☐ | Online | 5 | 09/14/2018 | ORDER TO SHOW CAUSE 28 U.S.C. §2255 on or before forty-five days from the date of this order, the respondent shall file a memorandum of fact and law to show cause why this motion should not be granted, and shall file therewith all documents necessary for the resolution of this motion. Signed | |

| Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|
| | | | by Magistrate Judge Patrick A. White on 9/14/2018. See attached document for full details. (fbn) (Entered: 09/14/2018) | |
| Free | 6 | 10/29/2018 | RESPONSE TO ORDER TO SHOW CAUSE re 5 Order to Show Cause, by United States of America. (Attachments: # 1 Appendix Indictment, # 2 Appendix Superseding Indictment, # 3 Appendix Second Superseding Indictment, # 4 Appendix Change of Plea Transcript, # 5 Appendix Transcript of Sentencing Hearing (5 16 2016), # 6 Appendix Transcript of Sentencing Hearing (5 23 2016), # 7 Appendix Government's Objections to PSI, # 8 Appendix Defense Objections to PSI, # 9 Appendix Defense Amended Objections to PSI, # 10 Appendix Defense Motion for Downward Variance, # 11 Appendix Judgment, # 12 Appendix 11th Circuit Opinion for Harding Case, # 13 Appendix Movant's 2255 Motion and Addendum)(Funk, Daniel) (Entered: 10/29/2018) | |
| Free | 7 | 10/29/2018 | First MOTION for Leave to File Excess Pages by United States of America. (Attachments: # 1 Text of Proposed Order)(Funk, Daniel) (Entered: 10/29/2018) | |
| | 8 | 10/30/2018 | PAPERLESS ORDER granting 7 Motion for Leave to File Excess Pages. THIS MATTER was considered upon the Government Motion to File OversizeResponsive Brief. The Court being advised in its premises, it is:ORDERED AND ADJUDGED that the Governments Motion is GRANTED and theGovernment shall be permitted to file an oversize brief styled Respondents Response to Movant Michael Edwin Hardings Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or CorrectSentence, in the above-captioned case. Signed by Magistrate Judge Patrick A. White on 10/30/2018. (jbr) (Entered: 10/30/2018) | |
| Online | 9 | 11/13/2018 | Pro Se MOTION for Extension of Time as to 6 Response to Order to Show Cause,, by Michael Edwin Harding. (mee) (Entered: 11/13/2018) | |
| | 10 | 11/14/2018 | PAPERLESS ORDER granting 9 Motion for Extension of Time to File. The motion for an extension to file a reply is granted. The reply shall be filed on or before December 30, 2018. No further extensions will be granted. Signed by Magistrate Judge Patrick A. White on 11/14/2018. (jbr) (Entered: 11/14/2018) | |
| | | 11/14/2018 | Reset Deadlines Per DE#10. Replies due by 12/30/2018. (cqs) (Entered: 11/14/2018) | |
| Free | 11 | 01/02/2019 | REPLY to Government's Response to Motion filed by Michael Edwin Harding. (lbc) (Entered: 01/02/2019) | |
| | 12 | 01/03/2019 | Case Reassignment of Paired Magistrate Judge pursuant to Administrative Order(s) - 2019-2 to Magistrate Judge Lisette Marie Reid. Magistrate Judge Patrick A. White no longer assigned to case. (jmd) (Entered: 01/03/2019) | |
| Free | 13 | 01/03/2019 | REPLY to 6 Response to Order to Show Cause,, by Michael Edwin Harding. (mee) (Entered: 01/04/2019) | |
| | 14 | 01/03/2019 | MOTION for Evidentiary Hearing for image see DE 13 by Michael Edwin Harding. (mee) (Entered: 01/07/2019) | |
| Online | 15 | 01/15/2019 | ORDER OF RECUSAL AND RE-ASSIGNMENT. Magistrate Judge Lisette M. Reid recused. Case reassigned to Magistrate Judge Dave Lee Brannon for all further proceedings. Motions referred to Judge Dave Lee Brannon. Signed by Magistrate Judge Lisette M. Reid on 1/10/2019. See attached document for full details. (vjk) (Main Document 15 replaced on 1/16/2019) (vjk). Modified Text and Judge on 1/16/2019 (vjk). (Entered: 01/15/2019) | |
| | 16 | 01/16/2019 | Clerks Notice of Docket Correction re 15 Order of Recusal. Incorrect Magistrate Judge Selected, Magistrate Judge Dave Lee Brannon added; Corrected by the Clerk. (vjk) (Entered: 01/16/2019) | |
| Free | 17 | 05/17/2019 | Order Appointing CJA Counsel and Setting Evidentiary Hearing (Evidentiary Hearing set for 8/23/2019 at 10:00 AM in West Palm Beach Division before Magistrate Judge Dave Lee Brannon). Signed by Magistrate Judge Dave Lee Brannon on 5/17/2019. See attached document for full details. (spe) (Entered: 05/17/2019) | |
| Online | 18 | 05/17/2019 | Writ of Habeas Corpus ad Testificandum Issued as to Michael Edwin Harding. Evidentiary Hearing set for 8/23/2019 at 10:00 A.M. in West Palm Beach Division before Magistrate Judge Dave Lee Brannon. Signed by Magistrate Judge Dave Lee Brannon on 5/17/2019. See attached document for full details. (spe) (Entered: 05/17/2019) | |
| | 19 | 05/17/2019 | PAPERLESS ORDER granting in part and denying in part 14 Michael Edwin Harding's Motion for Hearing. An evidentiary hearing, limited to one issue Movant raised in his 2255 motion, has been set by separate order. See DE 17 for details. Signed by U.S. Magistrate Judge Dave Lee Brannon on 5/17/2019. (js03) (Entered: 05/17/2019) | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Free | 20 | 05/20/2019 | ORDER Substituting CJA Counsel (Michael Bruce Cohen for Michael Edwin Harding as Counsel, Prior Counsel of Record Sheryl Joyce Lowenthal). (spe) (Entered: 05/20/2019) | |
| ☐ | Free | 21 | 06/10/2019 | Unopposed MOTION to Continue by Michael Edwin Harding. Responses due by 6/24/2019 (Cohen, Michael) (Entered: 06/10/2019) | |
| | | 22 | 06/11/2019 | PAPERLESS ORDER granting 21 Plaintiff's Unopposed Motion to Continue. The Evidentiary Hearing set for 8/23/2019 is hereby RESET to 10/4/2019 at 10:00 AM in West Palm Beach Division before U.S. Magistrate Judge Dave Brannon. Signed by U.S. Magistrate Judge Dave Lee Brannon on 6/11/2019. (js03) (Entered: 06/11/2019) | |
| ☐ | Online | 23 | 07/15/2019 | NOTICE by Michael Edwin Harding of filing Certification of waiver of attorney-client privileged (Cohen, Michael) (Entered: 07/15/2019) | |
| ☐ | Online | 24 | 08/02/2019 | First MOTION for Extension of Time EXTENSION OF TIME TO FILE PRETRIAL NARRATIVE STATEMENTS JOINT MOTION by United States Of America. Responses due by 8/16/2019 (Funk, Daniel) (Entered: 08/02/2019) | |
| | | 25 | 08/02/2019 | PAPERLESS ORDER granting 24 Joint Motion to Extend Deadline to File Pre-trial narrative Statements. Pre-trial narrative statements shall be filed by 8/30/2019. Signed by U.S. Magistrate Judge Dave Brannon on 8/2/2019. (js03) (Entered: 08/02/2019) | |
| ☐ | Free | 26 | 08/29/2019 | PRE-TRIAL NARRATIVE STATEMENT to 17 Order Setting/Cancelling Hearing,,, by Michael Edwin Harding. (Cohen, Michael) (Entered: 08/29/2019) | |
| ☐ | Free | 27 | 08/30/2019 | TRIAL BRIEF PRETRIAL NARRATIVE STATEMENT by United States Of America. (Funk, Daniel) (Entered: 08/30/2019) | |
| ☐ | Online | 28 | 09/26/2019 | Unopposed MOTION to Continue by Michael Edwin Harding. Responses due by 10/10/2019 (Cohen, Michael) (Entered: 09/26/2019) | |
| | | 29 | 09/30/2019 | PAPERLESS ORDER granting 28 Unopposed Motion to Continue. The Evidentiary Hearing set for 10/4/2019 is hereby RESET to 12/9/2019 at 10:00 AM in West Palm Beach Division before U.S. Magistrate Judge Dave Lee Brannon. Signed by U.S. Magistrate Judge Dave Lee Brannon on 9/30/2019.(jb02) (Entered: 09/30/2019) | |
| | | | 09/30/2019 | Reset Hearing Per DE#29. Evidentiary Hearing reset for 12/9/2019 10:00 AM before Magistrate Judge Dave Lee Brannon. (cqs) (Entered: 09/30/2019) | |
| ☐ | Free | 30 | 11/07/2019 | Agreed MOTION for Discovery of Fletcher Peacock pursuant to subpoena duces tecum by Michael Edwin Harding. Responses due by 11/21/2019 (Cohen, Michael) (Entered: 11/07/2019) | |
| | | 31 | 11/07/2019 | PAPERLESS ORDER granting 30 Petitioner's Agreed Motion to Take Discovery of Fletcher Peacock Pursuant to Subpoena Duces Tecum. Signed by U.S. Magistrate Judge Dave Lee Brannon on 11/7/2019. (jb02) (Entered: 11/07/2019) | |
| ☐ | Online | 32 | 11/21/2019 | MOTION to Compel Discovery by Michael Edwin Harding. Responses due by 12/5/2019 (Cohen, Michael) (Entered: 11/21/2019) | |
| | | 33 | 11/22/2019 | PAPERLESS ORDER denying without prejudice 32 Petitioner's Motion to Compel as the Motion fails to certify compliance with Local Rule 7.1(a)(3)s pre-filing requirement of conferral with all parties or non-parties who may be affected by the relief sought. After conferring, should counsel wish to pursue this matter further, i.e., the Court will need to know what counsel believes the notes contain, i.e., attorney-client communication or work product such as guideline calculations. Signed by U.S. Magistrate Judge Dave Lee Brannon on 11/22/2019. (jb02) (Entered: 11/22/2019) | |
| ☐ | Free | 34 | 12/02/2019 | STIPULATED MOTION for Substitution of Counsel. Substituting Marlene Montaner for Michael Cohen by Michael Edwin Harding. Attorney Marlene C. Montaner added to party Michael Edwin Harding(pty:pet). Responses due by 12/16/2019 (Montaner, Marlene) (Entered: 12/02/2019) | |
| ☐ | Online | 35 | 12/02/2019 | MOTION for Extension of Time to file pleadings and get ready for hearing by Michael Edwin Harding. Responses due by 12/16/2019 (Montaner, Marlene) (Entered: 12/02/2019) | |
| | | 36 | 12/02/2019 | PAPERLESS ORDER granting 34 Stipulated Motion for Substitution of Counsel. Attorney Marlene C. Montaner added. Attorney Michael Bruce Cohen terminated. Signed by U.S. Magistrate Judge Dave Lee Brannon on 12/2/2019. (jb02) (Entered: 12/02/2019) | |
| | | 37 | 12/02/2019 | PAPERLESS ORDER granting in part and denying in part 35 Unopposed Motion to continue. Evidentiary Hearing set for 12/9/2019 is hereby RESET to 2/7/2020 at 10:00 AM in West Palm Beach Division before U.S. | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | Magistrate Judge Dave Lee Brannon. Signed by U.S. Magistrate Judge Dave Lee Brannon on 12/2/2019. (jb02) (Entered: 12/02/2019) | |
| | | | 12/02/2019 | Set/Reset Hearings (Evidentiary Hearing set for 2/7/2020 10:00 AM in West Palm Beach Division before Magistrate Judge Dave Lee Brannon.), ***Deadline(s)/Hearing(s) terminated. (jb02) (Entered: 12/02/2019) | |
| ☐ | Free | 38 | 01/20/2020 | Unopposed MOTION for Extension of Time to file pleadings, view evidence, depose attorney and get ready for hearing by Michael Edwin Harding. Responses due by 2/3/2020 (Montaner, Marlene) (Entered: 01/20/2020) | |
| | | 39 | 01/21/2020 | PAPERLESS ORDER: Plaintiff's Motion for Extension of Time 38 is denied without prejudice as it lacks any explanation as to why Plaintiff's counsel is requesting an additional ninety days to prepare in this matter. Signed by U.S. Magistrate Judge Dave Lee Brannon on 1/21/2020. (jb02) (Entered: 01/21/2020) | |
| ☐ | Online | 40 | 01/21/2020 | Unopposed MOTION for Extension of Time to file pleadings, view evidence, review files and get ready for hearing by Michael Edwin Harding. Responses due by 2/4/2020 (Montaner, Marlene) (Entered: 01/21/2020) | |
| | | 41 | 01/22/2020 | PAPERLESS ORDER granting 40 Unopposed Motion to Continue. The Evidentiary Hearing set for 2/7/2020 is hereby RESET to 4/30/2020 at 10:30 AM in West Palm Beach Division before U.S. Magistrate Judge Dave Lee Brannon. Signed by U.S Magistrate Judge Dave Lee Brannon on 1/22/2020. (jb02) (Entered: 01/22/2020) | |
| | | | 01/22/2020 | Reset Hearing Per DE# 41. Evidentiary Hearing reset for 4/30/2020 10:30 AM before U.S. Magistrate Judge Dave Lee Brannon. (jb02) (Entered: 01/22/2020) | |
| | | 42 | 04/08/2020 | PAPERLESS ORDER RESETTING HEARING: In light of the present situation and out of concern for the health and safety of all parties involved, the Evidentiary Hearing set for 4/30/2020 is hereby RESET for 6/3/2020 at 10:30 AM in West Palm Beach Division before U.S. Magistrate Judge Dave Lee Brannon. U.S. Signed by Magistrate Judge Dave Lee Brannon on 4/8/2020. (jb02) (Entered: 04/08/2020) | |
| | | 43 | 05/13/2020 | PAPERLESS ORDER: The government has indicated to court staff that the parties intend to file a motion to continue the Evidentiary Hearing set for June 3, 2020 due to the current pandemic. Due to the procedures in place to move the petitioner for the hearing, for the Court to consider such a request, a proper motion must be filed by or before Friday May 15, 2020 at 5:00 PM EST. Signed by U.S. Magistrate Judge Dave Lee Brannon on 5/13/2020. (jb02) (Entered: 05/13/2020) | |
| ☐ | Free | 44 | 05/15/2020 | Unopposed MOTION for Extension of Time to file pleadings, view evidence, review files and get ready for hearing by Michael Edwin Harding. Responses due by 5/29/2020 (Montaner, Marlene) (Entered: 05/15/2020) | |
| | | 45 | 05/18/2020 | PAPERLESS ORDER granting 44 Petitioner's Unopposed Motion for Extension of Time. Due to delays and complications caused by the current pandemic, the Evidentiary Hearing set for 6/3/2020 is hereby RESET for 8/25/2020 at 10:30 AM in West Palm Beach Division before U.S. Magistrate Judge Dave Lee Brannon. Signed by U.S. Magistrate Judge Dave Lee Brannon on 5/18/2020. (jb02) (Entered: 05/18/2020) | |
| ☐ | Online | 46 | 08/07/2020 | MOTION to Continue JOINT MOTION TO CONTINUE EVIDENTIARY HEARING DUE TO COVID-19 by United States of America. Responses due by 8/21/2020 (Funk, Daniel) (Entered: 08/07/2020) | |
| | | 47 | 08/07/2020 | PAPERLESS ORDER granting 46 Joint Motion to Continue. The Evidentiary Hearing set for 8/25/2020 is hereby RESET for 1/14/2021 at 9:30 AM in West Palm Beach Division before U.S. Magistrate Judge Dave Lee Brannon. Signed by U.S. Magistrate Judge Dave Lee Brannon on 8/7/2020. (jb02) (Entered: 08/07/2020) | |
| ☐ | Free | 48 | 12/04/2020 | NOTICE of Attorney Appearance by Charles Garret White on behalf of Michael Edwin Harding. Attorney Charles Garret White added to party Michael Edwin Harding(pty:pet). (White, Charles) (Entered: 12/04/2020) | |
| ☐ | Online | 49 | 12/04/2020 | Agreed MOTION to Continue Evidentiary Hearing by Michael Edwin Harding. Responses due by 12/18/2020 (Attachments: # 1 Text of Proposed Order)(White, Charles) (Entered: 12/04/2020) | |
| | | 50 | 12/04/2020 | PAPERLESS ORDER granting 49 Agreed Motion to Continue Evidentiary Hearing. Due to delays and complications caused by the current pandemic, the Court finds good cause to grant the agreed motion. Accordingly, the Evidentiary Hearing set for 1/14/2021 is hereby RESET to 4/28/2021 at 10:00 AM in West Palm Beach Division before U.S. Magistrate Judge Dave Lee Brannon. Signed by U.S. Magistrate Judge Dave Lee Brannon on 12/4/2020. (jb02) (Entered: 12/04/2020) | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Online | 51 | 04/01/2021 | Unopposed MOTION to Continue Evidentiary Hearing re 50 Order on Motion to Continue, by Michael Edwin Harding. Responses due by 4/15/2021 (Attachments: # 1 Text of Proposed Order)(White, Charles) (Entered: 04/01/2021) | |
| | | 52 | 04/01/2021 | PAPERLESS ORDER granting 51 Unopposed Motion to Continue Evidentiary Hearing. According to Petitioner's motion, Petitioner "believes that any appropriate presentation of the facts and legal argument would be best presented in an in-person hearing before the Court." Counsel is not available for an in-person hearing on April 28, 2021 and seeks to continue the hearing to June or July of 2021. The Court is aware of the liberty interest of the Petitioner and his desire to have that interest resolved with an in-person hearing wherein he may testify and confront witnesses. Due to delays and complications caused by the current pandemic and in light of Petitioner's request to personally appear at the hearing, the Court finds good cause to grant the unopposed motion. Accordingly, the Evidentiary Hearing currently set for 4/28/2021 is hereby RESET for 7/28/2021 at 10:00 AM in West Palm Beach Division before U.S. Magistrate Judge Dave Lee Brannon. Signed by U.S. Magistrate Judge Dave Lee Brannon on 4/1/2021. (jb02) (Entered: 04/01/2021) | |
| | | 53 | 05/21/2021 | Case Reassignment of Paired Magistrate Judge to Magistrate Judge William Matthewman. Magistrate Judge Dave Lee Brannon no longer assigned to case. (vjk) (Entered: 05/21/2021) | |
| ☐ | Free | 54 | 05/28/2021 | Plaintiff's MOTION for clarification 17 Order Setting/Cancelling Hearing,,, and/or Expand the Scope of Evidentiary Hearing by Michael Edwin Harding. Responses due by 6/11/2021 (White, Charles) (Entered: 05/28/2021) | |
| | | 55 | 06/02/2021 | PAPERLESS ORDER REQUIRING RESPONSE AND SETTING STATUS CONFERENCE: This cause is before the Court on 53 The Clerk's Notice of Reassignment in which all further proceedings were reassigned from Magistrate Judge Dave Lee Brannon to the undersigned, due to the untimely death of Judge Brannon. The in-person evidentiary hearing was set by Judge Brannon for July 28, 2021 52 . So that the undersigned can set the evidentiary hearing on his calendar for a mutually agreeable date and time to allow Movant to personally appear at the evidentiary hearing, it is hereby ORDERED that a status conference shall be set for June 8, 2021, at 3:00 p.m., to take place via Zoom Video Teleconference (VTC) before Magistrate Judge William Matthewman. To log in through ZoomGov Meeting, use Meeting ID: 160 540 3826 and Passcode: 246129. All counsel shall appear by both audio and video. In advance of the status conference, the Government shall file a response to Movant's Motion to Clarify and/or Expand the Scope of Evidentiary Hearing 54 or before June 7, 2021. Signed by Magistrate Judge William Matthewman on 6/2/2021. (jb02) (Entered: 06/02/2021) | |
| ☐ | Online | 56 | 06/02/2021 | NOTICE of Attorney Appearance by Diana Margarita Acosta on behalf of United States Of America. Attorney Diana Margarita Acosta added to party United States Of America(pty:res). (Acosta, Diana) (Entered: 06/02/2021) | |
| ☐ | Online | 57 | 06/02/2021 | Motion for Extension of Time to File Response/Reply/Answer as to 54 Plaintiff's MOTION for clarification 17 Order Setting/Cancelling Hearing,,, and/or Expand the Scope of Evidentiary Hearing, by United States Of America. Responses due by 6/16/2021 (Acosta, Diana) Modified Relief on 6/3/2021 (ls). (Entered: 06/02/2021) | |
| | | 58 | 06/03/2021 | Clerks Notice to Filer re 57 MOTION for Extension of Time to file response to DE 54, 55 re 54 Plaintiff's MOTION for clarification 17 Order Setting/Cancelling Hearing,,, and/or Expand the Scope of Evidentiary Hearing, 55 Order,,,,, Set/Reset He. Wrong Motion Relief(s) Selected; ERROR - The Filer selected the wrong motion relief(s) when docketing the motion. The correction was made by the Clerk. It is not necessary to refile this document but future motions filed must include applicable reliefs. (ls) (Entered: 06/03/2021) | |
| | | 59 | 06/03/2021 | PAPERLESS ORDER granting 57 Motion for Extension of Time. It is hereby ORDERED that a status conference shall be RESET for June 21, 2021, at 2:00 p.m., to take place via Zoom Video Teleconference (VTC) before Magistrate Judge William Matthewman. To log in through ZoomGov Meeting, use Meeting ID: 160 540 3826 and Passcode: 246129. All counsel shall appear by both audio and video. The Government shall file a response to Movant's Motion to Clarify and/or Expand the Scope of Evidentiary Hearing 54 by or before June 11, 2021. Signed by Magistrate Judge William Matthewman on 6/3/2021. (jb02) (Entered: 06/03/2021) | |
| | | | 06/03/2021 | Active Hearings Before Prior Presider Deadline(s)/Hearing(s) terminated. | |

| Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|
| | | | (ch1) (Entered: 06/03/2021) | |
| Free | 60 | 06/11/2021 | RESPONSE in Opposition re 54 Plaintiff's MOTION for clarification 17 Order Setting/Cancelling Hearing,,, and/or Expand the Scope of Evidentiary Hearing filed by United States Of America. Replies due by 6/18/2021. (Funk, Daniel) (Entered: 06/11/2021) | |
| Free | 61 | 06/18/2021 | REPLY to Response to Motion re 54 Plaintiff's MOTION for clarification 17 Order Setting/Cancelling Hearing,,, and/or Expand the Scope of Evidentiary Hearing filed by Michael Edwin Harding. (White, Charles) (Entered: 06/18/2021) | |
| | 62 | 06/18/2021 | MOTION for Reconsideration of Interlocutory Orders by Michael Edwin Harding. (For Image See DE# 61 ) (cds) (Entered: 06/21/2021) | |
| | 63 | 06/21/2021 | Clerks Notice to Filer re 61 Reply to Response to Motion. Two or More Document Events Filed as One; ERROR - Only one event was selected by the Filer but more than one event was applicable to the document filed. The docket entry was corrected by the Clerk. It is not necessary to refile this document but in the future, the Filer must select all applicable events. (cds) (Entered: 06/21/2021) | |
| | 64 | 06/21/2021 | PAPERLESS Minute Entry for proceedings held before Magistrate Judge William Matthewman: The hearings were held by Zoom Video Teleconference. Status Conference held on 6/21/2021. Discussion held on scheduling the Evidentiary Hearing. The Evidentiary Hearing will be held on Tuesday, July 27, 2021 at 1:00 p.m. (in person) and if not completed that day, will be continued to July 28, 2021 at 1:00 p.m. Motion Hearing held on 6/21/2021 re 54 Plaintiff's MOTION for clarification 17 Order Setting Hearing and/or Expand the Scope of Evidentiary Hearing. Argument held. The Court granted the motion in part. Total time in court: 36 minutes. Attorney Appearance(s): Charles Garret White and Marlene C. Montaner for Petitioner, AUSA Daniel E. Funk and AUSA Diana Margarita Acosta for Respondent. (Digital 14:01:26) (kza) (Entered: 06/21/2021) | |
| Free | 65 | 06/21/2021 | ORDER GRANTING IN PART MOVANT'S MOTION TO CLARIFY AND/OR EXPAND THE SCOPE OF THE EVIDENTIARY HEARING [DE 54] AND RESETTING EVIDENTIARY HEARING: (Evidentiary Hearing set for 7/27/2021 at 1:00 PM in West Palm Beach Division before Magistrate Judge William Matthewman.). Signed by Magistrate Judge William Matthewman on 6/21/2021. See attached document for full details. (kza) (Entered: 06/21/2021) | |
| Online | 66 | 07/16/2021 | TRIAL BRIEF UNITED STATES OF AMERICA'S AMENDED PRETRIAL NARRATIVE STATEMENT by United States of America. (Funk, Daniel) (Entered: 07/16/2021) | |
| Online | 67 | 07/17/2021 | TRIAL BRIEF Pre-Trial Narrative Statement by Michael Edwin Harding. (White, Charles) (Entered: 07/17/2021) | |
| | 68 | 07/27/2021 | PAPERLESS Minute Entry for proceedings held before Magistrate Judge William Matthewman: Evidentiary Hearing (In Person) held on 7/27/2021 Witness: Michael Edwin Harding testified. Government's Exhibits 1-16 and Movant's Exhibits 1- 11 admitted in evidence. (Continuation of Evidentiary Hearing set for 7/28/2021 at 1:00 PM in West Palm Beach Division before Magistrate Judge William Matthewman.) Total time in court: 3 hour(s) : 05 minutes. Attorney Appearance(s): Charles Garret White and Marlene C. Montaner for Movant, AUSA Daniel E. Funk for Respondent. Court Reporter: Ellen Rassie, 954-769-5448 / ellen_rassie@flsd.uscourts.gov. (Digital 13:06:08/13:20:32) (kza) Modified on 7/27/2021 (kza). (Entered: 07/27/2021) | |
| | 69 | 07/28/2021 | PAPERLESS Minute Entry for proceedings held before Magistrate Judge William Matthewman: Continuation of Evidentiary Hearing (in person) on Movant's Motion to Vacate, Set Aside or Correct Judgment of Conviction and Sentence Pursuant to 28 U.S.C. 2255 held on 7/28/2021. Respondent's Witness: Fletcher Peacock, Movant's Rebuttal witnesses: Julie Harding, Judit Sohr (by telephone) testified. Argument held. The Movant orally amended his Petition to withdraw as to Counts 1 to 4 and seeks only to vacate as to Counts 5 and 6. Movant agreed on the record and the Court found the withdrawal knowing and voluntary. The Court took the matter under advisement. Written order to be issued. Total time in court: 3 hour(s) : 50 minutes. Attorney Appearance(s): Charles Garret White and Marlene C. Montaner for Movant, AUSA Daniel E. Funk for Respondent. Court Reporter: Ellen Rassie, 954-769-5448 / ellen_rassie@flsd.uscourts.gov. (Digital 13:21:37) (kza) (Entered: 07/31/2021) | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Online | 70 | 08/02/2021 | Exhibit List by United States Of America.. (Attachments: # 1 Exhibit 2, # 2 Exhibit 4, # 3 Exhibit 5, # 4 Exhibit 6, # 5 Exhibit 7, # 6 Exhibit 8, # 7 Exhibit 9, # 8 Exhibit 10, # 9 Exhibit 11, # 10 Exhibit 12, # 11 Exhibit 13, # 12 Exhibit 14, # 13 Exhibit 15, # 14 Exhibit 16)(Funk, Daniel) (Entered: 08/02/2021) | |
| ☐ | Online | 71 | 08/02/2021 | CERTIFICATE of Compliance Re Admitted Evidence for exhibit(s): 2,4-16 by Daniel E. Funk on behalf of United States Of America (Funk, Daniel) (Entered: 08/02/2021) | |
| ☐ | Free | 72 | 08/13/2021 | MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION REGARDING MOVANT'S MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE [DE 1]: Recommending that the Motion to Vacate be DENIED. Objections to R&R due by 8/20/2021. Signed by Magistrate Judge William Matthewman on 8/13/2021. See attached document for full details. (kza) (Entered: 08/13/2021) | |
| ☐ | Online | 73 | 08/20/2021 | First MOTION for Extension of Time to File Response/Reply/Answer as to 72 REPORT and RECOMMENDATIONS on 28 USC 2255 case re 1 Motion (Complaint) to Vacate/Set Aside/Correct Sentence (2255) filed by Michael Edwin Harding Recommending that the Motion to Vacate be DENIED.. by Michael Edwin Harding. (Montaner, Marlene) (Entered: 08/20/2021) | |
| ☐ | Online | 74 | 08/20/2021 | Agreed MOTION for Extension of Time to file Objections to Report and Recommendation of Magistrate Judge Recommending Motion to Vacate, Set Aside or Correct Illegal Sentence Pursuant to 28 U.S.C. Section 2255 Be Denied re 72 REPORT AND RECOMMENDATIONS on 28 USC 2255 case re 1 Motion (Complaint) to Vacate/Set Aside/Correct Sentence (2255) filed by Michael Edwin Harding Recommending that the Motion to Vacate be DENIED.. by Michael Edwin Harding. Responses due by 9/3/2021 (Attachments: # 1 Text of Proposed Order)(White, Charles) (Entered: 08/20/2021) | |
| ☐ | | 75 | 08/23/2021 | PAPERLESS ORDER granting in part and denying in part 74 Motion for Extension of Time. Movant seeks a 30-day extension of the August 20 deadline to file objections to the Report and Recommendation at docket entry 72 to enable Movant to obtain copies of the transcripts from the July 27 and 28 evidentiary hearings. The Court has communicated with the court reporter, who has represented that, provided she receives payment, she will endeavor to deliver the transcripts during the week of August 30. In light of that representation, Movant is granted an extension to September 13, 2021, to file objections to the Report and Recommendation. Signed by Judge Robin L. Rosenberg on 8/23/2021. (sk01) (Entered: 08/23/2021) | |
| ☐ | Free | 76 | 08/30/2021 | TRANSCRIPT of Evidentiary Hearing held on 07/27/2021 before Magistrate Judge William Matthewman, Volume Number 1 of 1, 1-160 pages, Court Reporter: Ellen Rassie, 954-769-5448 / ellen_rassie@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/20/2021. Redacted Transcript Deadline set for 9/30/2021. Release of Transcript Restriction set for 11/29/2021. (Rassie, Ellen) (Entered: 08/30/2021) | |
| ☐ | Free | 77 | 08/30/2021 | TRANSCRIPT of Continued Evidentiary Hearing held on 07/28/2021 before Magistrate Judge William Matthewman, Volume Number 1 of 1, 1-173 pages, Court Reporter: Ellen Rassie, 954-769-5448 / ellen_rassie@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/20/2021. Redacted Transcript Deadline set for 9/30/2021. Release of Transcript Restriction set for 11/29/2021. (Rassie, Ellen) (Entered: 08/30/2021) | |
| ☐ | Online | 78 | 09/10/2021 | Agreed MOTION for Extension of Time to File Objections to R&R of Magistrate Judge Recommending that Motion to Vacate, Set Aside or Correct Illegal Sentence pursuant to 28 U.S.C. Section 2255 Be Denied re 72 REPORT AND RECOMMENDATIONS on 28 USC 2255 case re 1 Motion (Complaint) to Vacate/Set Aside/Correct Sentence (2255) filed by Michael Edwin Harding Recommending that the Motion to Vacate be DENIED.. by Michael Edwin Harding. Responses due by 9/24/2021 (Attachments: # 1 Text of Proposed Order)(White, Charles) (Entered: 09/10/2021) | |
| ☐ | | 79 | 09/13/2021 | PAPERLESS ORDER granting in part and denying in part 78 Motion for Further Extension of Time to File Objections to 72 Report and Recommendation. Movant is granted an extension to September 24, 2021, | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | to file any objections to the Report and Recommendation. The Court will grant no further extensions of this deadline. Signed by Judge Robin L. Rosenberg on 9/13/2021. (sk01) (Entered: 09/13/2021) | |
| ☐ | Free | 80 | 09/24/2021 | OBJECTIONS to 72 Report and Recommendations of Magistrate Judge that Movant's Motion to Vacate, Set Aside and Correct Illegal Sentence be DENIED by Michael Edwin Harding. (White, Charles) (Entered: 09/24/2021) | |
| ☐ | Online | 81 | 09/27/2021 | Agreed MOTION Permit Filing of Oversize Objections to 72 Report and Recommendation of Magistrate Judge by Michael Edwin Harding. (Attachments: # 1 Text of Proposed Order)(White, Charles) Modified to add Link on 9/27/2021 (cds). (Entered: 09/27/2021) | |
| | | 82 | 09/27/2021 | Clerks Notice to Filer re 81 Agreed MOTION Permit Filing of Oversize Objections to Report and Recommendation of Magistrate Judge . Document Not Linked; ERROR - The filed document was not linked to the related docket entry. The correction was made by the Clerk. It is not necessary to refile this document. (cds) (Entered: 09/27/2021) | |
| | | 83 | 09/27/2021 | PAPERLESS ORDER granting 81 Movant's Unopposed Motion to file Objections in excess of the page limitations. The Court accepts the Movant's Objections filed at docket entry 80 . Signed by Judge Robin L. Rosenberg on 9/27/2021. (sk01) (Entered: 09/27/2021) | |
| ☐ | Free | 84 | 09/27/2021 | ORDER ADOPTING REPORT AND RECOMMENDATIONS, DENYING 1 Motion (Complaint) to Vacate/Set Aside/Correct Sentence (2255). Certificate of Appealability: DENIED. Closing Case. Signed by Judge Robin L. Rosenberg on 9/27/2021. See attached document for full details. (cds) (Entered: 09/28/2021) | |
| ☐ | Free | 85 | 11/26/2021 | Notice of Appeal as to 84 Order Adopting Report and Recommendations,, Order on Report and Recommendations, by Michael Edwin Harding. Filing fee $ 505.00 receipt number AFLSDC-15201331. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under Transcript Information. (Klugh, Richard) (Entered: 11/26/2021) | |
| | | | 11/29/2021 | Transmission of Notice of Appeal, Order under appeal and Docket Sheet to US Court of Appeals re 85 Notice of Appeal, Notice has been electronically mailed. (A certificate of appealability SHALL NOT ISSUE per DE 84 Order.) (apz) (Entered: 11/29/2021) | |
| ☐ | Online | 86 | 12/01/2021 | Acknowledgment of Receipt of NOA from USCA re 85 Notice of Appeal, filed by Michael Edwin Harding. Date received by USCA: 11/29/21. USCA Case Number: 21-14133-E. (hh) (Entered: 12/01/2021) | |
| | | 87 | 02/27/2023 | Pursuant to 11th Cir. R. 11-2 and 11th Cir. R. 11-3, the Clerk of the District Court for the Southern District of Florida certifies that the record is complete for purposes of this appeal re 85 Notice of Appeal, Appeal No. 21-14133-JJ. The entire record on appeal is available electronically. (jes) (Entered: 02/27/2023) | |



Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

LexisNexis®

About        Cookie Policy

Privacy Policy      Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

TAB B

 CourtLink (Dockets)             Client: -None-⌄    History    Help    More

**Document:**                  2:15cr14057, USA v. Harding                  Actions⌄

🖶  ✉  ⬇  ⎙  [Go to ⌄]  🔔                                    ‹ **1** of 3  |  Results list ›

## 2:15cr14057, USA v. Harding

US District Court Criminal Docket

United States District Court, Florida Southern

(Ft Pierce)

**This case was retrieved on 03/14/2023**

### ▼ Header

**Date Filed:** 10/01/2015                                    **Class Code:** Closed
**Other Docket:** Magistrate judge case number: 2:15mj00124              **Closed:** 05/31/2016

### ▼ Participants

### Defendant

| Name | Attorneys |
|---|---|
| Michael Edwin Harding | Fletcher Peacock |
| Appeals court case number: 16-13617-G 08543-104 English; YOBLEAD ATTORNEY;ATTORNEY TO BE NOTICED | |
| 1987 | Federal Public Defender's Office |
| *TERMINATED: 05/31/2016* | 109 North 2nd Street |
| | Fort Pierce, FL 34950 |
| | USA |
| | fletcher_peacock@fd.org |
| | 772-489-2123Fax: 772-489-3997Designation: Public Defender Appointment |

### Charges                                    Disposition

**Complaints:** 18:2252A.F Receiving and Distributing material involving sexual exploitation of minors and Possession of child pornography
**Pending:** 18:2252A.F ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO(1ss-4ss)

Imprisonment: Life, the term consists of 240 months as to each of Counts One through Four, life as to Count Five and 360 months as to Count Six. All Counts to be served concurrently. Supervised Release: Life as to Counts One through Six, concurrently; Special Assessment: $600.00 and Special Conditions as noted in Part G of the PSI. Restitution to be determined.

18:2422.F COERCION OR ENTICEMENT OF FEMALE(5ss)
18:2251.F SEXUAL EXPLOITATION OF CHILDREN(6ss)
**Offense Level (Opening):** Felony
**Terminated:** 18:2252A.F ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO(1-6)

CONSTITUTING/CONTAINING CHILD PORNO(1s-6s)

18:2422.F COERCION OR ENTICEMENT OF FEMALE(7s)

**Offense Level (Terminated):** Felony

**Case Assigned To:** Judge Robin L. Rosenberg

**Case Referred To:** Ch. Magistrate Judge Frank J. Lynch, Jr

## ▼U.S. Attorneys

Daniel E. Funk
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Attorney's Office
101 S. U.S. Highway 1
Fort Pierce, FL 34950
USA
daniel.funk@usdoj.gov
305-905-7509Fax: 772-466-1020Designation: Retained

Russell R. Killinger
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
United States Attorney's Office
101 South U.S. Hwy 1 Suite 3100
Fort Pierce, FL 34950
USA
772-466-0899Fax: 772-595-3606

Antonia J. Barnes
ATTORNEY TO BE NOTICED
United States Attorney's Office
500 South Australian Avenue Suite 400
West Palm Beach, FL 33401
USA
antonia.barnes@usdoj.gov
561-820-8711Fax: 655-9785

## ▼Proceedings

**Retrieve Document(s)**

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Free | 1 | 09/22/2015 | COMPLAINT as to Michael Edwin Harding (1). (cga)[2:15-mj-00124-FJL] (Additional attachment(s) added on 7/1/2019: # 1 Unredacted Criminal Complaint 15-124-FJL) (cga) (Entered: 09/22/2015) | |
| | | | 09/22/2015 | SYSTEM ENTRY - Docket Entry 2 restricted/sealed until further notice. (cga) [2:15-mj-00124-FJL] (Entered: 09/22/2015) | |
| | | 3 | 09/22/2015 | NOTICE OF HEARING as to Michael Edwin Harding Initial Appearance set for 9/23/2015 09:30 AM in Fort Pierce Division before FTP Duty Magistrate, Ch. Magistrate Judge Lynch. (cga) [2:15-mj-00124-FJL] (Entered: 09/22/2015) | |
| | | | 09/22/2015 | Arrest of Michael Edwin Harding (cga) [2:15-mj-00124-FJL] (Entered: 09/23/2015) | |
| ☐ | Online | 4 | 09/23/2015 | Minute Entry for proceedings held before Ch. Magistrate Judge Frank J. Lynch, Jr: Initial Appearance as to Michael Edwin Harding held on 9/23/2015. Date of Arrest: 9/22/2015. (Preliminary Hearing/Arraignment set for 10/2/2015 09:30 AM and Detention Hearing set for 9/30/2015 09:30 AM in Fort Pierce Division) Court orders Deft temporary detained as risk of flight and danger to community. Attorney added: Fletcher Peacock for Michael Edwin Harding (Digital 09.31.31) (cga) [2:15-mj-00124-FJL] (Entered: 09/23/2015) | |
| ☐ | Online | 5 | 09/23/2015 | Order on Initial Appearance as to Michael Edwin Harding for proceeding held on 9/23/2015. Signed by Ch. Magistrate Judge Frank J. Lynch, Jr on 9/23/2015. (cga) [2:15-mj-00124-FJL] (Entered: 09/23/2015) | |
| ☐ | Online | 6 | 09/23/2015 | Report Commencing Criminal Action as to Michael Edwin Harding - YOB: **/**/1987 Prisoner #: 08543-104 (cga) [2:15-mj-00124-FJL] (Entered: | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | 09/23/2015) | |
| ☐ | Free | 7 | 09/24/2015 | Notice of Assignment of Assistant Federal Public Defender as to Michael Edwin Harding. Attorney Fletcher Peacock added. (Peacock, Fletcher) [2:15-mj-00124-FJL] (Entered: 09/24/2015) | |
| ☐ | Online | 8 | 09/24/2015 | Invocation of Right to Silence and Counsel by Michael Edwin Harding (Peacock, Fletcher) [2:15-mj-00124-FJL] (Entered: 09/24/2015) | |
| ☐ | Online | 9 | 09/25/2015 | Arrest Warrant returned executed on 9/22/2015 as to Michael Edwin Harding (cga) [2:15-mj-00124-FJL] (Entered: 09/25/2015) | |
| ☐ | Free | 10 | 09/30/2015 | Minute Entry for proceedings held before Ch. Magistrate Judge Frank J. Lynch, Jr: Detention Hearing as to Michael Edwin Harding held on 9/30/2015 Court orders Defendant pretrial detained as risk of flight and danger to community(written order to follow) (Digital 09.30.16) (cga) [2:15-mj-00124-FJL] (Entered: 09/30/2015) | |
| ☐ | Free | 11 | 09/30/2015 | ORDER OF DETENTION as to Michael Edwin Harding Signed by Ch. Magistrate Judge Frank J. Lynch, Jr on 9/30/2015. (cga) [2:15-mj-00124-FJL] (Entered: 09/30/2015) | |
| ☐ | Free | 12 | 10/01/2015 | INDICTMENT as to Michael Edwin Harding (1) count(s) 1-6 and Forfeiture. (cga) (Additional attachment(s) added on 7/1/2019: # 1 Restricted Unredacted Indictment) (cga). (Entered: 10/01/2015) | |
| ☐ | Online | 13 | 10/02/2015 | Minute Entry for proceedings held before Ch. Magistrate Judge Frank J. Lynch, Jr: ARRAIGNMENT as to Michael Edwin Harding (1) Count 1-6 held on 10/2/2015 (Digital 09.31.33) (cga) (Entered: 10/02/2015) | |
| | | 14 | 10/02/2015 | PAPERLESS STANDING DISCOVERY ORDER as to Michael Edwin Harding: The defendant(s) having been arraigned this date in open Court, it is Ordered that within 14 days of the date of this order that all parties to this action shall review and comply with Southern District of Florida Local Rules 88.10 (Criminal Discovery), and 88.9(c) (Motions in Criminal Cases). Upon a sufficient showing, the Court may at any time, upon a properly filed motion, order that the discovery or inspection provided for by this Standing Order be denied, restricted or deferred, or make such other order as is appropriate. It is expected by the Court, however, that counsel for both sides shall make a good faith effort to comply with the letter and spirit of this Standing Order. It shall be the continuing duty of counsel for both sides to immediately reveal to opposing counsel all newly discovered information or other material within the scope of Local Rule 88.10. Signed by Ch. Magistrate Judge Frank J. Lynch, Jr on 10/2/2015. (cga) (Entered: 10/02/2015) | |
| ☐ | Online | 15 | 10/02/2015 | ORDER Re: Status Report, Speedy Trial and Pretrial Matters as to Michael Edwin Harding. Signed by Ch. Magistrate Judge Frank J. Lynch, Jr on 10/2/2015. (cga) (Entered: 10/02/2015) | |
| ☐ | Free | 16 | 10/15/2015 | SUPERSEDING INDICTMENT as to Michael Edwin Harding (1) count(s) 1s-6s, 7s and Forfeiture. (cga) (Additional attachment(s) added on 7/1/2019: # 1 Restricted Unredacted Indictment) (cga). (Entered: 10/15/2015) | |
| ☐ | Free | 17 | 10/16/2015 | First RESPONSE to Standing Discovery Order by USA as to Michael Edwin Harding (Funk, Daniel) (Entered: 10/16/2015) | |
| | | 18 | 10/19/2015 | NOTICE OF HEARING as to Michael Edwin Harding: Arraignment on Superseding Indictment 16 set for Thursday, 10/22/2015 at 1:30 PM, King Bldg., 99 NE 4th Street, 11th Floor, Courtroom 3 in Miami Division before MIA Duty Magistrate Jonathan Goodman. (lw1) (Entered: 10/19/2015) | |
| ☐ | Free | 19 | 10/19/2015 | Second RESPONSE to Standing Discovery Order by USA as to Michael Edwin Harding (Funk, Daniel) (Entered: 10/19/2015) | |
| ☐ | Online | 20 | 10/19/2015 | STATUS REPORT JOINT by USA as to Michael Edwin Harding (Funk, Daniel) (Entered: 10/19/2015) | |
| ☐ | Online | 21 | 10/19/2015 | ORDER SETTING TRIAL DATE as to Michael Edwin Harding: Calendar Call set for 11/4/2015 09:00 AM in Fort Pierce Division before Judge Robin L. Rosenberg. Jury Trial set for 11/16/2015 09:00 AM in Fort Pierce Division before Judge Robin L. Rosenberg. Signed by Judge Robin L. Rosenberg on 10/19/2015. (lh) (Entered: 10/19/2015) | |
| ☐ | Online | 22 | 10/20/2015 | AMENDED ORDER SETTING TRIAL DATE as to Michael Edwin Harding, ( Calendar Call set for 11/4/2015 09:00 AM in Fort Pierce Division before Judge Robin L. Rosenberg., Jury Trial set for 11/16/2015 09:00 AM in Fort Pierce Division before Judge Robin L. Rosenberg.) Signed by Judge Robin L. Rosenberg on 10/20/2015. (ots) (Entered: 10/21/2015) | |
| ☐ | Online | 23 | 10/22/2015 | Minute Order for proceedings held before Magistrate Judge Jonathan Goodman: ARRAIGNMENT as to Michael Edwin Harding (1) Count 1s-6s,7s held on 10/22/2015. (Digital 14:28:03) PAPERLESS STANDING | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | DISCOVERY ORDER: The defendant(s) having been arraigned this date in open Court, it is Ordered that within 14 days of the date of this order that all parties in this action shall review and comply with Southern District of Florida Local Rules 88.10 (Criminal Discovery), and 88.9(c) (Motions in Criminal Cases). Upon a sufficient showing, the Court may at any time, upon a properly filed motion, order that the discovery or inspection provided for by this Standing Order be denied, restricted or deferred, or make such other order as is appropriate. It is expected by the Court, however, that counsel for both sides shall make a good faith effort to comply with the letter and spirit of this Standing Order. It shall be the continuing duty of counsel for both sides to immediately reveal to opposing counsel all newly discovered information or other material within the scope of Local Rule 88.10. Signed by Magistrate Judge Jonathan Goodman on 10/22/2015. (wc) (Entered: 10/23/2015) | |
| ☐ | Online | 24 | 10/29/2015 | STATUS REPORT JOINT by USA as to Michael Edwin Harding (Funk, Daniel) (Entered: 10/29/2015) | |
| | | 25 | 11/02/2015 | PAPERLESS NOTICE OF HEARING **TIME CHANGE ONLY** as to Michael Edwin Harding Calendar Call set for 11/4/2015 08:45 AM in West Palm Beach Division before Judge Robin L. Rosenberg.Counsels who wish to appear via telephone shall call the toll-free number 1-877-873-8018 from a landline phone, five (5) minutes prior to the start of the calendar call.a.Enter Access Code Number 9890482 followed by the # sign,b.Enter Security Code Number 4008 followed by the # sign,c.State your name, the name of the party you represent and enter the conference.(mno) (Entered: 11/02/2015) | |
| ☐ | Online | 26 | 11/02/2015 | Joint MOTION to Continue Trial by Michael Edwin Harding. Responses due by 11/19/2015 (Peacock, Fletcher) (Entered: 11/02/2015) | |
| | | 27 | 11/02/2015 | PAPERLESS ORDER Granting 26 Motion to Continue Trial as to Michael Edwin Harding (1). Calendar Call set for 12/2/2015 09:00 AM in Fort Pierce Division before Judge Robin L. Rosenberg. Jury Trial set for 12/7/2015 09:00 AM in West Palm Beach Division before Judge Robin L. Rosenberg. Defense will file Waiver of Speedy within two (2) days of this Order. Parties shall file an updated Joint Status Report five (5) days prior to the Calendar Call. Signed by Judge Robin L. Rosenberg on 11/2/2015. (mno) (Entered: 11/02/2015) | |
| ☐ | Free | 28 | 11/05/2015 | MOTION to Dismiss 16 Indictment Or Merge Counts 4, 5 and 6 Due to Multiplicity by Michael Edwin Harding. Responses due by 11/23/2015 (Peacock, Fletcher) (Entered: 11/05/2015) | |
| ☐ | Online | 29 | 11/06/2015 | ORDER Directing Expedited Response and Reply as to Michael Edwin Harding re 28 MOTION to Dismiss 16 Indictment Or Merge Counts 4, 5 and 6 Due to Multiplicity filed by Michael Edwin Harding, as to 28 MOTION to Dismiss 16 Indictment Or Merge Counts 4, 5 and 6 Due to Multiplicity. ( Responses due by 11/13/2015, Replies due by 11/18/2015.) Signed by Ch. Magistrate Judge Frank J. Lynch, Jr on 11/5/2015. (cqs) (Entered: 11/06/2015) | |
| ☐ | Online | 30 | 11/12/2015 | RESPONSE to Motion by USA as to Michael Edwin Harding re 28 MOTION to Dismiss 16 Indictment Or Merge Counts 4, 5 and 6 Due to Multiplicity Replies due by 11/23/2015. (Funk, Daniel) (Entered: 11/12/2015) | |
| ☐ | Online | 31 | 11/12/2015 | ORDER DIRECTING EXPEDITED RESPONSE FROM FEDERAL PUBLIC DEFENDER as to Michael Edwin Harding re 30 Motion to deny Defendant's Motion to Dismiss or merge counts 4,5 and 6 filed by USA ( Response due no later than 3:00 p.m., Friday,11/13/2015) Signed by Ch. Magistrate Judge Frank J. Lynch, Jr on 11/12/2015. (cga) (Entered: 11/12/2015) | |
| ☐ | Free | 32 | 11/12/2015 | SECOND SUPERSEDING INDICTMENT as to Michael Edwin Harding (1) count(s) 1ss-4ss, 5ss, 6ss and Forfeiture. (cga) (Additional attachment(s) added on 7/1/2019: # 1 Restricted Unredacted Indictment) (cga). (Entered: 11/12/2015) | |
| ☐ | Online | 33 | 11/12/2015 | RESPONSE/REPLY by Michael Edwin Harding to 30 Response to Motion to Deny as Moot Defendant's Motion to Dismiss or Merge Counts 4, 5and 6 Due to Multiplicity (Peacock, Fletcher) (Entered: 11/12/2015) | |
| ☐ | Free | 34 | 11/13/2015 | REPORT AND RECOMMENDATIONS as to Michael Edwin Harding re 28 MOTION to Dismiss Indictment Or Merge Counts 4, 5 and 6 Due to Multiplicity and 30 Response to Motion to Dismiss Indictment. Objections to R&R due by 11/30/2015 Signed by Ch. Magistrate Judge Frank J. Lynch, Jr on 11/13/2015. (cga) (Entered: 11/13/2015) | |
| ☐ | Free | 35 | 11/16/2015 | Third RESPONSE to Standing Discovery Order by USA as to Michael Edwin Harding (Funk, Daniel) (Entered: 11/16/2015) | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | 36 | 11/18/2015 | NOTICE OF HEARING as to Michael Edwin Harding. Arraignment on Second Superseding Indictment set for 11/20/2015 01:30 PM in Miami Division before MIA Duty Magistrate. (Defendant is being housed at FDC-Miami)(mdc) (Entered: 11/18/2015) | |
| ☐ | Online | 37 | 11/18/2015 | NOTICE OF FILING by Michael Edwin Harding (Attachments: # 1 Written Waiver of Speedy Trial)(Peacock, Fletcher) (Entered: 11/18/2015) | |
| | | 38 | 11/18/2015 | WAIVER of Speedy Trial by Michael Edwin Harding (lh)see DE# 37 for image (Entered: 11/19/2015) | |
| | | 39 | 11/18/2015 | Clerks Notice to Filer re 37 Notice (Other). Wrong Event Selected; ERROR - The Filer selected the wrong event. The document was re-docketed by the Clerk, see [de#38]. It is not necessary to reflie this document. (lh) (Entered: 11/19/2015) | |
| ☐ | Online | 40 | 11/20/2015 | STATUS REPORT Defendant's by Michael Edwin Harding (Peacock, Fletcher) (Entered: 11/20/2015) | |
| ☐ | Free | 41 | 11/20/2015 | Minute Order for proceedings held before Magistrate Judge Andrea M. Simonton: ARRAIGNMENT as to Michael Edwin Harding (1) Count 1ss-4ss,5ss,6ss held on 11/20/2015 (Digital 13:43:14) PAPERLESS STANDING DISCOVERY ORDER: The defendant(s) having been arraigned this date in open Court, it is Ordered that within 14 days of the date of this order that all parties to this action shall review and comply with Southern District of Florida Local Rules 88.10 (Criminal Discovery), and 88.9(c) (Motions in Criminal Cases). Upon a sufficient showing, the Court may at any time, upon a properly filed motion, order that the discovery or inspection provided for by this Standing Order be denied, restricted or deferred, or make such other order as is appropriate. It is expected by the Court, however, that counsel for both sides shall make a good faith effort to comply with the letter and spirit of this Standing Order. It shall be the continuing duty of counsel for both sides to immediately reveal to opposing counsel all newly discovered information or other material within the scope of Local Rule 88.10. Signed by Magistrate Judge Andrea M. Simonton on 11/20/2015. (sl) (Entered: 11/23/2015) | |
| ☐ | Online | 42 | 11/30/2015 | MOTION to Continue Trial by Michael Edwin Harding. Responses due by 12/17/2015 (Peacock, Fletcher) (Entered: 11/30/2015) | |
| ☐ | Free | 43 | 12/01/2015 | MOTION in Limine by USA as to Michael Edwin Harding. Attorney Russell R. Killinger added to party USA(pty:pla). Responses due by 12/18/2015 (Attachments: # 1 Exhibit A-Declaration of Custodian of Records AT&amp;T, # 2 Exhibit B-Declaration of Custodian of Records AT&amp;T, # 3 Exhibit C-Declaration of Custodian of Records Kik)(Killinger, Russell) (Entered: 12/01/2015) | |
| | | 44 | 12/01/2015 | PAPERLESS ORDER ADOPTING REPORT AND RECOMMENDATION as to Michael Edwin Harding. No objections to the Report and Recommendation 34 have been filed, the Court has nonetheless conducted a review of the Report and Recommendation and the record and adopts the Report and Recommendation denying as moot 28 Defendant's MOTION to Dismiss and granting 30 Government's Motion to Deny. Signed by Judge Robin L. Rosenberg on 12/1/2015. (lw1) (Entered: 12/01/2015) | |
| ☐ | Online | 45 | 12/01/2015 | Proposed Voir Dire Questions by USA as to Michael Edwin Harding (Funk, Daniel) (Entered: 12/01/2015) | |
| | | 46 | 12/02/2015 | PAPERLESS MINUTE ORDER for proceedings held before Judge Robin L. Rosenberg: Calendar Call as to Michael Edwin Harding held on 12/2/2015 granting 42 Motion to Continue Trial as to Michael Edwin Harding (1). For the reasons stated in the motion and articulated in court, the Court finds that the interests of justice outweigh the demands of the Speedy Trial Act. Therefore,IT IS FURTHER AND ADJUDGED that the time between 11/30/15 and 1/25/16 is hereby excluded from the Speedy Trial Act. (Calendar Call reset for 1/20/2016 at 9:00 AM in Fort Pierce Division before Judge Robin L. Rosenberg., Jury Trial reset for 1/25/2016 at 9:00 AM in Fort Pierce Division before Judge Robin L. Rosenberg.). **Counsel who wish to appear at calendar call via telephone shall call the toll-free number 1-877-873-8018 from a landline phone, five (5) minutes prior to the start of the calendar call. a) Enter Access Code Number 9890482 followed by the # sign, b) Enter Security Code Number 4008 followed by the # sign, c) State your name, the name of the party you represent and enter the conference**. Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. Signed by Judge Robin L. Rosenberg. Text modified 12/3/2015 (lw1). (Entered: 12/03/2015) | |
| | | 47 | 12/11/2015 | PAPERLESS ORDER OF REFERRAL TO MAGISTRATE JUDGE as to Michael Edwin Harding. Pursuant to 28 U.S.C. § 636 and the Magistrate | |

| Availability | | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | Rules of the Local Rules of the Southern District of Florida, this matter is hereby referred to Ch. United States Magistrate Judge Frank J. Lynch, Jr. to take all necessary and proper action as required by law and/or to submit a Report and Recommendation to this Court regarding 43 MOTION in Limine filed by USA. Motion referred to Ch. Magistrate Judge Frank J. Lynch, Jr. **Please Note: Trial is currently set for 1/25/16** Signed by Judge Robin L. Rosenberg on 12/11/2015. (lw1). (Entered: 12/12/2015) | |
| ☐ | Online | 48 | 12/14/2015 | RESPONSE to Motion by Michael Edwin Harding re 43 MOTION in Limine Replies due by 12/24/2015. (Peacock, Fletcher) (Entered: 12/14/2015) | |
| ☐ | Free | 49 | 12/14/2015 | Supplemental RESPONSE to Standing Discovery Order by USA as to Michael Edwin Harding (Funk, Daniel) (Entered: 12/14/2015) | |
| ☐ | Online | 50 | 12/15/2015 | ORDER granting 43 Motion in Limine as to Michael Edwin Harding (1). Signed by Ch. Magistrate Judge Frank J. Lynch, Jr on 12/15/2015. (cga) (Entered: 12/15/2015) | |
| ☐ | Free | 51 | 12/30/2015 | Fifth RESPONSE to Standing Discovery Order by USA as to Michael Edwin Harding (Funk, Daniel) (Entered: 12/30/2015) | |
| ☐ | Online | 52 | 12/30/2015 | NOTICE OF ATTORNEY APPEARANCE Russell R. Killinger appearing for USA. (Killinger, Russell) (Entered: 12/30/2015) | |
| ☐ | Online | 53 | 12/30/2015 | MOTION in Limine To Admit Business Records Pursuant to Federal Rules of Evidence 902(11) & 803(6) by USA as to Michael Edwin Harding. Responses due by 1/19/2016 (Attachments: # 1 Exhibit A-Business Records Certification)(Killinger, Russell) (Entered: 12/30/2015) | |
| | | 54 | 12/30/2015 | PAPERLESS ORDER REFERRING 53 MOTION in Limine To Admit Business Records Pursuant to Federal Rules of Evidence 902(11) & 803(6) filed by USA. Motion referred to Ch. Magistrate Judge Frank J. Lynch, Jr. **Please Note: Trial is currently set for 1/25/16**. Signed by Judge Robin L. Rosenberg on 12/30/2015. Modified text on 12/30/2015 (lw1). (Entered: 12/30/2015) | |
| ☐ | Online | 55 | 01/05/2016 | RESPONSE to Motion by Michael Edwin Harding re 53 MOTION in Limine To Admit Business Records Pursuant to Federal Rules of Evidence 902(11) & 803(6) Replies due by 1/15/2016. (Peacock, Fletcher) (Entered: 01/05/2016) | |
| ☐ | Online | 56 | 01/05/2016 | ORDER granting 53 Motion in Limine as to Michael Edwin Harding (1). Signed by Ch. Magistrate Judge Frank J. Lynch, Jr on 1/5/2016. (lh) (Entered: 01/05/2016) | |
| ☐ | Free | 57 | 01/06/2016 | Sixth RESPONSE to Standing Discovery Order by USA as to Michael Edwin Harding (Killinger, Russell) (Entered: 01/06/2016) | |
| ☐ | Free | 58 | 01/11/2016 | Seventh RESPONSE to Standing Discovery Order by USA as to Michael Edwin Harding (Killinger, Russell) (Entered: 01/11/2016) | |
| ☐ | Online | 59 | 01/14/2016 | MOTION in Limine to Admit Evidence Pursuant to Federal Rules of Evidence 401, 403, and 404(b) by USA as to Michael Edwin Harding. Responses due by 2/1/2016 (Killinger, Russell) (Entered: 01/14/2016) | |
| | | 60 | 01/14/2016 | PAPERLESS ORDER REFERRING 59 MOTION in Limine to Admit Evidence Pursuant to Federal Rules of Evidence 401, 403, and 404(b) filed by USA. Motion referred to Ch. Magistrate Judge Frank J. Lynch, Jr. Please note: Trial is currently set for 1/25/16. Signed by Judge Robin L. Rosenberg on 1/14/2016. (lw1) (Entered: 01/14/2016) | |
| ☐ | Free | 61 | 01/15/2016 | REPORT AND RECOMMENDATIONS as to Michael Edwin Harding re 59 MOTION in Limine to Admit Evidence Pursuant to Federal Rules of Evidence 401, 403, and 404(b) Recommending that the motion be denied without prejudice. Objections to R&R due by 1/20/2016, Signed by Ch. Magistrate Judge Frank J. Lynch, Jr on 1/15/2016. (lh) (Entered: 01/15/2016) | |
| ☐ | Free | 62 | 01/19/2016 | Eighth RESPONSE to Standing Discovery Order by USA as to Michael Edwin Harding (Funk, Daniel) (Entered: 01/19/2016) | |
| ☐ | Online | 63 | 01/19/2016 | Unopposed MOTION to Continue Trial Or In The Alternative Exclude DNA Evidence by Michael Edwin Harding. Responses due by 2/5/2016 (Peacock, Fletcher) (Entered: 01/19/2016) | |
| | | 64 | 01/20/2016 | PAPERLESS MINUTE ORDER for proceedings held before Judge Robin L. Rosenberg: Calendar Call as to Michael Edwin Harding held on 1/20/2016 granting in part Defendant's 63 Unopposed Motion to Continue Trial as to Michael Edwin Harding (1). For the reasons stated in the motion and articulated in court, the Court finds that the interests of justice outweigh the demands of the Speedy Trial Act. Therefore,IT IS FURTHER AND ADJUDGED that the time between 1/19/16 and 2/22/16 is hereby excluded from the Speedy Trial Act calculations. (Calendar Call reset for 2/17/2016 at 9:00 AM in Fort Pierce Division before Judge Robin L. Rosenberg.; Jury | |

| Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|
| | | | Trial reset for 2/22/2016 at 9:00 AM in Fort Pierce Division before Judge Robin L. Rosenberg). **Counsel who wish to appear at calendar call via telephone shall call the toll-free number 1-877-873-8018 from a landline phone, five (5) minutes prior to the start of the calendar call. a) Enter Access Code Number 9890482 followed by the # sign, b) Enter Security Code Number 4008 followed by the # sign, c) State your name, the name of the party you represent and enter the conference**. Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. Signed by Judge Robin L. Rosenberg on 1/20/2016. (lw1) (Entered: 01/20/2016) | |
| | | 01/20/2016 | Set Hearings as to Michael Edwin Harding: Status Conference set for Wednesday, 2/3/2016 at 9:00 AM in West Palm Beach Division before Judge Robin L. Rosenberg. **Counsel who wish to appear at status conference via telephone shall call the toll-free number 1-877-873-8018 from a landline phone, five (5) minutes prior to the start of the conference. a) Enter Access Code Number 9890482 followed by the # sign, b) Enter Security Code Number 4008 followed by the # sign, c) State your name, the name of the party you represent and enter the conference**. (lw1) (Entered: 01/20/2016) | |
| | 65 | 01/21/2016 | PAPERLESS ORDER ADOPTING 61 REPORT AND RECOMMENDATION as Michael Edwin Harding. THIS MATTER is before the Court on the Report and Recommendation re 59 MOTION in Limine to Admit Evidence Pursuant to Federal Rules of Evidence 401, 403, and 404(b) filed by USA. After review of the Report and Recommendation, review of the record, and having received no objections thereto, it is ORDERED AND ADJUDGED that the Court adopts the Report and Recommendation denying without prejudice Defendant's 59 MOTION in Limine to Admit Evidence Pursuant to Federal Rules of Evidence 401, 403, and 404(b) filed by USA. Signed by Judge Robin L. Rosenberg on 1/21/2016. (lw1) (Entered: 01/21/2016) | |
| ☐ Free | 66 | 01/29/2016 | Ninth RESPONSE to Standing Discovery Order by USA as to Michael Edwin Harding (Funk, Daniel) (Entered: 01/29/2016) | |
| | 67 | 02/03/2016 | PAPERLESS MINUTE ENTRY for proceedings held before Judge Robin L. Rosenberg: Status Conference re: DNA Evidence as to Michael Edwin Harding held on 2/3/2016. **Telephonic Appearances: AUSA Daniel Funk present on behalf of the Government. AFPD Fletcher Peacock present on behalf of the Defendant (presence not required). Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. (lw1) (Entered: 02/03/2016) | |
| | 68 | 02/17/2016 | PAPERLESS MINUTE ENTRY for proceedings held before Judge Robin L. Rosenberg: Calendar Call as to Michael Edwin Harding held on 2/17/2016. Plea and trial related matters addressed. Parties shall continue to confer in an effort to reach resolution prior to trial and shall update the Court on their progress. **Appearances: AUSAs Russell Killinger and Daniel Funk present on behalf of the Government. AFPD Fletcher Peacock present (via phone) on behalf of Defendant Michael Edwin Harding. (lw1) (Entered: 02/18/2016) | |
| | 69 | 02/18/2016 | PAPERLESS NOTICE OF HEARING as to Michael Edwin Harding. Per the Court's request, Telephone Conference set for Friday, 2/19/2016 at 8:30 AM in West Palm Beach Division before Judge Robin L. Rosenberg. **The parties are instructed to please call the toll-free number 1-877-873-8018 from a landline phone, five (5) minutes prior to the start of the conference call. a) Enter Access Code Number 9890482 followed by the # sign, b) Enter Security Code Number 4008 followed by the # sign, c) State your name, the name of the party you represent and enter the conference**. (lw1) (Entered: 02/18/2016) | |
| ☐ Online | 70 | 02/18/2016 | Proposed Jury Instructions by USA as to Michael Edwin Harding (Funk, Daniel) (Entered: 02/18/2016) | |
| ☐ Online | 71 | 02/18/2016 | Witness List by USA as to Michael Edwin Harding (Killinger, Russell) (Entered: 02/18/2016) | |
| ☐ Online | 72 | 02/18/2016 | EXHIBIT LIST by USA as to Michael Edwin Harding (Killinger, Russell) (Entered: 02/18/2016) | |
| | 73 | 02/19/2016 | PAPERLESS MINUTE ENTRY for proceedings held before Judge Robin L. Rosenberg: Telephonic Status Conference as to Michael Edwin Harding held on 2/19/2016. Court to set matter for Change of Plea Hearing via separate Order. Jury trial set for Monday, 2/22/16 is cancelled. **Appearances: AUSAs Russell Killinger and Daniel Funk present (via phone) on behalf of the Government. AFPD Fletcher Peacock present (via phone) on behalf of Defendant Michael Edwin Harding. Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. (lw1) (Entered: 02/19/2016) | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | 74 | 02/19/2016 | PAPERLESS ORDER SETTING CHANGE OF PLEA HEARING as to Michael Edwin Harding. Change of Plea Hearing set for Monday, 2/22/2016 at 9:30 AM in Fort Pierce Division before Judge Robin L. Rosenberg. Signed by Judge Robin L. Rosenberg on 2/19/2016.(lw1) (Entered: 02/19/2016) | |
| | | 75 | 02/19/2016 | PAPERLESS NOTICE RESETTING CHANGE OF PLEA HEARING **TIME CHANGE ONLY** as to Michael Edwin Harding. Change of Plea Hearing reset for Monday, 2/22/2016 at 10:00 AM in Fort Pierce Division before Judge Robin L. Rosenberg. (lw1) (Entered: 02/19/2016) | |
| | | 76 | 02/22/2016 | PAPERLESS MINUTE ENTRY for proceedings held before Judge Robin L. Rosenberg: Change of Plea Hearing as to Michael Edwin Harding held on 2/22/2016. Defendant Michael Edwin Harding sworn during plea colloquy. Ashley Harding sworn & questioned by the Court. No written plea agreement. Factual basis for all counts read into the record by the Government. Michael Edwin Harding (1) Guilty plea entered as to Counts 1ss, 2ss, 3ss & 4ss; Nolo Contendere plea entered as to Counts 5ss & 6ss. **APPEARANCES: AUSAs Daniel Funk and Russell Killinger present on behalf of the Government. AFPD Fletcher Peacock present on behalf of Defendant Michael Edwin Harding who is also present in USM custody. Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. Text modified on 2/22/2016 (lw1). (Entered: 02/22/2016) | |
| | | 77 | 02/22/2016 | PAPERLESS ORDER SETTING DATE, TIME, AND PROCEDURES FOR THE SENTENCING HEARING as to Michael Edwin Harding. The Sentencing Hearing is set for Monday, 5/16/2016 at 9:30 AM for thirty (30) minutes in Fort Pierce Division before Judge Robin L. Rosenberg. The Probation Office shall disclose the Draft PSR no later than 35 days prior to the sentencing hearing. THE COURT ORDERS that if more than thirty (30) minutes is needed for the sentencing hearing, counsel shall file a notice estimating the amount of time needed for the sentencing hearing no later than fourteen (14) calendar days prior to the hearing. THE COURT FURTHER ORDERS that counsel shall file their Objections, and Motions for Departure and/or Variance from the guidelines, if any, to the DRAFT PSR within fourteen (14) days after disclosure of the DRAFT PSR. Responses to the Objections and any Motions for Departure and/or Variance from the guidelines shall be filed seven (7) days thereafter. The Probation Office shall disclose the Final PSR and Addendum no later than (7) days prior to the sentencing hearing. After the FINAL PSR has been disclosed to the parties, or if the PSR is subsequently Revised, or Supplemented, counsel shall file a Notice stating which of the previously filed Objections, if any, have been resolved and which Objections, if any, remain to be resolved by the Court at the sentencing hearing. This Notice shall be filed no later than three (3) days before the sentencing hearing. Signed by Judge Robin L. Rosenberg on 2/22/2016.(lw1) (Entered: 02/22/2016) | |
| | | 78 | 02/23/2016 | Notice of Presentence Investigation Assignment of Michael Edwin Harding to US Probation Officer Edward Cooley in the Fort Pierce Alto Lee Adams, Sr. U.S. Courthouse and he/she can be contacted at 772 467-2367 or Edward_Cooley@flsp.uscourts.gov. (mhz2) (Entered: 02/23/2016) | |
| ☐ | Online | 79 | 03/02/2016 | MOTION for Forfeiture of Property PRELIMINARY ORDER OF FORFEITURE by USA as to Michael Edwin Harding. Attorney Antonia J. Barnes added to party USA(pty:pla). Responses due by 3/21/2016 (Attachments: # 1 Text of Proposed Order (Preliminary Order of Forfeiture)) (Barnes, Antonia) (Entered: 03/02/2016) | |
| ☐ | Online | 80 | 03/02/2016 | PRELIMINARY ORDER OF FORFEITURE as to Michael Edwin Harding (1). Signed by Judge Robin L. Rosenberg on 3/2/2016. (lw1) (Entered: 03/02/2016) | |
| ☐ | Online | 81 | 04/05/2016 | Acknowledgment of Service on 03/22/16 by USA as to Michael Edwin Harding re 80 PRELIMINARY ORDER OF FORFEITURE as to Michael Edwin Harding (1). Signed by Judge Robin L. Rosenberg on 3/2/2016. (lw1) Miscellaneous Electronic Equipment (Barnes, Antonia) (Entered: 04/05/2016) | |
| ☐ | Online | 82 | 04/08/2016 | DRAFT Disclosure of Presentence Investigation Report of Michael Edwin Harding. This is a limited access document. Report access provided to attorneys Daniel E. Funk, Fletcher Peacock by USPO (Attachments: # 1 Position of Parties)(mhz2) (Entered: 04/08/2016) | |
| ☐ | Online | 83 | 04/12/2016 | SERVICE (Proof) by Publication by USA as to Michael Edwin Harding Last Publication date 4/3/2016. Claims/Positions/Written Defenses/Answers/etc., | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | due by 5/6/2016. (Attachments: # 1 Advertisement and Certification Report) (Barnes, Antonia) (Entered: 04/12/2016) | |
| ☐ | Free | 84 | 04/13/2016 | Letter re Sentencing from Judit Sohr as to Michael Edwin Harding (lh) (Entered: 04/13/2016) | |
| ☐ | Free | 85 | 04/22/2016 | OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT by USA as to Michael Edwin Harding (Funk, Daniel) (Entered: 04/22/2016) | |
| ☐ | Free | 86 | 04/26/2016 | OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT by Michael Edwin Harding (Peacock, Fletcher) (Entered: 04/26/2016) | |
| ☐ | Online | 87 | 05/09/2016 | FINAL Addendum 1 Disclosure of Presentence Investigation Report of Michael Edwin Harding. This is a limited access document. Report access provided to attorneys Daniel E. Funk, Fletcher Peacock by USPO (Attachments:(# 1) Addendum,# 2 Objections by Defendant,# 3 Government's Objections)(bma) (Entered: 05/09/2016) | |
| ☐ | Free | 88 | 05/09/2016 | NOTICE OF FILING by Michael Edwin Harding (Attachments: # 1 Letters of Consideration)(Peacock, Fletcher) (Entered: 05/09/2016) | |
| | | | 05/10/2016 | SYSTEM ENTRY - Docket Entry 89 restricted/sealed until further notice. (cga) (Entered: 05/10/2016) | |
| | | | 05/10/2016 | SYSTEM ENTRY - Docket Entry 90 restricted/sealed until further notice. (cga) (Entered: 05/10/2016) | |
| ☐ | Free | 92 | 05/11/2016 | MOTION for Downward Departure by Michael Edwin Harding. Responses due by 5/31/2016 (Peacock, Fletcher) (Entered: 05/11/2016) | |
| | | | 05/11/2016 | SYSTEM ENTRY - Docket Entry 91 restricted/sealed until further notice. (jmd) (Entered: 05/11/2016) | |
| | | | 05/12/2016 | SYSTEM ENTRY - Docket Entry 93 restricted/sealed until further notice. (jmd) (Entered: 05/12/2016) | |
| | | | 05/12/2016 | SYSTEM ENTRY - Docket Entry 94 restricted/sealed until further notice. (jmd) (Entered: 05/12/2016) | |
| ☐ | Online | 95 | 05/13/2016 | OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT by Michael Edwin Harding Defendant's Amended Objections to the Presentence Report (Peacock, Fletcher) (Entered: 05/13/2016) | |
| ☐ | Free | 96 | 05/13/2016 | SENTENCING MEMORANDUM by USA as to Michael Edwin Harding (Killinger, Russell) (Entered: 05/13/2016) | |
| | | 97 | 05/16/2016 | PAPERLESS MINUTE ENTRY for proceedings held before Judge Robin L. Rosenberg: Sentencing Hearing begun on 5/16/2016 as to Michael Edwin Harding. Witnesses: Sheila LaGrega (PSL PD), Danitza Byrd and S/A Brian Ray (HSI) sworn & testified. Sentencing continued. The Sentencing Hearing shall be continued via separate Notice to Monday, 5/23/16 at a time to be determined by the Court. AUSAs Daniel Funk and Russell Killinger present with case agent HSI S/A Brian Ray on behalf of the Government. AFPD Fletcher Peacock present on behalf of Defendant Michael Edwin Harding, who is also present in USM custody. USPO Ed Cooley present. Court Reporter: Pauline Stipes, 561-803-3434 /Pauline_Stipes@flsd.uscourts.gov. (lw1) (Entered: 05/16/2016) | |
| | | 98 | 05/18/2016 | PAPERLESS NOTICE SETTING CONTINUED SENTENCING HEARING as to Michael Edwin Harding. Continued Sentencing Hearing set for Monday, 5/23/2016 at 9:00 AM in Fort Pierce Division before Judge Robin L. Rosenberg. (lw1) (Entered: 05/18/2016) | |
| ☐ | Free | 102 | 05/18/2016 | MOTION to seal Notice of Filing of Victim Impact Statements by USA as to Michael Edwin Harding. Responses due by 6/6/2016 (Attachments: # 1 Appendix Proposed Order)(cga) (Entered: 05/23/2016) | |
| ☐ | Free | 99 | 05/19/2016 | MOTION for Protective Order and To Seal Exhibits Introduced at Sentencing by USA as to Michael Edwin Harding. Responses due by 6/6/2016 (Killinger, Russell) (Entered: 05/19/2016) | |
| ☐ | Free | 100 | 05/20/2016 | ORDER granting 99 Motion for Protective Order and To Seal Exhibits Introduced at Sentencing by USA as to Michael Edwin Harding (1). Signed by Judge Robin L. Rosenberg on 5/20/2016. (lw1) (Entered: 05/20/2016) | |
| ☐ | Online | 101 | 05/20/2016 | MOTION for Leave to Appear Telephonically/May 23, 2016/9:00 am . Attorney/Representative: Fletcher Peacock by Michael Edwin Harding. Responses due by 6/6/2016 (Attachments: # 1 Text of Proposed Order) (Peacock, Fletcher) (Entered: 05/20/2016) | |
| | | | 05/23/2016 | SYSTEM ENTRY - Docket Entry 103 restricted/sealed until further notice. (cga) (Entered: 05/23/2016) | |
| | | 104 | 05/23/2016 | PAPERLESS ORDER granting 101 Motion for Leave to Appear Telephonic as to Michael Edwin Harding (1). Signed by Judge Robin L. Rosenberg on 5/23/2016. (lw1) (Entered: 05/23/2016) | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | 05/23/2016 | SYSTEM ENTRY - Docket Entry 105 restricted/sealed until further notice. (dj) (Entered: 05/23/2016) | |
| | | 106 | 05/23/2016 | PAPERLESS MINUTE ENTRY for proceedings held before Judge Robin L. Rosenberg: Continued Sentencing Hearing held on 5/23/2016 as to Michael Edwin Harding. Witnesses: Dr. Michael P. Brannon (via phone), S/A Brian Ray (HSI), Wayne Walker, Ashley Harding, Julie Harding, Elizabeth Perry and Michael Harding, sworn & testified. All marked and admitted Sentencing Exhibits shall be filed under seal by agreement of the parties and the Court. Court denies Defendant's 92 Motion for Downward Variance for reasons stated on the record. Imprisonment: Life; Supervised Release: Life; Special Assessment: $600.00 and Special Conditions as noted in Part G of the PSI. Restitution to be determined. Defendant advised of right to appeal. AUSAs Daniel Funk and Russell Killinger present with case agent HSI S/A Brian Ray on behalf of the Government. AFPD Fletcher Peacock present on behalf of Defendant Michael Edwin Harding, who is also present in USM custody. USPO Ed Cooley present. Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. (lw1) Modified text on 5/24/2016 (lw1). (Entered: 05/24/2016) | |
| | Online | 107 | 05/23/2016 | Government and Defendant's Witness List from Sentencing Hearing held 5/16/16 and 5/23/16 as to Michael Edwin Harding. (lw1) (Entered: 05/24/2016) | |
| | | 108 | 05/23/2016 | PAPERLESS NOTICE OF HEARING as to Michael Edwin Harding. Restitution Hearing set for Wed. 8/24/2016 at 1:30 PM in Fort Pierce Division before Judge Robin L. Rosenberg. (lw1) (Entered: 05/24/2016) | |
| | | 109 | 05/23/2016 | PAPERLESS ORDER denying Defendant's 92 Motion for Downward Departure as to Michael Edwin Harding (1). The Court denied the Motion for reasons stated on the record at the continued Sentencing Hearing held 5/23/16. Signed by Judge Robin L. Rosenberg on 5/23/2016. (lw1) (Entered: 05/24/2016) | |
| | Free | 110 | 05/26/2016 | RELEASE OF EXHIBITS as to Michael Edwin Harding. Government's Sealed Exhibits Released to: S/A Brian Ray (HSI) (lw1) (Entered: 05/26/2016) | |
| | | | 05/27/2016 | SYSTEM ENTRY - Docket Entry 111 restricted/sealed until further notice. (jmd) (Entered: 05/27/2016) | |
| | Online | 112 | 05/27/2016 | Unopposed MOTION for Extension of Time to File Response Unopposed Motion to Extend Time for Objections to the Court's Findings of Fact and Sentence Imposed by Michael Edwin Harding. Responses due by 6/13/2016 (Peacock, Fletcher) (Entered: 05/27/2016) | |
| | | 113 | 05/27/2016 | PAPERLESS ORDER granting Defendant's 112 Unopposed Motion to Extend Time for Objections to the Court's Findings of Fact and Sentence Imposed as to Michael Edwin Harding (1). Signed by Judge Robin L. Rosenberg on 5/27/2016. (lw1) (Entered: 05/27/2016) | |
| | Free | 114 | 05/31/2016 | JUDGMENT as to Michael Edwin Harding (1), Imprisonment: Life, the term consists of 240 months as to each of Counts One through Four, life as to Count Five and 360 months as to Count Six. All Counts to be served concurrently. Supervised Release: Life as to Counts One through Six, concurrently; Special Assessment: $600.00 and Special Conditions as noted in Part G of the PSI. Restitution to be determined. Closing Case for Defendant. Signed by Judge Robin L. Rosenberg on 5/31/2016. (lh) NOTICE: If there are sealed documents in this case, they may be unsealed after 1 year or as directed by Court Order, unless they have been designated to be permanently sealed. See Local Rule 5.4 and Administrative Order 2014-69. (Entered: 05/31/2016) | |
| | Online | 115 | 06/07/2016 | MOTION for Forfeiture of Property FINAL ORDER OF FORFEITURE by USA as to Michael Edwin Harding. Responses due by 6/24/2016 (Attachments: # 1 Text of Proposed Order (Final Order of Forfeiture)) (Barnes, Antonia) (Entered: 06/07/2016) | |
| | Online | 116 | 06/10/2016 | FINAL ORDER OF FORFEITURE as to Michael Edwin Harding (1). Signed by Judge Robin L. Rosenberg on 6/10/2016. (lw1) (Entered: 06/10/2016) | |
| | Free | 117 | 06/14/2016 | NOTICE OF APPEAL by Michael Edwin Harding Re: 114 Judgment,,. Filing fee $ 505.00.. USA/FPD Filer - No Filing Fee Required. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under Transcript Information. (Peacock, Fletcher) (Entered: 06/14/2016) | |
| | | | 06/15/2016 | Transmission of Notice of Appeal and Docket Sheet as to Michael Edwin Harding to US Court of Appeals re 117 Notice of Appeal - Final Judgment, | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | Notice has been electronically mailed. (hh) (Entered: 06/15/2016) | |
| ☐ | Online | 118 | 06/17/2016 | Acknowledgment of Receipt of NOA from USCA as to Michael Edwin Harding re 117 Notice of Appeal - Final Judgment, date received by USCA: 6/15/16. USCA Case Number: 16-13617-G. (hh) (Entered: 06/17/2016) | |
| ☐ | Online | 119 | 06/21/2016 | TRANSCRIPT INFORMATION FORM as to Michael Edwin Harding re 117 Notice of Appeal - Final Judgment, filed by Michael Edwin Harding. Calendar Call, Status Conference, COP Hearing, Sentencing & Continuation of Sentencing transcript(s) ordered. Order placed by Fletcher Peacock. Email sent to Court Reporter Coordinator. (Peacock, Fletcher) (Entered: 06/21/2016) | |
| ☐ | Online | 120 | 06/21/2016 | TRANSCRIPT INFORMATION FORM as to Michael Edwin Harding re 117 Notice of Appeal - Final Judgment, filed by Michael Edwin Harding. Calendar Calls & Status Conference transcript(s) ordered. Order placed by Fletcher Peacock. Email sent to Court Reporter Coordinator. (Peacock, Fletcher) (Entered: 06/21/2016) | |
| ☐ | Online | 121 | 06/22/2016 | COURT REPORTER ACKNOWLEDGMENT as to Michael Edwin Harding re 117 Notice of Appeal - Final Judgment, 119 Transcript Information Form, Transcripts to be filed on or before 7.22.16. Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. (ps) (Entered: 06/22/2016) | |
| ☐ | Online | 122 | 06/22/2016 | COURT REPORTER ACKNOWLEDGMENT as to Michael Edwin Harding re 117 Notice of Appeal - Final Judgment, 120 Transcript Information Form, Transcripts to be filed on or before 7.22.16. Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. (ps) (Entered: 06/22/2016) | |
| ☐ | Free | 123 | 07/05/2016 | TRANSCRIPT of Calendar Call as to Michael Edwin Harding held on 12.02.15 before Judge Robin L. Rosenberg, 1-7 pages; re: 117 Notice of Appeal - Final Judgment, Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/29/2016. Redacted Transcript Deadline set for 8/8/2016. Release of Transcript Restriction set for 10/6/2016. (ps) (Entered: 07/05/2016) | |
| ☐ | Free | 124 | 07/05/2016 | TRANSCRIPT of Calendar Call as to Michael Edwin Harding held on 1.20.16 before Judge Robin L. Rosenberg, 1-13 pages; re: 117 Notice of Appeal - Final Judgment, Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/29/2016. Redacted Transcript Deadline set for 8/8/2016. Release of Transcript Restriction set for 10/6/2016. (ps) (Entered: 07/05/2016) | |
| ☐ | Free | 125 | 07/05/2016 | TRANSCRIPT of Status Conference as to Michael Edwin Harding held on 2.3.16 before Judge Robin L. Rosenberg, 1-9 pages, re: 117 Notice of Appeal - Final Judgment, Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/29/2016. Redacted Transcript Deadline set for 8/8/2016. Release of Transcript Restriction set for 10/6/2016. (ps) (Entered: 07/05/2016) | |
| ☐ | Free | 126 | 07/05/2016 | TRANSCRIPT of Calendar Call as to Michael Edwin Harding held on 2.17.16 before Judge Robin L. Rosenberg, 1-21 pages, re: 117 Notice of Appeal - Final Judgment, Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/29/2016. Redacted Transcript Deadline set for 8/8/2016. Release of Transcript Restriction set for 10/6/2016. (ps) (Entered: 07/05/2016) | |
| ☐ | Free | 127 | 07/05/2016 | TRANSCRIPT of Status Conference as to Michael Edwin Harding held on 2.19.16 before Judge Robin L. Rosenberg, 1-25 pages, re: 117 Notice of Appeal - Final Judgment, Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/29/2016. | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | Redacted Transcript Deadline set for 8/8/2016. Release of Transcript Restriction set for 10/6/2016. (ps) (Entered: 07/05/2016) | |
| ☐ | Free | 128 | 07/05/2016 | TRANSCRIPT of Plea as to Michael Edwin Harding held on 2.22.16 before Judge Robin L. Rosenberg, 1-58 pages, re: 117 Notice of Appeal - Final Judgment, Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/29/2016. Redacted Transcript Deadline set for 8/8/2016. Release of Transcript Restriction set for 10/6/2016. (ps) (Entered: 07/05/2016) | |
| ☐ | Free | 129 | 07/05/2016 | TRANSCRIPT of Sentence as to Michael Edwin Harding held on 5.16.16 before Judge Robin L. Rosenberg, 1-73 pages, re: 117 Notice of Appeal - Final Judgment, Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/29/2016. Redacted Transcript Deadline set for 8/8/2016. Release of Transcript Restriction set for 10/6/2016. (ps) (Entered: 07/05/2016) | |
| ☐ | Free | 130 | 07/05/2016 | TRANSCRIPT of Sentence as to Michael Edwin Harding held on 5.23.16 before Judge Robin L. Rosenberg, 1-179 pages, re: 117 Notice of Appeal - Final Judgment, Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/29/2016. Redacted Transcript Deadline set for 8/8/2016. Release of Transcript Restriction set for 10/6/2016. (ps) (Entered: 07/05/2016) | |
| ☐ | Online | 131 | 07/07/2016 | TRANSCRIPT NOTIFICATION as to Michael Edwin Harding - Transcript(s) ordered on: 6.22.16 by Fletcher Peacock, AFPD, Esq. have been filed by Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov re 117 Notice of Appeal - Final Judgment, 119 Transcript Information Form, 121 Court Reporter Acknowledgment,. (ps) (Entered: 07/07/2016) | |
| ☐ | Online | 132 | 07/07/2016 | TRANSCRIPT NOTIFICATION as to Michael Edwin Harding - Transcript(s) ordered on: 6.22.16 by Fletcher Peacock, AFPD, Esq. have been filed by Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov re 117 Notice of Appeal - Final Judgment, 120 Transcript Information Form, 122 Court Reporter Acknowledgment,. (ps) (Entered: 07/07/2016) | |
| | | 133 | 08/10/2016 | PAPERLESS NOTICE OF HEARING as to Michael Edwin Harding:Status Conference re: Restitution Hearing set for Thursday, 8/11/2016 at 11:00 AM in West Palm Beach Division before Judge Robin L. Rosenberg. **Counsel who wish to appear at status conference via telephone shall call the toll-free number 1-877-873-8018 from a landline phone, five (5) minutes prior to the start of the conference. a) Enter Access Code Number 9890482 followed by the # sign, b) Enter Security Code Number 4008 followed by the # sign, c) State your name, the name of the party you represent and enter the conference.**(lw1) (Entered: 08/10/2016) | |
| | | 134 | 08/11/2016 | PAPERLESS MINUTE ENTRY for proceedings held before Judge Robin L. Rosenberg: Telephonic Status Conference re: Restitution Hearing as to Michael Edwin Harding held on 8/11/2016. The parties indicate that they are in the process of conferring in an effort to resolve matter. Restitution pleadings shall be submitted consistent with instructions and deadlines stated by the Court in open court. Status Conference shall be set via separate notice. Telephonic Appearances: AUSA Daniel Funk present on behalf of the Government. AFPD Fletcher Peacock present on behalf of Defendant Michael Harding (appearance not required). Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. (lw1) (Entered: 08/12/2016) | |
| | | 135 | 08/12/2016 | PAPERLESS NOTICE OF HEARING as to Michael Edwin Harding. Telephonic Status Conference re: Restitution Hearing set for Friday, 8/19/2016 at 10:30 AM in West Palm Beach Division before Judge Robin L. Rosenberg. **Counsel who wish to appear at status conference via telephone shall call the toll-free number 1-877-873-8018 from a landline phone, five (5) minutes prior to the start of the conference. a) Enter Access Code Number 9890482 followed by the # sign, b) Enter Security Code | |

| Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|
| | | | Number 4008 followed by the # sign, c) State your name, the name of the party you represent and enter the conference.**(lw1) (Entered: 08/12/2016) | |
| Free | 136 | 08/16/2016 | First MOTION for Judgment MOTION FOR COURT ORDERED RESTITUTION by USA as to Michael Edwin Harding. Responses due by 9/2/2016 (Funk, Daniel) (Entered: 08/16/2016) | |
| | | 08/17/2016 | SYSTEM ENTRY - Docket Entry 137 restricted/sealed until further notice. (cga) (Entered: 08/17/2016) | |
| | 138 | 08/19/2016 | PAPERLESS MINUTE ENTRY for proceedings held before Judge Robin L. Rosenberg; Telephonic Status Conference re: Restitution as to Michael Edwin Harding held on 8/19/2016. The parties indicate to the Court that they are continuing their efforts to resolve the remaining issues with respect restitution in this case. The Restitution Hearing shall remain on the calendar for Wednesday, 8/24/16 at 1:30PM in Fort Pierce. The parties shall notify the Court on Monday, 8/22/16 to provide an update regarding the status of the restitution. **Telephonic Appearances: AUSA Russell Killinger (for AUSA Daniel Funk) present on behalf of the Government. AFPD Fletcher Peacock present on behalf of Defendant Michael Harding (appearance not required). Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. (lw1) (Entered: 08/19/2016) | |
| Online | 139 | 08/22/2016 | MOTION for Writ of Habeas Corpus ad prosequendum by USA as to Michael Edwin Harding. Responses due by 9/9/2016 (Attachments: # 1 Text of Proposed Order)(Funk, Daniel) (Entered: 08/22/2016) | |
| Online | 140 | 08/22/2016 | MOTION for Writ of Habeas Corpus ad prosequendum by USA as to Michael Edwin Harding. Responses due by 9/9/2016 (Attachments: # 1 Text of Proposed Order Writ of /Habeas Corpus Ad Prosequendum)(Funk, Daniel) (Entered: 08/22/2016) | |
| | 141 | 08/22/2016 | Clerks Notice to Filer re 139 MOTION for Writ of Habeas Corpus ad prosequendum . Document Unreadable; CORRECTIVE ACTION REQUIRED - Filer must file a Notice of Striking, then refile a legible copy of the document. (cga) (Entered: 08/23/2016) | |
| Online | 142 | 08/23/2016 | NOTICE of Striking 139 MOTION for Writ of Habeas Corpus ad prosequendum , 140 MOTION for Writ of Habeas Corpus ad prosequendum corrected by USA as to Michael Edwin Harding (Funk, Daniel) (Entered: 08/23/2016) | |
| Online | 143 | 08/23/2016 | ORDER granting 140 Motion for Writ of Habeas Corpus ad prosequendum as to Michael Edwin Harding (1). Restitution Hearing set for 8/24/2016 01:30 PM in Fort Pierce Division before Judge Robin L. Rosenberg. Signed by Ch. Magistrate Judge Frank J. Lynch, Jr on 8/23/2016. (cga) (Entered: 08/23/2016) | |
| | | 08/23/2016 | SYSTEM ENTRY - Docket Entry 144 restricted/sealed until further notice. (dj) (Entered: 08/23/2016) | |
| | 145 | 08/24/2016 | PAPERLESS MINUTE ENTRY for proceedings held before Judge Robin L. Rosenberg: Restitution Hearing held on 8/24/2016 as to Michael Edwin Harding. Oral arguments heard. Government's Witness: HSI S/A Brian Ray sworn & testified. Government's Exhibits: Sealed Ex. 1 and Exhibits 2-8 all marked and admitted. By 5:00PM close of business Wednesday, 8/31/16, the parties shall each submit to the Court's CM/ECF email address (rosenberg@flsd.uscourts.gov) proposed Orders of Restitution which comprise of proposed Findings of Fact and Conclusions of Law. **Appearances: AUSA Daniel Funk present on behalf of the Government with HSI S/A Brian Ray. AFPD Fletcher Peacock present on behalf of Defendant Michael Harding, who is also present in custody. USPO Ed Cooley present. Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. (lw1) (Entered: 08/24/2016) | |
| Online | 146 | 08/24/2016 | GOVERNMENT'S EXHIBIT and WITNESS LIST from Restitution Hearing held on 8/24/16 as to Michael Edwin Harding. (lw1) (Entered: 08/24/2016) | |
| | 147 | 08/24/2016 | Remark as to Michael Edwin Harding: Government's Exhibits from 8/24/16 Restitution Hearing are currently in the custody of the Court and shall be returned to the Government following the Court's ruling on restitution in this matter. Sealed Exh. 1 shall remain under seal until further Order of the Court, per Order DE#144. (lw1) (Entered: 08/24/2016) | |
| Free | 148 | 08/26/2016 | TRANSCRIPT of Restitution Hearing as to Michael Edwin Harding held on 8.24.16 before Judge Robin L. Rosenberg, 1-49 pages, Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/19/2016. Redacted Transcript Deadline set for | |

| Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|
| | | | 9/29/2016. Release of Transcript Restriction set for 11/28/2016. (ps) (Entered: 08/26/2016) | |
| Online | 149 | 08/30/2016 | TRANSCRIPT INFORMATION FORM as to Michael Edwin Harding re 117 Notice of Appeal - Final Judgment, filed by Michael Edwin Harding. Restitution Hearing transcript(s) ordered. Order placed by Fletcher Peacock. Email sent to Court Reporter Coordinator. (Peacock, Fletcher) (Entered: 08/30/2016) | |
| Online | 150 | 08/30/2016 | COURT REPORTER ACKNOWLEDGMENT as to Michael Edwin Harding re 117 Notice of Appeal - Final Judgment, 149 Transcript Information Form, Transcript on file. Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. (ps) (Entered: 08/30/2016) | |
| Free | 151 | 08/30/2016 | STIPULATED RESTITUTION ORDER as to Michael Edwin Harding. Signed by Judge Robin L. Rosenberg on 8/30/2016. (lw1) (Entered: 08/30/2016) | |
| | 152 | 11/30/2016 | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Southern District of Florida certifies that the record is complete for purposes of this appeal re: 117 Notice of Appeal - Final Judgment, Appeal No. 16-13617-GG. The entire record on appeal is available electronically with the exception of (1) Accordian Folder Containing Gov't Exhibits DE # 153 . (hh) (see transmitted roa de# 154) Text Modified on 1/25/2017 (hh). (Entered: 11/30/2016) | |
| | 155 | 11/30/2016 | Clerks Notice of Docket Correction re 152 Electronic Availability of ROA,. Docket Text Modified by Clerk. (hh) (Entered: 01/25/2017) | |
| Free | 153 | 01/24/2017 | NOTICE NOTICE OF FILING GOVERNMENT EXHIBITS 9 AND 11 UNDER SEAL PURSUANT TO THE REQUEST OF THE ELEVENTH CIRCUIT COURT OF APPEALS by USA as to Michael Edwin Harding (Funk, Daniel) (Additional attachment(s) added on 1/24/2017: # 1 See Supplemental Attachment(s) for CD of Exhibit 9 and 11) (nc). (Entered: 01/24/2017) | |
| Online | 154 | 01/24/2017 | Certified and Transmitted Record on Appeal as to Michael Edwin Harding to US Court of Appeals Consisting of (1) Accordian Folder Containing Gov't Exhibits DE# 153 re 117 Notice of Appeal - Final Judgment, USCA # 16-13617-GG (hh) (Entered: 01/25/2017) | |
| Online | 156 | 07/12/2017 | MANDATE of USCA, AFFIRMING judgment/order of the district court as to Michael Edwin Harding re 117 Notice of Appeal - Final Judgment, ; Date Issued: 7/12/17 ; USCA Case Number: 16-13617-GG (hh) (Entered: 07/12/2017) | |
| Online | 157 | 07/24/2017 | Appeal Record Returned from USCA (WPB/Records) Consisting of (1) Accordian Folder Containing Government Exhibits DE# 153 as to Michael Edwin Harding: 117 Notice of Appeal - Final Judgment, USCA # 16-13617-GG (hh) Text Modified on 8/23/2017 (hh). (Entered: 07/24/2017) | |
| Online | 158 | 09/04/2018 | Motion to Vacate under 28 U.S.C. 2255 by Michael Edwin Harding (civil case number 18-14359-CIV-ROSENBERG/WHITE.) All further docketing related to the motion to vacate is to be done in the civil case. (Attachments: # 1 Addendum to 2255 Petition) (cqa) (Entered: 09/04/2018) | |
| Online | 159 | 09/27/2021 | ORDER ADOPTING REPORT AND RECOMMENDATION, DENYING 158 MOTION TO VACATE SENTENCE as to Michael Edwin Harding (1) AND CLOSING CASE. A certificate of appealability SHALL NOT ISSUE. Signed by Judge Robin L. Rosenberg on 9/27/2021. See attached document for full details. (cds) (Entered: 09/28/2021) | |

**Retrieve Document(s)**

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***



About        Cookie Policy        RELX™

Privacy Policy        Terms & Conditions        Copyright © 2023 LexisNexis.

CVDE 85

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 18-14359-Civ-ROSENBERG

**MICHAEL EDWIN HARDING,**

**Movant,**

v.

**UNITED STATES OF AMERICA,**

**Respondent.**

_____/

## NOTICE OF APPEAL

Movant Michael Edwin Harding, through undersigned counsel, hereby appeals to the United States Court of Appeals for the Eleventh Circuit from this Court's order [DE:84], entered on September 28, 2021, denying Movant's motion to vacate conviction and sentence under 28 U.S.C. § 2255.

Respectfully submitted,

Dated: November 26, 2021

s/  Richard C. Klugh_____
Richard C. Klugh, Esq.
Fla. Bar No. 305294
Counsel for Movant
40 N.W. 3rd Street, PH 1
Miami, Florida 33128
Tel. (305) 536-1191
E-Mail rklugh@klughlaw.com

CRDE 32

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. <u>15-14057-CR-ROSENBERG/LYNCH(s)(s)</u>**
18 U.S.C. §§ 2252(a)(2) and (b)(1)
18 U.S.C. §§ 2252(a)(4)(B) and (b)(2)
18 U.S.C. § 2422(b)
18 U.S.C. §§ 2251(a) and (e)

UNITED STATES OF AMERICA,

v.

MICHAEL EDWIN HARDING,

 Defendant.

_____/

FILED BY ___CGA___

Deputy Clerk

*Nov 12, 2015*

STEVEN M. LARIMORE
CLERK U.S. DISTRICT CT.
S.D. OF FLA. Fort Pierce, FL

<u>**SECOND SUPERSEDING INDICTMENT**</u>

The Grand Jury charges that:

<u>**COUNT ONE**</u>

On or about July 23, 2015, in St. Lucie County, in the Southern District of Florida, and elsewhere, the defendant,

**Michael Edwin Harding,**

did knowingly distribute any visual depiction, using any means and facility of interstate and foreign commerce and that has been shipped and transported in interstate and foreign commerce by any means, including by computer, and the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2), and such visual depiction was of such sexually explicit conduct; in violation of Title 18, United States Code, Sections 2252(a)(2) and (b)(1).

## COUNT TWO

On or about July 26, 2015, in St. Lucie County, in the Southern District of Florida, and elsewhere, the defendant,

### Michael Edwin Harding,

did knowingly distribute any visual depiction, using any means and facility of interstate and foreign commerce and that has been shipped and transported in interstate and foreign commerce by any means, including by computer, and the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2), and such visual depiction was of such sexually explicit conduct; in violation of Title 18, United States Code, Sections 2252(a)(2) and (b)(1).

## COUNT THREE

On or about August 4, 2015, in St. Lucie County, in the Southern District of Florida, and elsewhere, the defendant,

### Michael Edwin Harding,

did knowingly distribute any visual depiction, using any means and facility of interstate and foreign commerce and that has been shipped and transported in interstate and foreign commerce by any means, including by computer, and the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2), and such visual depiction was of such sexually explicit conduct; in violation of Title 18, United States Code, Sections 2252(a)(2) and (b)(1).

2

## COUNT FOUR

On or about September 22, 2015, in St. Lucie County, in the Southern District of Florida, the defendant,

### Michael Edwin Harding,

did knowingly possess matter, that is, a PNY Thumb Drive, a Lexar Thumb Drive, a LG D800 (G2) cellular telephone, and a Samsung SM-G928A cellular telephone, which contained any visual depiction which had been shipped and transported using any means and facility of interstate and foreign commerce, and in and affecting interstate and foreign commerce, by any means, including by computer, and which was produced using materials that have been mailed, shipped, and transported in and affecting interstate and foreign commerce, by any means, including by computer, and the production of such visual depiction having involved the use of minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2), and such visual depiction was of such conduct, in violation of Title 18, United States Code, Sections 2252(a)(4)(B) and (b)(2).

Pursuant to Title 18, United States Code, Section 2252(b)(2), it is further alleged that such visual depiction included a prepubescent minor and a minor who had not attained twelve (12) years of age.

## COUNT FIVE

Beginning on or about August 12, 2015, and continuing until on or about September 10, 2015, in St. Lucie County, in the Southern District of Florida, and elsewhere, the defendant,

### Michael Edwin Harding,

using any facility and means of interstate commerce, that is, Kik and Skype internet communication applications, knowingly attempted to persuade, induce, entice and coerce an individual who had not attained the age of eighteen years, to engage in any sexual activity for

which any person can be charged with a criminal offense, in violation of Title 18, United States Code, Section 2422(b).

## COUNT SIX

On or about November 17, 2014, in St. Lucie County, in the Southern District of Florida, and elsewhere, the defendant,

### Michael Edwin Harding,

did use, persuade, induce, entice and coerce, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, and that visual depiction was produced using materials that had been mailed, shipped, and transported in interstate and foreign commerce, by any means; in violation of Title 18, United States Code, Sections 2251(a) and 2251(e).

## FORFEITURE

Upon conviction of any of the violations alleged in Counts One through Four, or Count Six, of this Superseding Indictment, the defendant **Michael Edwin Harding** shall forfeit to the United States any visual depiction, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction described in Title 18, United States Code, Section 2252, which was produced, transported, mailed, shipped or received in violation of the law; any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offense; and any property, real or personal, used or intended to be used to commit or to promote the commission of such offense or any property traceable to such property, including, but not limited to, the following:

a. One (1) PNY Attache Thumb Drive, serial number 1738920EE5118E0F;

b. One (1) Lexar Model JD Mercury Thumb Drive, serial number 0A4E970706330009097;

4

    c.      One (1) LG D800 (G2) cellular telephone IMSI number 3104106500018243;

    d.      One (1) Samsung SM-G928A cellular telephone, IMSI number

        310410834823717.

Pursuant to Title 18, United States Code, Section 2253.

Upon conviction of the violation alleged in Count Five of this superseding indictment, the defendant **Michael Edwin Harding** shall forfeit to the United States any property, real or personal, that was used or intended to be used to commit or to facilitate the commission of said violation, and any property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of said violation, including, but not limited to, the following:

Samsung SM-G928A cellular telephone, IMSI number 310410834823717.

Pursuant to Title 18, United States Code, Section 2428.

A TRUE BILL

FOREPERSON

WIFREDO A. FERRER
UNITED STATES ATTORNEY

DANIEL E. FUNK
ASSISTANT UNITED STATES ATTORNEY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**UNITED STATES OF AMERICA**          **CASE NO.**   15-CR-14057-RLR (s)(s)

v.

**MICHAEL EDWIN HARDING,**          **CERTIFICATE OF TRIAL ATTORNEY\***

_____ Defendant. /          **Indictment Case Information:**

**Court Division:** (Select One)

New Defendant(s)          Yes _____   No __x__
Number of New Defendants
Total number of counts          6

_____ Miami          _____ Key West
_____ FTL          _____ WPB   __X__   FTP

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:   (Yes or No)   No
     List language and/or dialect _____

4.   This case will take   5   days for the parties to try.

5.   Please check appropriate category and type of offense listed below:

|   | (Check only one) |   |   | (Check only one) |   |
|---|---|---|---|---|---|
| I | 0 to 5 days | X | Petty |  |  |
| II | 6 to 10 days |  | Minor |  |  |
| III | 11 to 20 days |  | Misdem. |  |  |
| IV | 21 to 60 days |  | Felony | X |  |
| V | 61 days and ove57 |  |  |  |  |

6.   Has this case been previously filed in this District Court?  (Yes or No)   Yes

If yes:
Judge:  Rosenberg          Case No.    15-CR-14057-RLR(s)
(Attach copy of dispositive order)
Has a complaint been filed in this matter?     (Yes or No)  Yes
If yes:
Magistrate Case No.          15-124-FJL
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of   9/22/15
Defendant(s) in state custody as of _____
Rule 20 from the _____   District of _____

Is this a potential death penalty case? (Yes or No)   No

7.   Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?          Yes   X   No

8.   Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?          Yes   X   No

_____
DANIEL E. FUNK
ASSISTANT UNITED STATES ATTORNEY

\*Penalty Sheet(s) attached

REV 4/8/08

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

## CASE NO. 15-14057-CR-ROSENBERG/LYNCH(s)(s)

**Defendant's Name:  MICHAEL EDWIN HARDING**

| COUNT | VIOLATION | U.S. CODE | MAX. PENALTY |
|-------|-----------|-----------|--------------|
| 1-3 | Distributing Material Involving Sexual Exploitation of Minors | 18:2252(a)(2) | 5-20 Years' Imprisonment<br>$250,000 Fine<br>SR: 5 Years to Life<br>$100 Special Assessment<br>$5,000 Special Assessment unless indigent |
| 4 | Possession of Material Involving Sexual Exploitation of Minors | 18:2252(a)(4)(B) | 20 Years' Imprisonment (image of prepubescent minor or minor under 12 years of age)<br>$250,000 Fine<br>SR: 5 Years to Life<br>$100 Special Assessment<br>$5,000 Special Assessment unless indigent |
| 5 | Attempt to Coerce and Entice a Minor to Engage in Sexual Activity | 18:2422(b) | 10 Years to Life Imprisonment<br>$250,000 Fine<br>SR: 5 Years to Life<br>$100 Special Assessment<br>$5,000 Special Assessment unless indigent |
| 6 | Producing Child Pornography | 18:2251(a),(e) | 15 Years to 30 Years' Imprisonment<br>$250,000 Fine<br>SR: 5 Years to Life<br>$100 Special Assessment |

# CRDE 114

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                    Page 1 of 6

# UNITED STATES DISTRICT COURT
## Southern District of Florida
## Fort Pierce Division

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>v.<br>**MICHAEL EDWIN HARDING** | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number: **15-14057-CR-ROSENBERG**<br>USM Number: **08543-104**<br><br>Counsel For Defendant: **Fletcher Peacock, AFPD**<br>Counsel For The United States: **Daniel Funk & Russell Killinger, AUSAs**<br>Court Reporter: **Pauline Stipes** |

**The defendant pleaded guilty to count(s) 1ss, 2ss, 3ss and 4ss of the Second Superseding Indictment.**

**The defendant pleaded nolo contendere to count(s) 5ss and 6ss of the Second Superseding Indictment which was accepted by the court.**

The defendant is adjudicated guilty of these offenses:

| TITLE & SECTION | NATURE OF OFFENSE | OFFENSE ENDED | COUNT |
|---|---|---|---|
| 18 U.S.C. § 2252(a)(2) and (b)(1) | Distributing Material Involving Sexual Exploitation of Minors | 07/23/2015 | 1ss |
| 18 U.S.C. § 2252(a)(2) and (b)(1) | Distributing Material Involving Sexual Exploitation of Minors | 07/26/2015 | 2ss |
| 18 U.S.C. § 2252(a)(2) and (b)(1) | Distributing Material Involving Sexual Exploitation of Minors | 08/04/2015 | 3ss |
| 18 U.S.C. § 2252(a)(4)(B) and (b)(2) | Possession of Material Involving Sexual Exploitation of Minors | 09/22/2015 | 4ss |
| 18 U.S.C. § 2422(b) | Attempt to Coerce and Entice a Minor to Engage in Sexual Activity | 09/10/2015 | 5ss |
| 18 U.S.C. § 2251(a), (e) | Producing Child Pornography | 11/17/2014 | 6ss |

The defendant is sentenced as provided in the following pages of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Date of Imposition of Sentence: **5/23/2016**

_____
**Robin L. Rosenberg**
**United States District Judge**

Date:   _____5/31/2016_____

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                                Page 2 of 6

DEFENDANT: **MICHAEL EDWIN HARDING**
CASE NUMBER: **15-14057-CR-ROSENBERG**

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of **Life.** The term consists of terms of 240 months as to each of Counts One through Four, life as to Count Five and 360 months as to Count Six, all to be served concurrently.

**The court makes the following recommendations to the Bureau of Prisons:**

- **That the Defendant be designated to a facility as close to South Florida as possible.**

**The defendant is remanded to the custody of the United States Marshal.**

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

_____

_____

Defendant          delivered          on          _____          to
_____

at _____, with a certified copy of this judgment.


_____
UNITED STATES MARSHAL


_____
DEPUTY UNITED STATES MARSHAL

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                     Page 3 of 6

DEFENDANT: **MICHAEL EDWIN HARDING**
CASE NUMBER: **15-14057-CR-ROSENBERG**

### SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **Life**. This term consists of life as to Counts One through Six, all such terms to run concurrently.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

**The defendant shall cooperate in the collection of DNA as directed by the probation officer.**

**The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.**

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

### STANDARD CONDITIONS OF SUPERVISION

1. The defendant shall not leave the judicial district without the permission of the court or probation officer;
2. The defendant shall report to the probation officer and shall submit a truthful and complete written report within the first fifteen days of each month;
3. The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4. The defendant shall support his or her dependents and meet other family responsibilities;
5. The defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6. The defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7. The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8. The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9. The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10. The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11. The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13. As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                      Page 4 of 6

DEFENDANT: **MICHAEL EDWIN HARDING**
CASE NUMBER: **15-14057-CR-ROSENBERG**

## SPECIAL CONDITIONS OF SUPERVISION

**Adam Walsh Act Search Condition** - The defendant shall submit to the U.S. Probation Officer conducting periodic unannounced searches of the defendant's person, property, house, residence, vehicles, papers, computer(s), other electronic communication or data storage devices or media, include retrieval and copying of all data from the computer(s) and any internal or external peripherals and effects at any time, with or without warrant by any law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of probation or supervised release. The search may include the retrieval and copying of all data from the computer(s) and any internal or external peripherals to ensure compliance with other supervision conditions and/or removal of such equipment for the purpose of conducting a more thorough inspection; and to have installed on the defendant's computer(s), at the defendant's expense, any hardware or software systems to monitor the defendant's computer use.

**Computer Possession Restriction** - The defendant shall not possess or use any computer; except that the defendant may, with the prior approval of the Court, use a computer in connection with authorized employment.

**Data Encryption Restriction** - The defendant shall not possess or use any data encryption technique or program.

**Employer Computer Restriction Disclosure** - The defendant shall permit third party disclosure to any employer or potential employer, concerning any computer-related restrictions that are imposed upon the defendant.

**Mental Health Treatment** - The defendant shall participate in an approved inpatient/outpatient mental health treatment program. The defendant will contribute to the costs of services rendered (co-payment) based on ability to pay or availability of third party payment.

**No Contact with Minors** - The defendant shall have no personal, mail, telephone, or computer contact with children/minors under the age of 18 years or with any victim.

**No Involvement in Youth Organizations** - The defendant shall not be involved in any children's or youth organization.

**Restricted from Possession of Sexual Materials** - The defendant shall not buy, sell, exchange, possess, trade, or produce visual depictions of minors or adults engaged in sexually explicit conduct. The defendant shall not correspond or communicate in person, by mail, telephone, or computer, with individuals or companies offering to buy, sell, trade, exchange, or produce visual depictions of minors or adults engaged in sexually explicit conduct.

**Sex Offender Registration** - The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.

**Sex Offender Treatment** - The defendant shall participate in a sex offender treatment program to include psychological testing and polygraph examination. Participation may include inpatient/outpatient treatment, if deemed necessary by the treatment provider. The defendant will contribute to the costs of services rendered (co-payment) based on ability to pay or availability of third party payment.

**Substance Abuse Treatment** - The defendant shall participate in an approved treatment program for drug and/or alcohol abuse and abide by all supplemental conditions of treatment. Participation may include inpatient/outpatient treatment. The defendant will contribute to the costs of services rendered (co-payment) based on ability to pay or availability of third party payment.

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                                                    Page 5 of 6

DEFENDANT: **MICHAEL EDWIN HARDING**
CASE NUMBER: **15-14057-CR-ROSENBERG**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | Fine | **Restitution** |
|---|---|---|---|
| TOTALS | **$600.00** | $0.00 | **To be determined** |

**The determination of restitution is deferred until 8/24/2016. An Amended Judgment in a Criminal Case (AO 245C) will be entered after such determination.**

**If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.**

| NAME OF PAYEE | TOTAL LOSS* | RESTITUTION ORDERED | PRIORITY OR PERCENTAGE |
|---|---|---|---|
|  |  |  |  |

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**Assessment due immediately unless otherwise ordered by the Court.

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                                    Page 6 of 6

DEFENDANT: **MICHAEL EDWIN HARDING**
CASE NUMBER: **15-14057-CR-ROSENBERG**

### SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A. Lump sum payment of $600.00 due immediately.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

This assessment/fine/restitution is payable to the CLERK, UNITED STATES COURTS and is to be addressed to:

**U.S. CLERK'S OFFICE**
**ATTN: FINANCIAL SECTION**
**400 NORTH MIAMI AVENUE, ROOM 08N09**
**MIAMI, FLORIDA 33128-7716**

The assessment/fine/restitution is payable immediately. The U.S. Bureau of Prisons, U.S. Probation Office and the U.S. Attorney's Office are responsible for the enforcement of this order.

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

| CASE NUMBER DEFENDANT AND CO-DEFENDANT NAMES (INCLUDING DEFENDANT NUMBER) | TOTAL AMOUNT | JOINT AND SEVERAL AMOUNT |
|---|---|---|
| | | |

**The Preliminary Order of Forfeiture dated MARCH 2, 2016 (D.E. 80) is incorporated into this Judgment and Commitment.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

CRDE 124

USCA11 Case: 21-14133    Document: 42

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                         FORT PIERCE DIVISION

 3                    CASE NO. 15-CR-14057-ROSENBERG

 4
      UNITED STATES OF AMERICA,         .
 5                                      .
           Plaintiff,                   .
 6                                      .
                vs.                     .
 7                                      .
      MICHAEL HARDING,                  .  Fort Pierce, FL
 8                                      .  January 20, 2016
                                        .
 9         Defendant.

10
                    TRANSCRIPT OF STATUS CONFERENCE
11              BEFORE THE HONORABLE ROBIN L. ROSENBERG
                      UNITED STATES DISTRICT JUDGE
12

13

14    APPEARANCES:

15
      FOR THE PLAINTIFF:       DANIEL FUNK
16                             RUSSELL KILLINGER
                               United States Attorney's Office
17                             101 S. U.S. Highway 1
                               Suite 3100
18                             Fort Pierce, FL 34950
                               305-905-7509
19
      FOR THE DEFENDANTS:      FLETCHER PEACOCK, ESQ.
20                             Federal Public Defender's Office
                               109 North 2nd Street
21                             Fort Pierce, FL 34950
                               772-489-2123
22

23    Official Court Reporter:    Pauline A. Stipes
                                   Fort Pierce/West Palm Beach
24                                 772-467-2337
                                   HON. ROBIN L. ROSENBERG
25
```

Pauline A. Stipes, Official Federal Reporter

---

Date Filed: 03/22/2023    Page: 48 of 155

```
 1          THE COURT:  Good morning.  Sorry to keep you waiting a

 2    couple of minutes.

 3          We are here on the calendar call of a number of

 4    matters.  I will call them in the order in which I have them

 5    before me and they appear on the calendar.

 6          The first case is United States versus Michael Edwin

 7    Harding, case number 15-CR-14057.

 8          If we could have all counsel state their appearance.

 9          MR. FUNK:  Good morning, Daniel Funk.

10          MR. KILLINGER:  Russell Killinger.

11          MR. PEACOCK:  Good morning, Fletcher Peacock on behalf

12    of Mr. Harding.

13          THE COURT:  Good morning.  My notes tell me it is the

14    second time up, the Government is ready, trial will take three

15    to four days, unlikely the case will resolve by way of a plea,

16    and I don't know that defense filed a motion for continuance or

17    is seeking to do so in light of having received DNA evidence

18    that the Government seeks to introduce at trial.

19          MR. PEACOCK:  I did file a motion.  The Government

20    recently discovered evidence and determined there was DNA

21    evidence of value there.  They timely let me know, but it was

22    only late last week.

23          I have not had a chance -- beyond reading the brief

24    report, I haven't had a chance to obtain an expert to look at

25    it or anything, that is going to be a timely process.
```

Pauline A. Stipes, Official Federal Reporter

---

```
 1          It is critical evidence, and I would ask the Court --

 2    I did file a motion.

 3          THE COURT:  I see it, yes, Docket Entry 63, 1/19/2016,

 4    and it appears to be an unopposed motion to continue trial, or

 5    in the alternative, to exclude DNA evidence.

 6          Has there been discussion of excluding the evidence?

 7          MR. PEACOCK:  If Your Honor wanted us to go in this

 8    calendar, I would ask that it be excluded.  If Your Honor is

 9    inclined to tentatively admit the evidence, I would ask for

10    time to obtain an expert and determine the value of this.

11          THE COURT:  Mr. Killinger, what is your position?

12          MR. KILLINGER:  I want to advise the Court of the

13    timeline on this.

14          We were aware certain items had been discovered by the

15    Defendant's wife and mother.  After the evens department

16    occurred they packed a bunch of stuff out of boxes and moved

17    it, she moved out of the marital home into the mother's house.

18          A week or two weeks after the actual arrest, they were

19    going through -- they didn't look at it at the time for the

20    most part, they threw it in bags and got it out of the house.

21          It was not taken at the time of the search, it called for

22    seizure of electronic devices, for the images.  We had no idea

23    there was hands-on sexual abuse on the stepdaughters.

24          They took it immediately to the detective, who

25    immediately took it to the lab.  We were aware the lab was
```

Pauline A. Stipes, Official Federal Reporter

---

```
 1    conducting DNA tests, but had no lab results to the reports.

 2          When I filed my motion in limine on the 14th, I filed

 3    it early in the morning on the 14th, before 10:00 o'clock or

 4    9:30, and that same day, approximately an hour later by

 5    happenstance, I guess, we were sent for the first time -- the

 6    Government received for the first time on the 14th of January

 7    the DNA lab report from the lab.

 8          Within three hours after that, Mr. Peacock was over

 9    meeting with Mr. Funk on a different case for discovery

10    matters, and we hand delivered that report.

11          I called Mr. Peacock the day before and in a telephone

12    conversation I alerted him that the lab results would be

13    forthcoming soon, and what the rulings were.

14          Of course, that is me talking, and that is double

15    hearsay.

16          I want the record to reflect that the Government

17    discovered this evidence immediately upon it coming into our

18    possession, so there was no dilatory tactics or anything, no

19    gaming going on by the Government.  I don't do that.

20          So, I understand Mr. Peacock's position.  We gave him

21    the evidence almost immediately upon us getting the evidence,

22    and obviously it is a critical key piece of evidence should it

23    be admitted at trial.

24          So the Court is aware, the evidence that was submitted

25    for DNA analysis were sexual devices, also known as sex toys,
```

Pauline A. Stipes, Official Federal Reporter

1  vibrators, and on one of those devices, the only DNA that was
2  found on the tip of the device was the DNA of the oldest
3  stepdaughter, C.W., which is the victim in Count 5, I believe,
4  or 6, which is the production count, so it is very, very
5  relevant.
6      It also corroborates Mr. Harding's chats during the
7  course of the -- not the investigation, but before the
8  investigation where he specifically talks about using these
9  devices on his stepdaughter.
10     So, that is the record as to how we got here today and
11  why the evidence was only received last week.
12     Other than that, you know, I fully understand Mr.
13  Peacock's position having just gotten this evidence, so, I am
14  not really in a position -- we are ready for trial.  We will be
15  ready for trial in any event, whether DNA evidence comes in or
16  not.  Even if it comes in, we are ready for trial.
17     Mr. Peacock has asked for more time and that is where
18  the Government is at this time on the case.
19     THE COURT:  The last time we had calendar call, DNA
20  evidence was not contemplated, found or brought to your
21  attention?
22     MR. KILLINGER:  I don't have the exact date of the
23  last calendar call, but I am not sure the items had been
24  submitted to the lab at that point.
25     I don't think we ever discussed any potential DNA

---

1  evidence.
2      THE COURT:  It is not in my notes from the last
3  calendar call.
4      There was -- now, Defendant raised the possibility of
5  a bench trial with the Government, but I think that was
6  something you were amenable to.  We talked about that.
7      Last time there was a request for the 30-day
8  continuance, and there may be state proceedings in conjunction
9  with the federal proceedings inextricably intertwined.  Is that
10  an issue?
11     MR. KILLINGER:  It is not, I was going to do it
12  anyway.  Mr. Peacock asked me to confer with the state
13  prosecutors over in the State Attorney's Office here in the
14  19th Judicial Circuit about the possibility of having them join
15  in and resolving the case in both jurisdictions.
16     I have spoken to them now, the last time was yesterday
17  afternoon.
18     Mr. Harding hasn't even been charged with the crimes
19  over in State Court yet.  There are arrest affidavits that have
20  been prepared and reviewed by the State Attorney's Office, but
21  he has not even been arrested on the state charges yet.
22     And the state prosecutor is just not -- he is looking
23  at a -- on three of their charges over there that they
24  contemplate bringing, he is looking at a mandatory minimum life
25  sentence in State Court.

---

1      They are not in a position to want to negotiate at all
2  given the strength of the case.  So I think that issue is
3  resolved.
4      I am not saying that something might not happen in the
5  future that might cause us to revisit it.  As of today, right
6  now, you know, the state is going to proceed on their path and
7  we are going to proceed on our path.
8      THE COURT:  So I understand, DNA has been turned over,
9  and you retained an expert or you need to retain an expert?
10     MR. PEACOCK:  No, Your Honor, I just received this the
11  end of last week, I haven't had time to get an expert yet.  I
12  will be expeditious about it.
13     The Government's assessment about the timing of this
14  happening is accurate.  There is no claim by the defense that
15  the Government is dilatory in turning it over.
16     THE COURT:  Okay, so all that remains at this point is
17  retaining an expert, evaluating -- having an expert evaluate
18  DNA, and everything else has been completed?
19     MR. PEACOCK:  Well, Judge, from a defense standpoint,
20  there is still work to do.  The State case is an issue.
21     Once again Mr. Killinger's assessment is accurate at
22  this point.  He will continue our efforts to resolve this in
23  that regard.  DNA is the critical thing I need more time for,
24  Your Honor.
25     THE COURT:  The next Ft. Pierce calendar that I have

---

1  that is within a reasonable period of time -- otherwise, we are
2  looking at an unduly long time before the Court has priority in
3  the week set aside for the Ft. Pierce docket, we divided them
4  among different judges -- is the two-week trial period of 2/22,
5  and 2/29.
6      So, it is not the 60-day continuance you are thinking,
7  it would be slightly longer than 30.  It would be about 30 days
8  when the Court could set the case for trial here in Ft. Pierce
9  with the two-week docket that the Court has reserved to it for
10  Ft. Pierce cases.
11     And I would make that a priority and, you know, would
12  special -- probably special set the case for the trial period
13  beginning 2/22, in order to ensure that it is tried and we
14  take -- we are able to use the Ft. Pierce period that is
15  allotted.
16     Otherwise, it becomes much longer down where I have
17  assurances that the two-week docket is reserved for me as
18  opposed to other judges.
19     MR. KILLINGER:  That is fine for the Government, and I
20  will add we will make our DNA expert, the author of the lab
21  report, we will make him on reasonable notice to Mr. Peacock.
22  He is very amenable.
23     That doesn't help him out on retaining his expert, but
24  we will make sure that we work with Mr. Peacock to expedite
25  whatever further investigation he needs to conduct in reference

1  to the DNA.

2      One further note is, I suspect at this point we have

3  more evidence, a lot more evidence now than what I originally

4  put in the certificate of trial attorney for the case.

5      I would suspect, given the nature of the case, and

6  more extended jury selection given the media attention and the

7  Defendant being a former Port St. Lucie police officer, I would

8  say the entire case from beginning of jury selection to verdict

9  may take a whole five days.

10      THE COURT:  Okay.  Okay.

11      MR. PEACOCK:  Just from an observation point, the

12  Government had this evidence and submitted it in very early

13  December.  They are just getting their results now, and I think

14  we are -- the 14th or the 15th is when they got their results.

15      I think it is overly optimistic to think I would get

16  my rulings that quickly from an independent examiner.

17      I am not sure that is a sufficient amount of time.  I

18  don't want to come back and tell Your Honor it is specially set

19  and I don't have my things ready.

20      The second point is, and perhaps the Court can

21  consider this, and Mr. Killinger just touched on it, I would

22  like to explore the possibility of the Court trying this case

23  in West Palm because of the publicity.

24      As the Government just noted, Mr. Harding was a Port

25  St. Lucie police officer, this did get quite a bit of notoriety

---

1  in the press at the time the arrest was made.

2      We have done our best and I commend the Government as

3  well for keeping this, well, low key and not putting it out in

4  the press, but I do think when we get to trial there will be

5  very pointed interest in this case, and I -- in addition to the

6  press being interested, he is a public figure, a public

7  official in the area.

8      So, I would ask the Court to consider trying it in

9  West Palm.

10      THE COURT:  What is the Government's position?

11      MR. KILLINGER:  Judge, we would object to that.

12      In my career, I've tried a number of high profile

13  cases, very high profile cases.  It always amazed me -- us

14  individuals in the business tend to be observant, so we keep up

15  with this in selecting juries in much more high profile cases

16  than this.  It never ceased to amaze me how many jurors don't

17  read the newspapers and pay attention to the news and have no

18  knowledge of the case.

19      The only ones may be people who have come in contact

20  with him, who may be a small amount of people.

21      The other thing, we pull our jury pool from five

22  different counties, Highlands, Okeechobee, Indian River County,

23  and I am sure the folks up there, even if they were watching

24  the news, didn't pay attention to some St. Lucie cop that got

25  arrested.

---

1      THE COURT:  Okay.

2      Lakeshia, is there a calendar call between now and the

3  17th that I could pull this up on a status conference?

4      I am going to place it on the 22nd docket, I want to

5  have a status conference mid day.

6      THE COURTROOM DEPUTY:  The 17th is calendar call.

7      THE COURT:  Here is what I am going to do, for all of

8  the reasons stated in open court and consistent with the

9  unopposed -- reasons raised in the unopposed motion to continue

10  trial, Docket Entry 63 filed 1/19/2016, the Court finds the

11  continuance outweighs the Speedy Trial Act, and grants the

12  motion to continue in part, not for the full 60 days, but for

13  the time period that will allow the case to be placed on the

14  two-week trial docket beginning February 22, 2016.

15      So, the time between January 19, 2016 and February 22,

16  2016 is hereby excluded from the speedy trial calculations.

17      I am going to set it for the calendar call in Ft.

18  Pierce on Wednesday, the 17th, at 9:00 a.m., and the week trial

19  period beginning 2/22/16, and runs to 2/29/16.

20      I am going to endeavor to -- and I think what we will

21  do is, we'll have a calendar call, albeit in West Palm Beach,

22  on February 3rd, so that is really in another week and a half,

23  and so, what I am going to do is set it for a status

24  conference.

25      Can you appear by phone?  No obligation, we are not

---

1  going to be in Ft. Pierce, and I would like a status of where

2  you are with the DNA.

3      I know it is turned over, you will get it in the hands

4  of your expert.  It needs to be analyzed, your expert needs to

5  give you the report.  The Government indicated it will make its

6  expert available at any time, and presumably there will be

7  progress, but the idea would be for the Court to try it the

8  week of 2/22, here in Ft. Pierce.

9      MR. PEACOCK:  It could go quickly, I just don't know.

10      THE COURT:  That is why I am granting the continuance,

11  and hopefully 30 days plus will be sufficient.

12      Now, the Report and Recommendation was denied -- the

13  recommendation was that it be denied, I think without

14  prejudice.  Objections are due 1/20.  Are any objections going

15  to be filed to that?

16      MR. KILLINGER:  No, Your Honor, I have no objection to

17  the result, ruling.  Motions on rulings are generally reserved

18  until the time of trial.  I will not be filing objections.

19      THE COURT:  Was defense planning on it?

20      MR. PEACOCK:  No.

21      THE COURT:  The Court will enter an order adopting the

22  Report and Recommendation at Docket Entry 51.

23      All right.  Thank you so much.

24      (Thereupon, the hearing was concluded.)

25              * * *

1    I certify that the foregoing is a correct transcript

2  from the record of proceedings in the above matter.

3

4    Date:  June 25, 2016

5                    /s/ Pauline A. Stipes, Official Federal Reporter

6                    Signature of Court Reporter

Pauline A. Stipes, Official Federal Reporter

CRDE 125

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                        FORT PIERCE DIVISION

 3                 CASE NO. 15-CR-14057-ROSENBERG

 4
      UNITED STATES OF AMERICA,      .
 5                                   .
             Plaintiff,              .
 6                                   .
             vs.                     .
 7                                   .
      MICHAEL HARDING,               .   West Palm Beach, FL
 8                                   .   February 3, 2016
             Defendant.             .
 9
10
                    TRANSCRIPT OF STATUS CONFERENCE
11               BEFORE THE HONORABLE ROBIN L. ROSENBERG
                     UNITED STATES DISTRICT JUDGE
12

13

14       APPEARANCES:

15
         FOR THE PLAINTIFF:          DANIEL FUNK
16                                   United States Attorney's Office
                                     101 S. U.S. Highway 1
17                                   Suite 3100
                                     Fort Pierce, FL 34950
18                                   305-905-7509

19       FOR THE DEFENDANTS:         FLETCHER PEACOCK, ESQ.
                                     Federal Public Defender's Office
20                                   109 North 2nd Street
                                     Fort Pierce, FL 34950
21                                   772-489-2123

22       Official Court Reporter:    Pauline A. Stipes
                                     Fort Pierce/West Palm Beach
23                                   772-467-2337
                                     HON. ROBIN L. ROSENBERG
24
25
```

---

```
 1             THE COURT:  The next case is Michael Edwin Harding,

 2   that is Case Number 15-CR-14057.

 3             If we could have all counsel state their appearance.

 4             MR. FUNK:  Good morning, Daniel Funk.

 5             MR. PEACOCK:  Fletcher Peacock appearing by phone.

 6             THE COURT:  Yes.  For the record, Mr. Funk is as well.

 7             We called this up for a status conference, this

 8   involves DNA.

 9             We had a calendar call on 1/20/2016, Defendant had an

10   unopposed motion to continue the trial, granted in part by the

11   Court.  The Court granted a 30-day continuance as opposed to

12   the 60-day agreed continuance requested by Defense.

13             So, calendar call has been reset for February 17th,

14   and jury trial reset during the two-week trial calendar

15   commencing February 22nd through February 29th.

16             Counsel believes that the trial would last about five

17   days, and we had agreed that I would set the matter for a

18   status conference today in order to receive an update from the

19   Defense regarding review of the Government's DNA evidence to be

20   presented at trial.

21             That was one of the issues that, you know, was really

22   discussed at length at our last calendar call and was the basis

23   in large part, if not entirely, for the request for the

24   continuance, and I know that at the last calendar call the

25   Government represented that the DNA had been turned over,
```

---

```
 1   Defendant was going to seek to retain an expert.  The

 2   Government was going to make its DNA expert available upon

 3   reasonable notice to expedite further investigation into DNA.

 4             So, what is the status of that process right now?

 5             MR. PEACOCK:  Your Honor, Fletcher Peacock speaking.

 6   I have obtained a DNA expert, I have sent the DNA expert the

 7   report that the Government provided to me.

 8             The DNA expert has responded with a request for

 9   certain items.  I provided that request to Mr. Funk yesterday,

10   and we are in the process, Judge, but I don't know what it is

11   going to entail until actually the experts speak.

12             My expert, Mr. Lipman, has worked with the same crime

13   laboratory the Government is using on the DNA.  He seems to

14   think that, you know, they have a good working relationship and

15   that shouldn't be a problem, but he doesn't know until he

16   receives these items what would be necessary.

17             THE COURT:  So, the request was given to the

18   Government yesterday?

19             MR. PEACOCK:  Yes, ma'am.  He responded to me last

20   Friday about the materials he would need to voice an opinion.

21             THE COURT:  Okay.

22             So, Mr. Funk, what is the status of the request handed

23   to you vis-a-vis your expert in responding to Defense to get it

24   back to Defense's expert?

25             MR. FUNK:  There were essentially three different
```

---

```
 1   categories requested.

 2             The documents we provided last Thursday would satisfy

 3   those first two categories, basically the electropherogram, the

 4   table notes, statistical analysis showing the results.  Those

 5   basic core documents have been provided.

 6             There is one outstanding issue I don't believe we need

 7   to litigate, but I need to contact the lab to see whether or

 8   not this particular analyst's information as far as

 9   irregularities in his performance would be made available.

10             I talked to the DNA analyst this morning, and he

11   looked at that request and said the documents that were

12   provided satisfied the vast majority of the request in that

13   document.

14             I think we will be able to move forward.  I will

15   provide to Mr. Peacock a response to a reasonable request.

16             I think it is literally a one-page document that I

17   need to check into with the lab to make sure it is okay in

18   releasing it, that they wouldn't object to it.  We are moving

19   forward on that.

20             THE COURT:  So, to summarize --

21             MR. PEACOCK:  There were two other matters in that

22   regard.

23             The first is, the Government filed a new discovery

24   response regarding the materials I haven't had a chance to

25   focus on because I have been getting ready for the Bully trial.
```

1    I don't know what delays that would cause as well.

2              I want the Court to know that when thinking about

3    this.

4              THE COURT:  This is something, Mr. Funk, you said you

5    produced to the Government last available.

6              MR. FUNK:  Yes, it is the case file from the crime lab

7    of the analyst Wayne Walker which included all of the analysis

8    and notes that he went through.

9              Anticipating that request, we provided it last week.

10   The response to the request that Mr. Peacock provided to me

11   yesterday, I think we satisfied that request for one

12   document, and I am willing to call the crime lab to see if I

13   can obtain it.  I will let Mr. Peacock know if that is an issue

14   today.

15             THE COURT:  Okay.

16             MR. PEACOCK:  I was referring to something different.

17             It appears the Government is alleging that Mr.

18   Harding used a Drop Box account to score or procure child

19   pornography images.  That is what I was referring to.

20             I haven't had a chance to look at that yet.

21             MR. FUNK:  That is a separate issue.  The Drop Box

22   account -- we received records at our request from Drop Box,

23   and it shows a Drop Box account that has child pornography.

24   There is a date on his computer that shows he had been

25   accessing the Drop Box.

1              Separate and apart from the DNA analysis and documents

2    requested there, the Drop Box is a new issue.  We would be

3    seeking to introduce it as 404(b) evidence.

4              So, in that regard, it is relatively straight forward.

5    I would make Brian Rey available, the agent, to show where

6    the data is contained in the electronic devices that show he

7    has access to that particular account.

8              The data is already there.  To be fair, it is like a

9    needle in a haystack finding where the Drop Box or evidence of

10   the Drop Box access is.

11             Brian Rey could probably explain it within ten or 15

12   minutes, showing the data and explaining the evidence that he

13   accessed from the Drop Box account.

14             THE COURT:  Okay, and speaking of making witnesses

15   available, has Defense taken the DNA expert of the Government's

16   deposition or --

17             MR. PEACOCK:  No, Judge, I haven't, until I got an

18   opinion from my expert.

19             I don't -- I am not any kind of an expert on DNA at

20   all, and I was going to wait until I have an opinion before I

21   ask the Government if I could speak to their expert.

22             Of course, I would do that once I am informed.

23             THE COURT:  Okay.

24             MR. PEACOCK:  Your Honor, I also ask the Court to keep

25   in mind this is a really serious case in the sense that Mr.

1    Harding's guidelines, if convicted, are in the mandatory life

2    range, and right behind this, we are in the shadow of a pretty

3    certain State prosecution, where the State indicated they would

4    be seeking a mandatory life sentence as well.

5              So, I really do appreciate any leeway the Court can

6    give us in this, we really do want to get it right.

7              THE COURT:  No, absolutely.  That is why I am holding

8    the status conference and granted the continuance.

9              It sounds like certainly everyone is working hard and

10   things have progressed since we had our calendar call back on

11   January 20th.

12             You know, we will convene again on February 17th.

13             Am I sensing from you, Mr. Peacock, that you are

14   feeling that the 2/22 date is not necessarily a date by which

15   you feel comfortable you will be ready, or are you just not

16   prepared one way or the other to say that until the rest of the

17   evaluation of the DNA and an opportunity to meet with Brian Rey

18   regarding the Drop Box?

19             MR. PEACOCK:  Judge, if I may, I am not prepared, but

20   I do think it is unlikely to be ready.

21             I will be out-of-pocket all next week.  The Bully case

22   is extremely involved, I don't think I will have a lot of time

23   to work on another case.

24             As the Court noted, the following Monday is a holiday,

25   so we are butting up against the February 22nd date pretty

1    quickly here.

2              THE COURT:  And you anticipate it being a five-day

3    case.

4              So, I suppose there is also that possibility of, as I

5    think we are doing with Bully, or maybe I am getting it

6    confused, but putting it on the second week of the trial period

7    as well.

8              So, you know, possibly looking at the week of 2/29, if

9    that will afford greater flexibility.

10             Is that true, Lakeshia, do we have both of these weeks

11   for this case, or something else on the 29th?

12             THE COURTROOM DEPUTY:  No, Judge, we have two weeks.

13             THE COURT:  The expectation is to get the case tried

14   during the two-week period, but the expectation is that every

15   party is able to complete what it needs to do to be fully

16   ready.

17             MR. PEACOCK:  Yes, ma'am.  I just want to let the

18   Court know that on March 3rd and 4th, I did have a long planned

19   annual leave with a trip outside the area.

20             THE COURT:  That is that second week of the trial?

21             MR. PEACOCK:  Yes, ma'am.

22             THE COURT:  I don't want to interfere with that.  We

23   will keep our eyes focused on the 22nd.

24             I do understand what the level of the issues are, and

25   also that you are going to be out-of-pocket next week, Mr.

1   Peacock.

2         We will check back in on the calendar call on 2/17.

3         I am not going to change the trial date at this point,

4   so there should be an expectation that is when trial is going,

5   but with the understanding, of course, that calendar call will

6   be the next opportunity to update the Court on what is

7   happening.

8         And I am trying to take detailed notes so you don't

9   have to repeat everything each time and what progress has been

10  made to get ready for trial every time.

11        Anything else on the Harding matter?

12        *MR. FUNK:*  No.

13        *MR. PEACOCK:*  No.

14        *THE COURT:*  All right.  Have a nice day.

15        (Thereupon, the hearing was concluded.)

16                              * * *

17

18        I certify that the foregoing is a correct transcript

19  from the record of proceedings in the above matter.

20

21     Date:  June 25, 2016

22                     /s/ Pauline A. Stipes, Official Federal Reporter

23                     Signature of Court Reporter

24

25

Pauline A. Stipes, Official Federal Reporter

CRDE 126

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                         FORT PIERCE DIVISION

 3                     CASE NO. 15-CR-14057-ROSENBERG

 4

 5    UNITED STATES OF AMERICA,            .

 6          Plaintiff,                     .

 7          vs.                            .

 8    MICHAEL HARDING,                     .  Fort Pierce, FL
                                           .  February 17, 2016
 9          Defendant.                     .

10               TRANSCRIPT OF STATUS CONFERENCE
          BEFORE THE HONORABLE ROBIN L. ROSENBERG
11             UNITED STATES DISTRICT JUDGE

12

13

14    APPEARANCES:

15    FOR THE PLAINTIFF:        DANIEL FUNK
                                RUSSELL KILLINGER
16                              United States Attorney's Office
                                101 S. U.S. Highway 1
17                              Suite 3100
                                Fort Pierce, FL 34950
18                              305-905-7509

19    FOR THE DEFENDANTS:       FLETCHER PEACOCK, ESQ.
                                Federal Public Defender's Office
20                              109 North 2nd Street
                                Fort Pierce, FL 34950
21                              772-489-2123

22
      Official Court Reporter:  Pauline A. Stipes
23                              Fort Pierce/West Palm Beach
                                772-467-2337
24                              HON. ROBIN L. ROSENBERG

25
```

```
 1          THE COURT:  Good morning.  You all may be seated.

 2          We will take up the calendar call.  Okay.

 3          Let's start with United States versus Michael Edwin

 4    Harding, Case Number 15-CR-14057.

 5          If we could have all counsel state their appearance.

 6          MR. KILLINGER:  Russell Killinger and Daniel Funk.

 7          MR. PEACOCK:  Good morning, Your Honor, Fletcher

 8    Peacock appearing by phone.

 9          THE COURT:  Where are you?

10          MR. PEACOCK:  I am on my way to West Palm, I have a

11    Judge Middlebrooks hearing this morning, Your Honor.

12          THE COURT:  All right.  Last word we had from

13    everybody -- it has quite a history, but to summarize, my

14    understanding is, it is the third time up, speedy trial runs on

15    4/3/16.  Per email from the Government on 2/11/16, the

16    Government is prepared for trial, and per email from Defense on

17    2/12, the Defendant did not plan to request any further

18    continuances, and there was a discussion about whether DNA

19    evidence had been fully exchanged and evaluated.

20          And perhaps that, Mr. Peacock, you were going to file

21    something at close of business on Tuesday with regard to an

22    Alford plea.  I have not seen that yet, I am having a problem

23    pulling up something on my iPad.

24          MR. PEACOCK:  I didn't.  I was concerned about press

25    coverage if I did that, and so, on second thought, I decided
```

```
 1    not to.  I wanted to raise it ore tenus for the Court.

 2          We discussed the possibility of having some publicity

 3    issues with this case before, and I didn't want to exacerbate

 4    that with that type of motion.  I did not file anything in

 5    writing.

 6          THE COURT:  Okay.

 7          So, what are we doing today?

 8          Are both sides ready to go?  Has DNA been fully

 9    exchanged and evaluated?

10          MR. PEACOCK:  If I may, Judge, once again, Fletcher

11    Peacock by phone.

12          I believe we are on schedule, if the case is tried, to

13    do it on the 22nd.  I don't want a continuance.

14          I would note this, Your Honor, I think you indicated

15    speedy trial ran on 4/3.  I think speedy trial has been tolled

16    at this point and is not running, as the Court knows.

17          I don't have in front of me what the computations are.

18    They were in my last motion for a continuance, and I think

19    those remain the same since that time, just to address that.

20          Secondly, as the Court is, I think, aware, this case

21    is unusual because there is a pending State case.  When I say

22    pending, we know there are charges that are going to be filed,

23    and those charges carry a potential penalty of mandatory life.

24          They are intertwined with the case before Your Honor.

25    That puts Mr. Harding in a difficult position in regard to a
```

```
 1    plea, in particular with regard to the count that charges

 2    production, and potentially to the other count, the charge of

 3    possession as well.

 4          Because if he were to enter a conventional plea, I

 5    believe that could be used as an admission in the State Court

 6    proceeding and we are not prepared to do that.

 7          I discussed this with the Government.

 8          The Government and I discussed the possibility of

 9    entering a no contest plea.  Not necessarily a all forward

10    plea, but a no contest plea where Mr. Harding not necessarily

11    maintains innocence, but does not enter a traditional guilty

12    plea.

13          I think the Government objects to that, but the Court,

14    according to my research and I think the Government's research,

15    has the ability to accept a no contest plea over the

16    Government's objection if it thinks it is in the best interest

17    for the Court and the case.

18          And so, I am asking the Court to accept that type of a

19    plea in this case due to the unusual circumstances involving

20    the State case which is pending in St. Lucie County.

21          THE COURT:  Is this as to all the counts or just as to

22    one or certain of the counts?

23          MR. PEACOCK:  Well, definitely as to the production

24    count, which is the last count of the superseding indictment.

25          THE COURT:  Production is Count 6.  Is that Count 6?
```

MR. PEACOCK:  Yes, ma'am.

With regard to the other counts, there is an enticement count, and it need not apply to that.  Mr. Harding could enter a straight up guilty plea to that.

The next thing is a distribution, receipt and possession count.

If the factual colloquy were to include certain items, we would be in the same position with regard to those counts.

Now, I don't think a factual colloquy needs to include specific pictures, specific images.  I think a factual colloquy is sufficient because the statute is violated by possession of a medium containing, and the indictment notes the mediums that the Government is charging; one, the thumb drive, and so on, and they are specifically identified.

THE COURT:  Okay.

So, to summarize my understanding of what you are raising is that -- are you suggesting to the Court that Mr. Harding is prepared to enter a plea of guilty as to all counts other than Count 6 to which he would want to enter a no contest plea?

MR. PEACOCK:  That is correct.

THE COURT:  Okay.  And he would be prepared to do this when?

MR. PEACOCK:  Well, last I heard, he is in Palm Beach County, I don't know if they moved him or not.  I discussed

that with the Marshals yesterday, and they indicated that they would move him, but they won't indicate exactly when.

So, I would think if we did this, it could be as early as Friday or perhaps Monday.

THE COURT:  Okay.

So, what does the Government have to say about the suggestion of a no contest plea as to Count 6?

I will clear the record for Mr. Peacock to say I did not see a lot of no contest pleas in State Court.  So, it is not something that is kind of a second nature --

MR. PEACOCK:  Oh, I understand.

THE COURT:  -- to me, just for the record.

So, does the Government have a position on that?

MR. KILLINGER:  As a general consideration, the Government does not agree to them.  There are any number of reasons.

When an individual enters a plea and does not admit publicly the underlying facts of the offense -- and as you can see from the statements that Mr. Peacock made, one of the issues in even going forward to the plea to the possession count is one of the images that the Government would proffer, whether it be -- well, we would prove it at trial.  If it goes to trial we would offer it as proof.

One of the images was an image of his then eight year old stepdaughter performing oral sex on him.

I disagree that all we have to do is allege the medium where the images were contained.  We have to prove they were child pornography, and the way he is charged in the possession count in this case, we further have to prove the aggravated penalty in the case that it was a child, a minor under 12 years old, which that image -- and we have to prove that he knew that it was child pornography.

So, we do have to go forward, and we do have to at least satisfy to the Court, we have to satisfy to the jury, that the these are child pornography images.

I don't think it is sufficient to just say that he possessed a thumb drive with a bunch of child pornography on it without giving a further description of some, certainly not all.  For that issue, we do.

I understand the Defense proposition.  We talked about this and talked about this and talked about this.

The Court obviously has discretion to entertain a no contest plea in extraordinary circumstances.

The problem here is we have a situation where Mr. Harding is not contesting the factual basis for the plea, but at the same time, he is not admitting his guilt either.

Your Honor can find him guilty based on the factual basis, and the Government -- I would request of the Court that the Government be allowed to present an extensive factual basis.  There are six different counts in this and defense --

over a long period of time, there are a lot of text messages.

If Your Honor is going to accept a no contest plea to protect the public, so the public doesn't get the impression that the Government has a weak case or just a technical case, and we are doing this as a matter of convenience for the Government, it is not a matter of convenience for the Government.

If anything, it is a matter of convenience for the Defendant, and we would ask we be allowed to present a full factual proffer to support all of the charges in the case.

The other thing is, I am a little -- still not sure whether the intent is to plead no contest to all the charges or guilty to some charges or no contest --

THE COURT:  I understood Mr. Peacock to say the proposal is that Mr. Harding would be pleading guilty to Counts 1 through 5 and no contest to 6.

Is that what -- do I have that correct, Mr. Peacock?

MR. PEACOCK:  Your Honor, yes, you do, but then, once again, it does depend on the factual proffer the Government puts forth.

THE COURT:  With all the discussions that both counsel have had, has anything been prepared in writing as far as a stipulated set of facts or factual proffer, albeit one perhaps Defense is not going to sign, but at least there is a recognition of the Government's proffered facts?

```
 1              Mr. Killinger is shaking his head no.
 2         MR. KILLINGER:  It has not.  It should be done in a
 3    fairly short fashion, but it has not been done, no, we have
 4    been preparing for trial.
 5         THE COURT:  Right, right.
 6              As you know, the standard colloquy in the pleas would
 7    be that I would ask the Government to -- if there is not a
 8    written agreed upon factual statement, and even if there is, I
 9    have it presented in Court, particularly if there is not
10    anything in writing, a presentation by the Government as to two
11    different components:
12              One, the nature of the counts, the claims, what are
13    they, the counts, and what are the essential elements, and I
14    ultimately look to the Defense to acknowledge that those are
15    the essential elements and the Government would have to prove
16    that beyond a reasonable doubt, and the Defendant is giving up
17    that right to be able to do that.
18              And I have the Government proffer all of the facts,
19    and particularly the facts that it believes will support the
20    essential elements of the crimes, and then I turn to both you,
21    Mr. Peacock, and the Defendant for an acknowledgment that those
22    are the facts, that defense acknowledges that the Government
23    could prove those facts if the case went to trial, and that
24    they do support the essential elements of the crime such that
25    the Court could make a finding as such.
```

```
 1              So, it seems to me, without a full discussion between
 2    counsel of exactly what those facts are that would be
 3    proffered, it is a little uncertain as to whether a plea could
 4    actually go forward.
 5              This is separate and apart from the no contest.  I am
 6    just talking about the first five counts.
 7              It sounds like until you all have spoken and the
 8    Government explains exactly what counts it believes -- what
 9    facts it needs to proffer, I don't want to find ourselves in a
10    plea and there are facts that you just don't feel comfortable
11    accepting as ones that the Government could prove beyond a
12    reasonable doubt for the reasons you articulated, because
13    perhaps of the consequences it may have in the State Court
14    proceedings.
15              I certainly understand it, but I want to avoid the
16    situation where we set up a plea and it doesn't go.
17              It seems to me, as to the first five counts, there
18    would seem to be a need for more discussion between counsel and
19    a better understanding of what Mr. Killinger and Mr. Funk would
20    be presenting, and, Mr. Peacock, you are comfortable
21    recognizing, yes, those are the facts, and the Government could
22    prove them and they meet the elements of the crime.
23         MR. PEACOCK:  I was going to say in response, Your
24    Honor, if I may, we really have been working on this, Judge, I
25    want the Court to know that.  We had a lot of discussions as to
```

```
 1    how this might work.
 2              I don't think we anticipated coming up with a factual
 3    scenario, but we can do that in short order.
 4         THE COURT:  Okay.
 5         MR. PEACOCK:  I want the Court to understand the
 6    Defense is not suggesting there are not sufficient facts in the
 7    record for which the Court could find a guilty plea.
 8              So, there are plenty of facts, independent of the
 9    State situation, which meet the elements of the offenses.  I
10    think we both agree on that.
11              It is whether we can call cull those things out, and
12    we can work on that.  I don't see any reason why we couldn't
13    have that by the end of business today if we can do it.  We
14    will know we can't do it or we can.
15         THE COURT:  Okay.
16         MR. KILLINGER:  I want to circle back.  Your Honor
17    keeps mentioning Counts 1 through 5, and Mr. Peacock in his
18    initial discussion with the Court also suggested --
19         MR. PEACOCK:  If Mr. Killinger could speak into the
20    microphone.
21         MR. KILLINGER:  Sorry, Mr. Peacock.  Can you hear me
22    now?
23         MR. PEACOCK:  Yes.
24         MR. KILLINGER:  I want to clarify, Mr. Peacock in his
25    initial comments discussed as a potential count or charge to
```

```
 1    which he might want to entertain a no contest plea would be the
 2    possession count.
 3              As I indicated, because that -- there is one
 4    particular image that is absolutely troubling on any number of
 5    levels to Mr. Harding, and vis-a-vis his State case.
 6              I think at the end of the day -- Mr. Peacock, correct
 7    me if I am wrong -- if the Government insisted on proffering,
 8    submitting that image that I have described, then you would
 9    only be in a position to enter a no contest plea and not a not
10    guilty plea.
11         MR. PEACOCK:  I think we are talking about the same
12    images.  We would not concede that image, no.  We could
13    concede -- I think there are sufficient images which we could
14    concede on the counts, but that image, no.
15         THE COURT:  Is that image as to Count 4, possession,
16    and Count 6, production?
17         MR. PEACOCK:  It is definitely in regard to Count 6,
18    production, and could be as to Count 4, but, Your Honor, there
19    are hundreds, if not more, images.
20         MR. KILLINGER:  That is true.
21         MR. PEACOCK:  That image is not necessary for the
22    possession count.
23         MR. KILLINGER:  The singular image to Count 6 is that
24    image.
25         THE COURT:  What I am understanding, if Mr. Harding
```

1   wants to plead no contest to Count 6, Mr. Killinger, at a

2   minimum, you would want to be able to present a sufficient

3   amount of evidence, including but not limited to the evidence

4   surrounding that image, since that is what comprises Count 6,

5   to ensure the record has been sufficiently made as to facts

6   sufficient to -- that the Government could prevail on Count 6

7   so the Court could make such a finding.

8        MR. KILLINGER:  Correct.

9        THE COURT:  With that understanding, is that your

10  understanding how a no contest plea would plead out,

11  nevertheless, the Government would have an opportunity to

12  present that information, including that one image, and even

13  though he would be seeking to enter a no contest, that is not

14  admitting to guilt or not guilt, would he nevertheless have to

15  acknowledge that those facts are as they are presented?

16       MR. PEACOCK:  I believe what we would acknowledge,

17  Your Honor could find through the Government's proffer that

18  they had presented substantial evidence to a judge and jury.  I

19  don't think we could -- I am getting a feedback of music.

20       THE COURT:  We were getting it, too, it is not from

21  the courtroom.

22       MR. PEACOCK:  I'm sorry, Judge.  What I said was, my

23  understanding is we would not acknowledge those facts as true.

24  We would simply not contest those facts, and then the Court,

25  through its own satisfaction, could make the finding that that

---

1   evidence exists, and it is sufficient to support a finding of

2   guilt.

3        THE COURT:  With that understanding -- although it is

4   not a matter of policy, it is not something the Government

5   would want to support or endorse.

6        With the opportunity to present as little or as much

7   evidence as you deem necessary for the Court to make its own

8   finding as to guilt on Count 6, with a no contest plea as to

9   that count and guilty plea as to all other counts,

10  understanding that all the other counts can be supported by

11  facts other than the particular image, but Count 6 can't, does

12  that appear to be a scenario the Government can work with?

13       MR. KILLINGER:  Yes, Judge.  If Your Honor is willing

14  to accept that, we will go forward in that manner.

15       THE COURT:  In your collective experiences, what

16  issues or problems have you seen if you had problems in the

17  past with the Court taking a no contest plea?  Have you seen

18  consequences that have been shown to lead to reversals or

19  undermine the process in any way?

20       MR. KILLINGER:  Your Honor, I can tell the Court I

21  have been doing Federal work now for 21 years and I have never

22  been involved in a no contest or Alford plea, for that matter,

23  I just haven't.

24       I can only point Your Honor to the committee notes

25  under Rule 11 where they discuss no contest pleas, and as far

---

1   as issues that might arise down the line, one of the things

2   that they point out on page 71 is -- where they talk about no

3   contest pleas in a correctional setting, and may therefore be

4   preferable to resolve guilt or innocence, thus complicating

5   correctional decisions.

6        I am not personally aware nor even anecdotally aware

7   of any problems that have arisen in the past, but something

8   must be the basis for this comment in the committee note.  But

9   again, it all goes to the general opposition in the public

10  interest, you know, that somebody comes in, we all understand

11  why he is doing it, this is a heinous, nasty, violent crime,

12  and he is not admitting it, he is not standing up and admitting

13  he is guilty of the crime, at least that is in the production

14  count.

15       MR. PEACOCK:  Your Honor, very briefly, I want the

16  Court to understand something, Mr. Harding doesn't even have

17  counsel on the State case yet.

18       Honestly, I am not qualified to even understand the

19  ins and outs of these charges in State Court, and so, I don't

20  want the Court to get the impression that we are conniving.

21       This is a very, very serious situation for which I

22  strongly believe that the State will pursue a mandatory life

23  sentence on Mr. Harding.  This is a difficult situation we find

24  ourselves in.  This is very serious, it is important.  I want

25  the Court to understand that.

---

1        THE COURT:  No, I appreciate that.  Thank you.

2        So, is the alternative if he doesn't plead, all

3   counsel are ready to go to trial on Monday?

4        MR. PEACOCK:  We'll be ready.

5        MR. KILLINGER:  Yes.

6        THE COURT:  How long is the trial anticipated to take?

7        MR. KILLINGER:  I would say a week.  Four to five

8   days, at least.

9        THE COURT:  Does the Government have your lineup of

10  witnesses?  Approximately how many witnesses?

11       MR. KILLINGER:  Approximately 15.

12       THE COURT:  Okay.  Mostly expert, some expert and lay?

13       MR. KILLINGER:  Two case agents, which are going to be

14  a lot of testimony.  One of them is Special Agent Brian Rey who

15  did all of the computer forensics, and a DNA expert and that

16  may take some time and a couple of the Defendant's -- the

17  Defendant's wife, perhaps her mother, Mr. Harding's

18  mother-in-law, and some other fairly short witnesses that I am

19  going to call just to establish Mr. Harding's whereabouts on

20  the days that certain images were sent and made.

21       THE COURT:  And from the Defense, would you be

22  anticipating any witnesses?

23       MR. PEACOCK:  Your Honor, I would need to discuss this

24  with Mr. Harding, but we might be in a position, I want the

25  Court to know, of not contesting anything at trial.

1      THE COURT:  Okay.

2      MR. PEACOCK:  If we present a witness, it will

3  probably be one witness, but that is all I anticipate now.

4      That is if we contest the evidence, which we may very

5  well not.

6      THE COURT:  Okay.

7      Are you on track with the submission of jury

8  instructions and other obligations at this point?

9      MR. KILLINGER:  The jury instructions are almost

10  complete, we could have those done probably by today.  We have

11  a witness list and we'll be finishing up the exhibit list

12  probably today or certainly by noon tomorrow.

13      There are quite a few exhibits.

14      THE COURT:  What is your sense of how many jurors

15  would be needed for this type of case?  If you've had other

16  cases of this nature, what is the number of jurors you pulled

17  up that you found sufficient?

18      MR. PEACOCK:  Are you referring to the Government?

19      THE COURT:  Either side.

20      MR. PEACOCK:  I would recommend at least 60.

21      MR. KILLINGER:  The last time we had this, I think I

22  threw out the number 80 the last time, just to make sure that

23  we don't get down to number 60 and we are two jurors short, and

24  we have to call in more.

25      THE COURT:  Well, here is what I am going to propose,

---

1  I need to get to other cases on calendar call.

2      I would like you to work together today to see what,

3  if anything, you can agree to as far as -- at least as to the

4  first five counts, the factual proffer, if you will, that would

5  support the guilty plea to which the Defendant would

6  acknowledge such facts in open court without any pause or

7  concern, and go through that scenario with each other.

8      Similarly, I would like you both to discuss Count 6

9  and what the Government would propose presenting in court so

10  that Mr. Peacock understands that and that can be communicated

11  to Mr. Harding, and I want to look into the no contest plea a

12  little more.

13      I am going to spend today doing that, to be able to

14  answer the question whether the Court would accept it.

15      I haven't seen anything in writing.  I am hearing for

16  the first time what was contemplated and why.

17      I would like to look into that.  Maybe I agree and

18  maybe I don't.

19      If I don't, what I am hearing is, that would take away

20  the option of a plea and it would go to trial.

21      It may be I am willing to do it, but it may be when

22  you confer with one another, you can't reach a meeting of the

23  minds as to what is going to be stipulated to as to Counts 1

24  through 5 and what is acceptable as far as presentation in

25  Count 6.

---

1      If we both do our parts looking into these issues,

2  what I would like is to get a status report from counsel to be

3  filed at the end of the day today where you have arrived on all

4  of these issues, and in the meanwhile, I will -- whether you

5  believe a plea can go forward in the event the Court accepts a

6  no contest plea.

7      If you have anything to offer on the no contest plea

8  from your own point of view, include that in the status as

9  well.

10      Why don't we say you don't have to file the jury

11  instructions, witness list, exhibit list, until the end of the

12  day tomorrow.

13      Everyone can see whether a plea can be worked out and

14  the Court will let you know whether it would accept a no

15  contest plea as to Count 6.

16      If the Court has any more questions about that upon

17  further research, it will let you know.

18      Sometime before noon tomorrow I will let you know

19  whether the Court is going to accept it, which would give you

20  until the end of the day to file jury instructions, exhibit and

21  witness list so you are not unnecessarily doing that today if

22  in fact it looks like a good possibility the plea is going to

23  go forward.

24      Does that make sense?

25      MR. PEACOCK:  Yes.

---

1      MR. KILLINGER:  Yes.

2      THE COURT:  The sooner you file a status report

3  letting me know you worked out the colloquy, stipulated facts,

4  anything you can shed light on Count 6 to enlighten me to

5  present that issue -- it has not been presented before, it did

6  in State, but different circumstances -- I will look into it as

7  well.

8      I would plan on trial for all intents and purposes

9  right now.

10      It will take the Court accepting a no contest plea and

11  the parties being able to work out the factual proffer.

12      If it is not worked out, this will be the case to go

13  to trial on Monday, here in Ft. Pierce, at 9:00 a.m. with all

14  of the jury instructions and witness list to be filed by five

15  o'clock on Thursday, including any proposed voir dire

16  questions, other than the standard ones that I ask.

17      Anything further that you think we need to discuss

18  related to this case?

19      MR. PEACOCK:  No.

20      MR. KILLINGER:  No, Your Honor.

21      THE COURT:  Okay, thank you, I will look for the

22  status report by 5:00 today or sooner.

23      (Thereupon, the hearing concluded.)

24

25                          * * *

1          I certify that the foregoing is a correct transcript

2     from the record of proceedings in the above matter.

3

4          Date:  June 25, 2016

5                         /s/ Pauline A. Stipes, Official Federal Reporter

6                         Signature of Court Reporter

Pauline A. Stipes, Official Federal Reporter

CRDE 127

USCA11 Case: 21-14133    Document: 42

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                        FORT PIERCE DIVISION

 3                    CASE NO. 15-CR-14057-ROSENBERG

 4
     UNITED STATES OF AMERICA,       .
 5                                   .
          Plaintiff,                 .
 6                                   .
          vs.                        .
 7                                   .  Fort Pierce, FL
     MICHAEL HARDING,                .  February 19, 2016
 8                                   .
          Defendant.                 .
 9
10
                      STATUS CONFERENCE PROCEEDINGS
11            BEFORE THE HONORABLE ROBIN L. ROSENBERG
                   UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15   FOR THE PLAINTIFF:       DANIEL FUNK
                              RUSSELL KILLINGER
16                            United States Attorney's Office
                              101 S. U.S. Highway 1
17                            Suite 3100
                              Fort Pierce, FL 34950
18                            305-905-7509

19
     FOR THE DEFENDANTS:      FLETCHER PEACOCK, ESQ.
20                            Federal Public Defender's Office
                              109 North 2nd Street
21                            Fort Pierce, FL 34950
                              772-489-2123
22

23   Official Court Reporter:  Pauline A. Stipes
                      Fort Pierce/West Palm Beach
24                            772-467-2337
                              HON. ROBIN L. ROSENBERG
25
```

Pauline A. Stipes, Official Federal Reporter

---

Date Filed: 03/22/2023    Page: 64 of 155

```
 1          THE COURT:  Good morning.  We are here in U.S.A.
 2   versus Harding, Case Number 15-14057.  I know everybody is
 3   appearing by phone.
 4          MR. KILLINGER:  Good morning, Russell Killinger and
 5   Daniel Funk for the United States.
 6          MR. PEACOCK:  Fletcher Peacock on behalf of Mr.
 7   Harding.
 8          THE COURT:  All right.  Since we last spoke on last
 9   Wednesday, I know you have been in touch with the office, and I
10   have seen emails where the Government and Defense have arrived
11   at an agreement as relates to, I think, four of the six counts.
12   I want to size up where we are right now based on my
13   understanding.
14          My understanding is that the parties worked together
15   and have arrived at a factual proffer, a stipulation that when
16   and if the Court goes forward with the plea, at least as to the
17   first four counts, the Government would be proffering facts to
18   which when the Court turns to the Defense, and Defense would
19   agree that those are facts that the Government could prove
20   beyond a reasonable doubt.  They contain the essential
21   elements, and they are sufficient for the Court to make a
22   finding that the Defendant committed the acts set forth in the
23   first four counts.
24          Is that correct?
25          MR. PEACOCK:  Yes, ma'am.  This is Mr. Peacock, yes.
```

Pauline A. Stipes, Official Federal Reporter

---

```
 1          MR. KILLINGER:  Russell Killinger for the Government.
 2          To be perfectly clear, the understanding between the
 3   parties is that Mr. Harding would be admitting his guilt as to
 4   Counts 1 through 4 on a straight guilty plea, just like a
 5   normal regular guilty plea.
 6          THE COURT:  Right.
 7          MR. KILLINGER:  The only two counts he would be asking
 8   the Court to accept a no contest plea would be Counts 5 and 6.
 9          THE COURT:  Right.
10          MR. KILLINGER:  And then the Government has requested
11   we be allowed to make a factual proffer into evidence for the
12   Court's sake more than anything else, and I guess have Mr.
13   Peacock at least acknowledge that, based on his investigation
14   of the case and going over discovery, that the facts that the
15   Government recites, he agrees that those facts would be
16   admitted in court and would support -- it would be enough to
17   get to the jury.
18          THE COURT:  Is that correct, Mr. Peacock?
19          MR. PEACOCK:  Your Honor, with regard to 5 and 6, I
20   would just intend on saying we plead no contest.
21          I don't feel comfortable acknowledging the facts.
22   That is my whole point.
23          THE COURT:  Let's take a step back.  I want to revisit
24   some of the issues raised as to why the desire to have the no
25   contest plea to begin with.
```

Pauline A. Stipes, Official Federal Reporter

---

```
 1          Let me be clear.  Did you say there is a current
 2   pending State Court case against the Defendant or not?
 3          MR. PEACOCK:  Your Honor, I will defer to the
 4   Government on this, they may know more than I do.
 5          My understanding is that charges have been prepared,
 6   drafted, and I don't know where it has gone from there.  There
 7   are prosecutors assigned and they intend to bring multiple
 8   counts of capital sexual battery and lewd and lascivious.
 9          MR. KILLINGER:  I will clarify the matter.
10          There have been warrants, arrest warrants prepared and
11   signed, not executed because he is in Federal custody, but
12   there are arrest warrants prepared and signed and are ready to
13   be executed when the State deems it timely to execute and start
14   their criminal process.
15          My understanding is there are arrest warrants for both
16   one count of capital sexual battery involving the nine year old
17   stepdaughter and another count involving the five year old
18   stepdaughter which, quite frankly, does not really factor into
19   the Federal case at all.
20          THE COURT:  Which one, the five year old?
21          MR. KILLINGER:  Correct.
22          THE COURT:  But the nine year old, it does?
23          MR. KILLINGER:  Yes, the nine year old is the victim
24   of Count 6 and Count 5, attempted enticement.
25          THE COURT:  The five year old is not involved in the
```

Pauline A. Stipes, Official Federal Reporter

1   Federal case?

2        MR. KILLINGER:  No.  No.

3        MR. PEACOCK:  And for caution, Your Honor, I would

4   add, though, that the admission in the Federal case could

5   affect the case with the five year old as well.  That is also a

6   capital battery, sexual battery count.

7        THE COURT:  Mr. Killinger, were you discussing what

8   was happening at the State level?

9        MR. KILLINGER:  That is where we are at.  Arrest

10  warrants are in place, they have been signed by a judge, and

11  it's just a matter of timing when they are going to serve the

12  warrants and bring him into the State system.

13       THE COURT:  It is not a matter of if, it is a matter

14  of when?

15       MR. KILLINGER:  Correct, Your Honor.

16       THE COURT:  Now, with respect to Count 5 and/or Count

17  6, is it the case -- is it going to be a factual proffer that

18  suggests evidence that the Defendant committed the acts that

19  involved the eight year old or nine year old on more than one

20  occasion or one occasion?

21       MR. KILLINGER:  More than one occasion.

22  Can I clarify that?

23       THE COURT:  Yes.

24       MR. KILLINGER:  Count 6, which is the production

25  count, that is a singular image that we recovered from the cell

Pauline A. Stipes, Official Federal Reporter

1   phone.

2        So, for Count 6, it would be -- as far as the proof is

3   concerned, it would be on November 17, 2014, the video was

4   taken on the cell phone, we have the actual image.

5        THE COURT:  This is a video of the Defendant with the

6   stepdaughter?

7        MR. KILLINGER:  We have a still image -- forensic

8   evidence indicates there is a video made and deleted, but the

9   thumbnail image clearly showing the sexual activity remained on

10  the phone.

11       THE COURT:  Okay, between the Defendant and

12  stepdaughter?

13       MR. KILLINGER:  Correct.

14       THE COURT:  Count 5.

15       MR. KILLINGER:  Count 5, there is an attempted

16  enticement where there are a number of chats, and during those

17  chats Mr. Harding on more than one occasion graphically

18  describes the various sexual acts that he has performed on his

19  stepdaughter.

20       That is why I say I think Count 5 -- the evidence

21  supporting Count 5 would be multiple -- his own statements that

22  he committed sexual battery on his nine year old stepdaughter

23  multiple times.

24       THE COURT:  Uh-hum.  So, one of the issues that, Mr.

25  Peacock, you raised, by admitting to 5 and 6, that that would

Pauline A. Stipes, Official Federal Reporter

1   have, you know, implications potentially for the Defendant as

2   relates to the potential State charges, which don't sound so

3   potential, they sound imminent, and including but not limited

4   to a sentence that could put him in a position of facing life.

5        Those were my notes from when you represented the

6   facts to me on Wednesday.  Is that correct?

7        MR. PEACOCK:  That is correct, it is mandatory life.

8        MR. KILLINGER:  My understanding, if he is convicted

9   on a capital sexual battery, there is only one sentence the

10  Court can impose and that is a mandatory life sentence.

11       THE COURT:  Now, in the Federal case, assuming -- let

12  me ask the position of the parties.  Again, this is getting

13  ahead because we are not at sentencing, but these are factors

14  that I am weighing.

15       What has been your experience and expectation with

16  respect to acceptance of responsibility when four of the counts

17  are guilty and the other two are not?

18       MR. KILLINGER:  If you don't mind, I will jump right

19  in.

20       THE COURT:  Okay.

21       MR. KILLINGER:  Bear with me one minute.

22       As I understand it -- excuse me, I am getting the case

23  that I pulled.

24       I did find a Sixth Circuit Court of Appeals case at

25  925 F.2d 900, and that is United States versus Tucker.

Pauline A. Stipes, Official Federal Reporter

1        In that case, at paragraph -- in that case, towards

2   the end of the opinion, the Sixth Circuit then refers to an

3   Eleventh Circuit case, which is United States versus Rodriguez,

4   905 F.2d 372, 1990, and the Sixth Circuit -- I will read it.

5        It says:  While not deciding this issue for us today,

6   they held that an Alford plea does not necessarily bar such a

7   reduction.  The Court expressly restated that we are inclined

8   to think that such a per se rule that an Alford plea bars an

9   acceptance of responsibility reduction would not be within the

10  intent of the guidelines.

11       The Sixth Circuit case says:  We are not required to

12  conclusively resolve the issue because the District Court had

13  not automatically precluded acceptance of responsibility.

14       Apparently the issue in Rodriguez was that the

15  Court -- the lower Court took the position that it had no

16  discretion to even consider acceptance in a no -- Alford guilty

17  plea.

18       I've discussed this with Mr. Funk and everything --

19  and it is kind of an interesting situation.

20       THE COURT:  Can you give me the cite again?  I am not

21  finding it.

22       MR. KILLINGER:  I am sorry, 990 -- 925 F.2d, 990.

23       THE COURT:  Okay, hold on.

24       This is the Tucker case.

25       MR. KILLINGER:  This would be an interesting kind of a

Pauline A. Stipes, Official Federal Reporter

1  hybrid because he is pleading guilty to four out of the six
2  counts.
3        I think the Government's position -- because I have
4  done the research, I think the Government would be hard pressed
5  to argue to the Court that the Court couldn't at least consider
6  acceptance of responsibility based on the guilty plea to four
7  counts and that a nolo plea, I don't think per se precludes
8  consideration of -- consideration of acceptance of
9  responsibility.
10       THE COURT:  Okay.
11       MR. PEACOCK:  Can I interject two things, Your Honor?
12  Fletcher Peacock.
13       First, in my experience, in an acceptance of
14  responsibility question, the Court is under an abuse of
15  discretion standard.  You have great discretion to determine
16  that one way or the other.
17       It is abuse of discretion standards, and you have wide
18  discretion in that regard.
19       The second thing I want to be clear about is Mr.
20  Killinger used the term "Alford plea".
21       In my research, there is a distinction between an
22  Alford plea and no contest or nolo.  It is the Defendant's
23  intention to enter a nolo plea, otherwise known as a no
24  contest.
25       The State doesn't use the term Alford, I don't want to

---

1  get into those distinctions.  What I am requesting is that the
2  Court accept a nolo plea in this case.
3        THE COURT:  Okay.
4        MR. KILLINGER:  I agree with that, Judge, and one
5  final thought.
6        In a nolo contendere plea, which is what we are
7  talking about, the Defendant is -- he is not admitting guilt,
8  but he is not denying guilt either.
9        THE COURT:  Right.
10       MR. KILLINGER:  That is why I made those comments
11  about acceptance of responsibility.
12       We all know -- if we go forward on this, we know why
13  we are doing it, and there are other cases that are similar to
14  this where Defendants go to trial not because they refused to
15  accept responsibility, but because they are preserving an issue
16  for appeal that is dispositive --
17       THE COURT:  Okay, I had another question.  Again, it
18  may appear I am jumping ahead, but these are factors I am
19  taking into account in light of the reason purported as to the
20  no contest plea, and that is the potential for mandatory life
21  in the State case.
22       Is this a case you believe -- that is why I asked the
23  question whether Counts 1 through 4 involved more than one
24  instance -- that the Guideline Section 4B1.5(b)(1) enhancements
25  for repeat and dangerous sex offenders against minors might

---

1  apply, which would result in a five point enhancement?
2        Have you looked at that issue?
3        MR. KILLINGER:  We have, Your Honor, and we are
4  applying that.  When I say we, the Government, we are
5  proceeding under the -- under our theory that it would apply,
6  and those five points would factor into the calculation of the
7  guidelines.
8        THE COURT:  If that is the case, and again, not making
9  any determinations whatsoever, but trying to cover all of the
10  potential issues, by my rough calculation, if that is the case,
11  and he has no -- I don't even know.  Let's assume, best case
12  scenario, he has no criminal history category, or I.
13       MR. KILLINGER:  He does not.
14       THE COURT:  It looks like it would be a guideline base
15  offense level of potentially 49, and even with a full three
16  point acceptance of responsibility, under the guidelines, he is
17  still looking at life, which raises the question to me -- it
18  doesn't suggest mandatory life, but perhaps that is the
19  distinction.
20       I am trying to understand again.
21       His guidelines are way up there, particularly with the
22  four, five level enhancement, and with no acceptance of
23  responsibility, it is a 49.  If there is three point acceptance
24  of responsibility, it is 46, potentially, I could be off.  I am
25  not suggesting these are definitive calculations.

---

1        43 is life, and even 42, it is 360 to life.
2        Is it your case, Mr. Peacock, that because it is not
3  mandatory life, that the Defendant holds this position of
4  wanting the no contest plea?
5        MR. PEACOCK:  That is correct, Your Honor.
6        You are not far off.  I guess I am not prepared to
7  give any definitive statement.
8        I have gone over the guidelines with the Probation
9  Officer, and you are not off; however, you know I mean, I am
10  not hiding the ball in the sense I hope down the road I could
11  convince Your Honor that is not an appropriate sentence in this
12  case.
13       For that reason I want to put Mr. Harding in as good a
14  light is a possible, and I want to reduce what the ultimate
15  range is if I can do so with acceptance of responsibility.
16       It is all relative to the sentencing position in this
17  case should Your Honor accept the plea.  That is our purpose.
18       Obviously, Mr. Harding is going to challenge the State
19  case, and that is the heart of our effort to get a no contest
20  plea, so he can go there.
21       Once again, Judge, I am not qualified to advise him on
22  a capital sexual battery case in State Court, as I think I
23  indicated to the Court at several calendar calls, I am not able
24  to counsel him.
25       He does not have counsel, and he does want to contest

1  those charges, and I think that he can put up a meaningful
2  defense in State Court.
3       Ultimately, we do want to avoid the life sentence in
4  the Federal case and State case.
5       THE COURT:  My next level of inquiry is the following:
6  Am I to understand the victim stepdaughter and -- the victim
7  stepdaughter, nine year old stepdaughter who is the one at
8  issue in the Federal case, the young girl and her mother and
9  any other family members who are involved, who know about what
10 happened, that they don't object to a no contest plea, or is it
11 that they support a no contest plea?
12      What is the thought and sentiment?  Maybe the
13 Government can let me know of the victim and the victim's
14 family as relates to a no contest plea for those two counts.
15      MR. KILLINGER:  Yes, Your Honor, both Mr. Funk and I
16 have had several lengthy discussions with Ashley Harding, who
17 is the wife of the victim -- the mother of the victim girls,
18 and also her mother, which is the grandmother.
19      THE COURT:  I'm sorry, Ashley Harding, she is married
20 to the Defendant now?
21      MR. KILLINGER:  She is.
22      THE COURT:  Okay, she is the mother of the victim
23 girls, but the girls are from another marriage, they are
24 stepdaughters, right?
25      MR. KILLINGER:  Correct.

Pauline A. Stipes, Official Federal Reporter

1       THE COURT:  You had contact with Ashley Harding and
2  Ashley's mother?
3       MR. KILLINGER:  Ashley's mother, Wilma Stevens, the
4  same day we came up for the calendar call.
5       THE COURT:  Okay.
6       MR. KILLINGER:  Judge, I will tell the Court they are
7  certainly angry, as anyone can imagine, and they want to see
8  Mr. Harding punished and they want to see him punished a lot.
9       I explained what we were going to accomplish, plead
10 guilty to four counts and no contest to the other two counts,
11 and he is exposing himself to a potential life sentence in
12 Federal Court.
13      Quite frankly, if his guidelines come out to life, the
14 Government is going to ask you to give him life.  The Court has
15 discretion, it is not mandatory.
16      They have some of their own concerns.  The mother,
17 Ashley Harding, would like to limit the publicity surrounding
18 this case and particularly the -- as she put it, she wants as
19 few as possible to have to look at the image of the daughter.
20      THE COURT:  Did you say as few people as possible?
21      MR. KILLINGER:  That is correct.
22      They don't relish or want a trial and testifying in
23 this case.
24      They support the plea that the Government has -- they
25 support the fact that he is going to essentially accept

Pauline A. Stipes, Official Federal Reporter

1  punishment as to all six counts up to potentially life in
2  prison.
3       THE COURT:  Now, let me ask something, number one --
4  two questions.  Number one, in the -- in the event the case
5  went to trial -- this is one of the questions I posed, and I
6  think there was an email response.  I want to be clear.
7       Would the victim, victim's mother, grandmother be
8  called to testify; if so, by whom, and would the image be
9  shown?
10      MR. KILLINGER:  Yes, Your Honor.  Ashley Harding, the
11 victim's mother, has seen the image, and she would be called to
12 testify that her daughter's face is clear in the image, there
13 is no doubt it is the daughter.
14      The only thing in the image that is clear is the penis
15 of Mr. Harding, which has some distinctive characteristic to
16 it, which obviously she is familiar with, and she would be
17 called and have to look at this image and have to look at the
18 jury and acknowledge that that is her daughter and that is the
19 Defendant in that image.
20      The grandmother would also have to be called not so
21 much to look at the image, but she would have to be called to
22 relive finding the sexual apparatuses that were found in the
23 house and also as a part of the chain of custody for one of the
24 apparatuses that the DNA of the minor stepdaughter was found
25 on.

Pauline A. Stipes, Official Federal Reporter

1       She would have to testify as well.
2       THE COURT:  The minor stepdaughter?
3       MR. KILLINGER:  The Government does not anticipate
4  calling the minor stepdaughter.
5       I leave that to Mr. Peacock, because I told him that
6  he didn't have to issue a subpoena and have a process server,
7  if he was going to call the daughter, I would make her
8  available.
9       And so, I will leave that to Mr. Peacock.
10      THE COURT:  Mr. Peacock.
11      MR. PEACOCK:  Your Honor, the stepdaughter is under
12 subpoena.
13      It has been a relatively amicable process in that
14 regard, I want the Court to know.  The family accepted process,
15 there wasn't any problem.
16      I am not saying we are going to call her.  I did that
17 in an abundance of caution.  I didn't want to end up in a trial
18 posture if I needed that witness.  We won't know until we are
19 actually there whether it is going to be necessary.
20      I honestly don't think it will be, but, once again, in
21 an abundance of caution I served the subpoena and I apologized
22 to Mr. Killinger.  I didn't realize the Government was going to
23 accept that.  I certainly would have gone that route.  I didn't
24 realize that they were in that position.
25      That is where we are on that.

Pauline A. Stipes, Official Federal Reporter

```
 1        THE COURT:  Mr. Killinger, you know of no one who
 2   opposes the scenario that has been presented, pleading guilty
 3   to four counts and no contest to two?
 4        MR. KILLINGER:  Unless you consider the whole
 5   Department of Justice being a person.
 6        THE COURT:  Yes, I am going to revisit that in a
 7   moment.
 8        MR. KILLINGER:  No, Judge, the victims have been
 9   consulted, they are on board with it.
10        As a matter of policy, I can't consent to it.
11        The main Justice -- I contacted main Justice, and they
12   said this was not a case that they would give me permission to
13   consent, therefore I am in a position where I have to maintain
14   the Government's objection.
15        THE COURT:  Okay.
16        Well, I understand as a representative of the
17   Department of Justice what you are saying is their policy.
18        It nevertheless seems as if you are working
19   cooperatively with Mr. Peacock, which doesn't suggest you are
20   undermining the Department of Justice's policy, I appreciate
21   you doing so.  You have done so at the request of the Court to
22   answer certain questions of the Court.
23        Is there anything other than the Department of
24   Justice, I guess, policy manual and position, not to minimize
25   it, but is there anything else that you believe you should
```

Pauline A. Stipes, Official Federal Reporter

```
 1   bring to the Court's attention as to why this is not an
 2   acceptable arrangement to do a guilty plea to four counts and
 3   not guilty -- no contest plea to 5 and 6, not just any of the
 4   counts, particularly they are 5 and 6, and the ones involving
 5   the stepdaughter.
 6        Can you explain to the Court the reason or reasons why
 7   the Court should not accept this?
 8        MR. KILLINGER:  I am hard pressed to do that.
 9        This is not -- I understand the policy reasons behind
10   objecting to no contest pleas generally, but there are some
11   extraordinary circumstances which on occasion call for them.
12        So, the answer to your question, Judge, is there is no
13   collateral consequences for the Government, for the Federal
14   Government that I can think of that would result from this
15   plea.
16        We are not agreeing to dismiss any charges; in fact it
17   is just the opposite.  He is agreeing to plead guilty to four
18   of them.
19        The entire case is going to be resolved in Federal
20   Court, and the Court can impose punishment to all of the
21   charges.  He is not in any way walking away with a sweetheart
22   deal in this case, and we have a strong case.  That is why we
23   are at this point.  So..
24        THE COURT:  So, just to recap, as to the first four
25   counts, you worked out the factual proffer, even though there
```

Pauline A. Stipes, Official Federal Reporter

```
 1   is not going to be something in writing, but the Government
 2   will stand up and state the facts and the Defense will
 3   acknowledge in the normal plea colloquy that you agree that the
 4   Government can prove the facts and that they contain the
 5   elements and in fact admitting that they, if proven -- it would
 6   go to the jury, that it would go to the jury.
 7        So, Mr. Peacock, you are in a position to do that as
 8   to the first four counts, correct?
 9        MR. PEACOCK:  Yes, ma'am.
10        THE COURT:  And as to the last two counts, the
11   Government is going to put on more extensive evidence.  Does
12   the image come in your presentation of the evidence in the
13   plea colloquy?
14        MR. KILLINGER:  I hadn't thought of that specifically,
15   Judge.
16        Off the top of my head, I don't think the image has to
17   come in at the change of plea.  The image will be published to
18   Your Honor at sentencing.  At the change of plea, no.  We can
19   describe the image sufficiently to suffice the elements of the
20   crime.
21        MR. PEACOCK:  Your Honor, there has been a factual
22   basis prepared on Counts 5 and 6 also, and that has been
23   provided to the Defense.
24        THE COURT:  In this instance, what is different from
25   the first four?  Defense is not going to say you agree the
```

Pauline A. Stipes, Official Federal Reporter

```
 1   Government can prove this by a preponderance of the evidence,
 2   you are simply going to say we don't contest these facts?
 3        MR. PEACOCK:  That is correct, Your Honor.  We choose
 4   not to challenge the Government's proof in this case.
 5        THE COURT:  And we agree that under -- as I understand
 6   it, under Rule 11(a)(3), the Court's acceptance of a no contest
 7   plea is not contingent upon Government consent, correct?
 8        MR. KILLINGER:  That is correct, Your Honor.
 9        MR. PEACOCK:  That is correct, Judge.
10        THE COURT:  I don't hear the Government saying if you
11   can confirm you are not taking the position -- I understand
12   what the Department of Justice position is.  You, as the
13   attorney in this case, knowing what is involved, are not saying
14   this in fact -- I am going to ask it one way, I may rephrase
15   it -- the issue, among others, that you raised at the calendar
16   call was whether the plea serves the public interest in the
17   effective administration of justice.
18        Do you believe, Mr. Killinger, with the Court
19   accepting guilty pleas as to four counts and no contest to the
20   other two that serves the public interest in the effective
21   administration of justice in this case?
22        MR. KILLINGER:  In this case, I do for a lot of the
23   reasons I think I stated a few minutes ago.
24        THE COURT:  Okay.
25        MR. KILLINGER:  We are not dropping counts.  He is not
```

Pauline A. Stipes, Official Federal Reporter

1   pleading to reduced charges, and he is accepting the full range

2   of punishment just as if we had gone through a week-long trial

3   and the jury found him guilty of all of the charges.

4          THE COURT:  Okay.

5          The Government doesn't see any risk accepting the no

6   contest plea from the Defendant of 4 and 5 in this case who

7   might be innocent of these charges?

8          MR. KILLINGER:  Absolutely not.

9          THE COURT:  5 and 6.

10          MR. KILLINGER:  Absolutely not.

11          THE COURT:  Does the Defendant hold any position that

12   the Court runs the risk of accepting a no contest plea from an

13   innocent defendant, Mr. Peacock, for Counts 5 and 6?

14          MR. PEACOCK:  Just to make clear, Mr. Harding does

15   intend to challenge those allegations in State Court.

16          I take no position with regard to that, Your Honor.

17   We just choose not to contest the Government's proof on 5 and

18   6.

19          THE COURT:  Okay.  How soon is he available and ready

20   to proceed with the plea?

21          MR. PEACOCK:  He is available at your convenience,

22   Judge.  He is in St. Lucie County Jail.

23          Judge, I said he is ready at your convenience, only --

24   I have gone over this with Mr. Harding.  He understands the

25   principles, legal principles, factual situation, he understands

1   the legal implications when it comes to sentencing.  He

2   understands a plea of no contest has the same validity as any

3   other guilt finding by the Court.  We have gone through that

4   whole scenario of possibilities and options in his case.

5          THE COURT:  Okay.

6          Well, the Court recognizes -- and there is a case,

7   United States versus AEM, Inc., 718 F.Supp. 2d 1334, 2010,

8   which is a very good opinion.

9          The facts are completely different from this case, but

10   the Court went through a very thorough analysis and rendered an

11   opinion by that particular judge, Judge John Anton, II.  It was

12   a series of ten factors that he considered as to why he

13   ultimately decided in a completely different kind of case to

14   accept a no contest plea, and began the opinion by indicating

15   the fact that the concept of a nolo contendere plea, also nolo,

16   is extraordinary.  It is a means by which a criminal Defendant

17   may be subject to a criminal offense without admitting guilt.

18   A plea of nolo stands as a plea of guilty.  That is Federal

19   Rule of Criminal Procedure 11.

20          Advisory committee note:  The difference is a plea of

21   nolo contendere is viewed not as an expressive admission of

22   guilt, but by consent of the Government, he would be guilty and

23   is a plea of leniency.  Although nolo pleas are specifically

24   authorized under the Federal procedure, District Courts have

25   broad discretion if they should be accepted.

1          Historically, the acceptance of nolo pleas have varied

2   from court to court, and while the view of the Government is

3   whether a nolo plea should be accepted by the Court is

4   important, Rule 1183 does not make acceptance contingent upon

5   Government consent.

6          The Government's position ordinarily has bearing on

7   the ultimate question of whether the plea serves the public

8   interest and the effective administration of justice.

9   Answering this question requires a case-by-case analysis.  Nolo

10   contendere pleas most often do not serve the public interest,

11   but the circumstances must be examined to determine the cost

12   and benefit of such a disposition.

13          Again, while the factors and analysis are helpful to

14   the Court, and I've studied them, I find that it is not

15   directly applicable insofar as this is a wholly different case

16   from the case that was at issue.  That involved corporate

17   Defendants and responsibility for criminal conduct of original

18   corporate Defendants.

19          So, I am satisfied that even though the Government has

20   represented to me that as a matter of policy by way of the

21   Department of Justice's position it doesn't agree or consent to

22   the no contest plea as to Counts 5 and 6, but it seems to me,

23   based on the case law, the ultimate and essential question is

24   whether in this case the public interest in the no contest plea

25   serves the public interest and the effective administration of

1   justice.

2          And Mr. Killinger unequivocally stated that it has and

3   does, and I am persuaded by that not only because of your

4   representation, but because of everything we have gone through.

5   And for all of the reasons and discussions that have been

6   stated on the record, including the most paramount importance,

7   the fact that the victims, if this did not occur -- I guess I

8   will ask that last question, Mr. Peacock.

9          If the Court did not accept the no contest plea, is

10   Mr. Harding prepared to go to trial?

11          MR. PEACOCK:  He is prepared to go to trial, yes,

12   ma'am.

13          THE COURT:  Understanding that, and understanding

14   while it would not be an overly lengthy trial -- and that is

15   one of the factors the Court considered in the AEM case.  I

16   decided not the length of the trial, but more importantly in

17   this case, the requirement that the mother testify, that the

18   grandmother testify, potentially the stepdaughter because she

19   is under subpoena to relive this horrific experience, to expose

20   the victim to publicity, the presentation of the photograph, to

21   me reinforces -- coupled with all of the other reasons that we

22   discussed, including that he will still face punishment as to

23   all six counts -- the punishment is severe.

24          All counsel are free to argue at sentencing what their

25   respective positions are, but we all agree the guidelines could

1    very well put him at the life category for a sentence, albeit

2    one that is not mandatory, as may be the case in State Court.

3          And so, for all of those reasons, the Court has

4    carefully considered this matter since it was brought to the

5    Court's attention for the first time on Wednesday at calendar

6    call, and concludes and is satisfied that this scenario of

7    pleading guilty to the first four counts and no contest as to

8    Counts 5 and 6 serves the public interest and the effective

9    administration of justice, and therefore the Court will accept

10   a no contest plea for Counts 5 and 6, and is setting the plea

11   for Monday morning at 9:30 a.m. in Ft. Pierce.

12         Is there anything further that anyone needs to bring

13   to my attention?

14         *MR. KILLINGER:* I don't think so, Judge. We pretty

15   much covered everything. I have a question, though. Could you

16   read the cite off for that case?

17         *THE COURT:* 718 F.Supp. 2d 1334, a Middle District of

18   Florida 2010 case.

19         *MR. KILLINGER:* Thank you.

20         *THE COURT:* Okay. Nothing further, Mr. Peacock?

21         *MR. PEACOCK:* No, ma'am.

22         *THE COURT:* All right. We will see you Monday morning

23   at 9:30.

24         Ms. Williams is going to work with the Marshals to be

25   sure the Marshals will have the Defendant there.

---

1          Have a nice day.

2          *(Thereupon, the hearing was concluded.)*

3                        * * *

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above matter.

6

7          Date:  June 28, 2016

8                 /s/ Pauline A. Stipes, Official Federal Reporter

9                 Signature of Court Reporter

CRDE 128

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                 FORT PIERCE DIVISION

 3              CASE NO. 15-CR-14057-ROSENBERG

 4
        UNITED STATES OF AMERICA,      .
 5
                  Plaintiff,           .
 6
                     vs.               .
 7
        MICHAEL HARDING,               .  Fort Pierce, FL
 8                                     .  February 22, 2016
                  Defendant.           .
 9

10              CHANGE OF PLEA PROCEEDINGS
        BEFORE THE HONORABLE ROBIN L. ROSENBERG
11            UNITED STATES DISTRICT JUDGE

12

13

14      APPEARANCES:

15      FOR THE PLAINTIFF:       DANIEL FUNK
                                 RUSSELL KILLINGER
16                               United States Attorney's Office
                                 101 S. U.S. Highway 1
17                               Suite 3100
                                 Fort Pierce, FL 34950
18                               305-905-7509

19      FOR THE DEFENDANTS:      FLETCHER PEACOCK, ESQ.
                                 Federal Public Defender's Office
20                               109 North 2nd Street
                                 Fort Pierce, FL 34950
21                               772-489-2123

22

23      Official Court Reporter:  Pauline A. Stipes
                                  Fort Pierce/West Palm Beach
24                                772-467-2337
                                  HON. ROBIN L. ROSENBERG
25
```

Pauline A. Stipes, Official Federal Reporter

---

```
 1          THE COURT:  Okay, good morning.  You may be seated.

 2          We are here this morning in a change of plea, U.S.A.

 3   versus Michael Harding, 15-CR-14057.

 4          If we could have all counsel state their appearance

 5   and the appearance of Mr. Harding.

 6          MR. FUNK:  Good morning, Daniel Funk on behalf of the

 7   United States.  I am here with Russell Killinger.

 8          THE COURT:  Good morning.

 9          MR. PEACOCK:  Good morning, Fletcher Peacock here with

10   Mr. Harding, who is here before the Court.

11          THE COURT:  Good morning.

12          I am going to begin by stating all of the matters and

13   the Court's comments and the ultimate basis for the Court's

14   decision to proceed with the plea today was based at the status

15   conference on Friday at 8:30 in the morning, Friday, the 19th,

16   and all of that is incorporated by reference into today's

17   proceeding and will be part of the record upon which the Court

18   is proceeding this morning.  So, I did want to state that.

19          My understanding is we are here for a change of plea

20   to the second superseding indictment that was filed on

21   November 12, 2015, Docket Entry 32, and that this is a plea

22   open to that second superseding indictment and that there will

23   be a plea of guilty as to Counts 1, 2, 3 and 4, and a nolo

24   contendere plea as to Counts 5 and 6.

25          So, with that, let's begin by swearing in the
```

Pauline A. Stipes, Official Federal Reporter

---

```
 1   defendant.

 2          (Thereupon, the defendant was duly sworn.)

 3   BY THE COURT:

 4   Q.  Okay.  Good morning, Mr. Harding.

 5   A.  Good morning.

 6   Q.  Do you understand that you are now under oath, and that if

 7   you answer any of my questions falsely, your answers may later

 8   be used against you in another prosecution for perjury or

 9   making a false statement?

10   A.  Yes, Your Honor.

11   Q.  If you would please state your full name?

12   A.  Michael Aaron Harding.

13   Q.  How old are you?

14   A.  28 years old.

15   Q.  How far did you go in school?

16   A.  Associate's Degree.

17   Q.  Do you read and write the English language?

18   A.  Yes, I do.

19   Q.  Have you ever been treated for addiction to drugs, alcohol

20   or a mental condition of any kind?

21   A.  I have been treated for anxiety and depression before.

22   Q.  You have been treated for anxiety and depression before?

23   A.  Yes.

24   Q.  When was that?

25   A.  That was several years ago, seven or eight years ago.
```

Pauline A. Stipes, Official Federal Reporter

---

```
 1   Q.  So, the diagnosis as to both anxiety and depression was

 2   seven or eight years ago, and continued to today?

 3   A.  Yes, Your Honor.

 4   Q.  And what are you doing, if anything, or have you been doing

 5   and are you doing, if anything, to treat the anxiety and

 6   depression?

 7   A.  I was prescribed mental health medication.

 8   Q.  How long ago?

 9   A.  Around the same time frame.

10   Q.  Seven to eight years ago?

11   A.  Yes, ma'am.

12   Q.  What medication is that?

13   A.  At the time, it was Zoloft and Klonopin.

14   Q.  Has it changed at all?

15   A.  The medication?

16   Q.  Yes.

17   A.  I don't take anything for either the anxiety or depression.

18   Q.  So, you were taking the medication that you indicated, but

19   you no longer are taking it?

20   A.  Correct, facilities don't provide that kind of medication.

21   Q.  When did you stop taking it?

22   A.  Upon my incarceration.

23   Q.  What was the date of the incarceration?

24   A.  September 22, I believe, 2015.

25   Q.  Is the fact you are not taking the medication affecting
```

Pauline A. Stipes, Official Federal Reporter

1   your state today?

2   A.   No.

3   Q.   Do you believe you are competent to enter into the change

4   of plea today?

5   A.   Yes, Your Honor.

6   Q.   Are you under any medical treatment at the facility where

7   you are being incarcerated now?

8   A.   No, Your Honor.

9   Q.   Have you taken any medication today?

10  A.   No, Your Honor.

11  Q.   Are you now under the influence of any drugs, alcohol or

12  other intoxicants that would affect your understanding of these

13  proceedings?

14  A.   No, Your Honor.

15          THE COURT:   Mr. Peacock, the fact that Mr. Harding had

16  been taking various forms of medication for anxiety and

17  depression approximately seven to eight years ago and is not

18  taking those medications as of approximately September 22,

19  2015; do you have any reason to believe based on your

20  interaction with Mr. Harding that the fact that he is not

21  taking the medication would interfere in any way with his

22  ability to understand what is happening here today and be

23  competent to change his plea today?

24          MR. PEACOCK:   No, ma'am.

25          THE COURT:   Does the Government believe any further

1   questioning in this area would be necessary as relates to Mr.

2   Harding's competency to enter the change of plea today?

3          MR. FUNK:   No, Your Honor.

4   BY THE COURT:

5   Q.   Mr. Harding, do you feel you are in full possession of your

6   faculties at this time?

7   A.   Yes, Your Honor.

8   Q.   Does the fact that you are not taking this medication

9   affect your ability to think at all?

10  A.   No, Your Honor.

11  Q.   Are you okay to make this important decision today?

12  A.   Yes, Your Honor.

13          THE COURT:   And, Mr. Peacock, you believe Mr. Harding

14  is capable of making this important decision today?

15          MR. PEACOCK:   Yes, Your Honor.

16  BY THE COURT:

17  Q.   Mr. Harding, have you received a copy of the second

18  superseding indictment against you, that is the written charges

19  against you in the second superseding indictment?

20  A.   Yes, Your Honor.

21  Q.   Have you fully discussed the charges with your attorney?

22  A.   Yes.

23  Q.   Have you had enough time to think about this and talk with

24  your attorney?

25  A.   Yes, Your Honor.

1   Q.   Are you fully satisfied with your attorney and the advice

2   and representation your attorney has given you in this case?

3   A.   I am, Your Honor.

4   Q.   Do you know what a felony is?

5   A.   Yes, Your Honor.

6   Q.   Have you ever pled guilty to a felony before?

7   A.   No, Your Honor.

8   Q.   Today I must determine whether your offer to plead guilty

9   as to Counts 1 through 4 and your no contest plea as to Counts

10  5 and 6 is done freely and voluntarily, with full knowledge of

11  the rights that you give up by such a plea, and also whether

12  your offer to plead guilty as to the first four counts and no

13  contest as to Counts 5 and 6 is done with a sufficient

14  understanding of the possible consequences of that plea.

15          If at any time you do not understand what I am saying, I

16  want you to stop me so you can consult with your attorney and

17  receive an explanation or so I can explain anything that you

18  don't understand.

19          Will you do that?

20  A.   Yes, Your Honor.

21  Q.   Have you understood everything so far?

22  A.   Yes, Your Honor.

23  Q.   Has anyone tried in any way to force you to enter into the

24  plea today or otherwise threaten you?

25  A.   No, Your Honor.

1   Q.   Has anyone made any promises or assurances of any kind to

2   get you to enter into this plea today, that is, including your

3   guilty pleas as well as your no contest pleas?

4   A.   No, Your Honor.

5          THE COURT:   Mr. Peacock, are you aware as to whether

6   any promises or assurances have been made to Mr. Harding to get

7   him to enter into the plea today?

8          MR. PEACOCK:   There have been none, Your Honor.

9          THE COURT:   Has the Government been aware or is the

10  Government aware of promises or assurances of any type made to

11  Mr. Harding to persuade him or otherwise influence him into

12  entering into this plea today?

13          MR. FUNK:   No, Your Honor.

14  BY THE COURT

15  Q.   As I understand it, as we proceed through the change of

16  plea, Mr. Harding, you are going to be entering a plea of

17  guilty as to Counts 1 through 4 and a no contest plea as to 5

18  and 6.   We'll discuss that further.

19          But is that your understanding?

20  A.   Yes, Your Honor.

21  Q.   Let me ask you as to the first four counts, that is Counts

22  1 through 3, distributing material involving sexual

23  exploitation of minors, and Count 4 -- that is in violation of

24  Title 18 United States Code Section 2252(a)(2), and as to Count

25  4, possession of material involving sexual exploitation of

1   minors, in violation of Title 18 U.S.C. 2254(a)(4)(B), are you
2   pleading guilty to those four counts because you are in fact
3   guilty?
4   A.  Yes, Your Honor.
5   Q.  And as to Count 5, attempt to coerce and entice a minor to
6   engage in sexual activity, in violation of Section 18 U.S.C. --
7   18 U.S.C. Section 2422 Subsection B, and Count 6, producing
8   child pornography, in violation of 18 U.S.C. Section 2251,
9   subsection A and E, you will be entering a no contest plea,
10  that is, you will not be contesting the facts that the
11  Government will be proffering as to what it says it can prove
12  at trial.
13      Is that correct?
14  A.  That's correct.
15  Q.  Do you understand the offenses to which you are pleading
16  guilty, and those to which you are pleading no contest, are
17  felony offenses?
18  A.  Yes, Your Honor.
19  Q.  And do you understand that if your plea is accepted, you
20  will be adjudged guilty of all offenses, not only the offenses
21  as to Counts 1 through 4 that you are pleading guilty to, to
22  the extent the Court accepts the plea, and to the extent the
23  Court accepts the no contest plea as to Counts 5 and 6 and
24  finds that the Government's factual proffer and the elements of
25  the offense to which it says it can prove at trial, should this

Pauline A. Stipes, Official Federal Reporter

---

1   case have gone to trial, beyond a reasonable doubt, that the
2   Court likewise as to those two counts, if the plea is accepted,
3   will be -- you would be adjudged guilty of those offenses as
4   well.
5       You will be adjudged guilty of all six offenses, do you
6   understand that?
7   A.  Yes.
8   Q.  Do you understand adjudication of guilt as to each and
9   every one of these offenses may deprive you of valuable civil
10  rights, the right to vote, the right to hold public office, the
11  right to serve on a jury and the right to possess any kind of
12  firearm?
13  A.  Yes, Your Honor.
14  Q.  If you were not born in this country, your guilty plea and
15  your no contest plea very likely will affect your right to stay
16  in this country and return to this country, and you may well be
17  deported.
18      Do you understand that?
19  A.  Yes, Your Honor.
20  Q.  Have you had enough time to discuss all of this with your
21  attorney?
22  A.  I have, Your Honor.
23  Q.  Do you understand neither your attorney nor anyone else can
24  predict what would happen with Immigration should Immigration
25  be an issue with you?

Pauline A. Stipes, Official Federal Reporter

---

1   A.  Yes, Your Honor.
2   Q.  If you hold any particular licenses, a conviction will
3   cause you to lose them.
4       Do you understand that?
5   A.  Yes, Your Honor.
6   Q.  Okay, I am going to state what my understanding is, and
7   then I will look to the Government afterwards to confirm what I
8   have said is correct.
9       I want to inform you, Mr. Harding, of the maximum possible
10  penalty provided by law and any mandatory minimum penalty that
11  involves jail, fine or supervised release that you may face as
12  a result of your guilty pleas, should the Court accept them
13  today, as to Counts 1 through 4 and your no contest pleas.
14      I am going to take it count by count.
15      The maximum penalty that you could face as to Counts 1
16  through 3 include five to 20 years imprisonment, $250,000 fine,
17  supervised release of five years to life, a $100 special
18  assessment per count, so Counts 1 through three, that would be
19  a $300 special assessment as to those three counts, although it
20  actually notes a $5,000 special assessment unless indigent.
21      THE COURT:  Let me ask the Government to clarify as to
22  Counts 1 through 3.
23      MR. FUNK:  To clarify the special assessment, Your
24  Honor?
25      THE COURT:  Yes.

Pauline A. Stipes, Official Federal Reporter

---

1       MR. FUNK:  $5,000 per count.
2       THE COURT:  Not $100?
3       MR. FUNK:  No, the special assessment is a recent
4   modification to the statute in child pornography.
5       THE COURT:  $100 or in addition to?
6       MR. FUNK:  In addition to.
7       THE COURT:  Am I correct as to the maximum penalty?
8       MR. FUNK:  You are.
9       THE COURT:  To clarify, a $100 special assessment as
10  to Counts 1 to 3, that is $300, and a $5,000 special
11  assessment -- did you say per count or total?
12      MR. FUNK:  Per count.
13      THE COURT:  In addition, a $5,000 special assessment
14  given the nature of the charges unless you are deemed indigent.
15  BY THE COURT:
16  Q.  Do you understand those are your maximum penalties as to
17  Counts 1 through 3?
18  A.  Yes.
19  Q.  That is distributing material involving exploitation of
20  minors.
21      Now, as to Count 4, possession of material involving sexual
22  exploitation of minors, in violation of 18 U.S.C.
23  2252(a)(4)(B), the maximum penalty that you face under that
24  statute is 20 years imprisonment, $250,000 fine, supervised
25  release of five years to life, a $100 special assessment, and a

Pauline A. Stipes, Official Federal Reporter

1  $5,000 special assessment unless indigent.

2           THE COURT:  Is that correct, from the Government?

3           MR. FUNK:  Yes.

4  BY THE COURT:

5  Q.  Do you understand that, Mr. Harding?

6  A.  Yes, Your Honor.

7  Q.  As to Count 5, the maximum penalty you face for attempt to

8  coerce and entice a minor to engage in sexual activity, in

9  violation of 18 U.S.C. Section 2422(b), is ten years to life

10 imprisonment, $250,000 fine, supervised release of five years

11 to life, $100 special assessment, and a $5,000 special

12 assessment unless indigent.

13          THE COURT:  Is that correct, from the Government?

14          MR. FUNK:  Yes.

15 BY THE COURT:

16 Q.  Do you understand that, Mr. Harding?

17 A.  Yes, Your Honor.

18 Q.  Okay, as to Count 6, producing child pornography, in

19 violation of 18 U.S.C. 2251(a) and (e), the maximum penalty is

20 15 years to 30 years, $250,000 fine, supervised release of five

21 years to life and a special assessment of $100.

22          THE COURT:  Is that correct, from the Government?

23          MR. FUNK:  Yes.

24 BY THE COURT:

25 Q.  Do you understand that, Mr. Harding?

1  A.  Yes, Your Honor.

2           THE COURT:  Maybe the Government can address the issue

3  so Mr. Harding understands as to whether these counts could

4  run -- must run concurrently or consecutively.  If the

5  Government could address that so I can ensure that Mr. Harding

6  understands that.

7           MR. FUNK:  The counts could run consecutively, there

8  is no statutory requirement that they could run consecutive.

9           THE COURT:  Each count could run consecutive to each

10 and every other count?

11          MR. FUNK:  Correct.

12          THE COURT:  Counts 1 to 3, when I said five to 20

13 years, that would be as to Count 1.  And Count 2, it would also

14 be five to 20 years.  It is for each and every count?

15          MR. FUNK:  Correct.

16 BY THE COURT:

17 Q.  Mr. Harding, I want to make sure you understand the concept

18 of concurrent and consecutive.

19      As the Government just explained, and we are talking about

20 maximum penalties, but you need to be aware of what the maximum

21 penalties are as you consider entering into your change of plea

22 here today, that the maximum penalty as to each and every count

23 can run consecutive with one another, that is back to back with

24 one another.

25      So that you could receive the maximum penalty as to Count

1  1, which would run back to back with the maximum penalty for

2  Count 2, which would run back to back with the maximum penalty

3  to Count 3, and the same for Counts 4 and 5 and 6.

4      Do you understand that concept?

5  A.  Yes, Your Honor.

6  Q.  Do you need any further explanation from the Court or any

7  time to confer with your attorney about the idea that they can

8  run consecutive to one another?

9  A.  No, Your Honor.

10 Q.  Okay.

11      Now, if as part of your sentence, you do -- you are placed

12 on supervised release, there are conditions that are placed as

13 part of the supervised release.

14      Do you understand that if you are placed on supervised

15 release and you have conditions imposed upon you, that if you

16 violate any of those conditions of supervised release you could

17 be given additional time in prison, that is above and beyond

18 what the Court has articulated as to the maximum penalties

19 associated with each and every count?

20 A.  Yes, Your Honor.

21          THE COURT:  And just to be clear, from the Government,

22 the Defendant does not face any mandatory minimum sentence, or

23 does he?

24          MR. FUNK:  There is, Your Honor.

25          THE COURT:  Could you articulate what the mandatory

1  minimum is?

2           MR. FUNK:  With regard to Count 1, five years; with

3  regard to Count 2, five years; with regard to Count 3,

4  mandatory five years; with regard to Count 5, minimum mandatory

5  ten years; Count 6, the minimum mandatory is 15 years.

6           THE COURT:  Did you say 4?

7           MR. FUNK:  There is no mandatory minimum as to Count

8  4.

9           THE COURT:  Okay.

10 BY THE COURT:

11 Q.  So, do you understand, Mr. Harding, even though there is

12 the range of, for example, Counts 1 through 3, five years to 20

13 years in Counts 1, 2, 3, that the law requires that there is a

14 mandatory minimum sentence of five years as to Counts 1, 2, 3?

15      Do you understand that concept?

16 A.  Yes.

17 Q.  Do you also understand there is a mandatory minimum of ten

18 years as to Count 5?

19 A.  Yes, Your Honor.

20 Q.  Do you understand there is a mandatory minimum sentence of

21 ten years as to Count 6?

22 A.  Yes.

23 Q.  Do you need additional time to speak to your attorney about

24 that?

25 A.  No.

1   MR. FUNK: With regard to supervised release, there is
2   a minimum mandatory, five years as to Counts 1 through 3, 4, 5
3   and 6. So all the counts require a five year minimum mandatory
4   for supervised release.
5           THE COURT: Okay.
6   BY THE COURT:
7   Q. Mr. Harding, do you understand there is a minimum of five
8   years as to each of the counts for the period of supervised
9   release with respect to any term of incarceration?
10  A. Yes, Your Honor.
11  Q. Do you have any questions about that?
12  A. No.
13  Q. Do you need additional time to speak with your attorney
14  about that?
15  A. No, Your Honor.
16  Q. Now, do you understand when the Probation Office is
17  determining your recommended sentencing range, which we will
18  do, and we will have that prior to sentencing should the Court
19  accept the plea today, that the Probation Office will use
20  relevant conduct to make that determination, meaning that it
21  can include conduct occurring under any dismissed counts in
22  determining the Sentencing Guideline range?
23          THE COURT: I don't believe there are any dismissed
24  counts in this case; is that correct?
25          MR. FUNK: Correct.

Pauline A. Stipes, Official Federal Reporter

---

1   BY THE COURT:
2   Q. I want to make sure you understand that as well.
3   A. Yes, Your Honor.
4   Q. Okay.
5           THE COURT: With respect to the Victim's Restitution
6   Act, has the Government assessed that issue at this time?
7           MR. FUNK: Not at this time. We are seeking out what
8   restitution might be owed and what victims might be identified.
9           THE COURT: Okay.
10  BY THE COURT:
11  Q. Mr. Harding, in addition to the maximum penalties the Court
12  has gone through with respect to each and every count, in
13  addition to that, the Court may also order -- be required to
14  order under the Mandatory Restitution Act that you make
15  restitution for the offense under 18, 3771(a)(6) and 62(a).
16      Do you understand that?
17  A. Yes.
18          THE COURT: Is there any forfeiture involved?
19          MR. FUNK: There is, Your Honor. We haven't discussed
20  it, but I would look to the Defense to agree to the forfeiture
21  to the items in the second superseding indictment.
22          MR. PEACOCK: May I have a minute with the Government?
23          THE COURT: Sure.
24          MR. PEACOCK: Your Honor, thank you. We have no
25  objection to the forfeiture.

Pauline A. Stipes, Official Federal Reporter

---

1           THE COURT: Okay. Where are the items that are being
2   forfeited outlined, that you are seeking?
3           MR. FUNK: They are listed within the second
4   superseding indictment.
5           THE COURT: Page four, Count 6?
6           MR. FUNK: One PM width attache thumb drive, one XRJ
7   model Mercury thumb drive, one cellular telephone and one
8   Samsung cellular phone.
9           THE COURT: All right.
10  BY THE COURT:
11  Q. Mr. Harding, do you understand the Court may require you to
12  forfeit certain items the Government outlined in Count 6 of the
13  second superseding indictment?
14  A. Yes, Your Honor.
15          MR. PEACOCK: Your Honor, if I may, in not contesting
16  forfeiture, Mr. Harding does not waive his rights to challenge
17  the possession of the items initially in future proceedings.
18          THE COURT: Okay.
19          MR. PEACOCK: Obviously, we'll be waiving that in this
20  case, but in any future case Mr. Harding reserves the right if
21  appropriate to challenge -- he is not abandoning those, we are
22  saying the Government has the power to forfeit.
23          THE COURT: Okay, is that the Government's
24  understanding as well?
25          MR. FUNK: Yes, Your Honor.

Pauline A. Stipes, Official Federal Reporter

---

1           THE COURT: Okay.
2   BY THE COURT:
3   Q. In addition to all of the other penalties that the Court
4   has addressed, Mr. Harding, do you understand the Court may
5   order notice to the victims of the offense under Section 3555?
6   A. Yes, Your Honor.
7   Q. So, do you understand that everything we have just gone
8   through, that all of these are possible consequences of your
9   plea here today?
10  A. Yes, Your Honor.
11  Q. Now, your sentence will be determined by a combination of
12  the advisory Sentencing Guidelines, possible departures and
13  variances from the Sentencing Guidelines and other statutory
14  factors set forth under 18 U.S.C. 3553(a).
15      Have you and your attorney discussed how the advisory
16  Sentencing Guidelines might apply to your case?
17  A. Yes, Your Honor.
18  Q. Do you need any additional time to discuss this with your
19  attorney?
20  A. No, Your Honor.
21  Q. Neither the Court nor anyone else will be able to determine
22  with certainty the advisory guideline range for your case until
23  after the Pre-Sentence Report has been completed and you and
24  the Government have had an opportunity to challenge the
25  reported facts and the application of the guidelines

Pauline A. Stipes, Official Federal Reporter

1 recommended by the Probation Officer.
2     Do you understand that?
3 A.  Yes, Your Honor.
4 Q.  So, the sentence I ultimately impose may be different from
5 any estimate your attorney may have given you.  It may be
6 higher or lower.
7     Do you understand that?
8 A.  Yes, Your Honor.
9 Q.  If I give you a higher sentence than you are hoping for
10 that is a chance by your plea today and would not be grounds to
11 withdraw your guilty plea.  Do you understand that?
12 A.  Yes, Your Honor.
13 Q.  For example, you heard what the maximum penalties are for
14 each and every offense, and you heard each and every penalty
15 could run back to back to each and other offense, that is
16 for all six counts the penalty could run consecutively, as I
17 described that to you.
18     If that were a sentence that the Court imposed, and if that
19 sentence was higher than you expected, maybe even higher than
20 what the guideline range is, higher than what your attorney has
21 indicated may be a likely outcome, do you understand that that
22 would not be a basis for you to seek to withdraw your guilty
23 plea?
24 A.  Yes, Your Honor.
25 Q.  And should the advisory guideline range, for example, show

1 a calculation of a guideline that suggests life imprisonment
2 for your pleas of guilty to Counts 1 through 4, and no contest
3 plea as to 5 and 6, and that is not something you are expecting
4 or maybe did not discuss with your attorney, but if the
5 guidelines show, and they may very well show that the sentence
6 imposed under the guidelines is a life sentence, do you
7 understand that that is part of your plea here today and that
8 would not be a basis for you to withdraw your plea at any later
9 time?
10 A.  Yes, Your Honor.
11 Q.  Now, after your initial guideline range has been
12 determined, the Court does have the authority in some
13 circumstances to depart upward or downward from that range and
14 examine other statutory sentencing factors under 3553(a) that
15 may result in a sentence that is either more or less than the
16 advisory guideline sentence.
17     Again, if I give you a higher sentence than you are hoping
18 for, that is a chance you take by your plea today and would not
19 be grounds to withdraw your guilty plea.
20     Do you understand that?
21 A.  Yes, Your Honor.
22 Q.  Do you understand parole has been abolished, and if you are
23 sentenced to prison, you will not be released on parole?
24 A.  Yes, Your Honor.
25 Q.  Do you understand the actual sentence you serve in custody

1 is between you and the Bureau of Prisons?
2 A.  Yes, Your Honor.
3 Q.  If the Bureau of Prisons makes you serve your entire
4 sentence, that is a part of your plea and would not be grounds
5 for you to withdraw your guilty plea.
6     Do you understand that?
7 A.  Yes, Your Honor.
8 Q.  Do you understand you do have the right to plead not guilty
9 to any offense charged against you and persist in that plea?
10 A.  Yes, Your Honor.
11 Q.  Do you understand you have a right to trial by jury?
12 A.  Yes, Your Honor.
13 Q.  Do you understand at a trial you would be presumed innocent
14 and the Government would have to prove your guilt beyond a
15 reasonable doubt?
16 A.  Yes.
17 Q.  Do you understand you have a right to defense counsel
18 appointed at trial and every other stage of the proceeding?
19 A.  Yes.
20 Q.  You have a right to confront the witnesses and see and hear
21 them and cross-examine them in your defense?
22 A.  Yes, Your Honor.
23 Q.  Do you understand you have a right to compel the attendance
24 of witnesses at a trial?
25 A.  Yes.

1 Q.  Do you understand if you decided not to testify or put on
2 any evidence at all, these facts could not be used against you?
3 A.  Yes, Your Honor.
4 Q.  Do you understand you also have a right to testify at trial
5 if you wish to do so?
6 A.  Yes, Your Honor.
7 Q.  By pleading guilty and by pleading no contest, guilty to
8 Counts 1 through 4 and no contest as to 5 and 6, if I accept
9 your plea, there will be no trial, and you will have given up
10 your right to trial as well as all the other rights we
11 discussed.
12     Do you understand that?
13 A.  Yes, Your Honor.
14 Q.  Okay.
15     At this point, I am going to ask the Government -- I will
16 ask you to listen very carefully, Mr. Harding, because I will
17 turn to you after the Government has spoken.
18     What I am going to ask the Government to do right now is to
19 summarize the second superseding indictment.
20     In doing so, I am going to ask the Government to explain
21 the essential elements of the offense for each and every count,
22 each and every charge, all six counts contained within the
23 superseding and second superseding indictment.
24     These are the elements of the offense which the Government
25 would have to prove beyond a reasonable doubt, and then I am

USCA11 Case: 21-14133    Document: 42

```
 1   going to turn to you, Mr. Harding, to make sure you understand
 2   that these are both the essential elements of each offense that
 3   the Government would have to prove beyond a reasonable doubt,
 4   and also, the facts that the Government says it can prove that
 5   support the essential elements such that if the case went to
 6   trial, the Government would be able to prove this beyond a
 7   reasonable doubt.
 8          THE COURT:  So, why don't we start with the -- I think
 9   the way you have broken it out, you have broken out each of the
10   counts separately.
11          Why don't we take it count by count, understanding
12   that the first three counts all contain the same elements of
13   the offense and same factual basis.
14          Let's start with Counts 1, 2 and 3, essential elements
15   and factual basis.
16          MR. FUNK:  Before we move on to that, one last thing
17   with regard to notice of the Defendant, that he understands
18   conviction for this offense will result in substantial
19   restrictions where he may live, work and associate.
20          THE COURT:  Okay.
21   BY THE COURT:
22   Q.  Do you understand that, Mr. Harding?
23   A.  Yes.
24   Q.  Do you have any questions about that?
25   A.  No.
```

Pauline A. Stipes, Official Federal Reporter

Date Filed: 03/22/2023    Page: 78 of 155

```
 1   Q.  Do you need additional time to confer with your attorney
 2   about that?
 3   A.  No, Your Honor.
 4          MR. FUNK:  Regarding Counts 1, 2 and 3, the elements
 5   of the offense for distributing material involving the sexual
 6   exploitation of minors, the prosecution would prove the
 7   following facts or elements to convict the Defendant of
 8   distributing material involving sexual exploitation of minors
 9   as alleged in Counts 1, 2 and 3 of the second superseding
10   indictment.
11          First, the Defendant knowingly distributed a visual
12   depiction; second, the depiction was shipped or transported in
13   interstate or foreign commerce by any means, including by
14   computer; third, producing the visual depiction involved using
15   a minor engaged in sexually explicit conduct; four, the
16   depiction is of a minor engaged in sexually explicit conduct
17   and; five, the Defendant knew that at least one performer in
18   the visual depiction showed the minor engaged in sexually
19   explicit conduct.
20          To "distribute" something means to deliver or transfer
21   possession of it to someone else, with or without any financial
22   interest in the transaction.
23          "Minor" means any person younger than 18 years old.
24          "Interstate or foreign commerce" is the movement of
25   property between different states or between the United States
```

Pauline A. Stipes, Official Federal Reporter

```
 1   and anyplace outside the United States.  The transmission of
 2   information through the internet is in or affecting interstate
 3   or foreign commerce.
 4          The term "state" means a State of the United States,
 5   the District of Columbia or any commonwealth, territory or
 6   possession of the United States.
 7          The term "computer" includes any high-speed data
 8   processing device that can perform logical, arithmetic or
 9   storage functions, including any data storage facility or
10   communications facility that is directly related to or operates
11   in conjunction with the device.  It does not include an
12   automated typewriter or typesetter, a portable hand-held
13   calculator, or similar devices which are limited in function to
14   word processing or mathematical calculations.
15          The term "sexually explicit conduct" means actual or
16   simulated:  Sexual intercourse, including genital-genital,
17   oral-genital, anal-genital or oral-anal contact, whether
18   between persons of the same or opposite sex; bestiality;
19   masturbation; sadistic or masochistic abuse or; lascivious
20   exhibition of the genitals or pubic area of any person.
21          "Lascivious exhibition" means indecent exposure of the
22   genitals or pubic area, usually to incite lust.  Not every
23   exposure is a lascivious exhibition.
24          To decide whether a visual depiction is a lascivious
25   exhibition, the jury would consider the context and setting in
```

Pauline A. Stipes, Official Federal Reporter

```
 1   which the genitalia or pubic area was displayed.
 2          Factors the jury may consider are the overall content
 3   of the material; whether the focal point of the visual
 4   depiction is on the minor's genitalia or pubic area; whether
 5   the setting of the depiction appears to be sexually inviting or
 6   suggestive, for example, in a location or in a pose associated
 7   with sexual activity; whether the minor appears to be displayed
 8   in an unnatural pose or inappropriate attire; whether the minor
 9   is partially clothed or nude.
10          Whether the depiction appears to convey sexual coyness
11   or an apparent willingness to engage in sexual activity and;
12   whether the depiction appears to have been designed to elicit a
13   sexual response in the viewer.
14          A visual depiction need not have all of these factors
15   to be a lascivious exhibition.
16          The term "visual depiction" includes undeveloped film
17   and videotape and data stored on computer media or by other
18   electronic means that can be converted into a visual image.
19          The internet, telephones, and cellular telephones are
20   facilities of interstate commerce.
21          The factual basis for Count 1.  The Defendant, Michael
22   Harding, on July 23, 2015, at approximately 9:11 a.m., using
23   the screen name "desthfromabovee",
24   D-E-S-T-H-E-F-R-O-M-A-B-O-V-E-E, posted two images of child
25   pornography in the Kik Messenger chat room titled
```

Pauline A. Stipes, Official Federal Reporter

1  #toddlerfuck, T-O-D-D-L-E-R-F-U-C-K.  One of the images posted
2  to the chat room depicts a preteen female, under the age of 18,
3  performing oral sex on an adult male.  The other image posted
4  to the chat room depicts a preteen girl, under the age of 18,
5  reclined on a couch holding her vagina to the camera.
6        Both images were downloaded from the internet by a
7  federal agent located in Wilmington, Delaware.  The images were
8  posted while Michael Harding was in the Southern District of
9  Florida.  The images posted over the internet.
10        *THE COURT:*  Was the screen name
11  D-E-S-T-H-F-R-O-M-A-B-O-V-E, or another E at the end?
12        *MR. FUNK:*  Two E's, Your Honor.
13        *THE COURT:*  All right.
14        *MR. FUNK:*  The factual basis for Count 2.  The
15  Defendant, Michael Harding, on July 26, 2015, at approximately
16  6:21 a.m., using the screen name "desthfromabovee", posted one
17  video of child pornography in the Kik Messenger chat room
18  titled #toddlerfuck.  The file uploaded to the chat room over
19  the internet depicts a prepubescent female being anally
20  penetrated by an adult male penis as he ejaculates.
21        The image was posted while Michael Harding was in the
22  Southern District of Florida, and as was the case in Count 1,
23  an image downloaded by a Federal agent who was in Delaware.
24        Factual basis for Count 3.  The Defendant, Michael
25  Harding, on August 4, 2015, at approximately 6:49 a.m., using

---

1  the screen name "desthfromabovee", posted one video of child
2  pornography in the Kik Messenger chat room titled #toddlerfuck.
3  The file uploaded to the chat room over the internet is
4  37 seconds long and shows an adult male rubbing his penis on
5  the vagina and anus of a preschool aged female.  The girl in
6  the video is prepubescent and under 12 years of age.
7        The image was posted while Michael Harding was in the
8  Southern District of Florida.  The image was downloaded from
9  the internet by an undercover agent in Delaware.
10  *BY THE COURT:*
11  *Q.*  As to Counts 1, 2 and 3, Mr. Harding, do you understand, as
12  the Government outlined in the beginning of its recitation,
13  that those are the essential elements of the crimes that you
14  are charged with in Counts 1, 2 and 3?
15  *A.*  Yes, Your Honor.
16  *Q.*  Do you understand if this case went to trial, the
17  Government would have had to prove each essential element of
18  the crime beyond a reasonable doubt?
19  *A.*  Yes, Your Honor.
20  *Q.*  When you plead guilty, you give up your right to have the
21  Government prove each essential element of the crime beyond a
22  reasonable doubt.
23        Do you understand that?
24  *A.*  Yes, Your Honor.
25  *Q.*  When you plead guilty, you give up any defenses, and there

---

1  may be a number, but you give them up.
2        Do you understand that?
3  *A.*  I do.
4  *Q.*  Have you spoken with your attorney about possible defenses
5  and the chances of winning at trial?
6        My question relates to Counts 1, 2 and 3.  Have you had
7  enough time to speak with your attorney about possible defenses
8  and your chances of winning at trial on Counts 1, 2 and 3?
9  *A.*  Yes.
10  *Q.*  Following the Government's recitation of the essential
11  elements of Counts 1, 2 and 3, the Government summarized the
12  facts -- factual basis for each of those counts and proffered
13  to the Court that it believes it could prove all of the facts,
14  and that the facts contain the essential elements beyond a
15  reasonable doubt.
16        Do you understand the Government says it can prove all of
17  these facts to support Counts 1, 2 and 3 if this case went to
18  trial?
19  *A.*  Yes.
20        *THE COURT:*  Mr. Peacock, do you take any exception to
21  the facts summarized by Mr. Funk?
22        *MR. PEACOCK:*  No, ma'am.
23        *THE COURT:*  Does the -- Mr. Peacock, does the
24  Defendant agree if this case went to trial, the Government
25  could have proved what it says it could have proven beyond a

---

1  reasonable doubt?
2        *MR. PEACOCK:*  We agree the Government could have shown
3  a prima facie case and the Court would have sent it to a jury.
4        *THE COURT:*  You agree that if the case went to trial,
5  I would have sent it to the jury?
6        *MR. PEACOCK:*  Yes.
7        *THE COURT:*  Mr. Peacock, do you agree the factual
8  recitation contained the essential elements of the crimes in
9  Counts 1, 2 and 3?
10        *MR. PEACOCK:*  Yes, ma'am.
11        *THE COURT:*  Okay.
12        I do find the facts are sufficient to establish the
13  crimes charged in Counts 1 through 3, distributing material
14  involving sexual exploitation of minors, in violation of 18
15  U.S.C. Section 2252(a)(2) and (b)(1).
16        If I could have the Government set forth the elements
17  of Count 4, possession of material involved in sexual
18  exploitation of minors, and the factual basis for Count 4.
19        *MR. FUNK:*  Yes, Your Honor.  With regard to Count 4,
20  the definitions of the terms as set out in Counts 1, 2 and 3
21  also apply to Count 4 with regard to the definition of minor,
22  interstate or foreign commerce, state, computer, sexually
23  explicit conduct and lascivious exhibitions.
24  *BY THE COURT:*
25  *Q.*  Do you understand that, Mr. Harding?

```
 1   A.  Yes.
 2        MR. FUNK:  The prosecution would prove the following
 3   facts or elements to convict the Defendant of possessing any
 4   matter involving sexual exploitation of minors as alleged in
 5   Count 4 of the second superseding indictment.
 6        First, the Defendant knowingly possessed a matter
 7   containing a visual depiction; second, the depiction was
 8   shipped or transported in or affecting interstate or
 9   commerce by any means, including computer, or that the matter
10   containing the depiction was produced using materials that have
11   been shipped or transported in or affecting interstate or
12   foreign commerce; third, producing the visual depiction
13   involved using a minor engaged in sexually explicit conduct;
14   four, the depiction is of a minor engaged in sexually explicit
15   conduct and; five, the Defendant knew that at least one
16   performance in the visual depiction was a minor and knew that
17   the depiction showed the minor engaged in sexually explicit
18   conduct.
19        The factual basis:  The Defendant, Michael Harding, on
20   September 22, 2015, did knowingly possess matters in and
21   affecting interstate and foreign commerce containing visual
22   depictions that involved the use of a minor engaged in sexually
23   explicit conduct.
24        On September 22, 2015, a search warrant was executed
25   at the residence of Michael Harding located in Port St. Lucie,
```

```
 1   Florida, in the Southern District of Florida.  A PNY thumb
 2   drive was located in a gun's case within a closet inside the
 3   bedroom of Michael Harding's home.  The PNY thumb drive
 4   contained 606 still images and 102 videos depicting minor
 5   children, including prepubescent children, engaging in sexually
 6   explicit conduct.  Some of the images also depict
 7   sadomasochistic conduct.
 8        One or more of the images discovered on the PNY thumb
 9   drive were produced outside the State of Florida and were
10   subsequently distributed over the internet before the Defendant
11   possessed them.
12        An LG-D800 cellular telephone registered to Michael
13   Harding was discovered in a nightstand next to his bed in the
14   bedroom.  It was manufactured in Korea and was shipped and
15   transported in interstate and foreign commerce prior to
16   September 22, 2015.
17        A forensic examination of the LG-D800 cellular
18   telephone revealed the presence of nine videos involving the
19   use of minors engaged in sexually explicit conduct, including
20   images uploaded to the Kik Messenger chat room #toddlerfuck" by
21   user "desthfromabovee" on July 26, 2015 and August 4, 2015.
22   BY THE COURT:
23   Q.  Mr. Harding, do you understand each of the essential
24   elements of the crime set forth in the second superseding
25   indictment in Count 4, that is possession of material involving
```

```
 1   sexual exploitation of minors, in violation of 18 U.S.C.
 2   2252(a)(4)(B)?
 3   A.  Yes, Your Honor.
 4   Q.  Do you understand that if this case went to trial, the
 5   Government would have had to prove each of the essential
 6   elements in Count 4 beyond a reasonable doubt?
 7   A.  Yes.
 8   Q.  Do you understand when you plead guilty, you give up your
 9   right to have the Government prove the elements beyond a
10   reasonable doubt?
11   A.  Yes.
12   Q.  When you plead guilty you give up all the defenses, and
13   there may be a number of defenses you do have, but you do give
14   them up by pleading guilty.
15        Do you understand that?
16   A.  Yes.
17   Q.  Have you had a chance to speak with your attorney about the
18   possible chances of winning at trial as to Count 4?
19   A.  Yes.
20   Q.  Do you similarly understand, Mr. Harding, the Government
21   went on to give the factual basis for the charge of Count 4 in
22   the second superseding indictment?
23        Do you understand the Government says it could prove those
24   facts beyond a reasonable doubt if the case went to trial?
25   A.  Yes.
```

```
 1        THE COURT:  Mr. Peacock, do you take any exception to
 2   the facts summarized in Count 4?
 3        MR. PEACOCK:  No objection, Your Honor.
 4        THE COURT:  Mr. Peacock, does Mr. Harding agree that
 5   if this case went to trial, the Government could have proven
 6   what it said in the proffer?
 7        MR. PEACOCK:  We agree the Government could have shown
 8   a prima facie case in which Your Honor would have sent the case
 9   to the jury.
10        THE COURT:  You stipulate had the case gone to trial,
11   I would have sent the case to the jury?
12        MR. PEACOCK:  Yes.
13        THE COURT:  Do you understand the factual recitation
14   contains the essential elements of the crime of Count 4?
15        MR. PEACOCK:  Yes.
16        THE COURT:  I find the facts are sufficient to
17   establish the crime charged in Count 4, possession of material
18   involving sexual exploitation of minors, in violation of 18
19   U.S.C. Section 2252(a)(4)(B).
20        If the Government could proceed as to the elements of
21   the offense and factual basis for Count 5.
22        MR. FUNK:  Yes, Your Honor.  The elements for the
23   offense charged in Count 5, attempt to coerce and entice a
24   minor to engage in sexual activity, is as follows.
25        The prosecution would be prepared to prove the
```

1  following facts or elements to convict the Defendant of
2  attempted coercion or enticement of a minor engaged in sexual
3  activity:
4       The Defendant knowingly persuaded, induced, enticed or
5  coerced an individual to engage in sexual activity; second, the
6  Defendant used a computer or other interstate facility to do
7  so; third, when the Defendant did these acts the individual was
8  less than 18 years old; fourth, one of the individuals engaging
9  in the sexual activity could have been charged with a criminal
10 offense under Florida law.
11      As a matter of law, the following acts are crimes
12 under Florida law:
13      Sexual Battery in violation of Florida Statute,
14 Section 794.011, Subsection 2, small a.  A person 18 years of
15 age or older who commits sexual battery upon a person under 12
16 years of age commits a capital felony.
17      Lewd or Lascivious Battery, in violation of Florida
18 Statute, Section 800.04 subsection small a, subsection 2.  A
19 person commits lewd or lascivious battery by encouraging,
20 forcing or enticing any person less than 16 years of age to
21 engage in sadomasochistic abuse, sexual bestiality.
22 Prostitution or any other act involving sexual activity.
23      This is a charge of attempt.  The prosecution needs to
24 prove the following facts or elements to convict the Defendant
25 of attempt:

---

1       One, that the Defendant knowingly intended to commit
2  the crime of enticement of a minor to engage in sexual
3  activity; and two, the Defendant's intent was strongly
4  corroborated by his taking a substantial step toward committing
5  the crime.
6       A "substantial step" is defined as an important action
7  leading up to the committing of an offense, not just an
8  inconsequential act.  It must be more than simply preparing.
9  It must be an act that would normally result in committing the
10 offense.
11      As used in this case, "induce" means to stimulate the
12 occurrence of or to cause.
13      A cellular telephone and the internet is a facility of
14 interstate commerce.
15      The Defendant need not communicate directly with a
16 minor; it is sufficient if the Defendant induces or attempts to
17 induce the minor via an adult intermediary.
18      The Government does not have to prove the existence of
19 or identity of a specific minor victim.  A fictitious minor
20 will suffice so long as the Defendant understood and believed
21 that a minor was involved.
22      Count 5, the defendant, Michael Harding, between
23 August 12, 2015 and September 10, 2015, using a facility and
24 means of interstate commerce, including transmissions by
25 computer on the internet, knowingly attempted to persuade,

---

1  induce, entice or coerce a person under 18 years of age to
2  engage in sexual activity for which any person could be charged
3  with a criminal offense.
4       Michael Harding, between August 12, 2015 and
5  September 10, 2015, engaged in chat conversations with a single
6  individual having the Kik Messenger screen name
7  "daddydearaimee" and the Skype screen name "Mel M".
8       The text conversations occurred on the Kik Messenger
9  application, and the Skype application, on Michael Harding's
10 LG-D800 cell phone and Samsung cell phone.  The person with
11 whom Michael Harding was having the conversation, hereinafter
12 referred to as "daddydearaimee", told Michael Harding that he
13 had a seven year old daughter and a 12 year old daughter.
14 "daddydearaimee" sent Michael Harding non-nude pictures of two
15 girls he stated were his minor children.  The two girls shown
16 in the images are clearly minor females.
17      "daddydearaimee" claimed he had performed sex acts on
18 both of his own minor children.  Michael Harding stated that he
19 had previously engaged in sexual acts with his nine year old
20 stepdaughter.
21      Michael Harding initiated a conversation about
22 exchanging their minor children for the purpose of engaging in
23 sexual acts.  Michael Harding graphically described the sex
24 acts he had performed on his stepdaughter.  Michael Harding
25 sent "daddydearaimee" non-nude images of both of his

---

1  stepdaughters showing their bodies, without showing their
2  faces.  One of the images showed the face of Michael Harding's
3  nine year old stepdaughter, the one that Michael Harding
4  proposed swapping for sex.
5       Michael Harding provided real biographical information
6  about himself, including his age, residence and the composition
7  of his family.  He had detailed conversations with
8  "daddydearaimee" regarding where they would meet and how
9  Michael Harding would explain to his wife why he was traveling
10 alone with his nine year old stepdaughter.
11      In carrying on these conversations, Michael Harding
12 did attempt to entice the minor child of "daddydearaimee" to
13 engage in sexual acts that would constitute a violation of
14 Florida law.
15      THE COURT:  Okay.
16 BY THE COURT:
17 Q.  Mr. Harding, first, do you understand that the Government
18 first began by outlining all of the essential elements that it
19 would need to prove beyond a reasonable doubt for attempted --
20 attempt to coerce and entice a minor to engage in sexual
21 activity as set forth in Count 5, in violation of 18 U.S.C.
22 Section 2422(b)?
23      Do you understand those were the essential elements of the
24 crime?
25 A.  Yes, Your Honor.

1    Q.  Do you understand if this case went to trial, the
2    Government would have had to prove each essential element of
3    the crime in Count 5 beyond a reasonable doubt?
4    A.  Yes, Your Honor.
5    Q.  And do you understand when you plead guilty -- in this
6    case, when you pled guilty or when you plead no contest, you
7    give up your right to have the Government prove each essential
8    element of the crime beyond a reasonable doubt?
9        Do you understand that?
10   A.  Yes, Your Honor.
11   Q.  And when you pled guilty or you plead no contest, you give
12   up all of your defenses, and you may have a number of defenses,
13   but you do give them up when you pled guilty or no contest.
14       Do you understand that?
15   A.  Yes, Your Honor.
16   Q.  Have you had enough time to speak with your attorney about
17   possible defenses and chances of winning at trial as relates to
18   Count 5?
19   A.  Yes.
20   Q.  Do you understand what it says the Government could prove
21   in your case as the factual basis for Count 5?
22       MR. PEACOCK:  Your Honor, could the Court rephrase
23   that?
24       THE COURT:  Yes.
25

1    BY THE COURT:
2    Q.  Do you understand what the Government says it can prove in
3    your case in Count 5?
4        MR. PEACOCK:  Just one second, Judge.
5        THE DEFENDANT:  Yes, I understand the words.
6        THE COURT:  Did you say you understand the words?
7        THE DEFENDANT:  Yes, Your Honor.
8    BY THE COURT:
9    Q.  I want to make sure you are answering this question:  That
10   you understand what the Government says it can prove in your
11   case; is that a yes or a no?
12   A.  Your Honor, I understand what they say they can prove.
13       THE COURT:  Mr. Peacock, do you take any exception or
14   objection to the facts as summarized on behalf of the
15   Government?
16       MR. PEACOCK:  We choose not to contest.
17       THE COURT:  Does the Defendant agree if this case had
18   gone to trial, the Government could have proven what it says it
19   could have proven in the proffer beyond a reasonable doubt?
20       MR. PEACOCK:  We take no position.  We choose not to
21   contest that.
22   BY THE COURT:
23   Q.  Mr. Harding, do you agree the Government could have proven
24   what it says it could have proven beyond a reasonable doubt?
25   A.  I choose not to contest.

1        THE COURT:  Mr. Peacock, do you agree if the case went
2    to trial, I would have sent the case to the jury?
3        MR. PEACOCK:  No, Your Honor, I choose not to contest
4    those facts on behalf of Mr. Harding.
5        THE COURT:  Do you stipulate -- Mr. Peacock, do you
6    stipulate the Government's factual recitation contains the
7    essential elements of the crime?
8        MR. PEACOCK:  If those facts were proven, I believe it
9    would state a prima facie case.
10       THE COURT:  Does the Government believe the Court
11   needs to consider anything further before it makes a finding
12   whether the Government has set forth sufficient facts to
13   establish the crime of attempt to coerce and entice a minor to
14   engage in sexual activity, in violation of 18 U.S.C. 2422 (b)
15   in light of the Defendant's responses?
16       MR. FUNK:  No, Your Honor.
17       THE COURT:  Okay.  I find the facts set forth are
18   sufficient to establish the crime charged in Count 5, attempt
19   to coerce and entice a minor to engage in sexual activity, in
20   violation of 18 U.S.C. 2422(b).
21       Turning to the last count of the superseding
22   indictment, which is Count 6, if the Government would set forth
23   the elements of this offense as well as the factual basis.
24       As with each and every other count, Mr. Harding, I ask
25   you to listen carefully.  The Court will ask the same line of

1    questioning with regard to Count 6.
2        MR. FUNK:  The definition of sexually explicit conduct
3    applies to Count 6 as they did to Counts 1, 2 and 3.
4        THE COURT:  Do you understand that, Mr. Harding?
5        THE DEFENDANT:  Yes.
6        MR. FUNK:  Production of child pornography, the
7    Government would be able to prove the Defendant guilty of this
8    crime through the following facts and prove so beyond a
9    reasonable doubt.
10       One, an actual minor, that is a real person who was
11   less than 18 years old, was depicted; two, the Defendant
12   employed or persuaded a minor to engage in sexually
13   explicit conduct for the purpose of producing a visual
14   depiction of the conduct and; three, the visual depiction was
15   produced using materials that had been mailed, shipped or
16   transported in interstate or foreign commerce by any means,
17   including by computer.
18       The term "interstate or foreign commerce" means the
19   movement of a person or property from one state to another
20   state, or from one state to another country.
21       The term "state" includes a state of the United
22   States, the District of Columbia or any commonwealth, territory
23   or possession of the United States.  It is not necessary for
24   the Government to prove the Defendant knew that the materials
25   used to produce the visual depiction had moved in interstate or

1    foreign commerce.
2         The term "minor" is any person who is less than 18
3    years old.
4         The term "producing" means producing, directing,
5    manufacturing issuing, publishing or advertising.
6         The term "computer" means an electronic, magnetic,
7    optical, electrochemical or other high-speed data processing
8    device performing logical, arithmetic or storage functions, and
9    includes any data storage facility or communications facility
10   directly related to or operating in conjunction with that
11   device, but the term does not include an automated typewriter
12   or typesetter, a portable hand-held calculator or similar
13   devices that are limited in function to only word processing or
14   mathematical calculations.
15        The term "visual depiction" includes undeveloped film
16   and videotape and data stored on a computer disk or by any
17   other electronic means that can be converted into a visual
18   image.
19        The following is the factual basis for Count 6:
20        On September 22, 2015, a search warrant was executed
21   at the residence of Michael Harding located in Port St. Lucie,
22   Florida, in the Southern District of Florida.  An LG-D800
23   cellular telephone owned by Michael Harding was discovered in a
24   nightstand next to his bed in his bedroom.  The phone contained
25   images of Michael Harding and the personal bank account

---

1    information of Mr. Harding.
2         The cell phone number matched the number Michael
3    Harding had on file at the Port St. Lucie Police Department as
4    his personal number.  The LG-D800 phone was manufactured in
5    Korea and was shipped and transported in interstate and foreign
6    commerce prior to September 22, 2014.
7         A forensic examination of the LG-D800 cellular
8    telephone revealed the presence of thumbnail, (imgcache,
9    I-M-G-C-H-C-H-E, .0 underline embedded underline 1092.jpg.)
10        I should put on the record because the image was
11   produced on November 17, 2014, that the LG-D800 cell phone had
12   been manufactured in Korea and shipped in foreign commerce
13   prior to November 17, 2014.
14        A forensic examination showed that there was a deleted
15   video named -- or titled rather, 20141117 underline 165134.mp4.
16   This image was originally located in the following path:
17   \0\DCMI\Camera\20141117, underline, 1650134.mp4.
18        The naming convention is consistent with other images
19   and videos produced by the phone in the "Camera" folder.  When
20   a video is recorded by the phone, a thumbnail image is
21   automatically created by the phone with an image from a frame
22   of the video.  Because the video and the thumbnail image are
23   stored in separate areas on the phone, it is possible to delete
24   the video without deleting the thumbnail image.
25        The image depicts Michael Harding's eight year old

---

1    stepdaughter performing oral sex on him.  Chat messages
2    recovered from the LG-D800 phone contain references to the
3    image found on the phone.
4         Michael Harding, in Kik and Skype chat messages
5    contained within the LG-D800 cell phone, describes how his then
6    eight year old stepdaughter performed oral sex on him, how he
7    videotaped the sex act, and then how he deleted the video
8    because he was afraid of getting caught.  The biological mother
9    of Michael Harding's step daughter is able to identify her
10   daughter in the thumb nail image.
11        Special Agent Brian Rey would be able to testify that
12   finding the thumb nail image on the phone is consistent with
13   the phone being used to create the video and the user deleting
14   the video.  He would also be able to testify that, consistent
15   with other images found on the cell phone, the video was
16   created on November 17, 2014.
17        THE COURT:  Is Special Agent Brian Rey here?
18        MR. FUNK:  He is.
19        THE COURT:  Does the Government believe it is
20   necessary to have him testify as to what you just proffered or
21   that your proffer is sufficient?
22        MR. FUNK:  The proffer is sufficient, Your Honor.
23        THE COURT:  Does the Defense belief the proffer is
24   sufficient?
25        MR. PEACOCK:  We choose not to contest, Your Honor.

---

1    BY THE COURT:
2    Q.  Mr. Harding, first, as to the essential elements of the
3    crime in the second superseding indictment as to Count 6,
4    producing child pornography, in violation of 18 U.S.C. 2251(a)
5    and (e), do you understand that these are the essential
6    elements of that crime which Mr. Funk, on behalf of the
7    Government, outlined in the beginning of his recitation of
8    Count 6?
9    A.  Yes, Your Honor.
10   Q.  Do you understand that if this case went to trial, the
11   Government would have had to have proven each essential element
12   of this crime set forth in Count 6, just as with all of the
13   other crimes, beyond a reasonable doubt?
14   A.  Yes, Your Honor.
15   Q.  Do you understand when you plead guilty, you give up the
16   right to have the Government prove each essential element of
17   the crime beyond a reasonable doubt?
18   A.  Yes.
19   Q.  When you plead guilty, you give up all of your defenses,
20   and there may be a number of defenses you have to Count 6, as
21   with any other count, but you give all of them up by pleading
22   guilty?
23   A.  Yes, Your Honor.
24   Q.  Have you had enough time to speak with your attorney about
25   possible defenses and winning at trial with respect to Count 6

1  or any other count?

2  A.  Yes.

3  Q.  After the essential elements, he went on to give a factual

4  basis to support the Government's ability to present and prove

5  beyond a reasonable doubt the crime set forth in Count 6,

6  producing child pornography.

7  Do you understand what the Government says it can prove in

8  this case, specifically now as to Count 6, as we have already

9  gone through in Counts 1 through 5?

10  A.  Yes, I understand what the Government says it can prove.

11  THE COURT:  Mr. Peacock, do you take any exception to

12  the facts summarized by the Government?

13  MR. PEACOCK:  On behalf of Mr. Harding, we do not

14  contest.

15  THE COURT:  Mr. Peacock, do you agree the Government

16  could have proven what it said it would have proven beyond a

17  reasonable doubt?

18  MR. PEACOCK:  We do not contest.

19  THE COURT:  That is with regard to Count 6.  Mr.

20  Harding, do you agree the Government could have proven what it

21  says it could have proven in Count 6?

22  THE DEFENDANT:  I wish not to contest, Your Honor.

23  THE COURT:  Mr. Peacock, do you agree had the case

24  gone to trial, I would have sent the Defendant's case to the

25  jury, now speaking about Count 6, as we covered in Counts 1

---

1  through 5?

2  MR. PEACOCK:  Once again, Your Honor, we do not

3  contest that.

4  THE COURT:  Mr. Peacock, do you stipulate the

5  Government's factual recitation contains the factual elements

6  of the crime in Count 6.

7  MR. PEACOCK:  If those facts were proven, I believe it

8  would.

9  THE COURT:  Does the Government believe there should

10  be any further inquiry or presentation before the Court makes

11  its finding whether the Government has set forth the specific

12  facts -- sufficient facts to prove the charge of producing

13  child pornography in Count 6?

14  MR. FUNK:  No.

15  THE COURT:  The Court finds the Government could prove

16  and has proffered sufficient facts to establish the crime

17  charged in Count 6, production of child pornography, 18 U.S.C.,

18  2251(a) and (e).

19  Does the Government believe that the Court should make

20  any further inquiry on any matter or go over anything further

21  before it inquires of the Defendant, Mr. Harding, as to how he

22  wishes to plead to each of the charges in the second

23  superseding indictment?

24  MR. FUNK:  No, Your Honor, thank you.

25  THE COURT:  Mr. Peacock, do you believe there is

---

1  anything the Court should cover and explain to Mr. Harding or

2  inquire of Mr. Harding before it goes to the next stage of the

3  plea colloquy in asking how he wishes to plead?

4  MR. PEACOCK:  No, I think the Court covered

5  everything.

6  I want the Court to know, I may be splitting hairs

7  here, I would like to use the phrase nolo contendere for the

8  actual plea.

9  THE COURT:  Does the Government have any objection to

10  the use of that phrase?

11  MR. FUNK:  No, Your Honor.

12  BY THE COURT:

13  Q.  Mr. Harding, have you had enough time to consider and

14  discuss with your attorney whether you wish to plead guilty

15  and/or how you wish to plead to any of the charges that are put

16  forth in the second superseding indictment?

17  A.  I am sorry, Your Honor, repeat that.

18  Q.  You had enough time to consider and discuss with your

19  attorney how you wish to plead to the charges in the second

20  superseding indictment?

21  A.  Yes.

22  Q.  Okay, I will take it count by count.

23  Mr. Harding, how do you wish to plead to the charge set

24  forth in Count 1, distributing material involving sexual

25  exploitation of minors, in violation of 18 U.S.C. Section

---

1  2252(a)(2)?

2  A.  Guilty.

3  Q.  Mr. Harding, how do you wish to plead to Count 2,

4  distributing material involving sexual exploitation of minors,

5  in violation of 18 U.S.C. Section 2252(a)(2)?

6  A.  Guilty.

7  Q.  How do you wish to plead as to the charges set forth in

8  Count 3 of the second superseding indictment, distributing

9  material involving sexual exploitation of minors, in violation

10  of 18 U.S.C. Section 2252(a)(2)?

11  A.  Guilty, Your Honor.

12  Q.  How do you wish to plead to the charges set forth in Count

13  4 of the second superseding indictment, possession of material

14  involving sexual exploitation of minors, in violation of 18

15  U.S.C. 2252(a)(4)(B)?

16  A.  Guilty.

17  Q.  How do you wish to plead to Count 5 of the second

18  superseding indictment, attempt to coerce and entice a minor to

19  engage in sexual activity, in violation of 18 U.S.C. 2422(b)?

20  A.  Nolo contendere.

21  Q.  How do you wish to plead to the charge set forth in Count 6

22  of the second superseding indictment, producing child

23  pornography, in violation of 2251(a) and (e)?

24  A.  Nolo contendere.

25  THE COURT:  Mr. Peacock, are you satisfied that Mr.

1  Harding understands the consequences of his guilty plea and
2  nolo contendere plea?
3       MR. PEACOCK: Yes.
4       THE COURT: Does the Government agree that Mr.
5  Harding understands the plea to his charges?
6       MR. FUNK: Yes.
7       THE COURT: Have all of the victims known to the
8  Government been notified about the change of plea here today
9  and given the opportunity to be reasonably heard, pursuant to
10 18 U.S.C. 3771, paren, small a paren four?
11      MR. FUNK: The mother of the minor child is present.
12 She does not wish to make a statement at this time.
13      THE COURT: Could you -- what were you going to say?
14      MR. FUNK: All other victims known to the Government
15 have been notified.
16      THE COURT: And they have chosen not to appear?
17      MR. FUNK: There are no other identified victims at
18 this time, we are in the process of determining that.
19      THE COURT: I would like to have the victims -- the
20 victim's mother, who you said was here but did not want to be
21 heard, simply, I would like her to state that she is here.
22      I would like to personally inquire of her that she
23 does not want to be heard. I will respect her desire not to be
24 heard, but I would like to get it on the record.
25      If I could just have you sworn in.

Pauline A. Stipes, Official Federal Reporter

---

1            (Ashley Harding was duly sworn.)
2  BY THE COURT:
3  Q.  Okay. Good morning.
4       Would you state your name for the record.
5  A.  Ashley Harding.
6  Q.  Okay. So, you are the mother of the person who was
7  referred to as the eight year old stepdaughter in Count 6?
8  A.  Yes.
9  Q.  Okay. And I just want to make sure that you know that you
10 have the opportunity to be heard here today.
11      Have you understood everything that has happened here
12 today?
13 A.  Yes.
14 Q.  Okay. You have the opportunity to be heard, to say
15 anything you would like or say nothing at all. I want to make
16 sure you understand that.
17      Do you understand that?
18 A.  Yes.
19 Q.  Do you have any questions of the Court as to what has
20 happened here today?
21 A.  No.
22 Q.  Are you satisfied with what has happened here today in
23 terms of the outcome of Mr. Harding's decision with respect to
24 how he is choosing to plead as to the six counts in this matter
25 in the second superseding indictment?

Pauline A. Stipes, Official Federal Reporter

---

1  A.  Yes.
2  Q.  Okay. And you have no questions of the Court?
3  A.  No, ma'am.
4  Q.  You have no objection to what is happening here today?
5  A.  No.
6  Q.  Okay.
7       THE COURT: Does the Government believe there should
8  be any further inquiry?
9       MR. KILLINGER: No. Russell Killinger. I want to put
10 on the record I have had extensive conversations with Ms.
11 Harding and her mother and her father, and I've explained to
12 them -- they are here today, they have a right to be here.
13      I explained they will have an opportunity at
14 sentencing and leading up to the sentencing, during the
15 Pretrial Services pre-sentence investigation to make whatever
16 statements or comments that they want to make to the Court
17 then.
18      THE COURT: Mr. Peacock, do you believe there should
19 be any further inquiry of Mrs. Harding here today?
20      MR. PEACOCK: No ma'am.
21      THE COURT: Okay, thank you very much.
22      Anything further from the Government before the Court
23 makes its finding?
24      MR. FUNK: No.
25      THE COURT: From Defense?

Pauline A. Stipes, Official Federal Reporter

---

1       MR. PEACOCK: No, Your Honor.
2       THE COURT: Okay, I find that the Defendant, Mr.
3  Harding, is alert and intelligent, fully competent and capable
4  of entering an informed plea in this case; that he is aware of
5  the nature of the charges and the consequences of the plea,
6  that is both the plea of guilty as to Counts 1 through 4 and
7  plea of nolo contendere as to Counts 5 and 6; and the plea of
8  guilty as to Counts 1 through 4, and nolo contendere as to
9  Counts 5 and 6, are knowing and voluntary pleas supported by an
10 independent basis in fact.
11      I find that Mr. Harding has freely, voluntarily and
12 intelligently entered his plea of guilty as to Counts 1 through
13 4, and nolo contendere to 5 and 6, and there are no promises,
14 no threats or mental impediment. And in addition, Mr. Harding
15 has had the advice of a competent attorney with whom he is
16 satisfied.
17      The plea is accepted and the Defendant is adjudged
18 guilty of Counts 1 through 3, distributing material involving
19 sexual exploitation of minors, in violation of 18 U.S.C.
20 Section 2252(a)(2), Count 4, possession of material involving
21 sexual exploitation of minors, in violation of 18 U.S.C.
22 Section 2252(a)(4)(B), Count 5, attempt to coerce and entice a
23 minor to engage in sexual activity, in violation of 18 U.S.C.
24 Section 2422(b), and Count 6, producing child pornography, in
25 violation of 18 U.S.C. Section 2251(a) and (e).

Pauline A. Stipes, Official Federal Reporter

1    These are all set forth in the second superseding

2    indictment.

3         A written Pre-Sentence Report will be prepared by the

4    Probation Office to assist me in sentencing.

5         Mr. Harding, you will be asked to give information for

6    the report.  Your attorney may be present for that if you wish.

7    You should cooperate and be truthful with the Probation Officer

8    or things may not go as well as you like during sentencing.

9         You and your attorney will have an opportunity to read

10   the report and object to it at the sentencing hearing.  You and

11   your attorney will have a chance to be heard at the sentencing

12   hearing, as well as the Government.  The victims will have a

13   chance to be heard at the sentencing hearing.

14        I refer Mr. Harding to the Probation Office for the

15   Pre-Sentence Investigation Report.  And sentencing will be set

16   on which date?

17        *THE COURTROOM DEPUTY:*  May 16th, at 9:30 a.m.

18        *THE COURT:*  May 16th, 9:30 a.m. here in Ft. Pierce.

19        Is there anything further that the Government believes

20   the Court needs to address in connection with the change of

21   plea?

22        *MR. FUNK:*  No, Your Honor, thank you.

23        *THE COURT:*  Is there anything further that Defense

24   believes the Court needs to address with the change of plea?

25        *MR. PEACOCK:*  No, ma'am.

Pauline A. Stipes, Official Federal Reporter

---

1        *THE COURT:*  Okay, thank you very much.

2        *MR. PEACOCK:*  Thank you.

3        *(Thereupon, the hearing was concluded.)*

4                           * * *

5        I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above matter.

7

8        Date:  June 29, 2016

9                    /s/ Pauline A. Stipes, Official Federal Reporter

10                   Signature of Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pauline A. Stipes, Official Federal Reporter

CRDE 129

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                       FORT PIERCE DIVISION

 3                  CASE NO. 15-CR-14057-ROSENBERG

 4
     UNITED STATES OF AMERICA,        .
 5                                    .
          Plaintiff,                  .
 6                                    .
          vs.                         .
 7                                    .
     MICHAEL HARDING,                 .   Fort Pierce, FL
 8                                    .   May 16, 2016
          Defendant.                  .
 9                                    .

10
               TRANSCRIPT OF SENTENCING PROCEEDINGS
11          BEFORE THE HONORABLE ROBIN L. ROSENBERG
                   UNITED STATES DISTRICT JUDGE
12
                          VOLUME 1
13

14   APPEARANCES:

15   FOR THE PLAINTIFF:       DANIEL FUNK
                              RUSSELL KILLINGER
16                            United States Attorney's Office
                              101 S. U.S. Highway 1
17                            Suite 3100
                              Fort Pierce, FL 34950
18                            305-905-7509

19
     FOR THE DEFENDANTS:      FLETCHER PEACOCK, ESQ.
20                            Federal Public Defender's Office
                              109 North 2nd Street
21                            Fort Pierce, FL 34950
                              772-489-2123
22

23   Official Court Reporter:  Pauline A. Stipes
                               Fort Pierce/West Palm Beach
24                             772-467-2337
                               HON. ROBIN L. ROSENBERG
25
```

Pauline A. Stipes, Official Federal Reporter

---

```
 1                            INDEX

 2   WITNESSES:

 3   SHEILA LaGREGA

 4     Direct Examination by Mr. Killinger      Page 11

 5     Cross Examination by Mr. Peacock        Page 35

 6   DANITZA BYRD

 7     Direct Examination by Mr. Funk          Page 47

 8   BRIAN REY

 9     Direct Examination by Mr. Funk          Page 50

10

11                          EXHIBITS

12                                      I.D.      Received

13     Government Exhibit 1                       Page 24

14     Government Exhibits 2-6                    Page 30

15     Government Exhibit 7                       Page 49

16     Government Exhibit 8                       Page 55

17     Government Exhibit 9                       Page 67

18      (All Exhibits Sealed)

19

20

21

22

23

24

25
```

Pauline A. Stipes, Official Federal Reporter

---

```
 1        THE COURT:  Okay, good morning.

 2        The matter before us is United States of America

 3   versus Michael Edwin Harding.  If we could have all counsel

 4   state their appearance for the record as well as the appearance

 5   of Mr. Harding.

 6        MR. FUNK:  Good morning, Daniel Funk on behalf of the

 7   United States.  I am here with Special Agent Brian Rey and

 8   Assistant United States Attorney Russell Killinger.

 9        MR. PEACOCK:  Good morning, Fletcher Peacock on behalf

10   of Mr. Harding, who is also present before the Court.

11        THE COURT:  Probation.

12        PROBATION OFFICER:  Edward Cooley for Probation.

13        THE COURT:  Government, have any and all victims been

14   notified today?

15        MR. KILLINGER:  They are present in the courtroom, the

16   minor children are not, their representative is, the mother.

17        THE COURT:  Back in November 2015, Mr. Hardy entered a

18   plea of guilty to Counts 1, 2, 3, 4, and nolo contendere to

19   Counts 5 and 6 of the second superseding indictment.

20        Counts 1, 2 and 3 charge exploitation of minors, in

21   violation of Title 18 United States Code, Section 2252.

22        Count 4 charges Mr. Harding with possession of

23   material involving the sexual exploitation of minors, in

24   violation of Title 18 United States Code, Section

25   2252(a)(4)(B).
```

Pauline A. Stipes, Official Federal Reporter

---

```
 1        Count 5 charges Mr. Harding with attempt to coerce and

 2   entice a minor to engage in sexual activity, in violation of

 3   Title 18 United States Code, Section 2252(b).

 4        Count 6 charges Mr. Harding with producing child

 5   pornography, in violation of Title 18 United States Code,

 6   Section 2251(a), and (e).

 7        Upon acceptance of Mr. Harding's plea, the Court

 8   adjudged him guilty of Counts 1 through 4, ordered a

 9   Pre-Sentence Investigation Report and deferred sentence until

10   today's date.  The Pre-Sentence Investigation Report appears at

11   Docket Entry 87.

12        Has the Government received and had ample opportunity

13   to review the Pre-Sentence Investigation Report?

14        MR. FUNK:  Yes.

15        THE COURT:  Has defense received and had ample

16   opportunity to review the Pre-Sentence Investigation Report?

17        MR. PEACOCK:  Yes, ma'am.

18        THE COURT:  Is there any legal reason why the Court

19   should not pronounce sentence in the case today?

20        MR. FUNK:  No.

21        MR. PEACOCK:  No, ma'am.

22        THE COURT:  I say that, recognizing that pronouncement

23   may not actually occur today given the length of the

24   anticipated sentencing, and given the Court's need to select a

25   jury in another matter in a case that is going to trial this
```

Pauline A. Stipes, Official Federal Reporter

```
 1   afternoon.
 2           We all recognize that in all likelihood we will
 3   continue that which we don't complete today until the following
 4   Monday.  I know Lakeshia has been in touch with everyone.
 5           Nevertheless, there is no legal reason why the Court
 6   should not proceed today; is that correct?
 7           MR. PEACOCK:  Yes.
 8           THE COURT:  Government?
 9           MR. FUNK:  Yes.
10           THE COURT:  The Court has received and reviewed a
11   series of submissions, including the letter regarding
12   sentencing from Judith Souer, Docket Entry 84, the Government
13   objections filed 4/22/16, Docket Entry 85, the Defendant's
14   objections to the Pre-Sentence Investigation Report, 4/26,
15   Docket Entry 86, Defendant's notice of filing letters of
16   consideration, 5/9/16, Docket Entry 88, the Defendant's sealed
17   notice of filing Dr. Brannon's sealed psychological examination
18   of Mr. Harding, 5/10/2016.
19           And in addition, there is the Government's sentencing
20   memorandum, Docket Entry 96, amended objections, 95,
21   Defendant's motion for downward variance, Docket Entry 92.
22           There was the -- I mentioned the one sealed document
23   relating to the medical examination.
24           There was also the Government's motion that was filed
25   at Docket Entry 91, motion to seal exhibit, and then the sealed
```

```
 1   exhibit itself, which is docket 91-2, which consists of
 2   approximately 83 pages.
 3           Has anyone submitted anything I have not mentioned for
 4   the Court's consideration in consideration of the sentencing
 5   here today?
 6           MR. FUNK:  No, Your Honor.
 7           MR. PEACOCK:  No, ma'am.
 8           THE COURT:  The Court has reviewed all of the
 9   attachments and letter and the 83 pages of the sealed document
10   by the Government, as well as the complete psychological report
11   and the memoranda.
12           So, with that, we can take up the objections first.
13           If I go to -- I know, as the PSI indicates on page
14   87-1, there is note there is an objection from the Government
15   and Probation, and that had to do with paragraphs 11 and 20 of
16   the Pre-Sentence Report which the Probation Office says it has
17   revised and this issue is resolved.
18           Do you believe your objections as to paragraphs 11 and
19   20 have been resolved?
20           MR. FUNK:  Yes.
21           THE COURT:  And then the addendum also notes there
22   were objections that related to paragraphs 12, 13, and 14 of
23   the Pre-Sentence Report regarding -- referring to conversations
24   the Defendant had with other individuals and Probation noted in
25   the addendum that the Government will file copies of the actual
```

```
 1   conversations under seal, which it did, and that issue has been
 2   resolved.
 3           Has that been resolved?
 4           MR. FUNK:  Yes, Your Honor.
 5           THE COURT:  And then there was a notation regarding
 6   the 94 previously identified series of child pornography within
 7   the images, and all of this is coming from 87-1, page two of
 8   seven, and again, the Probation Officer notes in the PSR that
 9   that issue has been resolved.
10           Has that been resolved?
11           MR. FUNK:  Yes, Your Honor.
12           THE COURT:  Okay, then we go to the Defendant's
13   objections.
14           Defense filed objections to paragraphs 12 through 20
15   of the Pre-Sentence Report denying that the Defendant had
16   engaged in sexual conduct or contact with a minor, and the
17   Probation Office responded as it did in the addendum in its
18   response to paragraphs 12 through 20, which the Court can -- it
19   is written in the addendum, all counsel have a copy of that,
20   and the Court would ask whether there is anything in that
21   objection that still needs to be addressed or whether it has
22   been resolved.
23           I am speaking specifically about the first objection
24   that appears in the PSR on page three of seven at Docket Entry
25   87-1.
```

```
 1           MR. PEACOCK:  Your Honor, I guess the easiest way to
 2   say this, my initial objections were inartfully drawn, that is
 3   why I filed the addendum objection.
 4           From that standpoint, it has been resolved.
 5           THE COURT:  Any factual objections the Court needs to
 6   rule on?
 7           MR. PEACOCK:  I believe they are all resolved.
 8           THE COURT:  Okay.
 9           With that, then, the guidelines would tell the Court
10   the total offense level is 43, criminal history category I, the
11   advisory guideline range for incarceration is life
12   imprisonment, probation ineligible, supervised release, five
13   years to life, 25,000 to $250,000 fine, restitution pending,
14   and a special assessment of $100 for each count.
15           Does the Government agree with that?
16           MR. FUNK:  Yes.
17           THE COURT:  Does Defense agree with that?
18           MR. PEACOCK:  Yes, ma'am.
19           THE COURT:  Okay, having addressed all of the
20   materials submitted that the Court has reviewed in connection
21   with the sentencing, having reviewed all of the objections, and
22   having representation from counsel for both sides that all
23   objections have been resolved, having agreement on what the
24   guidelines instruct the Court, we can proceed with defense as
25   to any evidence or argument that you want to present on behalf
```

USCA11 Case: 21-14133   Document: 42

1  of Mr. Harding.

2        Or maybe there has been a discussion between defense

3  and the Government as to whether there would be a different

4  order in terms of presentation of any evidence.

5        MR. FUNK:  Before we move on to that issue, there

6  should be some clarification with regard to the record.

7        Mr. Peacock filed pleading document 95 with the Court

8  on May 13th, and in paragraphs five, six, seven, I believe that

9  Mr. Peacock was making reference to paragraph numbers which

10  were included in the draft report and not the final report.

11        MR. PEACOCK:  That is correct, Judge.

12        THE COURT:  Paragraphs five, six, seven refers to

13  the -- of the amended objections, it refers to paragraphs 58,

14  64, and 66.  Should those be different paragraphs?

15        MR. PEACOCK:  I want to make it consistent with my

16  original objections, it was to the original report in this

17  case.  If that is in the record, that is sufficient.

18        THE COURT:  All right.  Does that satisfy the

19  Government?

20        MR. FUNK:  It does.

21        THE COURT:  Okay.

22        MR. PEACOCK:  Your Honor, as far as the order of

23  presentation, I had very briefly spoken with the Government

24  about this, and I think we anticipate the Government would

25  proceed first.  I think they probably have the larger share of

Pauline A. Stipes, Official Federal Reporter

---

Date Filed: 03/22/2023   Page: 90 of 155

1  evidence to put before the Court.

2        I will say from the defense standpoint, we have no

3  objection to a proffer, obviously that is within the

4  Government's discretion to accept or not accept.  I want that

5  to be on the record.

6        THE COURT:  All right.  Is that acceptable to the

7  Government, to proceed first with the evidence, and

8  understanding that the defense will accept your proffer, but

9  you are free to put on the evidence that you wish to put on?

10        MR. FUNK:  Yes.

11        THE COURT:  How are you going to proceed?

12        MR. FUNK:  By presentation of evidence.  Mr. Killinger

13  will proceed.

14        THE COURT:  All right.

15        MR. KILLINGER:  Your Honor, may I inquire, is Your

16  Honor's schedule the same as we left it last week?  You plan on

17  going how far today, until when?

18        THE COURT:  I will try to find a natural breaking

19  point, we have jurors arriving around noon, and they have

20  questionnaires to fill out.  So, we have some leeway.

21        I would like to cover as much ground as we can.  I

22  would like to have witnesses, if anyone has traveled, you know,

23  accommodate schedules and not cut a witness off.  Let me know

24  what you anticipate with each witness and we can assess what is

25  doable and what isn't.

Pauline A. Stipes, Official Federal Reporter

---

1        MR. KILLINGER:  That is fine.  The Government will

2  call Sheila LaGrega.

3        (Witness sworn).

4        THE COURTROOM DEPUTY:  State your name for the record

5  and spell your last name, please.

6        THE WITNESS:  Sheila LaGrega, L-A, capital G-R-E-G-A.

7        THE COURT:  I apologize to you, Ms. LaGrega, that I am

8  not always going to be looking right at you.

9        I have the computer here and you are there.  Be

10  assured I am listening to you, and everything you are saying is

11  recorded by the Court Reporter and it comes up over to the

12  screen to my left.

13        Everything -- we have a lot going on here, I am

14  listening even though my back is to you.

15                **DIRECT EXAMINATION**

16  BY MR. KILLINGER:

17  Q.  How are you employed?

18  A.  Currently assigned to the criminal investigations division

19  of the Port St. Lucie Police Department.

20  Q.  How long have you been employed by the Port St. Lucie

21  Police Department?

22  A.  Almost 16 years.

23  Q.  Were you employed by any other departments?

24  A.  No, sir.

25  Q.  What types of crimes do you investigate?

Pauline A. Stipes, Official Federal Reporter

---

1  A.  I have been investigating person's crimes for the majority

2  of my career, person's crimes is anything to do with people,

3  homicide, suicides, death investigation, sexual batteries,

4  robberies.

5  Q.  You mentioned sexual batteries.  You do investigate child

6  abuse cases, allegations of child abuse?

7  A.  Yes.

8  Q.  Have you had training in interviewing child witnesses and

9  conducting investigations?

10  A.  I have had several, yes.

11  Q.  Okay.  I would like to direct your attention to September

12  22nd of last year.

13        Did you have occasion to become involved in an

14  investigation regarding some allegations of sexual abuse of two

15  minor female children, and we are going to refer to them by

16  their initials, and that is C.W. and H.W.?

17  A.  Yes, I was.

18  Q.  How was it that you first got involved in that

19  investigation, besides being assigned to it by your supervisor?

20  What did you do when you first got notified?

21  A.  I was asked to conduct interviews with both C.W. and H.W.,

22  of course, by my supervisor.

23        I contacted, met with their mother.

24  Q.  What was her name?

25  A.  Ashley.

Pauline A. Stipes, Official Federal Reporter

1   Q.   Okay.
2   A.   They were brought to the police station.
3   Q.   Was Ashley, the mother of the children, did she have a
4   relationship with the Defendant in this case, Michael Harding?
5   A.   Yes.
6   Q.   What was that relationship?
7   A.   They were husband and wife.
8   Q.   What was the relationship of C.W. to and H.W. to Michael
9   Harding, if you know?
10  A.   Stepchildren.
11  Q.   Now, did you go out to a residence on September 22nd?
12  A.   Yes, I briefly met with Ashley at the house.
13  Q.   And then, did you conduct an interview of both C.W. and
14  H.W. on September 22, 2015?
15  A.   Yes, I did.
16  Q.   Where was that interview conducted?
17  A.   At the police station.
18  Q.   Was it videotaped?
19  A.   Yes.
20  Q.   How old is C.W -- how old was C.W. at the time you
21  interviewed her?
22  A.   Nine.
23  Q.   And how old was H.W.?
24  A.   Five.
25  Q.   Which girl did you interview first?

---

1   A.   C.W.
2   Q.   She was the nine year old?
3   A.   Yes.
4   Q.   Can you tell the Court -- first of all, before you sat down
5   and interviewed her, did you talk to Ashley, the mother, and
6   get any information from her as to what, if anything, the girls
7   had disclosed to her?
8   A.   Yes, I did.
9   Q.   And generally, did that involve in your experience
10  inappropriate sexual conduct?
11  A.   Yes, it did.
12  Q.   On behalf of the Defendant?
13  A.   Yes.
14  Q.   Where did the interview take place, the interview of C.W.?
15  A.   Right in criminal investigations, we have interview rooms
16  adjacent to the area we work in.
17  Q.   When you conduct interviews of child witnesses,
18  particularly nine years old and five years old, do you use
19  props or instruments to assist you in conducting the interview?
20  A.   I do at times, if it is necessary.
21  Q.   Do you find it generally difficult to get information from
22  such young children?
23  A.   Not -- normally, no.  But there is a period of time
24  that I need to take to build a rapport with them.
25  Q.   I am sorry?

---

1   A.   I need time to build a rapport with them.  Sometimes it
2   takes longer than others.
3   Q.   In this interview with C.W., the first interview, were you
4   able to -- in your opinion, able to develop a good rapport with
5   her?
6   A.   Yes, I was.  However, she was very shy and very
7   uncomfortable and very unsure because of everything that had
8   just happened, so she was not really trusting in the beginning,
9   no.
10  Q.   And you say everything that happened.  Do you know that
11  Michael Harding was actually arrested on the same day that you
12  interviewed C.W. and H.W. on September 22nd?
13  A.   Yes.  The girls had actually been at the house when
14  Homeland Security arrived and they witnessed all of that.  Mom
15  was allowed to take them to school and return back.
16       But, yes, they were there for a lot of that.
17  Q.   Did you use any -- in the interview of C.W. on the 22nd of
18  September, did you use any of the dolls or props that you have
19  in the room?
20  A.   No, not at that time.
21  Q.   Not at that time?
22  A.   No.
23  Q.   Okay.
24       And during the course of the interview did C.W. disclose to
25  you certain actions that Michael Harding had done to her that

---

1   would be considered inappropriate sexual conduct?
2   A.   Now, remember, I had that interview and then the girls were
3   sent to CBT and I had a second interview.
4        During the first interview, C.W. indicated that Michael
5   asked her to put her hand on his penis, not in those words,
6   those are my words, and also wanted her to take off her clothes
7   and lay with him naked.
8        That came out in the first interview.
9   Q.   Let me ask you a few questions about that.
10       What terminology did you use in your interview of C.W.,
11  that first interview?  Penis is your word?
12  A.   I would use the word private, she would use butt for the
13  back.
14       I take time in my interview qualifying the girls because I
15  like to make sure I am using the same verbiage they use.  If
16  they use privates for their vaginal area, that is the word I
17  would use during my interview, but in the adult world it is
18  easier for me to use the terminology that we all understand.
19  Q.   Of course.  So the judge is aware, what terminology did you
20  use with C.W. to refer to her vaginal area?
21  A.   Privates.
22  Q.   Privates.
23       And what did you reuse to refer to her anus?
24  A.   Her butt.
25  Q.   What about the top part, breast area?

```
 1   A.  Her chest.
 2   Q.  Her chest, okay.
 3       So, you testified she did, C.W., did disclose to you at the
 4   first interview that Michael Harding asked her to touch his
 5   penis?
 6   A.  Correct.
 7   Q.  Did she indicate to you at that time whether he was clothed
 8   or naked?
 9   A.  No.  She indicated that his clothes were off and that he
10   took his hand and put it on his penis, and he moved it around,
11   and then had asked her to touch his penis.
12   Q.  And did she tell you whether she did that or not?
13   A.  She said she did not.
14   Q.  She did not.
15       And did C. W. explain to you the circumstances of who else
16   was in the house she was in the situation with Michael Harding,
17   as she described to you?
18   A.  Throughout the two interviews that I did with both girls,
19   those incidents would occur when Ashley was napping with the
20   younger girl, the baby, they had just had a baby, and other
21   incidents would occur in the afternoon between the time -- with
22   H.W., between the time that he was going to pick C.W. up from
23   school and come home.
24   Q.  How many separate incidences was C.W. able to talk to you
25   about?
```

```
 1       Do you know what I mean by separate incidences?  Was she
 2   able to separate any particular incidences?
 3   A.  During my second conversation with her, I was able to get
 4   much more information.
 5   Q.  And was some of the information that she gave you -- first
 6   of all, what date was the second interview?
 7   A.  September 29th.
 8   Q.  Okay.
 9       Would you -- would it be your opinion that she was a lot
10   more forthcoming on the 29th, when you interviewed her the
11   second time?
12   A.  Yes.
13   Q.  And where did C. W. say that the -- that these -- the
14   incident where Michael Harding asked her to touch his penis,
15   where did that occur physically?
16   A.  In the living room and also his bedroom.
17   Q.  Where, in a house, apartment?
18   A.  In their house.
19   Q.  And where was that?
20   A.  It began in Ft. Pierce and continued to Port St. Lucie.
21   Q.  Okay.
22       And was (redacted) able to differentiate --
23       THE COURT:  You want to -- you spoke the name.  Why
24   don't we have that redacted.
25       You are talking about C.W.?
```

```
 1       MR. KILLINGER:  Yes.
 2   BY MR. KILLINGER:
 3   Q.  Was C.W. able to differentiate any instances according to
 4   the place they happened?
 5   A.  Yes.
 6   Q.  And did any of them -- did she tell you any of them
 7   happened in the apartment?
 8   A.  It began in the apartment, not so much the touching, but
 9   her being asked to take her clothes off and lay next to him or
10   sit next to him naked on the couch, those types of things.
11   Q.  Now, you said you interviewed H.W. on the 22nd?
12   A.  Yes.
13   Q.  H.W. is the five year old?
14   A.  Correct.
15   Q.  Can you tell us about that interview?  Were you able to
16   develop any rapport with H.W.?
17   A.  Her demeanor was -- she was very overwhelmed, she was not
18   that talkative at all.  She didn't understand -- she told me
19   she didn't understand why it was a big deal for her daddy to
20   look at naked kids, and she missed him and denied that anything
21   happened.
22   Q.  Okay.
23       So, on the first interview she denied anything happened?
24   A.  Correct.
25   Q.  Now, during the first interviews of C.W. and H.W. on the
```

```
 1   22nd, did either one of them -- or did you suggest that either
 2   one of them use a pad of paper to write or draw anything on the
 3   first interview?
 4   A.  No.
 5   Q.  Okay.
 6       Is that something you do sometimes with child witnesses?
 7   A.  I do that often.  I do that often.  If I feel like they are
 8   holding back or they are uncomfortable, you know, sometimes
 9   they don't want to speak the words, they would rather draw it
10   or write it in sentence form, which is totally fine.
11       However, understand, too, when I was interviewing the girls
12   the very first time, it was pretty late.  It was late in the
13   day, they were tired, they had a really long day.
14       So, my interview with H.W. -- C. W. was a little longer,
15   but the five year old, she really -- she couldn't even -- it
16   wasn't worth spending a lot of time with her that night.
17   Q.  Okay.
18       Now, you testified that the second interview, round of
19   interviews were on the 29th of September?
20   A.  Correct.
21   Q.  And prior to them coming in for the interviews on the 29th,
22   did you receive any information from Ashley as to whether
23   either one or both of the girls made any further disclosures to
24   her?
25   A.  Um-m-m, well, I had -- I had received information from
```

1   Ashley that there were some pretty explicit Kik messages, a

2   texting application, so I reviewed those messages prior to

3   their interview.

4       I had not set up a secondary interview at that point.  I

5   received the messages from him first, and I became very

6   concerned.  I called Ashley on the phone, I said, look, this is

7   what I have been told, I need the girls to go down to CPT for a

8   medical exam.  I really believe I have to talk to them again,

9   and she agreed.

10  Q.  You used the acronym CPT, what does that stand for?

11  A.  Child protection team, they do forensic interviews and

12  forensic medical exams for children.

13  Q.  Did C. W. and H.W. have a medical exam?

14  A.  Yes.

15  Q.  Was the it CPT team able to do an internal physical exam on

16  either one of the girls?

17  A.  They do not.  They would not do an internal exam on them

18  because of their ages.

19  Q.  Okay.

20      MR. KILLINGER:  May I approach the witness, Your

21  Honor?

22      THE COURT:  Yes.

23      MR. KILLINGER:  I am going to show you Government

24  Exhibit Number 1.

25      THE COURT:  Do you have an exhibit list?

---

1       MR. KILLINGER:  We are working on one, Your Honor, we

2   will have one by the end of the day.  We are also going out of

3   turn on this witness.

4       THE COURT:  So, what is Government Exhibit 1?

5       MR. KILLINGER:  Government Exhibit 1 -- if it is all

6   right, I will have the witness tell you what that is.

7   BY MR. KILLINGER:

8   Q.  Do you recognize that exhibit?

9   A.  I do.

10  Q.  Can you tell the Court what that exhibit is?

11  A.  This is a letter that C.W. wrote after I spoke with Ashley

12  about the information that I was given.  Ashley, in turn, sat

13  with the girls and asked them again, you know, is there

14  anything you need to tell me?

15      H.W. disclosed to her that she had been inappropriately

16  touched by Michael and C.W. wrote down he did the same things

17  to me.

18      MR. KILLINGER:  Can you read it into the record so the

19  Court Reporter has verbatim what it says?

20      THE COURT:  This is a letter from C.W.  Is there any

21  objection to its admissibility?

22      MR. PEACOCK:  Your Honor, I don't exactly understand.

23  The letter was written for this witness, it was written at

24  another time.  I would like that clarified.

25

---

1   BY MR. KILLINGER:

2   Q.  Let me ask you other questions.

3       Where did you receive that note from?

4   A.  This letter was given to me by Ashley, written on 9/25,

5   after Ashley had a discussion with C.W. and H.W. of the

6   information that I had given her.

7       She asked the girls some additional questions, and H.W.

8   then disclosed abuse.

9   Q.  So, there are two notations on the bottom of Exhibit 1.

10  Whose handwriting is that?

11  A.  Mine.

12  Q.  That is your handwriting?

13  A.  Correct.

14  Q.  You received this note from Ashley?

15  A.  From Ashley, yes.

16  Q.  And the note is from whom?

17  A.  C.W.

18  Q.  C.W.

19      Whose handwriting, if you know, is the note, the subject of

20  the note?

21  A.  That is C. W.'s handwriting.

22  Q.  That is C. W.'s handwriting?

23  A.  Yes.

24  Q.  She had written some things out for you later on?

25  A.  Correct.

---

1       MR. KILLINGER:  I introduce this into evidence at this

2   time.

3       THE COURT:  Any objection?

4       MR. PEACOCK:  May I have a quick question of the

5   witness, Your Honor?

6       THE COURT:  Yes.

7   BY MR. PEACOCK:

8   Q.  Ma'am, you said the writing is C.W.'s?

9   A.  Correct.

10  Q.  Is all the writing C.W.'s?

11  A.  No.

12  Q.  There is more writing than just C. W.'s on there?

13  A.  Mine.

14  Q.  Is that your writing at the bottom of the document?

15  A.  Correct.

16      MR. PEACOCK:  Thank you.

17      No objection, Your Honor.

18      THE COURT:  It is admitted without objection.

19      (Whereupon Government Exhibit 1 was marked for evidence.)

20  BY MR. KILLINGER:

21  Q.  Can you read verbatim what the note says?

22  A.  "He did the same things to me like he did to H.W., except

23  take pictures, and I didn't see anything on his phone or

24  computer."

25  Q.  Okay.

1   MR. KILLINGER: Your Honor, would you like to see
2   this?
3           THE COURT: Okay.
4   BY MR. KILLINGER:
5   Q. All right. So, let's talk --
6           THE COURT: So, in this admission of this exhibit, the
7   names of the girls need to be redacted. The Government will
8   take care of that?
9           MR. KILLINGER: Yes, I will.
10          MR. PEACOCK: Your Honor, I would ask this type of
11  exhibit be sealed.
12          THE COURT: Any objection to it being sealed?
13          MR. KILLINGER: No, that will take care of that.
14          I was going to request that once I got them all into
15  evidence.
16          THE COURT: This exhibit will be sealed.
17          Are you going to have every exhibit sealed or take it
18  exhibit by exhibit?
19          You can take it exhibit by exhibit.
20          For the record, this one is sealed.
21  BY MR. KILLINGER:
22  Q. Okay.
23          So, let's direct our attention to the 29th of September,
24  and you conducted another interview of C.W.?
25  A. Correct.

---

1   Q. Was that in the same place under the same circumstances?
2   A. It was at the police department in the same interview room,
3   correct.
4   Q. At that time, what did C. W. disclose to you?
5   A. Well, during this interview she was very uncomfortable
6   still, so I had an idea that it was going to be a little
7   difficult to, you know, get her to speak.
8           So, at that interview I introduced the notepad of paper and
9   asked her -- because she just didn't want to verbalize, she
10  didn't want to speak those words, she felt comfortable
11  handwriting things and drawing pictures.
12          I introduced the dolls into my interview to make things
13  easier. We used a combination of several different techniques
14  during the course of the interview with her.
15          And she also -- I was told ahead of time that the girls had
16  gotten -- that their aunt bought them puppies, therapy puppies,
17  and I urged the girls to bring the puppies with them, and they
18  did.
19          There were a lot of different techniques I chose to use
20  during those interviews.
21  Q. Okay.
22          And what -- tell the Court what types of things C.W.
23  disclosed to you regarding Michael Harding.
24  A. She disclosed that -- I will refer back to my notes, there
25  were several different things, if you don't mind.

---

1           That she would be in the living room and that he would take
2   his clothes off and he would sit on the couch with a blanket
3   over him.
4           The reason why she didn't say anything is she thought she
5   was going to be in trouble and her dad told her not to say
6   anything.
7           He would put his hand on his penis and move it around.
8           I asked her, I said, did anything ever happen with his
9   penis, and she said she wasn't paying attention.
10          I said, did he ever have a towel? Oh, he had tissues all
11  the time. And I said, why would he need tissues? And she
12  said, to wipe himself off. And I said, do you know what he was
13  wiping off? No. Do you know what color it was? And she said
14  clear. I said, what did he do with the tissues? He put it in
15  the garbage can in the kitchen after.
16          And she indicated he had touched her on her breasts and on
17  her butt, and that he would have her take her clothes off, and
18  she was able to use a doll to show me how she was positioned
19  during digital penetration, and he digitally penetrated --
20  Q. Did C. W. tell you Michael Harding digitally --
21  A. Yes, vaginally and anally. She drew -- showed me on the
22  doll.
23          I asked her, and she did put her mouth on the penis, and I
24  asked her if anything came out of the penis, and she said yes.
25  I said, where did it go? And she said on his leg.

---

1           I asked her how many times he put his penis inside of her
2   butt, and said -- I am sorry, his penis inside of her
3   privates, and she said a few times.
4           And I said, what did that feel like? She said it hurt. I
5   said, did he put it all the way inside or just a little bit?
6   And she said just a little bit.
7           And I asked her if she ever put her hand on his penis, and
8   she said yes. I said, well, what did you do? And she said
9   that he would have her move her hand around. And I said, well,
10  did anything come out? And she said yes. And I said, where
11  did it go? And she said on my hand.
12          She indicated to me that he had penetrated her anally with
13  his fingers.
14          And that pretty much covers it.
15  Q. Was she able to break down the number -- did you ask her
16  about the number of times it happened?
17  A. Well, remember, this was an ongoing thing.
18  Q. Right.
19  A. So, she was not able to give me specific times, specific,
20  you know, amounts of times that, you know, all of these things
21  happened. She knows what happened, she just, you know --
22  Q. Right. During the course of the interview, did you ask her
23  for any kind of a range? Did it happen more than once, a few
24  times?
25  A. She would say a few times.

1    Q.  A few times?

2    A.  Uh-hum.

3    Q.  Now, you said during the 9/29 interview, that C.W. actually

4    did write notes down.  She wrote answers down?

5    A.  She did.

6    Q.  And she also drew?

7    A.  Correct.

8    Q.  Let me show you -- Detective, I am going to show you

9    several exhibits, Exhibits 2 through 6, I believe.

10       As you are going through there, when you got to interview

11   H.W. on the 29th, did she also resort to drawing pictures and

12   writing things down?

13   A.  She did.

14   Q.  Would you go through the exhibits and separate the ones

15   C.W. wrote or drew and the ones H.W. wrote or drew.

16   A.  This is C.W., and the rest is H.W.

17   Q.  So Exhibit 2, is that C.W.?

18   A.  Right.

19   Q.  There are notations, a date, and other notations up here.

20   What do they indicate?

21   A.  That is my handwriting, I wrote her name on the top, the

22   date, and it says on with the time and off with the time.  That

23   is when I turned the video on and turned it off.

24       MR. KILLINGER:  Your Honor, I would seek to admit

25   Government Exhibit 2 at this time.

---

1    THE COURT:  Any objection?

2        MR. PEACOCK:  We don't contest admission, we ask it be

3    sealed.

4        THE COURT:  Okay, Exhibit 2, C. W.'s handwriting, is

5    admitted without objection.

6        And you mentioned 2 through 6.  No objection to 3, 4,

7    5, 6 from the Defense?

8        MR. PEACOCK:  Yes, ma'am.

9        THE COURT:  All sealed.

10       MR. KILLINGER:  Yes.

11       THE COURT:  Government Exhibits 3 through 6 are also

12   admitted without objection to be sealed.

13       (Whereupon Government Exhibits 2-6 were marked for

14       evidence.)

15       MR. KILLINGER:  Your Honor, if you want, I will pass

16   these up.

17       THE COURT:  Are you going to ask the witness about

18   them?

19       MR. KILLINGER:  I don't think so.

20       THE COURT:  Okay.  You mentioned Government Exhibit 2

21   was C. W.'s handwriting, and the others were H. W.'s

22   handwriting?

23       THE WITNESS:  Yes.

24       THE COURT:  Okay.

25

---

1    BY MR. KILLINGER:

2    Q.  So, let's talk about the interview on the 29th of September

3    of H.W.

4        What did H.W. disclose to you as far as anything that

5    Michael Harding had done to her?

6    A.  She actually was able to describe three separate kind of

7    incidents.

8        The first one she told me about happened in a tent when she

9    was spending the night in the yard with Michael.

10   Q.  In the what?

11   A.  In the yard, in a tent.

12   Q.  In a tent in their yard?

13   A.  Yes.

14   Q.  Okay.

15       What did she tell you happened in that tent?

16   A.  Well, in that she was drawing a picture.  I will articulate

17   what she told me.

18       She said when they were inside Michael took all of his

19   clothes off.  She said, I saw him naked, and she said she was

20   scared.  He took her clothes off of her and she basically said

21   she didn't understand what was going on, and at one point he

22   told her to lay down or he was going to smack her.  So she laid

23   down on the little sleeping bag, blanket that they had.

24       She said that he had touched her body.  And I said where?

25   At that point she got upset and she didn't want to -- like she

---

1    was kind of shutting down.

2    Q.  Right.

3    A.  So I asked her, at that point, you know, to start drawing a

4    picture.

5        She said that Michael went out of the tent and came back

6    with a screwdriver, a hammer and a silver knife that they used

7    for -- to cut vegetables with.

8        And I said, well, what did he need that for?  And she says,

9    well, he told me that he was going to check my heart, and took

10   the hammer and was pounding it on her chest and it hurt her

11   chest.

12       And I said, well, did he say anything?  She said he told me

13   it was for my safety.

14       And she went on to tell me that he had inserted the plastic

15   portion of a screwdriver, the handle portion, into her vaginal

16   area and her butt.

17   Q.  Was she able to describe for you what kind of screwdriver,

18   color, anything like that?

19   A.  I told her, I said, well, you know, there are different

20   screwdrivers, and I drew her a picture of a flat head and I

21   told her it is a star trip.  I asked her to circle which is

22   more like the one you are talking about, and she circled the

23   flat head screwdriver.

24   Q.  Okay.

25   A.  She also said he took pictures of her while they were in

1  the tent and told her that he was going to show Ashley.  And I
2  think she drew like several pictures of that.  I think two of
3  those pages are of that incident.  She said she remembered
4  having a strawberry dress on, and that she was very scared.
5  Q.  Now, was that the first time that you had learned from H.W.
6  that something -- that an instrument, a screwdriver, had been
7  used on her?
8  A.  Correct.
9  Q.  Okay.
10     So, after the interview, did you take any steps to try to
11  find that screwdriver?
12  A.  Um-m-m, well, yes, but Ashley had moved immediately out of
13  the house and went to live with her mom, and a lot of those
14  items had been packed up.
15     Ashley had called me and let me know that her mom had
16  located -- they were just putting things away, where do you
17  want this, where do you want that.
18  Q.  I will cut you off there.  We have other testimony for
19  that.
20     Did you go to the -- did you go to the marital home where
21  the incidents occurred to look for the knife or screwdriver?
22  A.  I did.  I did.
23     I took some photographs, but nothing -- nothing that I
24  thought could have been, you know, what was used.
25  Q.  Okay.

1  On that day you didn't collect any evidence, you didn't
2  collect a knife, a screwdriver?
3  A.  No.
4  Q.  At some point later -- was that the same day, was that the
5  same day, on the 29th --
6  A.  Yes.
7  Q.  -- as the interviews?  Okay.
8     At some time after that were you notified about an incident
9  involving a screwdriver?
10  A.  Yes.
11  Q.  And did Ashley bring to you a screwdriver?
12  A.  Correct.
13  Q.  Okay.
14     What did you do when Ashley brought that screwdriver to
15  you?
16  A.  Put it into evidence.
17  Q.  And did you submit that for any kind of DNA testing?
18  A.  Yes, as well as other items, yes.
19  Q.  Okay.
20         MR. KILLINGER:  May I have one moment, Your Honor?
21         THE COURT:  Yes.
22  BY MR. KILLINGER:
23  Q.  Other than the screwdriver that you submitted for DNA
24  testing, did Ashley bring you any other items that you
25  eventually submitted to have DNA testing?

1  A.  Yes.
2  Q.  What were those?
3  A.  There were two small vibrators and a butt plug.
4         MR. KILLINGER:  No further questions, Your Honor.
5         THE COURT:  Any cross-examination?
6         MR. PEACOCK:  Just one minute, Judge.
7         THE COURT:  Okay.
8         MR. PEACOCK:  I have a few questions, Your Honor.
9                    CROSS-EXAMINATION
10  BY MR. PEACOCK:
11  Q.  Is it detective or officer?
12  A.  Correct, detective.
13  Q.  Detective.  Good morning, Detective LaGrega.
14  A.  Good morning.
15  Q.  How long have you been a sex crimes investigator?
16  A.  I have been a person's detective for approximately 11 years
17  of my career.
18  Q.  Did you say a person's detective?
19  A.  Correct.
20  Q.  What does that mean?
21  A.  A person's detective handles any cases that come into the
22  office concerning people, robberies, homicides, death
23  investigations, sex batteries, those types of cases.
24  Q.  Okay.
25     So, not just sex crimes, but sex crimes is included in your

1  work?
2  A.  Correct.
3  Q.  Okay.
4     How long have you been a person's investigator, for 11
5  years?
6  A.  11 to 12 years of my career, yes.
7  Q.  Now, have you had any technical training in sex crimes
8  investigation?
9  A.  I had several classes throughout the years.
10  Q.  And for instance, when was the last one?
11  A.  I believe the last one was just a year ago.
12  Q.  And what was the topic of that course?
13  A.  That was interviewing children.
14  Q.  Okay.
15     How long was the course?
16  A.  I believe it was a day.
17  Q.  And where was that taught?
18  A.  I don't remember.  I don't remember where it was.
19  Q.  Do you get training, is it fair to say, on an annual basis?
20  A.  Annually we try to send the detectives to an actual class,
21  whether it be a one day, two day, three days.  It could be a
22  week.
23     However, we do a lot of training online as well with the
24  National Center for Children.  They have a lot of webinars and
25  really great training opportunities.

1  Q. Okay.

2      Now, were you the only detective on this particular case or

3  were there other detectives involved in the investigation?

4  A. I'm the one that conducted all the interviews of the girls.

5  There have been somebody that helped out along the way, but

6  primarily I handled the entire case.

7  Q. Are you in charge of the case for Port St. Lucie Police

8  Department?

9  A. Correct.

10  Q. I know you indicated that you interviewed C.W. and H.W. on

11  the 22nd of September.

12      Is that the same day you got involved in the case?

13  A. Yes.

14  Q. Now, when you interviewed C.W. and H.W. on the 22nd of

15  September, was anyone with you?

16  A. I don't remember whether Ashley was there or not. I don't

17  remember.

18      My focus -- when I am talking to the girls, I don't pay

19  attention to anybody else that may be there. I really focus in

20  on dealing one-on-one with the child.

21  Q. Okay.

22      In your training -- and you just said you went to a course

23  on interviewing child victims?

24  A. Uh-hum.

25  Q. Is there a certain protocol that you are supposed to use

1  when you interview a child of nine years old?

2  A. Not a particular protocol, each case is very, very

3  different. It sort of takes on a life of its own. You really

4  let the child, you know, kind of drive where the interview is

5  going to go.

6  Q. Okay.

7      Now, for instance, when you do that, are you supposed to

8  contact Child Protective Services?

9  A. No.

10  Q. No?

11  A. No. I don't have to do that.

12  Q. All right. In your experience and in your training, is it

13  appropriate to interview the child by yourself?

14  A. Absolutely.

15  Q. Okay.

16      Now, you recorded that interview on September 22nd,

17  correct?

18  A. I record all of my interviews that I do with the girls.

19  Q. Does that extend -- I know you said all. I want to be

20  clear, does that mean the one on the 29th of September as well?

21  A. Correct.

22  Q. Would it be both video and audio?

23  A. Yes, it would be.

24  Q. Did you record your conversations with Ashley Harding?

25  A. I believe I recorded -- no, I don't think I did. No.

1  Q. What do you do, take notes in that situation?

2  A. I do. Uh-hum.

3  Q. All right. Are there any -- we have seen the documents

4  admitted into evidence. Are there any other documents brought

5  to you during your investigation which we haven't seen today?

6  A. No.

7  Q. In the interview on the 22nd, is it accurate to say that

8  C.W. denied any sexual contact?

9  A. Correct.

10  Q. Now, did you have a chance to talk to Ashley Harding after

11  that interview?

12  A. Yes.

13  Q. Okay.

14      Did you give her any instructions on, you know, what to

15  watch for or what to make note of from that time on?

16  A. No, not specifically.

17  Q. Did you give her any advice on how to handle the situation?

18  A. I told her that I would not keep bringing it up and if the

19  girls, you know, said something or whatever, please give me a

20  call.

21      Nothing, nothing specific.

22  Q. Okay.

23      And did Ashley give you a call after the 22nd along those

24  same lines?

25  A. Yes.

1  Q. Okay.

2      When was that, do you know?

3  A. I do, I have it in my notes, actually.

4      Well, she actually called me a couple of times.

5      I had not really had any contact with her after the

6  interviews, so a couple of days later I got the information

7  from Brian Rey, Agent Rey, and I called her.

8  Q. Okay.

9  A. And I said this is the information I have, I really think

10  it would be beneficial to send the girls to CPT. How do you

11  feel about that?

12      So, we spoke of that, and on the 26th, she called about the

13  vibrators and the butt plug and said, this is what we found, do

14  you want it? What should I do?

15      So, I took that into evidence, and then on the 28th, H.W.

16  disclosed to Ashley some of the things that happened in the

17  tent.

18  Q. Right.

19  A. So she called me about that, and then we set up interviews

20  with the girls.

21      So, I had spoken to her several times over a few different

22  matters.

23  Q. Now, do you know when the girls went to CPT?

24  A. No. No. Not off the top of my head, I don't know the

25  exact date, but it was very close in that time frame.

1  Q. You do know that they went?

2  A. Yes, they did.

3  Q. And soon thereafter?

4  A. Correct.

5  Q. Now, you said CPT did not do a medical exam?

6  A. They did a medical exam, however, because of their ages,

7  they will not do an internal exam, like they won't use a

8  speculum to insert in their vaginal area just because how young

9  they are.

10     They will do an exterior exam, which is what they did.

11  Q. Did you receive the results of that exterior exam?

12  A. I believe I did, and I believe I also submitted that into

13  evidence.

14  Q. Was there anything remarkable to your recollection?

15  A. Nothing remarkable, no. Nothing that I can remember.

16  Q. Now, did the CPT folks, did they interview H.W. and C.W.?

17  A. They spoke with them, I believe, yes.

18  Q. Do you know whether they spoke with them about the alleged

19  incident or incidents?

20  A. I would have to review that report. I don't recall what

21  they asked them.

22  Q. Do you have that report with you today?

23  A. No.

24  Q. Their interview would be important, correct? Let me

25  withdraw that.

---

1  A. To me?

2  Q. Let me withdraw that for a second.

3     Are these experienced sex crime interviewers?

4  A. I don't know what their training is.

5  Q. Okay. I don't either, that is why I am trying to find out.

6     What do you know about them?

7  A. I know that we work with the Department of Children and

8  Family Services.

9     I know that many detectives send children there to be

10  interviewed and/or medically examined. I personally have not

11  had the best experience. I think that they are a little

12  lacking as far as their interviewing skills.

13     I do send children there because it is a better facility

14  for an exam other than sending them to the emergency room.

15  However, after reviewing many interviews they have done with

16  children I sent there, I am not really impressed.

17  Q. Okay. That is very diplomatic.

18     So, the CPT is a branch of Children and Family Services?

19  A. Correct.

20  Q. Okay.

21     Do you think you probably have their report somewhere?

22  A. I do.

23  Q. All right. Do you know if they make any conclusion about

24  what happened?

25  A. They will generally -- when a child is sent to them in

---

1  reference to a sexual allegation, they will generally find

2  positive findings for sexual abuse based on -- whether it be

3  the child's statement or medical exam, other evidence, a

4  combination of all.

5  Q. Okay.

6     Now, your interview on September 29th, where did that take

7  place?

8  A. At the police department, the same interview room.

9  Q. The one with the couch, sofa?

10  A. Correct.

11  Q. And do you know if anybody else was present for that

12  interview?

13  A. I know Ashley was there for H. W.'s and I want to say for

14  C. W.'s as well.

15  Q. Okay.

16     Anybody else from your agency?

17  A. Not that I -- no, not that I can remember.

18  Q. Exhibits 1 through 6 that are admitted -- you can look

19  at them if you need to -- did you obtain those on the 29th.

20  A. The one from C.W., Exhibit 1 --

21  Q. Uh-hum.

22  A. -- was earlier on. That was early on.

23  Q. Okay.

24  A. Exhibit number 2 from C.W., that one was obtained during

25  her interview on the 29th.

---

1  Q. On the 29th, okay.

2  A. Exhibits 3, 4, 5 and 6 were done by H.W. and that was also

3  all done on the 29th, during her interview.

4  Q. So, 2 through 6 were done on the 29th?

5  A. Correct.

6  Q. Were there any other drawings or writings done on the 29th

7  that you don't have in front of you there?

8  A. No.

9  Q. Okay.

10     Now, just to be clear, on the 29th, is that when H.W. would

11  have told you about the experience in the tent?

12  A. Correct.

13  Q. Okay.

14     After that, when you went to the Harding household to look

15  for the knife and screwdriver, was the house still intact, was

16  it still orderly and lived in?

17  A. No.

18  Q. What kind of condition was it in when you went to search?

19  Were the household items still in the house?

20  A. Some of them were, some were not.

21  Q. I assume you would look in the garage if you were looking

22  for a screwdriver, correct?

23  A. I did -- yes, I went through the entire house with Ashley.

24  Q. Kitchen?

25  A. Uh-hum. Yes.

**Panel 1 (Page 45)**

```
 1   Q.  Did you see knives?
 2   A.  Yes.
 3   Q.  Did you see screwdrivers?
 4   A.  No, no screwdrivers, just the knives that were in the
 5   kitchen.
 6   Q.  Nothing remarkable?
 7   A.  No.  She pointed out that the one -- the knives there that
 8   were on the counter and in the drawer there were the ones that
 9   they used on a daily basis.  So I took pictures of them, but I
10   didn't -- obviously, I didn't have H.W. with me.
11   Q.  Okay.
12       That is my next question.  Did you ever take H.W. to the
13   house and ask her to help you look through those items?
14   A.  No.  I wouldn't do that.
15   Q.  Okay.
16           MR. PEACOCK:  May I have a minute, Your Honor?
17           THE COURT:  Yes.
18           (Pause).
19   BY MR. PEACOCK:
20   Q.  Were you able to determine when the episode in the tent
21   might have occurred?
22   A.  That was, um-m-m -- that was when -- right after the baby
23   was born.
24   Q.  When you say the baby, you mean the younger Hardy child?
25   A.  Yes, yes.
```

Pauline A. Stipes, Official Federal Reporter

**Panel 2 (Page 46)**

```
 1   Q.  Do you know when that was?
 2   A.  2014, I believe.
 3   Q.  Okay.  That is all right.
 4   A.  I can look real quick.  Hold on one second.
 5       She was born 3/11/15, so that would have been maybe a few
 6   months after that.
 7   Q.  Uh-hum.  Were you able to confirm any kind of an
 8   incident -- you know, a camping incident like that with Ashley
 9   or anybody else?
10   A.  Ashley said that, yes, he did spend the night with her in
11   the tent after the baby was born.
12   Q.  Do you know if anybody else was present?
13   A.  No.
14   Q.  You don't know or you don't think anybody else was?
15   A.  Present in the tent with them.
16   Q.  Yes.
17   A.  No, there was not.  It was the two of them.
18   Q.  Okay.
19       Did you have an opportunity to ask C.W. about that?
20   A.  She wasn't in the tent.
21   Q.  Whether she knew anything about that?
22   A.  No, I did not.
23           MR. PEACOCK:  Thank you, ma'am.
24           THE COURT:  Any redirect?
25           MR. KILLINGER:  No, Your Honor.
```

Pauline A. Stipes, Official Federal Reporter

**Panel 3 (Page 47)**

```
 1           THE COURT:  All right.  You may step down.
 2       Who did the Government have in mind about the next
 3   witness and what is your estimate of length on direct?
 4           Just to clear one thing up, Mr. Killinger, I will give
 5   you back the exhibits, so we keep the exhibits on the table
 6   there until the proceeding is over today, and you can give them
 7   back to me.
 8       I do want to make a note, even though they are going
 9   to be sealed, if you'd redact the names.
10           MR. KILLINGER:  Okay.
11           THE COURT:  So, that would mean you taking them with
12   you at the end and bringing them back when we continue.
13           MR. KILLINGER:  Right.
14           THE COURT:  Who do you think would be the next witness
15   and how much time?
16           MR. FUNK:  I could call Danitza Byrd.
17           THE COURT:  Okay, let's do that.
18       DANITZA BYRD, GOVERNMENT'S WITNESS, SWORN
19           THE WITNESS:  Danitza Byrd, D-A-N-I-T-Z-A, last name,
20   B-Y-R-D.
21                   DIRECT EXAMINATION
22   BY MR. FUNK:
23   Q.  Where do you work?
24   A.  I work for the Port St. Lucie Police Department, crime
25   scene unit.
```

Pauline A. Stipes, Official Federal Reporter

**Panel 4 (Page 48)**

```
 1   Q.  How long have you worked there?
 2   A.  Two and a half years.
 3   Q.  What are your responsibilities?
 4   A.  I work as a crime scene investigator.
 5   Q.  Have you been trained to take DNA swabs from individuals?
 6   A.  Yes.
 7   Q.  Where did you receive that training?
 8   A.  I have gone to several certified training courses for crime
 9   scene.
10   Q.  Were you involved in the investigation of the State versus
11   Michael Harding?
12   A.  Yes.
13   Q.  Were you contacted by Ms. LaGrega to take DNA swabs from
14   C.W. and H.W.?
15   A.  Yes.
16   Q.  Did you in fact do that?
17   A.  Yes, I did.
18           MR. FUNK:  Your Honor, I show the Defendant Exhibit 7
19   for identification purposes.
20           THE COURT:  Okay.
21           MR. FUNK:  May I approach the witness?
22           THE COURT:  Yes.
23   BY MR. FUNK:
24   Q.  I am showing you what is marked Government Exhibit 7.  Do
25   you recognize what that is?
```

Pauline A. Stipes, Official Federal Reporter

1   A.  Yes, sir.

2   Q.  What is it?

3   A.  This is a DNA swab box that I collected.

4   Q.  From whom?

5   A.  From C.W.

6   Q.  How do you recognize that that is in fact the swabs that

7   you collected?

8   A.  My handwriting is on this box.

9   Q.  Where did that occur?

10  A.  At the Port St. Lucie Police Department in the interview

11  rooms.

12  Q.  Do you recall what date that occurred?

13  A.  September 29, 2015.

14  Q.  How did you know you were taking the swabs from C.W., the

15  identity of the individual?

16  A.  The detective was there and also the mother, and they

17  indicated which child was which.

18       MR. FUNK:  Your Honor, at this time I will move into

19  evidence Exhibit 7.

20       THE COURT:  Any objection?

21       MR. PEACOCK:  No objection, Your Honor.

22       THE COURT:  Okay.  Is that sealed?

23       MR. FUNK:  Yes, please, it does have the name of the

24  victim on it.

25       THE COURT:  The same as the others, the name should be

1   redacted.  I will have it sealed.  It is admitted without

2   objection, Government Exhibit 7.

3       (Whereupon Government Exhibit 7 was marked for evidence.)

4       MR. FUNK:  Thank you, no further questions.

5       THE COURT:  Any cross?

6       MR. PEACOCK:  No, ma'am.

7       THE COURT:  So, you are thinking of beginning with

8   Agent Rey, none of the others would be concluded in the day.

9       No, okay.  So, why don't we begin with Special Agent

10  Rey and see how far we can go.

11       MR. FUNK:  Judge, what we might do, since it would

12  take time to set up and let you see the images, if we could go

13  ahead, I will begin with a general introduction, some of his

14  investigation, and the next time we will come in the courtroom

15  early to set up the audio-visual.

16       THE COURT:  Okay.

17       BRIAN REY, GOVERNMENT'S WITNESS, SWORN

18       THE WITNESS:  Brian Rey, R-E-Y, B-R-I-A-N.

19                    **DIRECT EXAMINATION**

20  BY MR. FUNK:

21  Q.  Where do you work?

22  A.  For the Department of Homeland Security, Homeland Security

23  Investigation, Ft. Pierce, Florida.

24  Q.  How many years have you worked there?

25  A.  Since the department was founded in 2003, before that,

1   Customs Special Agent.

2   Q.  What are your responsibilities now?

3   A.  Criminal investigations related to the homeland security

4   priorities and I am a computer examiner.

5   Q.  What is your job experience?

6   A.  Law enforcement career in the military, nine years as a

7   security policeman for the United States Air Force.  Upon

8   separation from the service, seven years as a deputy sheriff

9   for the Pasco County Sheriff's Office, and in 2001, a federal

10  law enforcement career.

11  Q.  How many years have you been a computer forensic examiner

12  investigating crimes against children?

13  A.  I have been investigating crimes against children since

14  2003, and got my computer forensic examination in 2010.

15  Q.  What does it mean to be a computer forensic examiner?

16       MR. PEACOCK:  We stipulate to Agent Rey's

17  qualifications as a forensic computer examiner.

18       THE COURT:  Okay.

19  BY MR. FUNK:

20  Q.  What was your role in the investigation of United States

21  versus Michael Harding?

22  A.  I was assigned a collateral investigation, it came into our

23  office in Wilmington.

24  Q.  After that came in, what course did you take in trying to

25  determine the location of the chat room?

1   A.  I issued subpoenas and ultimately issued search warrants.

2   Q.  Did you come into possession of different electronic

3   devices that Mr. Harding possessed?

4   A.  Yes.

5   Q.  Did you do a forensic examination of those electronic

6   devices?

7   A.  Yes.

8   Q.  Did you also participate in the search of Mr. Harding's

9   residence?

10  A.  Yes.

11  Q.  On the electronic devices in the possession of Mr.

12  Harding, were you able to find still images, videos and chat

13  messaging that referred to the exploitation of children?

14  A.  Yes.

15  Q.  During the search warrant of the house, was it discovered

16  that in a part of the house there was a gun that was in a case

17  along with sex toys?

18  A.  Yes.

19  Q.  Was there also a thumb drive that was contained within that

20  case?

21  A.  That is correct.

22  Q.  Is that one of the thumb drives you were authorized to take

23  pursuant to the warrant of the house?

24  A.  Yes, sir.

25       MR. FUNK:  Your Honor, I am going to show defense

1    counsel what is marked as exhibit -- apparently defense counsel
2    has been shown Exhibit Number 8.
3             May I approach the witness, Your Honor?
4             THE COURT:  Yes.
5    BY MR. FUNK:
6    Q.   Agent Rey, do you recognize what that is?
7    A.   Yes.
8    Q.   What is it?
9    A.   The photograph of the firearms case opened up and the
10   firearms, along with three sex toys and the thumb drive or USB
11   drive.
12   Q.   What did you later find on the USB drive?
13   A.   There were folders and files relating to Mr. Harding,
14   photos of Mr. Harding, pictures related to his work in law
15   enforcement, along with a collection of child pornography.
16   Q.   Of the things that are shown in the image, which did you
17   take into evidence?
18   A.   The thumb drive, USB drive, sorry.
19   Q.   What is the reason not to take into evidence the toys that
20   are within the gun case?
21   A.   At that point, I had no indication that they had been used
22   on a child, and that being the case, it would have been outside
23   the scope of the warrant.
24            MR. FUNK:  Your Honor, I move into evidence Exhibit 8.
25            THE COURT:  Any objection?

---

1             MR. PEACOCK:  Your Honor, we don't contest the
2    admission of that.
3             THE COURT:  Okay.  Are we agreeing that they are all
4    going to be sealed or taking it one by one?
5             MR. FUNK:  That one does not need to be sealed.
6             THE COURT:  Admitted without objection, not sealed.
7             Did you say it included a picture of the gun as well,
8    the gun was in the case?
9             MR. FUNK:  Yes, ma'am.
10            MR. PEACOCK:  Judge, may we approach?
11            THE COURT:  It is hard.  Do you need a sidebar?
12            MR. PEACOCK:  Yes, ma'am.
13            THE COURT:  Does it need to be done right now?
14            MR. PEACOCK:  It needs to be, in sealing these
15   documents at some point.
16            THE COURT:  Is it your position it needs to be sealed?
17            MR. PEACOCK:  It is.
18            THE COURT:  Any objection from the Government?
19            MR. FUNK:  No objection.
20            THE COURT:  Are we going to have all exhibits sealed?
21            MR. FUNK:  The Government will agree.
22            MR. PEACOCK:  That is a good idea.
23            MR. KILLINGER:  I will prepare a motion and order
24   today.
25            THE COURT:  I will repeat this, sealed on an ongoing

---

1    basis, all exhibits are sealed, the names need to be redacted.
2             (Whereupon Government Exhibit 8 was marked for evidence.)
3    BY MR. FUNK:
4    Q.   When -- what were the devices that you did your examination
5    of?
6    A.   There are a number of devices that were examined.  The ones
7    that particularly had relative findings on them was the PNY USB
8    drive, the one depicted in 8, an LG 800 cell phone, a Samsung
9    cell phone and a MacBook laptop computer.
10   Q.   On the analysis of the LG 800 phone, did you find chat
11   messages?
12   A.   I did.  And in that list, there was also a Lexar USB drive
13   that was relevant.
14            Yes, I did recover chat messages from the LG 800.
15   Q.   And the Court is in possession of a chat message sealed
16   with the Court.
17            Could you explain how it was they were downloaded, what the
18   format is, and what each line represents that is included in
19   the printout?
20   A.   The printouts presented to you, that I understand were
21   given to the Court, are a conversation view that is generated
22   by my forensics software.  Those chats were deleted, so they
23   may not be all inclusive.
24            It looks like some of them, there was information before
25   the chats began, but you can see from the time stamps and the

---

1    conversation itself that the record is substantially complete
2    at the point where the chats were occurring.
3             THE COURT:  I'm sorry, can you -- when they are
4    redacted portions -- when there are redacted portions, what is
5    the purpose of the redacted portions?
6             THE WITNESS:  The redacted portions are screen names
7    relative to third parties and investigations ongoing relative
8    to those third parties.
9             THE COURT:  How does one indicate who the speakers
10   are; is there another way other than context?
11            THE WITNESS:  The redacted portions?
12            THE COURT:  No, non-redacted, as to who is speaking.
13            THE WITNESS:  Yes, the local user of the phone, there
14   is no identifier related with that particular chat box.
15            You will see in messages that are generated by a third
16   party communicating with the holder of the cell phone there is
17   identification information, that is redacted.  When you are
18   looking at the chat, a redacted third party, the sections that
19   have no redactions are from Mr. Harding.
20   BY MR. FUNK:
21   Q.   Can you explain to the Judge why there are entries that
22   contain no text messaging?
23   A.   The text messaging, the software is not able to recover
24   images that were going back and forth during the chat.  You see
25   some indications where there is just a box with no text, and

1    that is an image or video going back and forth between the

2    parties.

3         That is supported by the context of the conversations.

4         THE COURT:  You are saying every chat message is from

5    Mr. Harding, there are not chat messages from anyone else, even

6    though it is revealed in the printout?

7         THE WITNESS:  I don't understand that question, ma'am.

8         THE COURT:  I can't point to particular lines, and the

9    computer is acting funny now.

10        MR. FUNK:  I do have a copy I submitted to the Court,

11   maybe --

12        THE COURT:  My question was whether every single entry

13   is a message coming from Mr. Harding or whether some of the

14   entries are from another person.

15        THE WITNESS:  There are entries from the other person.

16   The other person's identity or user name was redacted.

17        THE COURT:  That is how I understood it.  Okay.

18   BY MR. FUNK:

19   Q.  You mentioned earlier, Agent Rey, that the software that

20   you have does not capture the image that was transferred, but

21   in this case, were you able to locate in the other media you

22   collected the images that you believe were transmitted in

23   certain portions of the chat messaging?

24   A.  There are some images I was able to obtain and correlate

25   between messages at the same time, yes, sir.

Pauline A. Stipes, Official Federal Reporter

---

1    Q.  What images were those?

2    A.  There were images of C.W. transmitted during the chats.

3    Q.  Which images were those and what part of the chats?

4    A.  There was one in a Skype portion of the chat that is an

5    image that was modified from its original image to include just

6    kind of a side-view of C.W.  The text around the portion of

7    that particular transmission was something to the effect -- I

8    don't have the chat message in front of me, but something to

9    the effect of that is my elbow and her sweet ass, something

10   along those lines.

11   Q.  Were you able to find within the media possessed by Mr.

12   Harding the full image of what had been cropped and sent to

13   this other person?

14   A.  Yes.

15   Q.  And which of the children did that show?

16   A.  C.W.

17   Q.  Was there an additional image of C.W. sent to a person as

18   part of the chat?

19   A.  Yes, sir.

20   Q.  And was that related to the enticement charge?

21   A.  Yes.

22   Q.  What was the additional image sent?

23   A.  An image of C.W. standing in a living room type of

24   environment.

25   Q.  Is that photograph redacted in any manner?

Pauline A. Stipes, Official Federal Reporter

---

1    A.  No, sir.

2    Q.  In the chat messages, there are some references to -- there

3    are references to mastodon.  Would you explain what mastodon is

4    referring to?

5    A.  There is a particular series of child exploitation material

6    entitled April blond series.

7         In many of the videos they have a, for lack of a better

8    word, production value to them, they were produced for the

9    purpose of entertaining others.

10        There are credits at the end usually that identify the

11   child in the video as April and the offender as mastodon.

12   Q.  Are there also other series recognized by people who

13   communicate regarding child pornography?

14   A.  By offenders communicating between themselves?

15   Q.  Correct.

16   A.  That is not uncommon, yes.

17   Q.  What are some of the others you recall being mentioned and

18   you saw in the images that are collected?

19   A.  There was the Tara series, it was, I believe, referred to.

20        There was another -- I don't recall the specific series

21   that they -- there is a lot of chat.

22        What the Court has is a small portion of everything I

23   recovered.

24        There was a lot of conversation back and forth regarding

25   child exploitation material.

Pauline A. Stipes, Official Federal Reporter

---

1         THE COURT:  Over what period of time?

2         THE WITNESS:  The earliest chat record that I was able

3    to recover related to Kik was March 25, 2015.

4         THE COURT:  And through what time?

5         THE WITNESS:  Up until a couple of days before the

6    Defendant was taken into custody.

7         THE COURT:  And that date was?

8         THE WITNESS:  September 22, 2015.

9         THE COURT:  Okay.

10   BY MR. FUNK:

11   Q.  You mentioned the Court is not in possession of all of the

12   chats.

13        What do you mean by that?

14   A.  I bookmarked in the records that I recovered from the LG

15   800 cell phone in excess of 70 separate communications related

16   to child exploitation, and I believe a small number was

17   provided to the Court.

18        By that I mean 76 -- over 70 exploitations.

19        THE COURT:  What is a conversation?

20        THE WITNESS:  Two people communicating, in some

21   instances a short period of time, and in other cases, pages.

22        THE COURT:  In the period of 3/25 to 9/22, there were

23   about 70?

24        THE WITNESS:  Over 70.

25        THE COURT:  What was filed, what does that represent,

Pauline A. Stipes, Official Federal Reporter

1  approximately how many, if you know?

2      THE WITNESS:  I don't know exactly the exhibits that

3  were filed.

4      THE COURT:  Does counsel know personally how many --

5      MR. FUNK:  I hate to speculate which ones they there

6  are, but by the next court hearing we will have the exact

7  number for you.

8      THE COURT:  Okay.

9  BY MR. FUNK:

10  Q.  Were the images sent to NCSEC Mike?

11  A.  Yes, they were.

12  Q.  Would you explain what NCSEC is?

13  A.  The National Center for Sexually Exploited Children.

14      They review images of child exploitation sent to them that

15  have been previously identified by law enforcement, victims

16  identified, and serve as a central repository for child

17  exploitation information coming in to further identify victims

18  of abuse.

19  Q.  Were they able to identify the images that you submitted?

20  A.  The ones I submitted, 94 series, were previously identified

21  by law enforcement.

22  Q.  What does that 94 series represent?

23  A.  94 separate -- a series is a group of images or videos

24  linked by an offender or victim or location.

25      So, when we say 94 separate series, that means generally 94

---

1  separate victims, 94 separate offenders, and however much

2  content they produce, it could be a handful of images up to

3  thousands in each series.

4      THE COURT:  You are saying everything you submitted to

5  the center -- the center identified of everything you submitted

6  94 separate victims and 94 separate offenders?

7      THE WITNESS:  Yes.  I do not want to limit that to 94

8  victims, many series contain many victims, a group of children,

9  but 94 separate series previously identified, yes.

10      THE COURT:  Some you submitted they didn't identify,

11  in other words, didn't match up with what they had in their --

12      THE WITNESS:  That is correct.  There are some that

13  are a known series, previously collected -- by known series,

14  they have seen it before, the series was identified, but the

15  victim has not, and those are ongoing investigations.

16  BY MR. FUNK:

17  Q.  Of the pornography that was on the electronic devices of

18  the Defendant, what percentage would you say was child

19  pornography and what otherwise would constitute adult

20  pornography that the Defendant was in possession of?

21  A.  After being asked to quantify that by the Government, I

22  went back and reviewed some of my previous findings, and from

23  what I have been able to ascertain, it looks like over 95

24  percent of the material would be child exploitation material.

25      The majority of the adult pornography that I observed, that

---

1  was produced by the Defendant.

2  Q.  Now, going back to the number of 94 separate victims and

3  offenders, from how many different countries from around the

4  world were those images produced?

5  A.  What I sent through the NCSEC, 20 different countries

6  including the United States.

7  Q.  Were victims' statements contained for some of those

8  individuals depicted in the images?

9  A.  Yes, not by me.  They are on file with the Department of

10  Justice.

11  Q.  And so the Court is aware, we'll submit a sealed exhibit

12  with those statements.

13      Were you able to tell how long the images had been on some

14  of these devices?

15  A.  There are date and time stamps associated with -- I believe

16  on the images that were recovered in this case, and the

17  earliest date time stamp was March 6, 2008.

18  Q.  And how do you come -- what is the significance of that

19  date and how do you come to the conclusion that is the earliest

20  that the child pornography had been downloaded?

21  A.  Date time stamps are kept as a matter of course by

22  operating systems, whether it is Windows, Macintosh or whatnot.

23      Dates and times are tracked by the operating system so the

24  operating system can -- if, for example, you search for a trial

25  on a particular date or time, they can find it.

---

1      There are several times and dates associated with files.

2  Standard ones are the last time the file was written and the

3  creation time.

4      The creation time is what I am using in this particular

5  instance, the time the file was first created on that drive,

6  and the earliest one I had I said was from 2008.

7      And there were other videos, images that covered the time

8  frame from 2008 up until the seizure occurred.

9  Q.  What are the other names of chat rooms the Defendant

10  visited?

11  A.  I identified in my report several other chat rooms beyond

12  the one that our office in Wilmington encountered him in.

13      I don't have that exhibit in front of me, or that report in

14  front of me to give you the actual names.

15  Q.  Okay.

16      Had you had contact with C.W. during the course of your

17  investigation?

18  A.  The day we executed the search warrant, yes, sir.

19  Q.  Did you search the media in the possession of the Defendant

20  to see whether or not there was an image of C.W. on any of it?

21  A.  Yes.

22  Q.  Were you able to find an image of C.W.?

23  A.  Yes.

24  Q.  Where is that located?

25  A.  On the LG 800 cell phone.

1  Q.  Are you in possession of that image right now?

2  A.  Yes, sir.

3  Q.  When you -- do you know from your forensic examination how

4  it was that image was created?

5  A.  From the forensic exam, I was able to determine that a

6  video had been created, and this appears to be a thumbnail

7  image related to the video that was created.

8     It is pretty common for thumbnail images to be created when

9  you have a video so people can visually quickly determine the

10 image of the file.

11    The image recovered was a cached, C-A-C-H-E-D, image.

12       THE COURT:  What does that mean?

13       THE WITNESS:  One stored by the operating system.

14 BY MR. FUNK:

15 Q.  Why don't we do a step by step.  Someone takes a video, and

16 what does the operating system do?  How does it hold it, and

17 then when you go to try to erase it, what happens?

18 A.  Okay.  This particular particular video image

19 relates to the cell phone which was using an Android operating

20 system.

21    You first create the video, it records the images coming

22 into the camera on a flash memory within the cell phone.

23    Typically, it creates a thumbnail image in a gallery view,

24 for instance, when you go to photo gallery on your phone so

25 users can quickly identify what the image or video contains.

1     In this case, it appears the original video was deleted.

2     When that occurs on this type of operating system, and on a

3  phone in particular, which is flash memory rather than a hard

4  drive, a lot of times that is cleared and overridden, so I

5  cannot recover the original video.

6     But out of the database that had that thumbnail image, I

7  was still able to recover the thumbnail image.

8     There was a path associated with the thumbnail image that

9  told me where the original video was located and what the name

10 was.

11    So, the original video was in DCIM, which is a standard

12 location for videos and photos to occur, a photo called camera,

13 and the name of the file, 2014, 11, 17, underscore 165134.

14    I am familiar, and other videos on the phone confirm, that

15 is the standard naming convention for videos created on the

16 phone with the date and time.

17    So, it would have been created November 17, 2014, at 4:51

18 p.m.

19 Q.  Is that naming convention and creation of the thumbnail

20 image something the phone automatically does?

21 A.  Yes.

22 Q.  Is the deleting of the video something that needs to be

23 manually done?

24 A.  That is correct.

25 Q.  Where is the actual image -- did you print out an image of

1  the thumbnail for the Court to see?

2  A.  I did, I created an exhibit that has an image and text

3  below it detailing what I just explained.

4  Q.  Do you have that physically with you at the stand?

5  A.  Yes.

6       MR. FUNK:  Your Honor, may I approach the witness?

7       THE COURT:  Yes.

8       MR. FUNK:  This image has been provided in discovery.

9    I will mark that Government Exhibit Number 9, and we

10 will have that under seal, request the Court put that under

11 seal.

12       THE COURT:  This is the image of C.W. on the phone?

13       MR. FUNK:  Correct.

14       THE COURT:  Any objection to its admission?

15       MR. PEACOCK:  We don't contest its admission.

16       THE COURT:  Admitted without objection.

17    (Whereupon Government Exhibit 9 was marked for evidence.)

18       MR. FUNK:  Judge, I think, unless you want me to

19 continue, that might be a good place to stop.

20       THE COURT:  Okay, let's talk about where we are and

21 where we need to go.

22    We have nine exhibits admitted into evidence.  The

23 Government is going to put together on the AO form the exhibit

24 list that contains that nine, as well as any others you want

25 admitted and/or marked in the next proceeding.

1     As we said, any names of the children will be

2  redacted.  All the exhibits are under seal.

3     As I understand it, when we return, we are working

4  around some scheduling issues.

5     We are going to resume Monday, the 23rd.  We have --

6  Mr. Peacock, do you have a 10:00 o'clock or 11:00 o'clock with

7  Judge Martinez?

8       MR. PEACOCK:  10:00 o'clock, violation of supervised

9  release.

10       THE COURT:  How long do you think that will last?

11       MR. PEACOCK:  I would say no more than 30 minutes.

12       THE COURT:  Okay, that means starting at 10:30.  You

13 are available?

14       MR. PEACOCK:  I would say 10:45 in an abundance of

15 caution.

16       THE COURT:  We are going to be doing that in Judge

17 Lynch's courtroom.

18    Judge Graham is using this courtroom for an 11:00 a.m.

19 hearing that will last 30 or 45 minutes.

20    We should get started at 10:30, when Mr. Peacock

21 finishes, in Judge Lynch's courtroom, and when we break, if

22 there is a reason to come back to this courtroom, we can do

23 that.

24    How much time do we need remaining so we see it

25 that we can accomplish this on Monday, the 23rd.

```
 1            Why doesn't the Government tell me, what more do you
 2   see in terms of your witnesses and time?
 3            Agent, you can step down, if you like.
 4            THE WITNESS:  Yes, ma'am.
 5            THE COURT:  How much longer with Special Agent Rey on
 6   direct?
 7            MR. FUNK:  With Agent Rey, I think, if we don't have
 8   any technical difficulties presenting, we'll be a half hour,
 9   and additional witnesses will take an hour and a half.
10            THE COURT:  So you are going to need to know where
11   we'll be, you will need to set up technology.  We may be in
12   Judge Lynch's courtroom.  We all prefer to be in one courtroom,
13   particularly with the technology, and with Pauline's court
14   reporting technology as well.
15            Half hour on direct, and what about on cross?
16            MR. PEACOCK:  15 minutes.
17            THE COURT:  And the Government has Ms. Harding,
18   Ms. Stevens and Mr. Walker.
19            Tell me the order you intend to call them.
20            MR. FUNK:  In that order.
21            THE COURT:  Next would be Ms. Harding?
22            MR. FUNK:  Correct.
23            THE COURT:  How long would you be on direct?
24            MR. KILLINGER:  Direct, 45 minutes to an hour, 45
25   minutes.
```

Pauline A. Stipes, Official Federal Reporter

---

```
 1            THE COURT:  45 minutes.  What about cross?
 2            MR. PEACOCK:  Ten to 15 minutes.
 3            THE COURT:  Okay.  And then Ms. Stevens, how long on
 4   direct?
 5            MR. KILLINGER:  If she is called, no more than 20
 6   minutes.
 7            And it may very likely be after Mrs. Harding
 8   testifies, I will not need to call Ms. Stevens.  I won't make
 9   that decision until after she testifies.
10            THE COURT:  And cross?
11            MR. PEACOCK:  I have no idea.
12            THE COURT:  Okay.
13            MR. PEACOCK:  To be helpful to the Court, probably
14   half of whatever the direct is.
15            THE COURT:  Ten minutes.  Lastly, Mr. Walker.
16            MR. FUNK:  15 minutes.
17            THE COURT:  Direct.  And cross?
18            MR. PEACOCK:  I doubt if I have any questions.
19            THE COURT:  That is it for the witnesses; is that
20   correct, for evidence witnesses and any other kind of evidence
21   from the Government?
22            MR. KILLINGER:  Yes, other than perhaps an allocution
23   by Ms. Harding which would be separate from her testimony.  I
24   think she prepared something she wants to read.
25            THE COURT:  Okay, from the defense, what are we
```

Pauline A. Stipes, Official Federal Reporter

---

```
 1   expecting?
 2            MR. PEACOCK:  I believe I will have three witnesses,
 3   Your Honor, and I would say that that would take --
 4            THE COURT:  Who are these witnesses?
 5            MR. PEACOCK:  Julie Harding.
 6            THE COURT:  How long on direct?
 7            MR. PEACOCK:  20 to 30 minutes.
 8            THE COURT:  Cross?
 9            MR. FUNK:  Probably ten minutes.
10            THE COURT:  Who is the next witness?
11            MR. PEACOCK:  Lisbet Perry, 15 to 20 minutes.
12            THE COURT:  Cross?
13            MR. FUNK:  Five, to ten minutes.
14            THE COURT:  Who else?
15            MR. PEACOCK:  Dr. Michael Brannon, I probably will put
16   Dr. Brannon on first.
17            THE COURT:  How long do you think he will be on
18   direct?
19            MR. PEACOCK:  I would say Dr. Brannon will be on
20   direct for 30 minutes.
21            THE COURT:  Cross?
22            MR. FUNK:  15 minutes.
23            THE COURT:  How much time is going to be needed for --
24   that is it with the evidence from Government and defense?
25            MR. FUNK:  Yes.
```

Pauline A. Stipes, Official Federal Reporter

---

```
 1            THE COURT:  How much time for argument do you
 2   anticipate from the Government?
 3            MR. FUNK:  20 minutes.
 4            THE COURT:  From defense?
 5            MR. PEACOCK:  30.
 6            THE COURT:  I haven't added all of that up, I don't
 7   know if that fits into half a day or not.
 8            We will continue to look at scheduling and see how it
 9   can be done in the time allotted or make changes to the time
10   allotted to see if we can get this done.
11            Anything else that we need to discuss?
12            MR. FUNK:  No, Your Honor.
13            MR. PEACOCK:  No, ma'am.
14            THE COURT:  Okay, all right.  Thank you, and we'll
15   resume on Monday, the 23rd, but we will keep you closely
16   informed as to the logistics.
17            We are going to try to make something work that works
18   for everybody and allows us to complete the sentencing at our
19   next session.
20            Okay, we are adjourned for now.
21            (Thereupon, the hearing was concluded.)
22                           *  *  *
23
24
25
```

Pauline A. Stipes, Official Federal Reporter

```
 1        I certify that the foregoing is a correct transcript

 2   from the record of proceedings in the above matter.

 3

 4        Date:  June 4, 2016

 5                    /s/ Pauline A. Stipes, Official Federal Reporter

 6                    Signature of Court Reporter

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Pauline A. Stipes, Official Court Reporter

| | |
|---|---|
| **$** | 43 [1] 9/10 |
| **$100** [1] 8/14 | 45 [4] 68/19 69/24 69/24 70/1 |
| **$500,000** [1] 8/13 | 47 [1] 2/7 |
| | 48 [1] 2/15 |
| **3** | 49 [1] 66/11 |
| | **5** |
| **3** [1] 7/5/5 | |
| **1** | 5/10/2016 [1]  5/18 |
| **101** [1]  1/17 | 5/9/16 [1]  5/16 |
| **109** [1]  1/20 | 50 [1]  2/9 |
| **10:00** o'clock [2]  68/6 68/8 | 55 [1]  2/16 |
| **10:30** [2]  68/12 68/20 | 58 [1]  9/13 |
| **10:45** [1]  68/14 | **6** |
| **11** [7]  2/4 6/15 6/18 35/16 36/4 36/6 66/13 | 64 [1]  9/14 |
| **11:00** [1]  68/18 | 66 [1]  9/14 |
| **11:00** o'clock [1]  68/6 | 67 [1]  2/17 |
| **12** [4]  6/22 7/14 7/18 36/6 | **7** |
| **13** [1]  6/22 | |
| **13th** [1]  9/8 | 70 [4]  60/15 60/18 60/23 60/24 |
| **14** [1]  6/22 | 7509 [1]  1/18 |
| **15** [6]  46/5 69/16 70/2 70/16 71/11 71/22 | 76 [1]  60/18 |
| **15-CR-14057-ROSENBERG** [1]  1/3 | 772-467-2337 [1]  1/24 |
| **16** [4]  1/8 5/13 5/16 11/22 | 772-489-2123 [1]  1/21 |
| **16514** [1]  66/13 | **8** |
| **17** [2]  66/13 66/17 | |
| **18** [4]  3/21 3/24 4/3 4/5 | 800 [5]  55/8 55/10 55/14 60/15 64/25 |
| | 83 [2]  6/2 6/9 |
| **2** | 84 [1]  5/12 |
| **2-6** [2]  2/14 30/13 | 85 [1]  5/13 |
| **20** [9]  6/15 6/19 7/14 7/18 63/5 70/5 71/7 | 86 [1]  5/15 |
| 71/11 72/3 | 87 [1]  4/11 |
| **2001** [1]  51/9 | 87-1 [3]  6/14 7/7 7/25 |
| **2003** [2]  50/25 51/14 | 88 [1]  5/16 |
| **2008** [3]  63/17 64/6 64/8 | **9** |
| **2010** [1]  51/14 | |
| **2014** [3]  46/2 66/13 66/17 | 9/22 [1]  60/22 |
| **2015** [5]  3/17 13/14 49/13 60/3 60/8 | 9/25 [1]  23/4 |
| **2016** [3]  1/8 5/18 73/4 | 9/29 [1]  29/3 |
| **2123** [1]  1/21 | 91 [1]  5/25 |
| **22** [3]  13/14 60/8 60/22 | 91-2 [1]  6/1 |
| **2251** [1]  4/6 | 92 [1]  5/13 |
| **2252** [3]  3/21 3/25 4/3 | 94 [12]  7/6 61/20 61/22 61/23 61/25 61/25 |
| **22nd** [11]  12/12 13/12 15/12 15/17 19/11 | 621 62/6 62/6 62/7 62/9 63/2 |
| 20/1 37/11 37/14 38/16 39/7 39/23 | 95 [3]  5/20 9/7 62/23 |
| 40/17 44 | 96 [1]  5/20 |
| **23rd** [1]  13/14 | **A** |
| **25** [3]  23/4 60/3 60/22 | |
| **25,000** [1]  8/13 | am [1]  68/18 |
| **26** [1]  5/14 | able [28]  15/4 15/4 17/24 18/2 18/3 18/22 |
| **26th** [1]  40/12 | 19/3 19/13 21/15 27/18 28/15 28/19 31/6 |
| **28th** [1]  40/15 | 32/17 45/20 46/7 52/12 56/23 57/21 57/24 |
| **29** [2]  29/3 49/13 | 58/11 60/2 61/19 62/23 63/13 64/22 65/5 66/7 |
| **29th** [17]  18/7 18/10 20/19 20/21 25/23 29/11 | about [28]  7/23 9/24 16/9 16/25 17/25 18/18 |
| 31/2 34/5 38/20 43/6 43/8 45/9 46/1 44/1 44/3 | 19/15 22/12 28/16 30/17 31/2 31/8 32/24 32/8 |
| 44/4 44/6 44/10 | 40/11 40/12 40/19 41/18 42/6 42/23 44/1 |
| **2nd** [1]  1/20 | 46/19 46/21 47/2 60/23 67/20 69/15 70/1 |
| | above [1]  73/2 |
| **3** | Absolutely [1]  36/14 |
| | abstract [1]  68/14 |
| **3/11/15** [1]  46/5 | amended [2]  5/20 9/13 |
| **3/25** [1]  60/22 | abuse [6]  12/6 12/6 12/14 23/8 42/1 61/18 |
| **30** [6]  2/14 68/11 68/19 71/7 71/20 72/5 | accept [3]  10/4 10/4 10/8 |
| **305-905-7509** [1]  1/18 | acceptable [1]  10/6 |
| **3100** [1]  1/17 | acceptance [1]  4/7 |
| **34950** [2]  1/18 1/21 | accommodate [1]  10/23 |
| **35** [1]  2/5 | accomplish [1]  68/25 |
| | according [1]  19/3 |
| **4** | accurate [1]  39/7 |
| **4/22/16** [1]  5/13 | acronym [1]  21/10 |
| **4/26** [1]  5/14 | acting [1]  57/9 |
| | actions [1]  15/25 |

| | |
|---|---|
| activity [1]  4/2 |
| actual [4]  6/25 36/20 64/14 66/25 |
| actually [7]  4/23 15/11 15/23 29/3 31/6 40/3 |
| 44/14 |
| additional [4]  23/7 58/17 58/22 60/9 |
| addressed [2]  7/21 8/19 |
| adjacent [1]  14/16 |
| adjourned [1]  72/20 |
| adjudged [1]  4/8 |
| admissibility [1]  22/21 |
| admission [5]  25/6 30/2 54/2 67/14 67/15 |
| admit [1]  29/24 |
| admitted [10]  24/18 30/5 30/12 30/4 43/18 |
| 50/1 54/6 67/16 67/22 67/25 |
| adult [3]  16/17 62/19 62/25 |
| advice [1]  39/17 |
| advisory [1]  3/11 |
| after [17]  22/11 23/5 27/15 33/10 34/8 39/10 |
| 39/23 40/5 42/15 44/14 45/22 46/6 46/11 |
| 51/24 62/21 70/7 70/9 |
| afternoon [2]  5/1 17/21 |
| again [3]  7/8 21/8 22/13 |
| against [2]  51/12 51/13 |
| agency [1]  43/16 |
| Agent [11]  3/7 40/7 50/8 50/9 51/1 51/16 |
| 53/6 57/19 69/3 69/5 69/7 |
| ages [2]  21/18 41/6 |
| ago [1]  36/11 |
| agree [3]  8/15 8/17 54/21 |
| agreed [1]  21/9 |
| agreeing [1]  54/3 |
| agreement [1]  8/23 |
| ahead [2]  26/15 50/13 |
| Air [1]  51/7 |
| all [48]  2/18 3/3 3/13 5/2 5/2 6/8 7/7 7/19 8/7 |
| 8/19 8/21 8/22 9/18 10/6 10/14 14/1 15/14 |
| 16/18 18/6 19/18 23/9 24/10 25/5 25/14 27/10 |
| 28/5 28/20 30/9 31/18 37/4 38/12 38/18 38/19 |
| 39/3 42/23 43/4 44/3 46/3 47/1 54/3 54/20 |
| 55/1 55/23 60/11 68/2 69/12 72/6 72/14 |
| allegation [1]  43/1 |
| allegations [2]  12/6 12/14 |
| alleged [1]  41/18 |
| allocation [1]  70/22 |
| allotted [2]  72/9 72/10 |
| allowed [1]  15/15 |
| allows [1]  72/18 |
| Almost [1]  11/22 |
| along [6]  57/5 58/23 52/17 53/10 53/15 58/10 |
| also [18]  3/10 5/24 6/21 16/6 16/16 16/16 22/2 |
| 30/15 29/6 29/11 30/11 32/25 41/12 44/2 |
| 49/16 52/8 52/19 55/12 59/12 |
| always [1]  11/8 |
| am [18]  3/7 7/23 1/17 14/10 11/13 14/25 |
| 16/15 21/23 26/2 29/8 37/18 42/5 42/16 48/24 |
| 51/4 52/25 64/4 69/5 |
| amended [2]  5/20 9/13 |
| AMERICA [2]  1/4 3/2 |
| amounts [1]  28/20 |
| ample [2]  4/12 4/15 |
| amply [2]  27/21 28/12 |
| analysis [1]  65/18 |
| and/or [2]  42/10 67/25 |
| Android [1]  65/19 |
| annual [1]  36/19 |
| Annually [1]  36/20 |
| another [6]  4/25 22/24 25/24 56/10 57/14 |
| 59/20 |

| | | |
|---|---|---|
| **A** | Attorney's [1]  1/16 | Brannon's [1]  5/17 |
| answers [1]  29/4 | audio [2]  39/22 50/15 | break [2]  28/15 68/21 |
| anticipate [3]  9/3 10/24 72/2 | audio-visual [1]  50/15 | breaking [1]  10/18 |
| anticipated [1]  4/24 | aunt [1]  26/16 | breast [1]  16/25 |
| anus [1]  16/23 | authorized [1]  52/22 | breasts [1]  27/16 |
| any [50]  3/13 4/18 8/5 8/25 9/4 11/23 14/6 | automatically [1]  66/20 | BREAN [5]  2/8 3/7 40/7 50/17 50/18 |
| 15/17 15/18 18/2 19/3 19/6 19/6 19/16 20/22 | available [1]  68/13 | briefly [2]  9/23 13/12 |
| 20/23 22/20 24/5 25/12 28/23 30/1 33/10 34/1 | aware [2]  16/19 63/11 | bring [3]  26/17 34/11 34/24 |
| 34/17 34/24 35/5 35/12 36/7 39/3 39/4 39/8 | away [1]  33/16 | bringing [2]  39/18 47/12 |
| 39/14 39/17 40/5 42/23 44/6 46/7 46/24 49/20 | | brought [3]  13/2 34/14 39/4 |
| 50/5 53/25 54/18 58/25 66/20 67/14 67/24 | **B** | build [2]  14/24 15/1 |
| 68/1 69/8 70/18 70/20 | B-R-I-A-N [1]  50/18 | built [7]  16/12 16/24 27/17 28/2 32/16 35/3 |
| 68/1 69/8 70/18 70/20 | B-Y-R-D [1]  47/20 | 40/13 |
| anyone [4]  6/3 10/22 37/15 57/5 | baby [5]  17/20 17/20 45/21 45/24 46/11 | BYRD [4]  2/6 47/16 47/18 47/19 |
| anything [20]  6/3 7/20 12/2 14/6 19/20 19/23 | 46/14 | |
| 20/2 22/14 24/23 27/4 27/6 27/8 27/24 28/10 | back [16]  3/17 11/14 15/15 16/13 20/8 26/24 | **C** |
| 31/14 32/12 32/18 41/14 46/21 72/11 | 32/5 47/5 47/7 47/12 56/24 57/1 59/24 62/22 | C-A-C-H-E-D [1]  65/11 |
| AO [1]  67/23 | basically [1]  31/20 | C.W [52]  12/16 12/21 13/8 13/13 13/20 13/20 |
| apartment [3]  18/17 19/7 19/8 | basis [3]  36/19 45/9 55/1 | 14/1 14/14 15/3 15/6 15/17 15/24 16/4 16/10 |
| apologize [1]  11/7 | batteries [3]  12/3 12/5 35/23 | 16/20 17/3 17/22 17/24 18/20 19/3 19/25 |
| apparently [1]  53/1 | be [61]  7/21 9/3 9/6 9/14 10/5 11/8 11/9 16/1 | 20/22 20/3 29/15 29/16 29/17 37/10 37/14 |
| appearance [2]  3/4 3/4 | 18/9 25/7 25/11 25/16 26/6 27/1 27/5 30/2 | 39/4 38/2 38/6 38/16 58/17 58/23 64/16 |
| APPEARANCES [1]  1/14 | 30/12 36/21 36/21 37/5 37/19 38/22 38/23 | 64/20 64/22 67/12 |
| appears [4]  4/10 7/24 65/6 66/1 | 40/10 41/24 42/9 43/2 44/10 47/9 47/14 49/4 | C.W.'s [2]  24/8 24/10 |
| application [1]  21/2 | 50/8 51/15 54/4 54/5 54/13 54/14 54/16 55/3 | collect [2]  34/1 34/2 |
| approach [3]  21/20 40/21 53/3 54/10 67/6 | 55/21 62/2 62/24 65/6 65/8 66/22 67/19 68/4 | collected [5]  49/3 49/7 57/22 59/18 62/13 |
| appropriate [1]  30/13 | 68/16 68/8 69/11 69/11 69/12 69/25 69/25 | collection [1]  55/15 |
| approximately [3]  6/2 35/16 61/1 | 70/7 70/13 70/23 71/17 71/19 71/23 72/9 | color [2]  27/13 32/18 |
| April [2]  59/6 59/11 | Beach [1]  1/23 | combination [2]  26/13 43/6 |
| are [88] | became [1]  21/5 | come [8]  13/23 19/6 24/25 54/9 55/4 59/13 |
| area [6]  14/16 16/16 16/20 16/25 32/16 41/8 | because [7]  19/7 16/14 21/18 26/9 41/6 41/8 | 63/19 60/22 |
| argument [2]  8/25 72/3 | 42/13 | comes [1]  11/11 |
| around [7]  10/19 17/10 27/7 28/9 58/6 63/3 | become [1]  12/13 | comfortable [1]  26/10 |
| 68/4 | bedroom [1]  18/16 | coming [15]  7/7 20/21 57/13 61/17 65/21 |
| arrested [1]  15/11 | been [38]  3/13 5/4 6/19 7/1 7/3 7/9 7/10 7/22 | 65/24 65/25 65/9 66/25 68/22 66/23 69/3 72/9 |
| arrived [1]  15/14 | 8/4 8/23 9/1 12/20 12/1 15/13 21/7 22/15 33/6 | 72/10 |
| arriving [1]  10/19 | 33/14 33/24 35/16 35/16 36/4 36/5 40/5 40/8 | can't [1]  17/8 |
| articulate [1]  31/16 | 51/11 51/13 53/2 53/22 53/22 54/13 62/1 62/8 | cannot [1]  66/5 |
| as [47]  3/4 3/4 6/10 6/10 6/13 6/18 7/17 8/24 | 62/23 63/13 65/18 65/20 | capital [1]  11/6 |
| 9/3 9/22 9/22 10/16 10/21 16/21 14/6 17/17 | before [10]  1/11 3/2 3/10 9/5 10/1 14/4 50/25 | capture [1]  57/20 |
| 20/22 29/10 31/4 31/4 33/4 34/23 36/13 | 55/24 66/5 67/16 | care [2]  29/8 54/4 |
| 38/20 42/12 42/13 43/14 48/4 49/25 51/6 51/8 | began [3]  18/20 19/9 55/21 | career [5]  12/2 35/17 36/6 51/6 51/10 |
| 51/15 51/22 54/17 57/11 58/1 58/10 59/22 | begin [2]  59/9 59/13 | case [19]  1/3 2/9 3/5 20/11 31/7 33/8 33/6 |
| 61/16 62/21 63/7/24 67/24 68/3 69/19 71/6 | beginning [2]  15/8 50/7 | 37/7 37/12 38/2 52/24 52/30 59/3 53/20 53/22 |
| 72/16 | behalf [4]  3/6 3/9 8/25 14/12 | 54/8 57/21 62/16 66/5 |
| ascertain [1]  62/23 | being [8]  12/19 19/9 25/12 53/22 59/17 62/21 | cases [4]  12/6 35/17 35/23 60/21 |
| Ashley [29]  12/25 13/3 13/12 14/5 17/19 | believe [17]  6/18 8/7 9/8 21/9 28/9 30/6 34/1 | category [1]  8/10 |
| 20/22 21/11 21/18 22/1 22/2 22/10 22/4 23/5 | 36/16 38/21 41/12 41/12 41/17 46/2 37/22 | caution [1]  68/15 |
| 23/14 33/3 33/12 33/13 34/1 34/14 34/24 | 59/19 60/16 63/15 73/2 | cell [17]  55/8 55/9 56/16 60/15 64/25 65/9 |
| 37/16 38/24 39/10 39/25 40/24 40/25 46/6 | beneficial [1]  49/10 | 65/22 |
| 46/8 46/10 | besides [1]  12/19 | center [4]  36/24 61/13 62/5 62/5 |
| ask [10]  7/20 16/9 23/12 25/18 28/15 28/22 | best [1]  42/11 | central [1]  61/16 |
| 30/2 30/17 45/13 46/19 | better [2]  42/13 59/7 | certain [3]  15/25 37/25 57/23 |
| asked [18]  12/21 16/5 17/4 17/11 18/14 19/9 | between [6]  9/2 17/21 17/22 57/1 57/25 59/10 | certified [1]  40/8 |
| 22/13 23/7 26/9 27/8 27/23 27/24 28/1 28/7 | beyond [1]  64/11 | certify [1]  73/1 |
| 32/3 32/21 41/21 42/21 | big [1]  19/19 | chance [1]  39/10 |
| assess [1]  11/4 | bit [2]  28/5 28/6 | changes [1]  72/9 |
| assessment [1]  33/14 | blanket [2]  27/2 31/23 | charge [3]  3/20 37/7 58/20 |
| assigned [3]  11/18 12/19 51/22 | blond [1]  19/6 | charges [3]  3/22 4/1 4/4 |
| assist [1]  14/19 | body [1]  31/24 | chat [19]  51/25 52/12 55/10 55/14 55/15 |
| Assistant [1]  3/8 | bookmarked [1]  60/14 | 56/14 56/18 56/24 57/4 57/5 57/23 58/4 58/8 |
| associated [3]  65/3 64/1 66/8 | born [5]  43/21 43/21 46/5 46/11 | 58/18 59/2 59/21 60/2 64/9 64/8 |
| assume [1]  44/21 | both [6]  9/22 12/21 13/13 17/18 20/23 30/22 | chats [6]  55/22 55/22 56/2 58/2 58/3 60/12 |
| assured [1]  11/10 | bottom [2]  23/9 24/14 | check [1]  32/9 |
| attachments [1]  6/9 | bought [1]  26/16 | chest [4]  17/1 17/12 32/10 32/11 |
| attempt [1]  4/1 | box [4]  49/3 49/8 54/14 56/25 | child [29]  4/4 7/6 12/5 12/6 12/8 14/17 28/6 |
| attention [4]  12/11 25/23 27/9 37/19 | branch [1]  42/18 | 21/11 37/20 37/22 38/1 38/4 38/6 38/9 38/13 |
| Attorney [1]  3/8 | Brannon [3]  71/15 71/16 71/19 | dates [2]  63/22 64/1 |

| | | |
|---|---|---|
| **C** | conversation [3]  18/3 55/21 56/1 59/24 60/19 | day [13]  15/11 20/13 20/13 22/2 34/1 34/4 |
| child... [7]  59/25 60/16 61/14 61/16 62/18 | conversations [4]  6/23 7/1 38/24 57/3 | 34/5 56/16 56/21 56/21 57/11 63/17 68/18 72/7 |
| 62/24 65/20 | Cooley [1]  3/12 | 34/5 56/16 56/21 56/21 57/11 63/17 68/18 72/7 |
| child's [1]  43/3 | copies [1]  6/25 | days [3]  36/2 48/6 60/5 |
| children [19]  3/16 12/15 13/3 14/22 21/11 | copy [2]  7/19 57/10 | deal [1]  19/19 |
| 21/13 23/25 24/8 42/2 42/3 42/6 42/10 52/2 | correct [37]  5/6 9/11 17/6 19/4 19/24 20/20 | dealing [1]  37/20 |
| 52/13 53/13 62/13 62/18 62/24 63/8 68/1 | 36/13 36/24 42/7 42/9 42/13 42/16 43/1 48/8 | deals [1]  64/20 |
| chose [1]  26/19 | 48/10 48/16 63/4 63/5 63/24 68/1 64/1 64/9 | December [12]  1/9 6/24 7/15 13/4 14/12 |
| circle [1]  32/21 | 52/21 59/15 62/2 64/24 63/5 69/7 70/8 | 48/18 60/4 62/18 62/20 63/7/14 66/8 64/9 64/10 |
| circled [1]  32/22 | 73/1 | Defendant [5]  3/11 6/13 5/16 5/21 7/12 |
| circumstances [2]  17/15 26/1 | correlate [1]  57/24 | DEFENDANTS [1]  1/19 |
| clarification [1]  9/6 | couch [3]  19/10 27/2 43/9 | Defender's [1]  1/20 |
| clarify [2]  41/19 41/19 | could [7]  3/13 33/24 34/21 47/16 50/12 55/17 | defense [13]  4/15 7/14 8/17 8/24 9/2 10/1 |
| clarity [1]  33/10 | 62/2 | 10/6 30/7 52/25 53/1 54/5 54/22 72/16 |
| class [1]  36/20 | couldn't [2]  20/5 | defining [1]  28/16 |
| classes [1]  36/9 | could've [1]  63/25 | definitely [2]  5/9 58/10 |
| clear [4]  27/14 38/20 44/10 47/4 | counsel [6]  3/3 7/23 39/21 53/5 67/6 72/16 | delete [2]  66/4 66/11 |
| cleared [1]  66/4 | count [4]  3/22 4/1 4/4 8/10 | deleted [2]  55/22 66/1 |
| close [1]  40/25 | counter [1]  45/8 | deleting [1]  66/22 |
| closely [1]  72/15 | countries [2]  63/3 63/5 | demeanor [1]  22/9 |
| closer [1]  60/23 | country [1]  51/10 | denied [3]  19/20 19/23 39/8 |
| closet [1]  17/8 | couple [6]  7/23 12/22 16/19 26/14 28/22 | denying [1]  71/5 |
| clothes [7]  16/6 17/9 19/7 27/2 27/17 31/19 | County [1]  51/9 | department [11]  11/19 11/21 26/2 37/8 42/7 |
| 31/19 | couple [3]  40/4 40/6 60/5 | 43/6 47/24 47/25 48/23 50/25 |
| Code [4]  3/21 3/24 4/3 4/5 | course [11]  12/22 15/24 16/19 26/14 28/22 | departments [1]  11/23 |
| coerce [1]  4/1 | covered [1]  27/6 | depending [2]  55/24 60/8 |
| collateral [1]  51/22 | covers [1]  31/22 | depicts [1]  53/8 |
| collect [2]  34/1 34/2 | cover's [1]  31/22 | deputy [1]  51/8 |
| collected [5]  49/3 49/7 57/22 59/18 62/13 | court [36]  1/1 1/23 49/4 49/8 54/5 55/6 54/4 | describe [2]  31/6 32/17 |
| collection [1]  55/15 | 7/18 7/20 8/5 9/9 9/24 10/3 10/23 11/10 14/7 | described [1]  31/17 |
| color [2]  27/13 32/18 | 14/22 23/12 20/11 22/5 45/15 46/19 54/11 | detailing [1]  67/3 |
| combination [2]  26/13 43/6 | 57/19 57/18 59/18 59/18 60/16 60/16 | detailed [2]  4/2 4/10 4/12 |
| come [8]  13/23 19/6 24/25 54/9 55/4 59/13 | 68/22 68/25 69/5 69/11 72/7 | detective [24]  29/8 35/11 35/12 35/13 35/13 |
| 63/19 60/22 | Court's [2]  3/14 72/6 | 35/16 35/18 35/21 37/2 40/6 |
| comes [1]  11/11 | courtroom [8]  3/15 50/14 68/17 68/18 68/21 | determine [4]  48/20 51/25 65/5 65/9 |
| comfortable [1]  26/10 | 68/22 69/12 | developed [4]  13/9 52/8 |
| coming [15]  7/7 20/21 57/13 61/17 65/21 | cover [1]  10/21 | devices [7]  52/3 52/6 52/11 55/5 55/6 62/17 |
| 65/24 65/25 65/9 66/25 68/22 66/23 69/3 72/9 | cover's [3]  51/9 54/14 58/20 | 63/14 |
| 72/10 | CPT [8]  21/7 21/10 21/15 48/10 40/23 41/5 | did [14] |
| can't [1]  17/8 | 41/16 | didn't [24]  19/18 19/19 24/23 26/20 |
| cannot [1]  66/5 | crate [1]  65/21 | difference [2]  35/22 60/10 |
| capital [1]  11/6 | created [8]  64/5 65/6 65/8 65/7 65/8 66/15 | different [11]  9/3 9/14 24/13 |
| capture [1]  57/20 | 66/17 67/3 | difficulties [1]  49/10 |
| care [2]  29/8 54/4 | creates [1]  65/23 | digital [1]  27/19 |
| career [5]  12/2 35/17 36/6 51/6 51/10 | creation [2]  64/3 64/4 66/19 | digitally [2]  27/19 27/20 |
| case [19]  1/3 2/9 3/5 20/11 31/7 33/8 33/6 | credits [1]  38/10 | diplomatically [1]  42/17 |
| 37/7 37/12 38/2 52/24 52/30 59/3 53/20 53/22 | crime [4]  42/3 47/24 48/6 48/8 | direct [19]  2/4 2/7 2/10 11/15 12/21 25/23 47/3 |
| 54/8 57/21 62/16 66/5 | crimes [9]  16/21 15/13 12/25 35/23 35/25 | 47/21 50/6 69/23 |
| cases [4]  12/6 35/17 35/23 60/21 | 36/7 51/12 51/13 | directly [1]  28/24 |
| category [1]  8/10 | criminal [1]  37/11 16/13 14/17 | dis [1]  72/8 |
| caution [1]  68/15 | cropped [1]  38/12 | discretion [2]  72/12 72/5 |
| cell [17]  55/8 55/9 56/16 60/15 64/25 65/9 | cross [11]  2/5 35/5 35/9 56/6 56/9 70/1 | discussed [1]  56/7 56/13 57/25 |
| 65/22 | 70/10 70/17 70/18 71/2 72/2 | discuss [1]  72/16 |
| center [4]  36/24 61/13 62/5 62/5 | cross-examination [2]  35/5 70/17 | discussed [4]  56/7 56/13 57/25 |
| central [1]  61/16 | cross-examine [1]  72/2 | discussion [2]  9/2 23/5 |
| certain [3]  15/25 37/25 57/23 | current [1]  62/16 | DISTRICT [3]  1/1 1/1 1/11 |
| certified [1]  40/8 | **D** | division [2]  1/2 11/18 |
| certify [1]  73/1 | D-A-N-I-T-Z-A [1]  47/19 | do [62]  46/7 49/16 65/9 |
| chance [1]  39/10 | dad [1]  27/5 | doctor [2]  45/10 61/7 |
| changes [1]  72/9 | daddy [1]  19/19 | DNA [6]  34/18 34/19 34/20 48/5 48/13 48/19 |
| charge [3]  3/20 37/7 58/20 | daily [1]  45/9 | do [67] |
| charges [3]  3/22 4/1 4/4 | DANIEL [2]  1/15 3/6 | doctor [2]  49/16 61/7 |
| chat [19]  51/25 52/12 55/10 55/14 55/15 | DANITZA [4]  2/6 47/16 47/18 47/19 | docket [1]  4/13 |
| 56/14 56/18 56/24 57/4 57/5 57/23 58/4 58/8 | context [1]  65/2 | does [10]  6/6 6/11 43/3 5/10 5/15 5/16 17/23 |
| 58/18 59/2 59/21 60/2 64/9 64/8 | continue [2]  64/23 66/4 | 5/23 5/25 6/6 6/11 |
| chats [6]  55/22 55/22 56/2 58/2 58/3 60/12 | continued [4]  18/20 69/2 64/9 65/26 60/24 | document [4]  7/19 9/8/19 8/20 66/7 |
| chest [4]  17/1 17/12 32/10 32/11 | 48/6 | documents [3]  38/3 39/4 54/15 |
| child [29]  4/4 7/6 12/5 12/6 12/8 14/17 28/6 | continuing [1]  29/11 | does [25]  5/10 5/15 5/16 17/23 |
| 21/11 37/20 37/22 38/1 38/4 38/6 38/9 38/13 | control [1]  66/13 66/19 | 38/19 47/12 37/5 37/14 38/16 53/7 |
| dates [2]  63/22 64/1 | | dates [2]  63/22 64/1 |

D

does... [8] 57/20 60/25 61/4 61/22 65/12 65/16 65/16 66/20
doesn't [1] 69/1
doing [1] 68/16
doll [2] 27/18 27/22
dolls [2] 15/18 26/12
don't [32] 5/3 18/24 20/9 22/22 26/25 30/2 30/19 36/18 36/18 37/16 37/16 37/18 38/11 38/25 40/24 41/20 42/4 42/5 44/7 46/14 46/14 50/9 54/1 57/7 58/8 59/20 61/2 64/13 65/15 67/15 69/7 72/6
done [11] 15/25 31/5 42/15 44/2 44/3 44/4 44/6 54/13 66/23 72/9 72/10
doubt [1] 70/18
down [12] 14/4 21/7 22/16 28/15 29/4 29/4 29/12 31/22 31/23 32/1 47/1 69/3
downloaded [2] 55/17 63/20
downward [1] 5/21
Dr [4] 5/17 71/15 71/16 71/19
draft [1] 9/10
draw [2] 20/2 20/9
drawer [1] 45/8
drawing [4] 26/11 29/11 31/16 32/3
drawings [1] 44/6
drawn [1] 8/2
dress [1] 33/4
drew [6] 27/21 29/6 29/15 29/15 32/20 33/2
drive [11] 38/4 52/19 53/10 53/11 53/12 53/18 53/18 55/8 55/12 64/5 66/4
drives [1] 52/22
during [18] 15/24 16/4 16/17 18/3 19/25 26/5 26/14 26/20 27/19 28/22 29/3 39/5 43/24 44/3 52/15 56/24 58/2 64/16

E

each [5] 8/14 10/24 38/2 55/18 62/3
earlier [2] 43/22 57/19
earliest [4] 60/2 63/17 63/19 64/6
early [2] 43/22 50/15
easier [2] 16/18 26/13
easiest [1] 8/1
Edward [1] 3/12
Edwin [1] 3/3
effect [2] 58/7 58/9
either [5] 20/1 20/1 20/23 21/16 42/5
elbow [1] 58/9
electronic [4] 52/2 52/5 52/11 62/17
else [10] 17/15 37/19 43/11 43/16 46/9 46/12 46/14 57/5 71/14 72/11
emergency [1] 42/14
employed [3] 11/17 11/20 11/23
encountered [1] 64/12
end [3] 22/2 47/12 59/10
enforcement [5] 51/6 51/10 53/15 61/15 61/21
engage [1] 4/2
engaged [1] 7/16
entered [1] 3/17
entertaining [1] 59/9
entice [1] 4/2
enticement [1] 58/20
entire [2] 37/6 44/23
entitled [1] 59/6
entries [3] 56/21 57/14 57/15
entry [10] 4/11 5/12 5/13 5/15 5/16 5/20 5/21 5/25 7/24 57/12
environment [1] 58/24
episode [1] 45/20
erase [1] 65/17

ESQ [1] 1/19
estimate [1] 47/3
even [4] 11/14 20/15 47/8 57/5
eventually [1] 34/25
ever [4] 25/8 27/10 28/7 45/12
every [3] 25/17 57/4 57/12
everybody [1] 72/18
everyone [1] 5/4
everything [7] 11/10 11/13 15/7 15/10 59/22 62/4 62/5
evidence [27] 8/25 9/4 10/1 10/7 10/9 10/12 24/1 24/19 25/15 30/14 34/1 34/16 39/4 40/15 41/13 43/3 49/19 50/3 53/17 53/19 53/24 55/2 67/17 67/22 70/20 70/20 71/24
exact [2] 40/25 61/6
exactly [2] 22/22 61/2
exam [12] 21/8 21/13 21/15 21/17 41/5 41/6 41/7 41/10 41/11 42/14 43/3 65/5
examination [15] 2/4 2/5 2/7 2/9 5/17 5/23 11/15 35/5 35/9 47/21 50/19 51/14 52/5 55/4 65/3
examined [2] 42/10 55/6
examiner [4] 51/4 51/11 51/15 51/17
example [1] 63/24
exams [1] 21/12
except [1] 24/22
excess [1] 60/15
executed [1] 64/18
exhibit [43] 2/13 2/15 2/16 2/17 5/25 6/1 21/24 21/25 22/4 22/5 22/8 22/10 23/9 24/19 25/6 25/11 25/16 25/17 25/18 25/18 25/19 25/19 29/17 29/25 30/4 30/20 43/20 43/24 48/18 48/24 49/19 50/2 50/3 53/1 53/2 53/24 55/2 63/11 64/13 67/2 67/9 67/17 67/23
exhibits [17] 2/11 2/14 2/18 29/9 29/9 29/14 30/11 30/13 43/18 44/2 47/5 47/5 54/20 55/1 61/2 67/22 68/2
expecting [1] 71/1
experience [5] 14/9 38/12 42/11 44/11 51/5
experienced [1] 42/3
explain [5] 17/15 55/17 56/21 59/3 61/12
explained [1] 67/3
explicit [1] 21/1
exploitation [9] 3/20 3/23 52/13 59/5 59/25 60/16 61/14 61/17 62/24
exploitations [1] 60/18
Exploited [1] 61/13
extend [1] 38/19
exterior [2] 41/10 41/11

F

facility [1] 42/13
fact [2] 48/16 49/6
factual [1] 8/5
fair [1] 36/19
familiar [1] 66/14
Family [2] 42/8 42/18
far [5] 9/22 10/17 31/4 42/12 50/10
federal [3] 1/20 51/9 73/5
feel [3] 20/7 28/4 40/11
felt [1] 26/10
female [1] 12/15
few [8] 16/9 28/3 28/23 28/25 29/1 35/8 40/21 46/5
file [6] 6/25 63/9 64/2 64/5 65/10 66/13
filed [7] 5/13 5/24 7/14 8/3 9/7 60/25 61/3
files [2] 53/13 64/1
filing [2] 5/15 5/17
fill [1] 10/20
final [1] 9/10
find [11] 10/18 14/21 33/11 42/5 43/1 52/12 53/12 55/10 58/11 63/25 64/22
findings [3] 43/2 55/7 62/22
fine [3] 8/13 11/1 20/10
fingers [1] 28/13
finishes [1] 68/2
firearms [2] 53/9 53/10
first [24] 6/12 7/23 9/25 10/7 12/18 12/20 13/25 14/4 15/3 16/4 16/8 16/11 17/4 18/5 19/23 19/25 20/3 20/12 21/5 31/8 33/5 64/5 65/21 71/16
fits [1] 72/7
five [8] 8/12 9/8 9/12 13/24 14/18 19/13 20/15 71/13
FL [3] 1/7 1/18 1/21
flash [2] 65/22 66/3
flat [2] 32/20 32/23
FLETCHER [2] 1/19 3/9
FLORIDA [2] 1/1 50/23
focus [2] 37/18 37/19
folders [1] 53/13
folks [1] 41/16
following [1] 5/3
Force [1] 51/7
foregoing [1] 73/1
forensic [9] 21/11 21/12 51/11 51/14 51/15 51/17 52/5 65/3 65/5
forensics [1] 55/22
form [2] 20/10 67/23
format [1] 55/18
FORT [5] 1/2 1/7 1/18 1/21 1/23
forth [3] 56/24 57/1 59/24
forthcoming [1] 18/10
found [1] 40/13
founded [1] 50/25
frame [2] 40/25 64/8
free [1] 10/9
front [4] 44/7 58/8 64/13 64/14
Ft [3] 1/23 18/20 50/23
full [1] 58/12
FUNK [4] 1/15 2/7 2/9 3/6
funny [1] 57/9
further [4] 20/23 35/4 50/4 61/17

G

G-R-E-G-A [1] 11/6
gallery [2] 65/23 65/24
garage [1] 44/21
garbage [1] 27/15
gave [1] 18/5
general [1] 50/13
generally [5] 14/9 14/21 42/25 43/1 61/25
generated [2] 55/21 56/15
get [7] 14/6 14/21 18/3 26/7 36/19 68/20 72/10
girl [2] 13/25 17/20
girls [21] 14/6 15/13 16/2 16/14 17/18 20/11 20/23 21/7 21/16 22/13 23/7 25/7 26/15 26/17 37/4 37/18 38/18 39/19 40/10 40/20 40/23
give [8] 28/19 39/14 39/17 39/19 39/23 47/4 47/6 64/14
given [6] 4/23 4/24 22/12 23/4 23/6 55/21
go [15] 6/13 7/12 13/11 21/7 27/25 28/11 29/14 33/20 33/20 38/5 50/10 50/12 65/17 65/24 67/21
going [34] 4/25 10/11 10/17 11/8 11/13 12/15 17/22 21/23 22/2 25/14 25/17 26/6 27/5 29/8 29/10 30/17 31/21 31/22 32/9 33/1 38/5 47/8 52/25 54/4 54/20 56/24 57/1 63/2 67/23 68/5 68/16 69/10 71/23 72/17
gone [1] 48/8
good [8] 3/1 3/6 3/9 15/4 35/13 35/14 54/22

G

good... [1] 67/19
got [8] 12/18 12/20 25/14 29/10 31/25 37/12 40/6 51/14
gotten [1] 26/16
Government [44] 2/13 2/14 2/15 2/16 2/17 3/13 4/12 5/8 5/12 6/10 6/14 6/25 8/15 9/3 9/19 9/23 9/24 10/7 11/1 21/23 22/4 22/5 24/19 25/7 29/25 30/11 30/13 30/20 47/2 48/24 50/2 50/3 54/18 54/21 55/2 62/21 67/9 67/17 67/23 69/1 69/17 70/21 71/24 72/2
Government's [5] 5/19 5/24 10/4 47/18 50/17
Graham [1] 68/18
great [1] 36/25
ground [1] 10/21
group [2] 61/23 62/8
guess [1] 8/1
guideline [1] 8/11
guidelines [2] 8/9 8/24
guilty [2] 3/18 4/8
gun [4] 52/16 53/20 54/7 54/8

H

H.W [32] 12/16 12/21 13/8 13/14 13/23 15/12 17/22 19/11 19/13 19/16 19/25 20/14 21/13 22/15 23/5 23/7 24/22 29/11 29/15 29/16 31/3 31/4 33/5 37/10 37/14 40/15 41/16 44/2 44/10 45/10 45/12 48/14
had [58] 4/12 4/15 6/15 6/24 7/15 9/23 12/8 12/10 14/7 15/7 15/13 15/25 16/2 16/3 17/11 17/20 17/20 20/13 20/25 20/25 21/4 22/15 23/5 23/6 23/24 26/6 26/15 27/10 27/16 28/12 31/5 31/23 31/24 32/14 33/5 33/6 33/12 33/14 33/15 33/15 36/7 36/9 40/5 40/5 40/21 42/11 53/21 53/21 55/7 58/12 62/11 63/13 63/20 64/6 64/16 64/16 65/6 66/6
half [6] 48/2 69/8 69/9 69/15 70/14 72/7
hammer [2] 32/6 32/10
hand [6] 16/5 17/10 27/7 28/7 28/9 28/11
handful [1] 62/2
handle [2] 32/15 39/17
handled [1] 37/6
handles [1] 35/21
handwriting [11] 23/10 23/12 23/19 23/21 23/22 26/11 29/21 30/4 30/21 30/22 49/8
happen [2] 27/8 28/23
happened [13] 15/8 15/10 19/4 19/7 19/21 19/23 28/16 28/21 28/21 31/8 31/15 40/16 42/24
happens [1] 65/17
hard [2] 54/11 66/3
HARDING [37] 1/7 3/3 3/5 3/10 3/22 4/1 4/4 5/18 9/1 13/4 13/9 15/11 15/25 17/4 17/16 18/14 26/23 27/20 31/5 38/24 39/10 44/14 48/11 51/21 52/3 52/12 53/13 53/14 56/19 57/5 57/13 58/12 69/17 69/21 70/7 70/23 71/5
Harding's [2] 4/7 52/8
Hardy [2] 3/17 45/24
has [23] 4/12 4/15 5/4 5/10 6/3 6/8 6/16 7/1 7/3 7/9 7/10 7/21 8/4 8/20 9/2 10/22 22/19 53/2 59/22 62/15 67/2 67/8 69/17
hate [1] 61/5
have [94]
haven't [2] 39/5 72/6
having [5] 8/19 8/21 8/22 8/23 33/4
he [37] 17/7 17/9 17/10 17/22 22/16 24/22 24/22 27/1 27/2 27/7 27/10 27/10 27/11 27/12 27/14 27/14 27/16 27/17 27/19 28/1 28/5 28/9 28/12 31/20 31/21 31/22 31/24 32/8 32/9 32/9 32/12 32/12 32/14 32/25 33/1 46/10 71/17

head [3] 32/20 32/23 40/24
hearing [3] 61/6 68/19 72/21
heart [1] 32/9
help [1] 45/13
helped [1] 37/6
helpful [1] 70/13
her [86]
here [5] 3/7 6/5 11/9 11/13 29/19
Highway [1] 1/17
him [9] 4/8 16/7 19/9 19/10 19/20 21/5 27/3 31/19 64/12
himself [1] 27/12
his [21] 16/5 17/4 17/9 17/10 17/10 17/11 18/14 18/16 24/23 27/2 27/7 27/7 27/8 27/25 28/1 28/2 28/7 28/13 31/18 50/13 53/14
history [1] 8/10
hold [2] 46/4 65/16
holder [1] 56/16
holding [1] 20/8
home [2] 17/23 33/20
homeland [4] 15/14 50/22 50/22 51/3
homicide [1] 12/3
homicides [1] 35/22
HON [1] 1/24
Honor [30] 6/6 7/4 7/11 8/1 9/22 10/15 21/21 22/1 22/22 24/5 24/17 25/1 25/10 29/24 30/15 34/20 35/4 35/8 45/16 46/25 48/18 49/18 49/21 52/25 53/3 53/24 54/1 67/6 71/3 72/12
Honor's [1] 10/16
HONORABLE [1] 1/11
hour [4] 69/8 69/9 69/15 69/24
house [13] 13/12 15/13 17/16 18/17 18/18 33/13 44/15 44/19 44/23 45/13 52/15 52/16 52/23
household [2] 44/14 44/19
how [45] 10/11 10/17 11/17 11/20 12/18 13/20 13/20 13/23 17/24 27/18 28/1 35/15 36/4 36/15 39/17 40/10 41/8 47/15 48/1 49/6 49/14 50/10 50/24 51/11 55/17 56/9 57/17 61/1 61/4 63/3 63/13 63/18 63/19 65/3 65/16 68/10 68/24 69/5 69/23 70/3 71/6 71/17 71/23 72/1 72/8
however [6] 15/6 20/11 36/23 41/6 42/15 62/1
hum [6] 29/2 37/24 39/2 43/21 44/25 46/7
hurt [2] 28/4 32/10
husband [1] 13/7

I

I'm [2] 37/4 56/3
I.D [1] 2/12
idea [3] 26/6 54/22 70/11
identification [2] 48/19 56/17
identified [8] 7/6 61/15 61/16 61/20 62/5 62/9 62/14 64/11
identifier [1] 56/14
identify [5] 59/10 61/17 61/19 62/10 65/25
identity [2] 49/15 57/16
image [30] 53/16 57/1 57/20 58/5 58/5 58/12 58/17 58/22 58/23 64/20 64/22 65/1 65/4 65/7 65/10 65/11 65/11 65/18 65/18 65/23 65/25 66/6 66/7 66/8 66/20 66/25 66/25 67/2 67/8 67/12
images [22] 7/7 50/12 52/12 56/24 57/22 57/24 58/1 58/2 58/3 59/18 61/10 61/14 61/19 61/23 62/2 63/4 63/8 63/13 63/16 64/7 65/8 65/21
immediately [1] 33/12
important [1] 41/24
impressed [1] 42/16
imprisonment [1] 8/12

inappropriate [2] 14/10 16/1
inappropriately [1] 22/15
inartfully [1] 8/2
incarceration [1] 8/11
incidences [3] 17/24 18/1 18/2
incident [6] 18/14 33/3 34/8 41/19 46/8 46/8
incidents [5] 17/19 17/21 31/7 33/21 41/19
include [1] 58/5
include just [1] 58/5
included [4] 9/10 35/25 54/7 55/18
including [2] 5/11 63/6
inclusive [1] 55/23
INDEX [1] 2/1
indicate [3] 17/7 29/20 56/9
indicated [6] 16/4 17/9 27/16 28/12 37/10 49/17
indicates [1] 6/13
indication [1] 53/21
indications [1] 56/25
indictment [1] 3/19
individual [1] 49/15
individuals [3] 6/24 48/5 63/8
ineligible [1] 8/12
information [13] 14/6 14/21 18/4 18/5 20/22 20/25 22/12 23/6 40/6 40/9 55/24 56/17 61/17
informed [1] 72/16
initial [1] 8/2
initials [1] 12/16
inquire [1] 10/15
insert [1] 41/8
inserted [1] 32/14
inside [4] 28/1 28/2 28/5 31/18
instance [4] 36/10 38/7 64/5 65/24
instances [2] 19/3 60/21
instruct [1] 8/24
instructions [1] 39/14
instrument [1] 33/6
instruments [1] 14/19
intact [1] 44/15
intend [1] 69/19
internal [3] 21/15 21/17 41/7
interview [53] 13/13 13/16 13/25 14/14 14/14 14/15 14/19 15/3 15/3 15/17 15/24 16/2 16/3 16/4 16/8 16/10 16/11 16/14 16/17 17/4 18/6 19/15 19/23 20/3 20/14 20/18 21/3 21/4 25/24 26/2 26/5 26/8 26/12 26/14 28/22 29/3 29/10 31/2 33/10 38/1 38/4 38/13 38/16 39/7 39/11 41/16 41/24 43/6 43/8 43/12 43/25 44/3 49/10
interviewed [8] 13/21 14/5 15/12 18/10 19/11 37/10 37/14 42/10
interviewers [1] 42/3
interviewing [5] 12/8 20/11 36/13 37/23 42/12
interviews [14] 12/21 14/17 17/18 19/25 20/19 20/21 21/11 26/20 34/7 37/4 38/18 40/6 40/19 42/15
introduce [1] 24/1
introduced [2] 26/8 26/12
introduction [1] 50/13
investigate [2] 11/25 12/5
investigating [3] 12/1 51/12 51/13
investigation [17] 4/9 4/10 4/13 4/16 5/14 12/3 12/14 12/19 36/8 37/3 39/5 48/10 50/14 50/23 51/20 51/22 64/17
investigations [7] 11/18 12/9 14/15 35/23 51/3 56/7 62/15
investigator [3] 35/15 36/4 48/4
involve [1] 14/9
involved [5] 12/13 12/18 37/3 37/12 48/10
involving [2] 3/23 34/9
is [172]

I

isn't [1] 10/25
issue [4] 6/17 7/1 7/9 9/5
issued [2] 52/1 52/1
issues [1] 68/4
it [127]
items [5] 33/14 34/18 34/24 44/19 45/13
its [6] 7/17 22/21 38/3 58/5 67/14 67/15
itself [2] 6/1 56/1

J

job [1] 51/5
judge [13] 1/11 9/11 16/19 35/6 50/11 54/10 56/21 67/18 68/7 68/16 68/18 68/21 69/12
Judith [1] 5/12
Julie [1] 71/5
June [1] 73/4
jurors [1] 10/19
jury [1] 4/25
just [19] 15/8 17/20 24/12 26/9 28/5 28/6 28/21 33/16 35/6 35/25 36/11 37/22 41/8 44/10 45/4 47/4 56/25 58/5 67/3
Justice [1] 63/10

K

keep [3] 39/18 47/5 72/15
kept [1] 63/21
kids [1] 19/20
Kik [2] 21/1 60/3
KILLINGER [5] 1/16 2/4 3/8 10/12 47/4
kind [10] 28/23 31/6 32/1 32/17 34/17 38/4 44/18 46/7 58/6 70/20
kitchen [3] 27/15 44/24 45/5
knew [1] 46/21
knife [4] 32/6 33/21 34/2 44/15
knives [3] 45/1 45/4 45/7
know [48] 5/4 6/13 10/22 10/23 13/9 15/10 18/1 20/8 22/13 23/19 26/7 27/12 27/13 28/20 28/20 28/21 32/3 32/19 33/15 33/24 37/10 38/4 38/19 39/14 39/19 40/2 40/23 40/24 41/1 41/18 42/4 42/6 42/7 42/9 42/23 43/11 43/13 46/1 46/8 46/12 46/14 49/14 61/1 61/2 61/4 65/3 69/10 72/7
known [2] 62/13 62/13
knows [1] 28/21

L

L-A [1] 11/6
lack [1] 59/7
lacking [1] 42/12
LaGREGA [6] 2/3 11/2 11/6 11/7 35/13 48/13
laid [1] 31/22
Lakeshia [1] 5/4
laptop [1] 55/9
larger [1] 9/25
last [9] 10/16 11/5 12/12 36/10 36/11 47/19 64/2 68/10 68/19
Lastly [1] 70/15
late [2] 20/12 20/12
later [4] 23/24 34/4 40/6 53/12
law [5] 51/6 51/10 53/14 61/15 61/21
lay [3] 16/7 19/9 31/22
learned [1] 33/5
leeway [1] 10/20
left [2] 10/16 11/12
leg [1] 27/25
legal [2] 4/18 5/5
length [2] 4/23 47/3
let [9] 10/23 16/9 23/2 29/8 33/15 38/4 41/24 42/2 50/12
let's [5] 25/5 25/23 31/2 47/17 67/20
letter [6] 5/11 6/9 22/11 22/20 22/23 23/4
letters [1] 5/15
level [1] 8/10
Lexar [1] 55/12
LG [5] 55/8 55/10 55/14 60/14 64/25
life [3] 8/11 8/13 38/3
like [18] 10/21 10/22 12/11 16/15 20/7 22/24 24/22 25/1 28/4 31/25 32/18 32/22 33/2 41/7 46/8 55/24 62/23 69/3
likelihood [1] 5/2
likely [1] 70/7
limit [1] 62/7
line [1] 55/18
lines [3] 39/24 57/8 58/10
linked [1] 61/24
Lisbet [1] 71/11
list [3] 21/25 55/12 67/24
listening [2] 11/10 11/14
little [6] 20/14 26/6 28/5 28/6 31/23 42/11
live [1] 33/13
lived [1] 44/16
living [3] 18/16 27/1 58/23
local [1] 56/13
locate [1] 57/21
located [3] 33/16 64/24 66/9
location [3] 51/25 61/24 66/12
logistics [1] 72/16
long [12] 11/20 20/13 35/15 36/4 36/15 48/1 63/13 68/10 69/23 70/3 71/6 71/17
longer [3] 15/2 20/14 69/5
look [9] 19/20 21/6 33/21 43/18 44/14 44/21 45/13 46/4 72/8
looking [3] 11/8 44/21 56/18
looks [2] 55/24 62/23
lot [11] 11/13 15/16 18/9 20/16 26/19 33/13 36/23 36/24 59/21 59/24 66/4
Lucie [6] 11/19 11/20 18/20 37/7 47/24 49/10
Lynch's [3] 68/17 68/21 69/12

M

ma'am [13] 4/17 4/21 6/7 8/18 24/8 30/8 46/23 50/6 54/9 54/12 57/7 69/4 72/13
MacBook [1] 55/9
Macintosh [1] 63/22
made [1] 20/23
majority [2] 12/1 62/25
make [9] 9/15 16/15 26/12 39/15 42/23 47/8 70/8 72/9 72/17
making [1] 9/9
manner [1] 58/25
manually [1] 66/23
many [12] 17/24 28/1 42/9 42/15 50/24 51/11 59/7 61/1 61/4 62/8 62/8 63/3
March [2] 60/3 63/17
March 25 [1] 60/3
March 6 [1] 63/17
marital [1] 33/20
mark [1] 67/9
marked [8] 24/19 30/13 48/24 50/3 53/1 55/2 67/17 67/25
Martinez [1] 68/7
mastodon [3] 59/3 59/3 59/11
match [1] 62/11
material [5] 3/23 59/5 59/25 62/24 62/24
materials [1] 8/20
matter [4] 3/2 4/25 63/21 73/2
matters [1] 40/22
may [18] 1/8 4/23 9/8 10/15 21/20 24/4 34/20 37/5 37/19 45/16 47/1 48/21 53/3 54/10 55/23 67/6 69/11 70/7
maybe [3] 9/2 46/5 57/11
me [37] 10/23 16/9 16/18 19/18 22/14 22/17 23/2 23/4 24/22 27/18 27/21 28/12 28/19 29/8 31/8 31/17 32/9 32/12 32/14 33/15 33/15 39/19 40/4 40/19 41/24 42/1 42/2 45/10 47/7 58/8 63/9 64/13 64/14 66/9 67/18 69/1 69/19
mean [9] 18/1 35/20 38/20 45/24 47/11 51/15 60/13 60/18 65/12
means [2] 61/25 68/12
media [3] 57/21 58/11 64/19
medical [7] 5/23 21/8 21/12 21/13 41/5 41/6 43/3
medically [1] 42/10
memoranda [1] 6/11
memorandum [1] 5/20
memory [2] 65/22 66/3
mentioned [8] 5/22 6/3 12/5 30/6 30/20 57/19 59/17 60/11
message [4] 55/15 57/4 57/13 58/8
messages [9] 21/1 21/2 21/5 55/11 55/14 56/15 57/5 57/25 59/2
messaging [4] 52/13 56/22 56/23 57/23
met [2] 12/23 13/12
MICHAEL [20] 1/7 3/3 13/4 13/8 15/11 15/25 16/4 17/4 17/16 18/14 22/16 26/23 27/20 31/5 31/9 31/18 32/5 48/11 51/21 71/15
might [3] 45/21 50/11 67/19
Mike [1] 61/10
military [1] 51/6
mind [2] 26/25 47/2
Mine [2] 23/11 24/13
minor [4] 3/16 4/2 7/16 12/15
minors [2] 3/20 3/23
minute [2] 35/6 45/16
minutes [17] 68/11 68/19 69/16 69/24 69/25 70/1 70/2 70/6 70/15 70/16 71/7 71/9 71/11 71/13 71/20 71/22 72/3
missed [1] 19/20
modified [1] 58/5
mom [3] 15/14 33/13 33/15
moment [1] 34/20
Monday [4] 5/4 68/5 68/25 72/15
months [1] 46/6
more [8] 18/4 18/10 24/12 28/23 32/22 68/11 69/1 70/5
morning [5] 3/1 3/6 3/9 35/13 35/14
mother [5] 3/16 12/23 13/3 14/5 49/16
motion [4] 5/21 5/24 5/25 54/23
mouth [1] 27/23
move [5] 9/5 27/7 28/9 49/18 53/24
moved [2] 17/10 33/12
Mr [30] 2/4 2/5 2/7 2/9 3/5 3/10 3/17 3/22 4/1 4/4 4/7 5/18 9/1 9/7 9/9 10/12 47/4 52/3 52/8 52/11 53/13 53/14 56/19 57/5 57/13 58/11 68/6 68/20 69/18 70/15
Mrs. [1] 70/7
Mrs. Harding [1] 70/7
Ms [1] 70/8
Ms. [7] 11/7 48/13 69/17 69/18 69/21 70/3 70/23
Ms. Harding [3] 69/17 69/21 70/23
Ms. LaGrega [2] 11/7 48/13
Ms. Stevens [2] 69/18 70/3
much [10] 10/21 18/4 19/8 28/14 47/15 62/1 68/24 69/5 71/23 72/1
my [31] 8/2 9/15 11/12 11/14 12/2 12/22 16/6 16/14 16/17 18/3 20/14 26/12 26/24 28/11 29/21 32/9 32/13 35/17 36/6 37/18 38/18 40/3 40/24 45/12 49/8 51/14 55/22 57/12 58/9 62/22 64/11

N

naked [5] 16/7 17/8 19/10 19/20 31/19
name [11] 11/4 11/5 12/24 18/23 29/21 47/19 49/23 49/25 57/16 66/9 66/13
names [7] 25/7 47/9 55/1 56/6 64/9 64/14 68/1
naming [2] 66/15 66/19
napping [1] 17/19
National [2] 36/24 61/13
natural [1] 10/18
NCSEC [3] 61/10 61/12 63/5
necessary [1] 14/20
need [19] 4/24 14/24 15/1 21/7 22/14 25/7 27/11 32/8 43/19 54/5 54/11 54/13 55/1 67/21 68/24 69/10 69/11 70/8 72/11
needed [1] 71/23
needs [5] 7/21 8/5 54/14 54/16 66/22
Nevertheless [1] 5/5
next [11] 19/9 19/10 45/12 47/2 47/14 50/14 61/6 67/25 69/21 71/10 72/19
night [3] 20/16 31/9 46/10
nine [7] 13/22 14/2 14/18 38/1 51/6 67/22 67/24
no [60] 1/3 4/20 4/21 5/5 6/6 6/7 10/2 11/24 14/23 15/9 15/20 15/22 17/9 20/4 24/11 24/17 25/13 27/13 30/6 34/3 35/4 38/9 38/10 38/11 38/25 38/25 39/6 39/16 40/24 40/24 41/15 41/23 43/17 44/8 44/17 45/4 45/4 45/7 45/14 46/13 46/17 46/22 46/25 49/21 50/4 50/6 50/9 53/21 54/19 56/12 56/14 56/19 56/22 56/25 59/1 68/11 70/5 70/11 72/12 72/13
nolo [1] 3/18
non [1] 56/12
non-redacted [1] 56/12
none [1] 50/8
noon [1] 10/19
normally [1] 14/23
North [1] 1/20
not [56] 3/16 4/19 4/23 5/6 6/3 9/10 10/4 10/23 11/8 14/23 14/23 15/8 15/20 15/21 16/5 17/12 17/13 17/14 19/8 19/17 21/4 21/17 21/17 27/5 28/19 35/25 37/16 38/2 39/16 39/18 40/5 40/24 41/5 41/7 42/10 42/16 43/17 43/17 44/20 46/17 46/22 53/19 54/5 54/6 55/23 56/23 57/5 57/20 59/16 60/11 62/7 62/15 63/9 64/20 70/8 72/7
notation [1] 7/5
notations [3] 23/9 29/19 29/19
note [9] 6/14 23/3 23/14 23/16 23/19 23/20 24/21 39/15 47/8
noted [1] 6/24
notepad [1] 26/8
notes [6] 6/21 7/8 26/24 29/4 39/1 40/3
nothing [7] 33/23 33/23 39/21 39/21 41/15 41/15 45/6
notice [2] 5/15 5/17
notified [3] 3/14 12/20 34/8
November [2] 3/17 66/17
November 17 [1] 66/17
now [24] 13/11 16/2 19/11 19/25 20/18 29/3 33/5 36/7 37/2 37/14 38/7 38/16 39/10 40/23 41/5 41/16 43/6 44/10 51/2 54/13 57/9 63/2 65/1 72/20
number [10] 21/24 28/15 28/16 43/24 53/2 55/6 60/16 61/7 63/2 67/9
numbers [1] 9/9

O

o'clock [3] 68/6 68/6 68/8
objection [23] 6/14 7/21 7/23 8/3 10/3 22/21 24/3 24/17 24/18 25/12 30/1 30/5 30/6 30/12 49/20 49/21 50/2 53/25 54/6 54/18 54/19 67/14 67/16
objections [14] 5/13 5/14 5/20 6/12 6/18 6/22 7/13 7/14 8/2 8/5 8/21 8/23 9/13 9/16
observed [1] 62/25
obtain [2] 43/19 57/24
obtained [1] 43/24
obviously [2] 10/3 45/10
occasion [1] 12/13
occur [6] 4/23 17/19 17/21 18/15 49/9 66/12
occurred [4] 33/21 45/21 49/12 64/8
occurring [1] 56/2
occurs [1] 66/2
off [14] 10/23 16/6 17/9 19/9 27/2 27/12 27/13 27/17 29/22 29/23 31/19 31/20 33/18 40/24
offender [2] 59/11 61/24
offenders [4] 59/14 62/1 62/6 63/3
offense [1] 8/10
office [8] 1/16 1/20 6/16 7/17 35/22 51/9 51/23 64/12
officer [2] 7/8 35/11
Official [2] 1/23 73/5
often [2] 20/7 20/7
Oh [1] 27/10
okay [74]
old [9] 13/20 13/20 13/23 14/2 14/18 14/18 19/13 20/15 38/1
once [2] 25/14 28/23
one [37] 5/22 20/1 20/2 20/23 21/16 22/1 22/2 25/20 31/8 31/21 32/22 34/20 35/6 36/10 36/11 36/21 37/4 37/20 37/20 38/20 43/9 43/20 43/24 45/7 46/4 47/4 52/22 54/4 54/4 54/5 55/8 56/9 58/4 64/6 64/12 65/13 69/12
one-on-one [1] 37/20
ones [7] 29/14 29/15 45/8 55/6 61/5 61/20 64/2
ongoing [4] 28/17 54/25 56/7 62/15
online [1] 36/23
only [1] 37/2
opened [1] 53/9
operating [7] 63/22 63/23 63/24 65/13 65/16 65/19 66/2
opinion [2] 15/4 18/9
opportunities [1] 36/25
opportunity [3] 4/12 4/16 46/19
order [5] 9/4 9/22 54/23 69/19 69/20
ordered [1] 4/8
orderly [1] 44/16
original [7] 9/16 9/16 58/5 66/1 66/5 66/9 66/11
other [28] 6/24 11/23 17/20 23/2 29/19 33/18 34/18 34/23 34/24 37/3 39/4 42/14 43/3 44/6 56/10 57/15 57/16 57/21 58/13 59/12 60/21 62/11 64/7 64/9 64/11 66/14 70/20 70/22
others [7] 15/2 30/21 49/25 50/8 59/9 59/17 67/24
otherwise [1] 62/19
our [4] 25/23 51/22 64/12 72/18
out [14] 10/20 13/11 16/8 22/2 23/24 27/24 28/10 32/5 33/12 37/5 42/5 45/7 66/6 66/25
outside [1] 53/22
over [8] 11/11 27/3 40/21 47/6 60/1 60/18 60/24 62/23
overridden [1] 66/4
overwhelmed [1] 19/17
own [1] 38/3

P

p.m [1] 66/18

packed [1] 33/14
pad [1] 20/2
page [12] 2/4 2/5 2/7 2/9 2/13 2/14 2/15 2/16 2/17 6/13 7/7 7/24
pages [4] 6/2 6/9 33/3 60/21
Palm [1] 1/23
paper [2] 20/2 26/8
paragraph [1] 9/9
paragraphs [9] 6/15 6/18 6/22 7/14 7/18 9/8 9/12 9/13 9/14
part [4] 16/25 52/16 58/3 58/18
participate [1] 52/8
particular [12] 18/2 37/2 38/2 56/14 57/8 58/7 59/5 63/25 64/4 65/18 65/18 66/3
particularly [3] 14/18 55/7 69/13
parties [3] 56/7 56/8 57/2
party [2] 56/16 56/18
Pasco [1] 51/9
pass [1] 30/15
path [1] 66/8
Pauline [2] 1/23 73/5
Pauline's [1] 69/13
Pause [1] 45/18
pay [1] 37/18
paying [1] 27/9
PEACOCK [7] 1/19 2/5 3/9 9/7 9/9 68/6 68/20
pending [1] 8/13
penetrated [2] 27/19 28/12
penetration [1] 27/19
penis [13] 16/5 16/11 17/5 17/10 17/11 18/14 27/7 27/9 27/23 27/24 28/1 28/2 28/7
people [5] 12/2 35/22 59/12 60/20 65/9
percent [1] 62/24
percentage [1] 62/18
perhaps [1] 70/22
period [4] 14/23 60/1 60/21 60/22
Perry [1] 71/11
person [4] 57/14 57/15 58/13 58/17
person's [7] 12/1 12/2 35/16 35/18 35/21 36/4 57/16
personally [2] 42/10 61/4
phone [17] 21/6 24/23 55/8 55/9 55/10 56/13 56/16 60/15 64/25 65/19 65/22 65/24 66/3 66/14 66/16 66/20 67/12
photo [2] 65/24 66/12
photograph [2] 53/9 58/25
photographs [1] 33/23
photos [2] 53/14 66/12
physical [1] 21/15
physically [2] 18/15 67/4
pick [1] 17/22
picture [4] 31/16 32/4 32/20 54/7
pictures [7] 24/23 26/11 29/11 32/25 33/2 45/9 53/14
PIERCE [7] 1/2 1/7 1/18 1/21 1/23 18/20 50/23
Pierce/West [1] 1/23
place [5] 14/14 19/4 26/1 43/7 67/19
Plaintiff [2] 1/5 1/15
plan [1] 10/16
plastic [1] 32/14
plea [2] 3/18 4/7
pleading [1] 9/7
please [3] 11/5 39/19 49/23
plug [2] 35/3 40/13
PNY [1] 55/7
point [10] 10/19 21/4 31/21 31/25 32/3 34/4 53/21 54/15 56/2 57/8
pointed [1] 45/7
police [9] 11/19 11/21 13/2 13/17 26/2 37/7

**P**

police... [3] 43/8 47/24 49/10
policeman [1] 51/7
pornography [9] 4/5 7/6 53/15 59/13 62/17 62/19 62/20 62/25 63/20
Port [6] 11/19 11/20 18/20 37/7 47/24 49/10
portion [5] 32/15 32/15 58/4 58/6 59/22
portions [6] 56/4 56/4 56/5 56/6 56/11 57/23
position [1] 54/16
positioned [1] 27/18
positive [1] 43/2
possessed [2] 52/3 58/11
possession [8] 3/22 52/2 52/11 55/15 60/11 62/20 64/19 65/1
pounding [1] 32/10
Pre [8] 4/9 4/10 4/13 4/16 5/14 6/16 6/23 7/15
Pre-Sentence [8] 4/9 4/10 4/13 4/16 5/14 6/16 6/23 7/15
prefer [1] 69/12
prepare [1] 54/23
prepared [1] 70/24
present [6] 3/10 3/15 8/25 43/11 46/12 46/15
presentation [3] 9/4 9/23 10/12
presented [1] 55/20
presenting [1] 69/8
pretty [4] 20/12 21/1 28/14 65/8
previous [1] 62/22
previously [5] 7/6 61/15 61/20 62/9 62/13
primarily [1] 37/6
print [1] 66/25
printout [2] 55/19 57/6
printouts [1] 55/20
prior [2] 20/21 21/2
priorities [1] 51/4
private [1] 16/12
privates [4] 16/16 16/21 16/22 28/3
probably [5] 9/25 42/21 70/13 71/9 71/15
probation [8] 3/11 3/12 6/15 6/16 6/24 7/8 7/17 8/12
proceed [6] 5/6 8/24 9/25 10/7 10/11 10/13
proceeding [2] 47/6 67/25
proceedings [2] 1/10 73/2
produce [1] 62/2
produced [3] 59/8 63/1 63/4
producing [1] 4/4
production [1] 59/8
proffer [2] 10/3 10/8
pronounce [1] 4/19
pronouncement [1] 4/22
props [2] 14/19 15/18
protection [1] 21/11
Protective [1] 38/8
protocol [2] 37/25 38/2
provided [2] 60/17 67/8
PSI [1] 6/13
PSR [2] 7/8 7/24
psychological [2] 5/17 6/10
Public [1] 1/20
puppies [3] 26/16 26/16 26/17
purpose [2] 56/5 59/9
purposes [1] 48/19
pursuant [1] 52/23
put [15] 10/1 10/9 10/9 16/5 17/10 27/7 27/14 27/23 28/1 28/5 28/7 34/16 67/10 67/23 71/15
putting [1] 33/16

**Q**

qualifications [1] 51/17
qualifying [1] 16/14
quantify [1] 62/21
question [4] 24/4 45/12 57/7 57/12
questionnaires [1] 10/20
questions [7] 16/9 23/2 23/7 35/4 35/8 50/4 70/18
quiet [2] 34/4 46/4
quickly [2] 65/9 65/25

**R**

R-E-Y [1] 50/18
range [2] 8/11 28/23
rapport [4] 14/24 15/1 15/4 19/16
rather [2] 20/9 66/3
read [3] 22/18 24/21 70/24
real [1] 46/4
really [10] 15/8 20/13 20/15 21/8 36/25 37/19 38/3 40/5 40/9 42/16
reason [5] 4/18 5/5 27/4 53/19 68/22
recall [4] 41/20 49/12 59/17 59/20
receive [4] 20/22 23/3 41/11 48/7
received [7] 2/12 4/12 4/15 5/10 20/25 21/5 23/14
recognize [5] 5/2 22/8 48/25 49/6 53/6
recognized [1] 59/12
recognizing [1] 4/22
recollection [1] 41/14
record [12] 3/4 9/6 9/17 10/5 11/4 22/18 25/20 38/18 38/24 56/1 60/2 73/2
recorded [3] 11/11 38/16 38/25
records [2] 60/14 65/21
recover [5] 55/14 56/23 60/3 66/5 66/7
recovered [4] 59/23 60/14 63/16 65/11
redact [1] 47/9
redacted [16] 18/22 18/24 25/7 50/1 55/1 56/4 56/4 56/5 56/6 56/11 56/12 56/17 56/18 57/16 58/25 68/2
redactions [1] 56/19
redirect [1] 46/24
refer [4] 12/15 16/20 16/23 26/24
reference [2] 9/9 43/1
references [2] 59/2 59/3
referred [2] 52/13 59/19
referring [2] 6/23 59/4
refers [2] 9/12 9/13
regard [1] 9/6
regarding [7] 5/11 6/23 7/5 12/14 26/23 59/13 59/24
related [8] 6/22 51/3 53/14 56/14 58/20 60/3 60/15 65/7
relates [1] 65/19
relating [2] 5/23 53/13
relationship [3] 13/4 13/6 13/8
relative [3] 55/7 56/7 56/7
release [2] 8/12 68/9
relevant [1] 55/13
remaining [1] 68/24
remarkable [3] 41/14 41/15 45/6
remember [8] 16/2 28/17 36/18 36/18 37/16 37/17 41/15 43/17
remembered [1] 33/3
repeat [1] 54/25
report [17] 4/9 4/10 4/13 4/16 5/14 6/10 6/16 6/23 7/15 9/10 9/10 9/16 41/20 41/22 42/21 64/11 64/13
Reporter [5] 1/23 11/11 22/19 73/5 73/6
reporting [1] 69/14
repository [1] 61/16
represent [2] 60/25 61/22
representation [1] 8/22
representative [1] 3/16
represents [1] 55/18
request [2] 25/14 67/10
residence [2] 13/11 52/9
resolved [10] 6/17 6/19 7/2 7/3 7/9 7/10 7/22 8/4 8/7 8/23
resort [1] 29/11
responded [1] 7/17
response [1] 7/18
responsibilities [2] 48/3 51/2
rest [1] 29/16
restitution [1] 8/13
results [1] 41/11
resume [2] 68/5 72/15
return [2] 15/15 68/3
reuse [1] 16/23
revealed [1] 57/6
review [4] 4/13 4/16 41/20 61/14
reviewed [6] 5/10 6/8 8/20 8/21 21/2 62/22
reviewing [1] 42/15
revised [1] 6/17
REY [12] 2/8 3/7 40/7 40/7 50/8 50/10 50/17 50/18 53/6 57/19 69/5 69/7
Rey's [1] 51/16
right [22] 9/18 10/6 10/14 11/8 14/15 22/6 25/5 28/18 28/22 29/18 32/2 38/12 39/3 40/18 42/23 45/22 46/3 47/1 47/13 54/13 65/1 72/14
robberies [2] 12/4 35/22
ROBIN [2] 1/11 1/24
role [1] 51/20
room [8] 15/19 18/16 26/2 27/1 42/14 43/8 51/25 58/23
rooms [4] 14/15 49/11 64/9 64/11
ROSENBERG [3] 1/3 1/11 1/24
round [1] 20/18
rule [1] 8/6
RUSSELL [2] 1/16 3/8

**S**

safety [1] 32/13
said [51] 17/13 19/11 21/6 24/8 27/8 27/9 27/10 27/11 27/12 27/12 27/13 27/14 27/24 27/25 27/25 28/2 28/3 28/4 28/4 28/5 28/6 28/8 28/8 28/8 28/9 28/10 28/10 28/11 29/3 31/18 31/19 31/19 31/20 31/24 31/24 32/5 32/8 32/12 32/12 32/19 32/25 33/3 37/22 38/19 39/19 40/9 40/13 41/5 46/10 64/6 68/1
same [15] 10/16 15/11 16/15 22/16 24/22 26/1 26/1 26/2 34/4 34/5 37/12 39/24 43/8 49/25 57/25
Samsung [1] 55/8
sat [2] 14/4 22/12
satisfy [1] 9/18
saw [2] 31/19 59/18
say [21] 4/22 8/2 10/2 15/10 18/13 27/4 27/5 28/25 32/12 35/18 36/19 39/7 43/13 45/24 54/7 61/25 62/18 68/11 68/14 71/3 71/19
saying [3] 11/10 57/4 62/4
says [5] 6/16 22/19 24/21 29/22 32/8
scared [2] 31/20 33/4
scene [3] 47/25 48/4 48/9
schedule [1] 10/16
schedules [1] 10/23
scheduling [2] 68/4 72/8
school [2] 15/15 17/23
scope [1] 53/23
screen [2] 11/12 56/6
screwdriver [14] 32/6 32/15 32/17 32/23 33/6 33/11 33/21 34/2 34/9 34/11 34/14 34/23 44/15 44/22
screwdrivers [3] 32/20 45/3 45/4
seal [5] 5/25 7/1 67/10 67/11 68/2
sealed [26] 2/18 5/16 5/17 5/22 5/25 6/9 25/11 25/12 25/16 25/17 25/20 30/3 30/9

**S**

sealed... [13] 30/12 47/9 49/22 50/1 54/4 54/5 54/6 54/16 54/20 54/25 55/1 55/15 63/11
sealing [1] 54/14
search [7] 44/18 52/1 52/8 52/15 63/24 64/18 64/19
second [8] 3/19 16/3 18/3 18/6 18/11 20/18 42/2 46/4
secondary [1] 21/4
Section [4] 3/21 3/24 4/3 4/6
sections [1] 56/18
security [5] 15/14 50/22 50/22 51/3 51/7
see [15] 24/23 25/1 45/1 45/3 50/10 50/12 55/25 56/15 56/24 64/20 67/1 68/24 69/2 72/8 72/10
seek [1] 29/24
seen [3] 39/3 39/5 62/14
seizure [1] 64/8
select [1] 4/24
send [4] 36/20 40/10 42/9 42/13
sending [1] 42/14
sent [9] 16/3 42/16 42/25 58/12 58/17 58/22 61/10 61/14 63/5
sentence [11] 4/9 4/9 4/10 4/13 4/16 4/19 5/14 6/16 6/23 7/15 20/10
sentencing [7] 1/10 4/24 5/12 5/19 6/4 8/21 72/18
separate [15] 17/24 18/1 18/2 29/14 31/6 60/15 61/23 61/25 62/1 62/1 62/6 62/6 62/9 63/2 70/23
separation [1] 51/8
September [16] 12/11 13/11 13/14 15/12 15/18 18/7 20/19 25/23 31/2 37/11 37/15 38/16 38/20 43/6 49/13 60/8
September 22 [2] 13/14 60/8
September 22nd [3] 13/11 15/12 38/16
September 29 [1] 49/13
September 29th [2] 18/7 43/6
series [17] 5/11 7/6 59/5 59/6 59/12 59/19 59/20 61/20 61/22 61/23 61/25 62/3 62/8 62/9 62/13 62/13 62/14
serve [1] 61/16
service [1] 51/8
Services [3] 38/8 42/8 42/18
session [1] 72/19
set [5] 21/4 40/19 50/12 50/15 69/11
seven [5] 7/8 7/24 9/8 9/12 51/8
several [10] 12/10 26/13 26/25 29/9 33/2 36/9 40/21 48/8 64/1 64/11
sex [8] 35/15 35/23 35/25 35/25 36/7 42/3 52/17 53/10
sexual [11] 3/23 4/2 7/16 12/3 12/5 12/14 14/10 16/1 39/8 43/1 43/2
Sexually [1] 61/13
share [1] 9/25
she [112]
SHEILA [3] 2/3 11/2 11/6
sheriff [1] 51/8
Sheriff's [1] 51/9
short [1] 60/21
should [7] 4/19 5/6 9/6 9/14 40/14 49/25 68/20
show [8] 21/23 27/18 29/8 29/8 33/1 48/18 52/25 58/15
showed [1] 27/21
showing [1] 48/24
shown [2] 53/2 53/16
shutting [1] 32/1
shy [1] 15/6
side [1] 58/6
side-view [1] 58/6
sidebar [1] 54/11
sides [1] 8/22
Signature [1] 73/6
significance [1] 63/18
silver [1] 32/6
since [3] 50/11 50/25 51/13
single [1] 57/12
sir [8] 11/24 49/1 52/24 57/25 58/19 59/1 64/18 65/2
sit [2] 19/10 27/2
situation [3] 17/16 39/1 39/17
six [2] 9/8 9/12
skills [1] 42/12
Skype [1] 58/4
sleeping [1] 31/23
smack [1] 31/22
small [3] 35/3 59/22 60/16
so [49] 6/12 10/20 15/8 16/19 17/3 19/8 19/23 20/14 21/2 22/4 22/18 23/9 25/5 25/6 25/23 26/6 26/8 28/19 29/17 30/19 31/2 31/22 32/3 33/10 35/25 40/6 40/12 40/15 40/19 40/21 42/18 44/4 45/9 46/5 47/5 47/11 50/7 50/9 55/22 61/25 63/11 63/23 65/9 65/24 66/4 66/11 66/17 68/24 69/10
sofa [1] 43/9
software [3] 55/22 56/23 57/19
some [28] 9/6 10/20 12/14 18/5 21/1 23/7 23/24 33/23 34/4 34/8 40/16 44/20 44/20 50/13 54/15 55/24 56/25 57/13 57/24 59/2 59/17 60/20 62/10 62/12 62/22 63/7 63/13 68/4
somebody [1] 37/5
Someone [1] 65/15
something [10] 20/6 33/6 39/19 58/7 58/8 58/9 66/20 66/22 70/24 72/17
sometimes [3] 15/1 20/6 20/8
somewhere [1] 42/21
soon [1] 41/3
sorry [4] 14/25 28/2 53/18 56/3
sort [1] 38/3
Souer [1] 5/12
SOUTHERN [1] 1/1
speak [3] 20/9 26/7 26/10
speakers [1] 56/9
speaking [2] 7/23 56/12
special [5] 3/7 8/14 50/9 51/1 69/5
specific [4] 28/19 28/19 39/21 59/20
specifically [2] 7/23 39/16
speculate [1] 61/5
speculum [1] 41/8
spell [1] 11/5
spend [1] 46/10
spending [2] 20/16 31/9
spoke [5] 18/23 22/11 40/12 41/17 41/18
spoken [2] 9/23 40/21
St [6] 11/19 11/20 18/20 37/7 47/24 49/10
stamp [1] 63/17
stamps [3] 55/25 63/15 63/21
stand [2] 21/10 67/4
standard [3] 64/2 66/11 66/15
standing [1] 58/23
standpoint [2] 8/4 10/2
star [1] 32/21
start [1] 32/3
started [1] 68/20
starting [1] 68/12
state [3] 3/4 11/4 48/10
statement [1] 43/3
statements [2] 63/7 63/12
STATES [14] 1/1 1/4 1/11 1/16 3/2 3/7 3/8 3/21 3/24 4/3 4/5 51/7 51/20 63/6
station [2] 13/2 13/17
step [4] 47/1 65/15 65/15 69/3
Stepchildren [1] 13/10
steps [1] 33/10
Stevens [3] 69/18 70/3 70/8
still [7] 7/21 26/6 44/15 44/16 44/19 52/12 66/7
Stipes [2] 1/23 73/5
stipulate [1] 51/16
stop [1] 67/19
stored [1] 65/13
strawberry [1] 33/4
Street [1] 1/20
subject [1] 23/19
submissions [1] 5/11
submit [2] 34/17 63/11
submitted [11] 6/3 8/20 34/23 34/25 41/12 57/10 61/19 61/20 62/4 62/5 62/10
subpoenas [1] 52/1
substantially [1] 56/1
such [1] 14/22
sufficient [1] 9/17
suggest [1] 20/1
suicides [1] 12/3
Suite [1] 1/17
superseding [1] 3/19
supervised [2] 8/12 68/8
supervisor [2] 12/19 12/22
supported [1] 57/3
supposed [2] 37/25 38/7
sure [1] 16/15
swab [1] 49/3
swabs [4] 48/5 48/13 49/6 49/14
sweet [1] 58/9
sworn [3] 11/3 47/18 50/17
system [6] 63/23 63/24 65/13 65/16 65/20 66/2
systems [1] 63/22

**T**

table [1] 47/5
take [27] 6/12 14/14 14/24 15/15 16/6 16/14 19/9 24/23 25/8 25/13 25/17 25/19 27/1 27/17 33/10 39/1 43/6 45/12 48/5 48/13 50/12 51/24 52/22 53/17 53/19 69/9 71/3
taken [1] 60/6
takes [3] 15/2 38/3 65/15
taking [3] 47/11 49/14 54/4
talk [7] 14/5 17/24 21/8 25/5 31/2 39/10 67/20
talkative [1] 19/18
talking [3] 18/25 32/22 37/18
Tara [1] 59/19
taught [1] 36/17
team [2] 21/11 21/15
technical [2] 36/7 69/8
techniques [2] 26/13 26/19
technology [3] 69/11 69/13 69/14
tell [15] 8/9 14/4 17/12 19/6 19/15 22/6 22/10 22/14 26/22 27/20 31/15 32/14 63/13 69/1 69/19
ten [4] 70/2 70/15 71/9 71/13
tent [12] 31/8 31/11 31/12 31/15 32/5 33/1 40/17 44/11 45/20 46/11 46/15 46/20
terminology [3] 16/10 16/18 16/19
terms [2] 9/4 69/2
testified [2] 17/3 20/18
testifies [2] 70/8 70/9
testimony [2] 33/18 70/23
testing [3] 34/17 34/24 34/25

**T**

text [5] 56/22 56/23 56/25 58/6 67/2
texting [1] 21/2
than [10] 15/2 24/12 28/23 34/23 42/14 56/10 66/3 68/11 70/5 70/22
Thank [4] 24/16 46/23 50/4 72/14
that [367]
their [17] 3/4 3/16 12/16 12/23 16/16 18/18 21/3 21/18 26/16 31/12 41/6 41/8 41/24 42/4 42/12 42/21 62/11
them [35] 12/15 14/24 15/1 15/15 19/6 19/6 20/1 20/2 20/21 21/8 21/17 22/13 25/14 26/16 26/17 30/18 41/17 41/18 41/21 42/6 42/14 42/25 43/19 44/20 45/9 46/15 46/17 47/6 47/11 47/12 55/7 55/24 59/8 61/14 69/19
themselves [1] 59/14
then [13] 5/25 6/21 7/5 7/12 8/9 13/13 16/2 17/11 23/8 40/15 40/19 65/17 70/3
therapy [1] 26/16
there [86]
thereafter [1] 41/3
Thereupon [1] 72/21
these [7] 18/13 28/20 30/16 42/3 54/14 63/14 71/4
they [67] 3/15 8/7 9/25 10/19 13/2 13/7 15/14 15/16 16/15 16/16 17/20 19/4 20/7 20/8 20/9 20/9 20/13 20/13 21/11 21/17 21/17 26/17 29/20 31/18 31/23 32/6 32/25 33/16 36/24 41/1 41/2 41/6 41/7 41/7 41/9 41/10 41/10 41/16 41/17 41/18 41/21 42/11 42/15 42/23 42/25 43/1 45/9 47/8 49/16 53/21 54/3 55/17 55/22 56/3 59/7 59/8 59/21 61/5 61/11 61/14 61/19 62/2 62/10 62/11 62/14 63/9 63/25
thing [2] 28/17 47/4
things [13] 19/10 22/16 23/24 24/22 26/11 26/12 26/22 26/25 28/20 29/12 33/16 40/16 53/16
think [16] 9/24 9/25 30/19 33/2 33/2 38/25 40/9 42/11 42/21 46/14 47/14 67/18 68/10 69/7 70/24 71/17
thinking [1] 50/7
third [4] 56/7 56/8 56/15 56/18
this [49] 4/25 6/17 7/7 8/2 9/16 9/24 13/4 15/3 21/6 22/3 22/11 22/20 22/23 23/4 23/14 24/1 24/1 25/2 25/6 25/6 25/10 25/16 25/20 26/5 28/17 29/16 29/25 33/17 37/2 40/9 40/13 49/3 49/8 49/18 54/25 57/21 58/13 63/16 64/4 65/6 65/18 66/1 66/2 67/8 67/12 68/18 68/22 68/25 72/10
those [25] 9/14 16/5 16/6 17/19 19/10 21/2 26/10 26/20 33/3 33/13 35/2 35/23 39/23 43/19 45/13 52/5 55/22 56/8 58/1 58/3 58/10 62/15 63/4 63/7 63/12
though [3] 11/14 47/8 57/6
thought [2] 27/4 33/24
thousands [1] 62/3
three [5] 7/24 31/6 36/21 53/10 71/2
through [14] 4/8 7/14 7/18 29/9 29/10 29/14 30/6 30/11 43/18 44/4 44/23 45/13 60/4 63/5
throughout [2] 17/18 36/9
thumb [4] 52/19 52/22 53/10 53/18
thumbnail [8] 65/6 65/8 65/23 66/6 66/7 66/8 66/19 67/1
time [50] 13/20 14/23 15/1 15/20 15/21 16/14 17/7 17/21 17/22 18/11 20/12 20/16 22/24 24/2 26/4 26/15 27/11 29/22 29/22 29/25 33/5 34/8 39/15 40/25 47/15 49/18 50/8 50/12 50/14 55/25 57/25 60/1 60/4 60/21 63/15 63/17 63/21 63/25 64/2 64/3 64/4 64/5 64/7 66/16 68/24 69/2 71/23 72/1 72/9 72/9
times [14] 14/20 28/1 28/3 28/16 28/19 28/20 28/24 28/25 29/1 40/4 40/21 63/23 64/1 66/4
tired [1] 20/13
tissues [3] 27/10 27/11 27/14
Title [4] 3/21 3/24 4/3 4/5
today [11] 3/14 4/19 4/23 5/3 5/6 6/5 10/17 39/5 41/22 47/6 54/24
today's [1] 4/10
together [1] 67/23
told [15] 19/18 21/7 26/15 27/5 31/8 31/17 31/22 32/9 32/12 32/19 32/21 33/1 39/18 44/11 66/9
too [1] 20/11
took [8] 17/10 31/18 31/20 32/9 32/25 33/23 40/15 45/9
top [3] 16/25 29/21 40/24
topic [1] 36/12
total [1] 8/10
totally [1] 20/10
touch [4] 5/4 17/4 17/11 18/14
touched [3] 22/16 27/16 31/24
touching [1] 19/8
towel [1] 27/10
toys [3] 52/17 53/10 53/19
tracked [1] 63/23
trained [1] 48/5
training [10] 12/8 36/7 36/19 36/23 36/25 37/22 38/12 42/4 48/7 48/8
transcript [2] 1/10 73/1
transferred [1] 57/20
transmission [1] 58/7
transmitted [2] 57/22 58/2
traveled [1] 10/22
trial [2] 4/25 63/24
trip [1] 32/21
trouble [1] 27/5
trusting [1] 15/8
try [5] 10/18 33/10 36/20 65/17 72/17
trying [2] 42/5 51/24
turn [2] 22/3 22/12
turned [2] 29/23 29/23
two [10] 7/7 12/14 17/18 23/9 33/2 35/3 36/21 46/17 48/2 60/20
type [3] 25/10 58/23 66/2
types [4] 11/25 19/10 26/22 35/23
Typically [1] 65/23

**U**

U.S [1] 1/17
Uh [6] 29/2 37/24 39/2 43/21 44/25 46/7
Uh-hum [6] 29/2 37/24 39/2 43/21 44/25 46/7
ultimately [1] 52/1
um [3] 20/25 33/12 45/22
um-m-m [3] 20/25 33/12 45/22
uncomfortable [3] 15/7 20/8 26/5
uncommon [1] 59/16
under [5] 7/1 26/1 67/10 67/10 68/2
underscore [1] 66/13
understand [9] 16/18 19/18 19/19 20/11 22/22 31/21 55/20 57/7 68/3
understanding [1] 10/8
understood [1] 57/17
unit [1] 47/25
UNITED [14] 1/1 1/4 1/11 1/16 3/2 3/7 3/8 3/21 3/24 4/3 4/5 51/7 51/20 63/6
unless [1] 67/18
unsure [1] 15/7
until [7] 4/9 5/3 10/17 47/6 60/5 64/8 70/9
up [19] 6/12 11/11 17/22 21/4 29/19 30/16 33/14 39/18 40/19 47/4 50/12 50/15 53/9 60/5 62/2 62/11 64/8 69/11 72/6
Upon [2] 4/7 51/7
upset [1] 31/25
urged [1] 26/17
us [3] 3/2 19/15 72/18
USB [5] 53/10 53/12 53/18 55/7 55/12
use [16] 14/18 15/17 15/18 16/10 16/12 16/12 16/15 16/16 16/17 16/18 16/20 20/2 26/19 27/18 37/25 41/7
used [7] 21/10 26/13 32/6 33/7 33/24 45/9 53/21
user [2] 56/13 57/16
users [1] 65/25
using [4] 16/15 64/4 65/19 68/18
usually [1] 59/10

**V**

vaginal [4] 16/16 16/20 32/15 41/8
vaginally [1] 27/21
value [1] 59/8
variance [1] 5/21
vegetables [1] 32/7
verbalize [1] 26/9
verbatim [2] 22/19 24/21
verbiage [1] 16/15
versus [3] 3/3 48/10 51/21
very [14] 9/23 15/6 15/6 15/7 19/17 20/12 21/5 26/5 33/4 38/2 38/2 40/25 42/17 70/7
vibrators [2] 35/3 40/13
victim [3] 49/24 61/24 62/15
victims [9] 3/13 37/23 61/15 61/17 62/1 62/6 62/8 62/8 63/2
victims' [1] 63/7
video [16] 29/23 38/22 57/1 59/11 65/6 65/7 65/9 65/15 65/18 65/21 65/25 66/1 66/5 66/9 66/11 66/22
videos [7] 52/12 59/7 61/23 64/7 66/12 66/14 66/15
videotaped [1] 13/18
view [3] 55/21 58/6 65/23
violation [5] 3/21 3/24 4/2 4/5 68/8
visited [1] 64/10
visual [1] 50/15
visually [1] 65/9
VOLUME [1] 1/12

**W**

W.'s [8] 23/21 23/22 24/12 30/4 30/21 30/21 43/13 43/14
Walker [2] 69/18 70/15
want [18] 8/25 9/15 10/4 18/23 20/9 26/9 26/10 30/15 31/25 33/17 33/17 38/19 40/14 43/13 47/8 62/7 67/18 67/24
wanted [1] 16/6
wants [1] 70/24
warrant [4] 52/15 52/23 53/23 64/18
warrants [1] 52/1
was [177]
wasn't [3] 20/16 27/9 46/20
watch [1] 39/15
way [4] 8/1 28/5 37/5 56/10
we [79]
we'll [4] 63/11 69/8 69/11 72/14
webinars [1] 36/24
week [2] 10/16 36/22
well [21] 3/4 6/10 20/25 26/5 28/8 28/9 28/17 31/16 32/8 32/9 32/12 32/19 33/12 34/18 36/23 38/20 40/4 43/14 54/7 67/24 69/14
went [10] 32/5 32/14 33/13 37/22 40/23 41/1 44/14 44/18 44/23 62/22
were [70] 6/22 8/2 9/10 11/23 13/2 13/7 15/3

**W**

were... [63] 15/16 16/2 17/9 19/15 20/13 20/19 21/1 26/19 26/25 30/13 30/21 31/18 32/25 33/16 34/8 35/2 35/3 37/2 37/3 44/2 44/4 44/6 44/19 44/20 44/20 44/21 45/4 45/8 45/8 45/20 46/7 48/10 48/13 49/14 52/12 52/22 53/13 55/4 55/6 55/17 55/20 55/22 56/2 56/24 57/21 57/22 58/1 58/2 58/3 58/11 59/8 60/22 61/3 61/10 61/11 61/19 61/20 63/4 63/7 63/13 63/16 64/7 64/22
West [1] 1/23
what [110]
whatever [2] 39/19 70/14
whatnot [1] 63/22
when [41] 10/17 12/20 14/17 15/13 17/19 18/10 20/11 29/10 29/23 31/8 31/18 34/14 36/10 37/14 37/18 38/1 38/7 40/2 40/23 42/25 44/10 44/14 44/18 45/20 45/22 45/24 46/1 47/12 55/4 56/3 56/4 56/17 61/25 65/3 65/8 65/17 65/24 66/2 68/3 68/20 68/21
where [30] 13/16 14/14 18/13 18/14 18/15 18/17 18/19 23/3 27/25 28/10 31/24 33/16 33/17 33/20 36/17 36/18 38/4 43/6 47/23 48/7 49/9 50/21 56/2 56/25 64/24 66/9 66/25 67/20 67/21 69/10
Whereupon [5] 24/19 30/13 50/3 55/2 67/17
whether [15] 7/20 7/21 9/3 17/7 17/12 20/22 36/21 37/16 41/18 43/2 46/21 57/12 57/13 63/22 64/20
which [22] 5/3 6/1 6/1 6/16 7/1 7/18 9/9 13/25 20/10 32/21 39/5 41/10 49/17 49/17 53/16 58/3 58/15 61/5 65/19 66/3 66/11 70/23
while [1] 32/25
who [10] 3/10 17/15 47/2 47/14 56/9 56/12 59/12 71/4 71/10 71/14
whom [2] 23/16 49/4
Whose [2] 23/10 23/19
why [12] 4/18 5/5 8/3 18/23 19/19 27/4 27/11 42/5 50/9 56/21 65/15 69/1
wife [1] 13/7
will [45] 5/2 6/25 10/2 10/8 10/13 10/18 11/1 22/2 22/6 25/7 25/9 25/13 25/16 26/24 30/15 31/16 33/18 41/7 41/10 42/25 43/1 47/4 49/18 50/1 50/13 50/14 54/21 54/23 54/25 56/15 61/6 67/9 67/10 68/1 68/10 68/19 69/9 69/11 70/8 71/2 71/15 71/17 71/19 72/8 72/15
Wilmington [2] 51/23 64/12
Windows [1] 63/22
wipe [1] 27/12
wiping [1] 27/13
wish [1] 10/9
withdraw [2] 41/25 42/2
within [6] 7/6 10/3 52/19 53/20 58/11 65/22
without [6] 24/18 30/5 30/12 50/1 54/6 67/16
witness [17] 10/23 10/24 11/3 21/20 22/3 22/6 22/23 24/5 30/17 47/3 47/14 47/18 48/21 50/17 53/3 67/6 71/10
witnessed [1] 15/14
witnesses [11] 2/2 10/22 12/8 14/17 20/6 69/2 69/9 70/19 70/20 71/2 71/4
won't [2] 41/7 70/8
word [4] 16/11 16/12 16/16 59/8
words [5] 16/5 16/6 20/9 26/10 62/11
work [9] 14/16 36/1 42/7 47/23 47/24 48/4 50/21 53/14 72/17
worked [2] 48/1 50/24
working [2] 22/1 68/3
works [1] 72/17
world [2] 16/17 63/4
worth [1] 20/16
would [58] 7/20 8/9 9/3 9/24 10/21 10/22 12/11 16/1 16/12 16/12 16/17 17/19 17/21 18/9 18/9 20/9 21/17 22/24 25/1 25/10 27/1 27/1 27/2 27/7 27/11 27/17 28/9 28/25 29/14 29/24 38/22 38/23 39/18 40/10 41/20 41/24 44/10 44/21 46/5 47/11 47/14 50/8 50/11 53/22 59/3 61/12 62/18 62/19 62/24 66/17 68/11 68/14 69/21 69/23 70/23 71/3 71/3 71/19
wouldn't [1] 45/14
write [3] 20/2 20/10 29/4
writing [5] 24/8 24/10 24/12 24/14 29/12
writings [1] 44/6
written [6] 7/19 22/23 22/23 23/4 23/24 64/2
wrote [6] 22/11 22/16 29/4 29/15 29/15 29/21

**Y**

yard [3] 31/9 31/11 31/12
year [5] 12/12 14/2 19/13 20/15 36/11
years [14] 8/13 11/22 14/18 14/18 35/16 36/5 36/6 36/9 38/1 48/2 50/24 51/6 51/8 51/11
yes [102]
you [314]
you'd [1] 47/9
young [2] 14/22 41/8
younger [2] 17/20 45/24
your [64] 6/6 6/18 7/4 7/11 8/1 9/22 10/8 10/15 10/15 11/4 11/5 12/11 12/19 14/9 15/4 16/10 16/11 18/9 21/20 22/1 22/22 23/12 24/5 24/14 24/17 25/1 25/10 29/24 30/15 34/20 35/4 35/8 35/25 37/22 38/12 38/12 38/24 39/5 41/14 43/6 43/16 45/16 46/25 47/3 48/3 48/18 49/18 49/21 51/2 51/5 51/20 52/25 53/3 53/24 54/1 54/16 55/4 64/16 65/3 65/24 67/6 69/2 71/3 72/12
yourself [1] 38/13

CRDE 130

```
 1           UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
 2               FORT PIERCE DIVISION

 3           CASE NO. 15-CR-14057-ROSENBERG

 4

 5   UNITED STATES OF AMERICA,      .

 6        Plaintiff,                .

 7        vs.                       .

 8   MICHAEL HARDING,               .   Fort Pierce, FL
                                    .   May 23, 2016
 9        Defendant.                .


10           TRANSCRIPT OF SENTENCING PROCEEDINGS
11        BEFORE THE HONORABLE ROBIN L. ROSENBERG
             UNITED STATES DISTRICT JUDGE
12
                        VOLUME 2
13

14   APPEARANCES:

15   FOR THE PLAINTIFF:     DANIEL FUNK
                            RUSSELL KILLINGER
16                          United States Attorney's Office
17                          101 S. U.S. Highway 1
                            Suite 3100
18                          Fort Pierce, FL 34950
                            305-905-7509500
19

20   FOR THE DEFENDANT:     FLETCHER PEACOCK, ESQ.
                            Federal Public Defender's Office
21                          109 North 2nd Street
                            Fort Pierce, FL 34950
22                          772-489-2123

23
     Official Court Reporter:   Pauline A. Stipes
24                              Fort Pierce/West Palm Beach
                                772-467-2337
25                              HON. ROBIN L. ROSENBERG
```

Pauline A. Stipes, Official Federal Reporter

---

INDEX

WITNESSES:

MICHAEL BRANNON

Direct Examination by Mr. Peacock        Page 7

Cross Examination by Mr. Funk            Page 21

Redirect Examination by Mr. Peacock      Page 32

BRIAN REY (Continued)

Direct Examination by Mr. Funk           Page 35

ASHLEY HARDING

Direct Examination by Mr. Killinger      Page 55

Cross Examination by Mr. Peacock         Page 87

Redirect Examination by Mr. Killinger    Page 95

WAYNE WALKER

Direct Examination by Mr. Funk           Page 98

Cross Examination by Mr. Peacock         Page 103

Redirect Examination by Mr. Funk         Page 104

JULIE HARDING

Direct Examination by Mr. Peacock        Page 106

ELIZABETH PERRY

Direct Examination by Mr. Peacock        Page 115

Pauline A. Stipes, Official Federal Reporter

---

EXHIBITS

                            I.D.      Received

Government Exhibit 11                  Page 48
Government Exhibit 12                  Page 51
Government Exhibit 13                  Page 53
Government Exhibit 10                  Page 54
Government Exhibit 14                  Page 82

(All Exhibits Sealed)

Pauline A. Stipes, Official Federal Reporter

---

```
 1        THE COURT:  Good morning, you may be seated.
 2        Okay, good morning.  We are here on the matter of
 3   United States of America versus Michael Edwin Harding.
 4   15-14057, and it is a continuation of the sentencing of Mr.
 5   Harding that we began last Monday, May 16th.
 6        If we could have all counsel state their appearance
 7   for the record and the appearance of Mr. Harding.
 8        MR. FUNK:  Daniel Funk on behalf of the United States,
 9   with Russell Killinger, Assistant United States Attorney, and
10   Brian Rey, Homeland Security Investigations.
11        THE COURT:  Good morning.
12        MR. PEACOCK:  Fletcher Peacock on behalf of Michael
13   Harding, who is also present before the Court.
14        THE COURT:  Okay, good morning.
15        We left off last time with Special Agent Brian Rey on
16   the stand.
17        I think we had gotten up to Exhibit 9 and -- I think I
18   need to get that exhibit list from you, Lakeshia.
19        Right, Exhibit 9, and they are all under seal.
20        As I understand it, Special Agent Rey was going to
21   come back on the stand for half an hour on direct and 15
22   minutes of cross.
23        Now, a couple of additional filings came in.
24        There was a motion to permit Dr. Michael Brannon to
25   testify by telephone that was filed on May 20th, Docket Entry
```

Pauline A. Stipes, Official Federal Reporter

USCA11 Case: 21-14133    Document: 42

```
 1   101.
 2              I understand the Government doesn't have an objection;
 3   is that correct?
 4              MR. FUNK:  That is correct.
 5              THE COURT:  Okay, when we get to Dr. Brannon, we will
 6   get to him by phone.  The only thing we need to make sure is
 7   that he is on a land line and holding the phone handle so we
 8   can hear him clearly.  We find that speaker and cell phones
 9   don't work out well.
10              MR. PEACOCK:  Your Honor, we had anticipated putting
11   him on first thing this morning.
12              MR. FUNK:  Yes.
13              MR. PEACOCK:  He is awaiting testimony in a first
14   degree murder trial in Broward.  I did confirm he is there
15   right now.
16              He does have a cell phone.
17              THE COURT:  We will see how it works.
18              Our experience has been irregular with cell phones.
19   If that is all he has, that is how it works.
20              I anticipate -- I see you have him 30 minutes on
21   direct.
22              MR. PEACOCK:  Yes.
23              THE COURT:  Another filing, docket 103, sealed notice
24   of filing, impact statement that was just filed -- just file
25   stamped May 18.  It was entered in the docket on the 23rd.
```

---

Date Filed: 03/22/2023    Page: 111 of 155

```
 1              When did the Government file that, the 18th or 23rd?
 2              MR. KILLINGER:  Filed sealings have to be delivered to
 3   the Clerk's Office, there is a lag.
 4              THE COURT:  It was just made available to me this
 5   morning.  I will have to read them.  I read everything else
 6   that I had not read, it just became apparent to me literally
 7   this morning it was just filed.
 8              That is the only filing I see other than Dr. Brannon
 9   to appear by telephone.
10              I will make sure I read those before the pronouncement
11   of sentence.
12              Okay, with that, why don't we endeavor to get Dr.
13   Brannon on the phone.
14              MICHAEL BRANNON, GOVERNMENT WITNESS, SWORN
15              THE COURTROOM DEPUTY:  Please state your name for the
16   record and spell your last name, please.
17              THE WITNESS:  Michael Brannon, B-R-A-N-N-O-N.
18              THE COURT:  Good morning, Dr. Brannon.  This is Judge
19   Rosenberg, and we are ready to begin with direct examination by
20   Mr. Peacock, who has anticipated about 30 minutes.
21              I will let you know when 30 minutes has come up, and
22   we can hear you well, thankfully.  If we can't hear you well,
23   we will let you know.
24              THE WITNESS:  Thank you, I appreciate the Court
25   allowing me to testify by telephone this morning.
```

---

```
 1              THE COURT:  Not a problem.  You may proceed.
 2              MR. PEACOCK:  Thank you, Judge.
 3              Your Honor, by agreement of the parties, we would
 4   offer Dr. Brannon as a qualified expert in the area of
 5   psychological forensic evaluation.
 6              MR. FUNK:  That is correct, Your Honor.
 7              THE COURT:  Okay.
 8                      DIRECT EXAMINATION
 9   BY MR. PEACOCK:
10   Q.  Dr. Brannon, good morning.
11   A.  Yes, good morning, Mr. Peacock.
12   Q.  Dr. Brannon, briefly, how long have you been a forensic
13   psychologist?
14   A.  I have operated in the area of forensic psychologist since
15   1994, licensed as a psychologist since 1990.
16   Q.  Have you acted as a forensic psychologist since that time?
17   A.  I have, in State and Federal Courts in Florida, as well as
18   other states, and I speak primarily since that time, 1994.
19   Q.  Dr. Brannon, did you have the opportunity to evaluate
20   Michael Harding in this case?
21   A.  Yes, sir, I did.
22   Q.  Was that at my request?
23   A.  Yes, sir, it was.
24   Q.  And exactly what do you recall that I requested you to do?
25   A.  A psychological evaluation to assess whether there are any
```

---

```
 1   psychological problems or issues that can be used as part of a
 2   mitigation hearing.
 3   Q.  Now, did you in fact conduct a forensic evaluation of
 4   Michael Harding?
 5   A.  Yes, I did.
 6   Q.  When did you do that?
 7   A.  December 30, 2015.
 8   Q.  Now, in conducting your evaluation, how do you go about
 9   doing that?  How do you start out?
10   A.  You start off by doing a psychological evaluation, but
11   prior to that time, hopefully becoming aware of some of the
12   facts involved in the case, arrest reports, criminal
13   complaints, whatever you get your hands on as far as the actual
14   fact patterns that occurred, and being able to interview
15   individuals familiar with that, and eventually getting some
16   records that would also corroborate or contradict what a person
17   might have told you during the course of the interview,
18   multiple psychological tests, testing that contain validity
19   scales or measures of the person's response style, and the
20   possibility of a person faking or malingering.
21   Q.  Did you do that in this case, get the background
22   information?
23   A.  Yes, I did all of those things, case law, psychological
24   testing, collateral source information, being his mother, and
25   prior treatment records.
```

1  Q.  In obtaining background information, did you feel you
2  received satisfactory information in order to conduct an
3  adequate evaluation of Michael Brannon --
4  A.  Michael Harding.
5  Q.  Michael Harding?
6  A.  Yes, I did.  Based on the information I had, I had
7  sufficient information.
8  Q.  Now, once you compile your background history and
9  information, do you actually then conduct testing of the
10  subject?
11  A.  Yes.  Specific testing with regard to psychological
12  difficulties, problems, substance abuse, as well as what I
13  mentioned earlier, any type of response distortion or lying in
14  the format of the test.
15  Q.  And do you choose different tests depending upon the
16  circumstances?
17  A.  Sure.  I use different tests depending on what the person
18  tells me, what they relate to me, all of them frequently used
19  tests when sentencing, and I use what they tell me in the
20  course of history to determine what protocol of tests I would
21  use.
22  Q.  Tell me a little bit -- what is a psychological test; where
23  does it come from?
24  A.  They are objective measures standardized on thousands,
25  sometimes tens of thousands of individuals to establish the

1  presence or absence of psychological conditions, such as
2  depression, anxiety or psychosis.
3  Also, tests in forensic settings also have scales that
4  assess how the person approaches the test itself; do they
5  minimize the problems, do they randomly respond to a test or do
6  they try to exaggerate or fabricate any type of symptoms.
7  So, it is an analysis of not only psychological problems,
8  but do they report those problems, if they have them, in a
9  manner consistent with what we know about mental illness.
10  Q.  Now, in choosing the tests that you submitted to Michael
11  Harding, what were your concerns there?
12  A.  Well, the concerns were, A, does he have any type of mental
13  health condition, reporting anxiety, depression, possible
14  post-traumatic stress, and past history of substance abuse.  He
15  was indicating all of the problems throughout the course of
16  many years.
17  I chose tests that would assess all of those areas or the
18  malingering that might occur as well of the conditions.
19  Q.  Did you also have records of previous psychological
20  treatment for Mr. Harding?
21  A.  Yes, sir, I did have those afterwards.  I asked you, Mr.
22  Fletcher, if you could get those records to further
23  corroborate.  Even though I spoke to his mother, I wanted
24  objective measures, and that would be prior treatment records.
25  Yes, we did get those.

1  Q.  What is the importance of having prior the treatment
2  diagnosis and prognosis?
3  A.  It helps to corroborate the person with the treatment
4  records.  We have an individual treated over 16 sessions or a
5  couple of years, and it gives us an objective source of
6  information, what he is reporting and what the severity of the
7  conditions were.
8  It is important to get that forensically when the person
9  has a motivation to be dishonest or information to help them
10  out in their case, if you will.
11  Q.  Do you have the previous diagnosis with you?
12  A.  Yes, I do.
13  Q.  What was the previous diagnosis and when was it from?
14  A.  The diagnosis of the treatment records of his psychiatrist,
15  Dr. Yanique Duval, 16 sessions of psychiatric and psychological
16  treatment, prescribed medication, as well as go through several
17  sessions of individual counseling.
18  He was diagnosed with anxiety disorder, panic disorder, and
19  poly substance abuse, anti-depressants, anti-anxiety
20  medications, most specifically Zoloft and Klonopin.
21  Q.  Now, did that -- to the best of your knowledge, did that
22  treatment appear to be voluntary treatment on Michael Harding's
23  part?
24  A.  It was, yes.
25  Q.  Now, you indicated that you examined him on December 30,

1  2015?
2  A.  Yes.
3  Q.  Where did you speak with him?
4  A.  Federal Detention Center Miami.
5  Q.  At that time, did you administer your battery of
6  psychological tests?
7  A.  I did.
8  Q.  Could you tell the Court about the tests that you
9  administered on December 30, 2015?
10  A.  Sure.  Would you like me to list the tests or speak about
11  each test, or both?
12  Q.  Just one second, Dr. Brannon.
13  MR. PEACOCK:  Your Honor, I filed this under seal.
14  THE COURT:  What docket entry was that?
15  MR. PEACOCK:  Judge, I don't have it.
16  THE COURT:  I do have it.  Let's see.
17  MR. PEACOCK:  I have an extra copy.
18  THE COURT:  If you make one, that will make it go
19  quickly.  I have it, I read it.
20  MR. PEACOCK:  I do.  I thought it might be easier to
21  follow along.
22  THE COURT:  Yes, that is fine.
23  Be assured I have received it, it has been filed, and
24  I read it.
25  MR. PEACOCK:  Yes, ma'am.

1    THE COURT:  In fact, I think it is Docket Entry 90.

2        MR. PEACOCK:  Very good.

3    BY MR. PEACOCK:

4    Q.  Dr. Brannon, I would like you to go through each test

5    briefly, explain what its purpose is, whether you administered

6    it, whether you thought the results were reliable.

7    A.  Okay.  I will give a brief summary of each test.  If the

8    Court would like me to elaborate, I will do that.

9        The first test I gave was called the MCMI-III, Millon

10   Clinical Multiaxial Inventory – Third Edition, MCMI-III.  It's

11   a personality test standardized on various individuals with

12   various forms of mental disorders.

13       It is important in a legal setting, it has a variety of

14   scales.  It tells us if someone is malingering or faking

15   disorders.

16       The results of those tests were a valid profile, no faking

17   of mental health symptoms, with significant elevations in areas

18   that would suggest depression, anxiety, post-traumatic stress

19   and alcohol abuse.

20       The next test I gave was the Beck Anxiety Inventory, the

21   single best measure of the construct of anxiety, and he scored

22   in the moderate range, he had a moderate range of anxiety.

23       The next test, Beck Depression Inventory, Second Edition,

24   that is one of the most commonly utilized in clinical studies

25   for depression.

---

1    That result was in the severe range, more depression than

2    anxiety in his response.

3        The next test, the Substance Abuse Subtle Screening

4    Inventory, specifically measures for drug or alcohol problems,

5    and indeed, it did show problems in both of those areas, and

6    more importantly, all of the tests, meaning for individuals

7    exaggerating substance abuse problems, fell well within the

8    normal range.  There was no evidence of fake or faking

9    substance abuse symptoms.  Elevations that would suggest drug

10   and alcohol problems.

11       The final test that I gave is called the Miller Forensic

12   Assessment of Symptoms Test, a test that is designed to do one

13   thing, measure for faking of mental health symptoms, signs as

14   to malingering.

15       He fell below the cutoff score that would suggest

16   malingering for the test.  This test would tell us no

17   malingering.  The people who score as low as he did, there is

18   generally no malingering in psychological testing.

19   Q.  After you conducted your testing of Mr. Harding, and also

20   all of your background research and information, did you come

21   to a diagnosis of Mr. Harding?

22   A.  Yes, sir, I did.

23   Q.  And when I say diagnosis, what is your definition of that

24   term?

25   A.  Well, these would be classifications from our most recent

---

1    coded book, which would be the Diagnostic and Statistical

2    Manual, Fifth Edition, the latest version classifying mental

3    disorders.  A person would have to meet within specific

4    criteria within that manual for diagnoses.

5        I diagnosed based on that manual.

6    Q.  When you say your manual, who do you mean by our?

7    A.  It's published by the American Psychiatric Association,

8    with considerable assistance from the American Psychological

9    Association.  A new version was published three years ago, the

10   DSM-5.

11   Q.  Is that DSM-5, is that a learned treatise that is accepted

12   in your profession as an accepted manual of diagnoses of

13   psychological illness?

14   A.  Yes, the most frequently used book for diagnosing

15   individuals.

16   Q.  What was your diagnosis of Mr. Harding?

17   A.  Based upon the information that was available to me, he

18   best met criteria for persistent depressive disorder,

19   unspecified anxiety disorder, alcohol use and cannabis use, and

20   I also put in what are rule out or considerations diagnoses.

21       I saw some evidence of the conditions, but could not give a

22   full diagnosis, he did not meet the full threshold.  Those were

23   post-traumatic stress and panic disorder.

24       THE COURT:  What do you mean by persistent depressive

25   disorder?

---

1        THE WITNESS:  This stays for a period of time,

2    persistent depressive disorder could be associated with

3    something like a walking flow, something that causes impairment

4    in a person's life, but they are able to function.  A person

5    feels low, blue, lethargic, hopeless, not debilitating.

6        THE COURT:  Are you able to ascertain how long Mr.

7    Harding was suffering from or has been suffering from, for

8    example, persistent depressive disorder or unspecified anxiety

9    disorder?

10       THE WITNESS:  We can objectively trace it back to

11   2010, that is the prior records are, he was prescribed

12   anti-anxiety and anti-depressive medication.

13       We can trace it to there, and it goes back further to

14   childhood, absent father, mother with mental health problems,

15   and so we could speculate there.  Objectively we could say 2010

16   with certainty.

17       THE COURT:  Okay.

18       MR. PEACOCK:  May I proceed?

19       THE COURT:  Yes.

20   BY MR. PEACOCK:

21   Q.  Dr. Harding, could you describe -- you described persistent

22   depressive disorder.  Could you describe the anxiety disorder,

23   and in particular, what unspecified means?

24   A.  Yes.  It doesn't cleanly fit into one category, he has

25   anxiety and panic disorder.  He has a number of different

1 anxiety and conditions, it is a collection.

2 He has had anxiety for awhile, and psychological testing

3 does show anxiety symptoms. This again is a condition in which

4 a person feels higher levels of stress, tension or worry than

5 you ordinarily expect. It isn't just because of someone facing

6 criminal prosecution or being put in jail, although certainly

7 that could be a factor, but he shows the symptoms prior to the

8 current legal problems and difficulties.

9 He reports this for a considerable period of time, prior to

10 2010, worry, distress, tension and etc.

11 Q. Now, in regard to the post-traumatic stress disorder

12 symptoms, I know you said you didn't find enough to confirm a

13 full diagnosis.

14 Could you tell the Court what factors you did find that

15 could make post-traumatic stress disorder part of your

16 diagnoses?

17 A. Sure. On the MCMI-III, one of the tests I administered,

18 the first one I mentioned, a significant elevation on the post

19 traumatic stress scale. He does report frequent thoughts,

20 recurrences and dreams back to the time of his sexual abuse as

21 a child by two individuals, and he does suggest at times he

22 feels overwhelming anxiety when things trigger or remind him of

23 those situations that occur to him at that time.

24 I couldn't give it as a full diagnosis because I couldn't

25 corroborate the events of the report.

---

1 There were other symptoms missing. At least he reports

2 some of the symptoms, reactions that we expect that someone had

3 been abused during their childhood.

4 Q. Let's move next to the panic disorder, and I ask the same

5 question.

6 A. He reports periods where he feels overwhelmed by anxiety,

7 not to the point where he reports all of the symptoms necessary

8 in the DSM-5, panic disorder, but does report panic at times

9 that stops and interferes with daily activities.

10 There are suggestions he may have panic disorder, but does

11 not meet the full criteria, but we can't rule it out for

12 further diagnosis.

13 Q. With regard to the alcohol use and marijuana use, let me

14 ask you this: Did Mr. Harding report any abuse of prescription

15 drugs as well?

16 A. Yes, sir, he did.

17 Q. And do you know what those were, what type of drugs those

18 were?

19 A. Yes, they were opioids or painkillers, they were prescribed

20 to him for a period of time, but he said he used them for a

21 short period of time in 2015.

22 Q. Were you aware he was taking anti-psychotic medication as

23 well?

24 A. The only medication I was aware he was taking was the

25 opioids and antidepressant and antiseizure medication often

---

1 used for anxiety.

2 Q. My anti-psychotic term may be inaccurate. Would

3 psychoactive be --

4 A. Psychotropic medication.

5 He received the diagnosis by a psychiatrist, that is the

6 psychotropic medication he was receiving.

7 Q. He was receiving Klonopin and Zoloft?

8 A. Correct.

9 Q. Now, the combination of these drugs, along with the alcohol

10 and marijuana abuse, would that have any effect on his -- on

11 your diagnosis of him?

12 A. Well, certainly, yes, that contributed to the diagnosis I

13 gave him.

14 He said he was not using the opioids and medication, but

15 still using alcohol and marijuana at the time of the offense,

16 at the time of the arrest, actually. Those conditions would be

17 relative to diagnosis, that is why I listed them in my

18 criteria.

19 Q. You reported to his incidents of sexual abuse as a child.

20 What, if any, part would they play in your diagnosis?

21 A. Well, he does report multiple incidents as a child of

22 sexual abuse. Those could be the symptoms of post-traumatic

23 stress, the elevations of the MCMI, which looks like

24 post-traumatic stress, recurrent thoughts and dreams, those are

25 consistent with someone sexually abused, especially if he

---

1 hasn't relayed that information, he kept it to himself.

2 Q. Are you aware that the offense which he has been charged

3 and convicted of involves child pornography?

4 A. Yes, I am.

5 Q. And allegations of child sexual abuse as well?

6 A. Yes, I am aware of that.

7 Q. Do you see any connection between his prior child abuse and

8 the offenses which I just mentioned?

9 A. I can only speak generally about that. I did not ask him

10 about the offense.

11 I can say individuals that have been sexually abused are

12 over represented in regard to the individuals who view child

13 pornography, a larger percentage of those have gone through

14 aberrant sexual behavior in their childhood themselves.

15 Q. Now, are you familiar -- do you have expertise in clinical

16 research and evaluation of sex offenders?

17 A. Yes, I do.

18 Q. And in particular, those who are accused and convicted of

19 sex offenses against children?

20 A. Yes, sir, I do.

21 Q. Now, could you explain to the Court what the progress of

22 dangerousness to the community is as an individual grows older,

23 in particular child sex offenders?

24 A. We know that age is a relevant factor, one of the most

25 salient factors in the research in regards to frequency of

1  probability of someone engaging in sexually violent or abusive

2  behaviors.

3      We know if individuals achieve a certain age, there is a

4  graphic drop off in recurrence or recidivism of those

5  behaviors.  We know that age is about the age of 55.

6      So, there is a term for it called desistence.  The only --

7  that is not just for sex crimes, but in particular sex crimes,

8  we know that individuals usually were younger, between the ages

9  of 18 and 30, but there is research that says 18 to 30 have the

10  highest incident, and those drop off at 55, have lower rates.

11     The only exception is if a person has anti-social

12  personality disorder or psychopathic personality disorder, with

13  a long criminal history of violations.

14     If we see those infringements, a -- there is no diagnosis

15  of that.  We expect in this case, if you look at the clinical

16  research, desistence would be a factor here and the probability

17  lower.  It would be descending behavior after the age of 55.

18         MR. PEACOCK:  Thank you.  That is all I have, Your

19  Honor.

20         THE COURT:  Okay.  Cross-examination.

21                    **CROSS-EXAMINATION**

22  BY MR. FUNK:

23  Q.  Good morning, Dr. Brannon.

24  A.  Good morning.

25  Q.  When you completed your report in December of 2015, were

1  you provided by Mr. Peacock with the charging document in this

2  case?

3  A.  I had the criminal complaint, which is what I reviewed

4  earlier on, and I had discussions with Mr. Peacock about other

5  allegations.

6  Q.  In your report, you do not note that the Defendant was

7  charged with attempted enticement of a child; is that correct?

8  A.  Yes, sir, that is correct.

9  Q.  You do not note in your report that the Defendant was

10  charged with production of child pornography?

11  A.  Correct.

12  Q.  Are you aware of the facts underlying the enticement

13  charge?

14  A.  Yes, sir.  I sat through the Court's last hearing in this

15  matter, and I spoke to Mr. Peacock previously.

16  Q.  At the time you first knew about the enticement, the

17  information did not come from the chat messages that are a part

18  of the case?

19  A.  That is correct, I was not asked to do anything with the

20  charges, risk assessment, I was not asked about those areas.

21  Q.  You are giving your opinion whether or not the Defendant is

22  engaged in a behavior that a pedophile would behave in,

23  correct?

24  A.  Yes, sir.

25  Q.  And part of the facts that you could use to support your

1  assessment would be chat messages that the Defendant engaged

2  with other people regarding explicit sexual conversations

3  involving children?

4  A.  Yes, sir, that is correct.

5  Q.  And you didn't request from Mr. Peacock to look at those

6  chat messages?

7  A.  No, I was not asked to look in that area.  I was asked to

8  do a risk assessment, but I wasn't asked to do that.

9  Q.  So, given an assessment of whether or not individuals would

10  offend at 55 years of age, that is a general opinion about

11  offenders in general, correct?

12  A.  Yes, that is correct.

13  Q.  It does not necessarily apply to Mr. Harding?

14  A.  Well, he didn't ask me about the fact patterns, I couldn't

15  apply it to him.

16  Q.  Would the severity of the abuse of pornography have an

17  effect on whether someone would reoffend?

18  A.  Not the amount.  No clinical research says the amount

19  increases or decreases the risk.  The content does, but the

20  amount does not.

21  Q.  What kind of content would be more aggravating or probable

22  of having someone offend?

23  A.  Younger children, kids under the age of five, kids who had

24  been abused in any way, or bondage, kids with animals.

25  Q.  What is the diagnosis criteria for pedophiles?

1  A.  Primarily an interest in prepubescent children, and

2  additional factors that changed in the DSM-5.

3      The required diagnosis in the DSM-4 requires some sort of

4  touch, the DSM-5 does not, only requires significant

5  interference in a person's life as a result of that primary

6  sexual attraction to prepubescent.

7  Q.  Would a statement, I like girls 5 to 12, in regards to him

8  be a pedophile?

9  A.  It could be, if it is primarily in prepubescent children,

10  pornography looked at and saved, put in subdirectories, if the

11  information is the prepubescent children, then likely the

12  diagnosis would fit.

13  Q.  Would an abuse of an individual between the ages of five to

14  nine be a pedophile?

15  A.  It would be one of the diagnostic criteria, yes.

16  Q.  With hands-on response, would you agree he would reoffend?

17  A.  Any time there is a contact offense, that increases future

18  abuse.

19  Q.  Would his offer to exchange his stepchild with an

20  individual on line in order to have sex with the child of the

21  other person, would that be an indicator of a greater

22  probability of him offending in the future?

23  A.  Yes, it would.

24  Q.  Would his encouraging other people to produce child

25  pornography be an indicator of risk of future offending?

A.  In general, any contact, specific -- any contact with any person about child pornography increases risk.

Q.  Would the fact of 95 percent of the pornography that he had on his electronic devices being child pornography, would that be an indicator him being a pedophile?

A.  Yes.  Not that alone, but other factors to that yes.

Q.  Would the quantity or proportion of the pornography being child pornography, would that be a greater risk of future offending?

A.  Yes, if it is prepubescent children, yes.

Q.  And if it includes sadistic behavior, would that be an indicator of future offending?

A.  Yes.

Q.  Did you consider evaluating the defendant for anti-social personality disorder?

A.  I did.  The scales on the MCMI are designed for that measure of personality, for anti-social personality disorder.

Also, his reported history is not consistent with anti-social personality disorder.

Q.  Do you include just the inventory -- excuse me, do you just include those tests in your evaluation or do you look to other evidence to base your opinion?

A.  Other evidence as well.

I spoke to his mom and got the prior treatment records.

Q.  Did you ever speak to his wife?

A.  I did not.

Q.  Did you ever make an attempt to speak to his wife?

A.  I did not.

Q.  Would the fact that she lived with him on a full-time basis give her a better understanding of his psychological state than his mother?

A.  I can't answer that without having spoken to her.  I can't answer her -- I don't know.  His mother would know him longer and have more of a history of him.  She seemed to have pretty good judgment of his behavior.

Q.  Do you know when his mother stopped living -- when the Defendant stopped living with his mother?

A.  I do not.

Q.  Did you speak with his employer?

A.  I did not.

Q.  Did you administer any tests that would evaluate for pedophilia?

A.  There is no test that would assess pedophilia, but there are fact patterns.  If you are doing that type of assessment you could look at them, many of which you mentioned, that would help you arrive or form that diagnosis.

Q.  Did you look at the PCA's, probable cause affidavits, for the hands-on offending?

A.  No, only the criminal complaint which I mentioned to you.

Q.  Is one of the criteria of an anti-social personality an

impairment in self functioning?

A.  Yes, that is one of the many criteria, yes.

Q.  Does it include self direction, goal setting based on personal gratification, absence of pro social internal standards associated with failure to conform to lawful cultural normative ethical behavior?

A.  Yes.

Q.  Would the victimizing of prepubescent children for the purpose of personal gratification be a violation of lawful or cultural normative ethical behavior?

A.  Yes.

Q.  In the absence of pro social internal standards, would that be evidenced by his conversations with other people in lacking any empathy for the pain of the child that he is abusing?

A.  I didn't ask him specifically about that.

I guess the factor that he had been married for a period of time and residing with his wife would be pro social behavior.  Without further speaking to those things that you mentioned, I could not respond to that.

Q.  Would it be goal settings based on personal gratification if you were to arrange a meeting with someone in another city in order to swap children for sexual abuse?

A.  Hum, yes.

Q.  Would it be -- do people that have anti-social personalities, do they lie to other people in order to carry

out their own goals?

A.  They are generally lying, being lying generally would be one of the criteria.

Q.  The second criteria for the anti-social personality is that they lack empathy -- have a lack of concern for feelings, needs or suffering for others, lack of remorse after hurting or mistreating another person; is that correct?

A.  Yes.

Q.  Would a statement regarding -- would the absence of any concern of the physical harm to a victim be an indication of the lack of concern of feelings, need or suffering of others?

A.  Not necessarily.  You need a constant pattern of that throughout the course of your life.

That diagnosis requires a diagnosis of conduct disorder by the age of 15.  Any one incident or a couple of incidents wouldn't necessarily be that.  It would be a lifetime pattern of those behaviors.

Q.  Would a pattern of over four years be taken into consideration?

A.  Yes, absolutely.

Q.  If there were multiple events in which a child was harmed by the Defendant over a period of four years, would that be a factor that would contribute to a diagnosis of anti-social personality?

A.  Well, it would start before the age of 15.  You have to see

USCA11 Case: 21-14133   Document: 42

1  patterns of behavior consistent with what you are talking about
2  before the age of 15.  All of these things are anti-social and
3  problematic behavior, but in order to get the full diagnosis
4  you need a life-long pattern of disruptive school behavior,
5  infractions, that go on for a period of time.
6  Q.  Would those type of behaviors contribute to the risk of
7  someone reoffending throughout the course of their life?
8  A.  Yes.
9  Q.  What is the concept of co-morbidity?
10  A.  Well, the factors you are looking at with regard to risk
11  behavior, more probability of working out -- reoffending.
12  Q.  Does a victim of child sexual abuse necessarily commit
13  child sexual abuse when they become older?
14  A.  No.
15  Q.  Does a person who is depressed necessarily commit child
16  sexual abuse?
17  A.  No.
18  Q.  Does a person who is anxious or has anxiety disorder
19  necessarily commit child sexual abuse?
20  A.  No.  Those factors just increase probabilities, they are
21  not a guarantee that a person will behave in any specific way.
22  Q.  Was there any indication that the Defendant had the
23  incapacity to understand the criminal nature of the behavior?
24  A.  No.
25  Q.  Would the fact that he is chatting with other people online

---

Date Filed: 03/22/2023   Page: 117 of 155

1  talking about how other people got caught for what he was
2  doing, would that be an indication that he understood the
3  criminal nature of his offense?
4  A.  Yes.
5  Q.  One of the conclusions that you came to in the end of your
6  report is that you -- the use of alcohol -- let me read it for
7  you.
8     "Moreover, the examinee's apparent addictions to marijuana,
9  alcohol and pornography likely impaired his judgment and
10  ability to control his impulses at the time of the alleged
11  offenses."
12     Do you have a copy of your report?
13  A.  Yes.
14  Q.  Is there any place you refer to the pornography as child
15  pornography?
16  A.  No.  That is not what he reported.  He reported he went to
17  counseling in 2010 for addiction to adult pornography.  That is
18  what I was referencing.
19  Q.  You informed him the examination was for mitigation at
20  sentencing?
21  A.  Correct.
22  Q.  Are you trying to say in your report that alcohol use or
23  marijuana was going on at the time he committed these offenses?
24  A.  Only that he reports he was using those substances during
25  the period of time in which the allegations occurred, in which

---

1  the events of the behavior occurred.
2     We know using alcohol causes poor judgment, difficulty with
3  reasoning.  Based on that self-induced condition he put himself
4  in for that period of time, certainly that could be a factor
5  whether or not he engaged in behavior to violate the law.
6  Q.  Were you aware he was transmitting child pornography while
7  he was on duty as a law enforcement officer?
8  A.  I did know that was an allegation, he was employed as a
9  officer at the time of the arrest.
10  Q.  Do you know of any difficulties he had with his employment?
11  A.  I didn't check on that, but he didn't report any.
12  Q.  Do you know of any instances while he was employed where it
13  was reported that he was using alcohol or using marijuana?
14  A.  Again, I didn't have those records.  He didn't report any
15  disciplinary action as a result of that.
16     MR. FUNK:  Just one moment, Doctor, sorry.
17     THE WITNESS:  Yes, sir.
18  BY MR. FUNK:
19  Q.  Do you agree in the course of this examination the
20  Defendant had a motive to be dishonest?
21  A.  Yes.  There was no indication of it, but anybody in a
22  sentencing setting has a motive to avoid a punitive sentence.
23  Q.  Do you know if the defendant was employed -- before the
24  employment with law enforcement agencies, was he given
25  psychological examinations prior to employment?

---

1  A.  I know, yes, in order to be a police officer, he would have
2  to have pre-examination, and that included psychological
3  testing.
4     MR. FUNK:  Your Honor, that is all I have.  Thank you.
5     THE COURT:  Okay.  Does that conclude this witness?
6     MR. PEACOCK:  Judge, I have a few questions.
7     THE COURT:  Okay.
8              REDIRECT EXAMINATION
9  BY MR. PEACOCK:
10  Q.  Dr. Brannon, Fletcher Peacock again.
11  A.  Yes.
12  Q.  We talked about risk.
13     Is it safe to say a risk assessment at this time would not
14  be good for Mr. Harding given the factors that you know about
15  the case?
16  A.  Yes, and all the factors the Government mentioned.
17     No, it is not favorable if it were conducted now.
18  Q.  Do you still maintain that once Michael Harding reaches the
19  age of 50 or 55, his risk will fall way off statistically?
20  A.  Well, I can speak in general and say individuals who have
21  not been diagnosed with psychopathic or anti-social
22  personality, those individuals have a great drop off in terms
23  of re-offensive behaviors in general, especially sexual abuse
24  over the age of 55.
25  Q.  Now, Mr. Funk asked you about anti-social personality

disorder.

1    Did you consider that in your testing?

2    A.  Very much so.  It's a very important variable diagnosis,

3    that is one of the reasons why I chose the tests I did.  I do

4    look for that in all evaluations as it would be a factor in

5    which the treatment would be assessed in the future.

6    Q.  Based on your testing, did you rule that out?

7    A.  Not just testing.  Yes, I did rule that out.  He does not

8    meet the full criteria for that condition.

9    Q.  In fact, many of the things that he demonstrates show a

10   great comportment with societal norms, correct?

11   A.  Yes, he shows behaviors that are pro social at times.  The

12   fact that he is involved in relationships, maintained jobs, and

13   not violate societal rules from the point of being arrested,

14   those kind of things argue strongly against anti-social

15   personality disorder.

16   Q.  How about the fact of completing college?

17   A.  Less so, but that certainly can be a factor in terms he

18   maintained following rules and regulations, and was responsible

19   enough to complete that college, yes.

20   Q.  And how about the fact of being a police officer and being

21   awarded Officer of the Year?

22   A.  Sure, not violating any rules or having disciplinary

23   reactions that he related to me and being removed from the

24   force, that would be important.

---

1    Usually people in that position are frequent rule breakers

2    and come to their attention frequently.

3    Q.  Last, once again, the self reporting of prior sexual abuse

4    by Mr. Harding, is it safe to say that statistically

5    individuals who self report child abuse are statistically more

6    likely to be abusers in the future?

7    A.  Yes.  We know perpetrators -- there is a higher percentage

8    of individuals who have been abused and some sexual behavior

9    occurred to them, we know it is a risk factor.

10   We do not mean that all people abused abuse themselves, but

11   it is a likelihood they will abuse someone else.

12   Q.  Are you still confident in your diagnosis considering all

13   of the questions on cross-examination?

14   A.  Yes.

15       MR. PEACOCK:  Thank you.

16       THE COURT:  Thank you, Dr. Brannon.

17       THE WITNESS:  Thank you, Your Honor.

18       THE COURT:  Okay.

19       Now, do we want to go back to Special Agent Rey?

20       MR. FUNK:  Yes.

21       THE COURT:  Okay, we have a half hour on direct.

22       MR. PEACOCK:  Your Honor, may I inquire what the

23   Court's schedule will be, roughly?

24       THE COURT:  Well, whatever time it takes to get

25   through the sentencing.

---

1        MR. PEACOCK:  I didn't know what time you were going

2    to break for lunch.

3        THE COURT:  No, I haven't thought about that yet.  I

4    would like to do it in a time that is convenient, not breaking

5    up a witness.

6        I know we have the rest of Special Agent Rey, and we

7    have Mrs. Harding.

8        Maybe at least those two witnesses, that might bring

9    us to the lunch hour.

10       MR. PEACOCK:  I just need to step out and make phone

11   calls at some point.

12       THE COURT:  All right.  Just keep us apprized.

13       Okay, we have Special Agent Rey back on the stand for

14   direct continuation.

15           DIRECT EXAMINATION continued

16   BY MR. FUNK:

17   Q.  What is Drop Box?

18   A.  It is a service that is designed to share files.

19   Q.  How does one share files on Drop Box?

20   A.  A couple of different ways; one, they provide a use of Drop

21   Box, an account user provides access to files they uploaded to

22   the service.  In that way, they can share files by sending

23   direct links to a particular file.

24   Q.  Were there indications in your forensic examination that

25   the Defendant had been using Drop Box in order to view child

---

1    pornography?

2    A.  Yes.

3    Q.  Did you see any indication in your examination as to

4    whether or not the Defendant was organizing his collection of

5    child pornography?

6        THE COURT:  I am sorry, did we re-swear the witness?

7        If not, why don't we do that.

8        BRIAN REY, GOVERNMENT'S WITNESS, SWORN

9        THE COURT:  Thank you very much.

10       MR. FUNK:  Thank you.

11   BY MR. FUNK:

12   Q.  Was there any indication, Agent, whether or not the

13   Defendant was organizing or cataloging images of child

14   pornography?

15   A.  Yes.

16   Q.  What did that appear to be from your examination?

17   A.  On the PNY phone drive, he had a folder structure where he

18   was keeping his child pornography.

19   Q.  Did he have a folder structure as well on the LGD 800 cell

20   phone?

21   A.  Not that I remember recalling, no.

22   Q.  Was there a path or folder that was created entitled Kik

23   videos?

24   A.  Yes.

25   Q.  Where was that created?

1   A.   On the LG 800.
2           THE COURT:  That is the phone?
3           THE WITNESS:  Yes, ma'am.
4   BY MR. FUNK:
5   Q.   Was it Kik that he posted the videos on?  Was it on that
6   application on that chat site?
7   A.   It was.
8   Q.   Is that naming convention for that path created by the
9   phone or something the Defendant would have needed to create
10  himself?
11  A.   It would have been a user created folder.
12  Q.   During one of the chat conversations with another
13  individual, does the Defendant indicate he made attempts, or he
14  had a desire to attempt to retrieve the video he made with
15  C.W.?
16  A.   Yes, that is one of the chats.
17  Q.   Is there some indication independent of that statement
18  whether or not the Defendant took acts to retrieve the video?
19  A.   I did find a thumbnail image that appeared to be from a
20  video instructing people how to recover deleted video files.
21  Q.   Have you prepared a compact disk which includes images that
22  you found on the electronic devices that were in the possession
23  of the Defendant?
24  A.   Yes, sir.
25           MR. FUNK:  Your Honor, if I could have Agent Rey step

---

1   down, please.
2           THE COURT:  Yes, he may.
3           MR. FUNK:  Your Honor, the exhibit we are going to
4   present is 11.
5           THE COURT:  The DVD.  Is there going to be any
6   objection to Exhibit 11?  Has counsel seen it?
7           MR. PEACOCK:  I have not reviewed it.
8           I have gotten discovery, and I have had discovery
9   conferences.  I will stand here.
10          THE COURT:  We are discussing it now and it's marked
11  now.  Let me know when you are ready to move it into evidence
12  and I will see if there is any objection.
13  BY MR. FUNK:
14  Q.   How did you compile the images contained in the CD?
15  A.   I reviewed child exploitation material on the Defendant's
16  digital media with counsel to select some demonstrative images
17  on the video.
18          MR. FUNK:  Your Honor, for the record, we have turned
19  all the monitors towards the Court so the gallery cannot view
20  the images.
21          The videos will come up, the only people that will see
22  the images are the people in front of the counsel table.
23          THE COURT:  Lakeshia, do you have it on the setting
24  that wouldn't show it on the large screen?
25          THE COURTROOM DEPUTY:  Judge, the television is off.

---

1           THE COURT:  All that would show is the Court's desk
2   and counsel's computers which are facing the Court, not facing
3   counsel or anyone here in the courtroom.
4           So, does counsel want to acknowledge that?  Mr.
5   Peacock, is that how you see the monitors, it is facing you and
6   not toward the back of the courtroom?
7           MR. PEACOCK:  Yes.
8           THE COURT:  Mr. Killinger and Mr. Funk?
9           MR. KILLINGER:  Yes.
10          THE COURT:  You may prepare the images as
11  demonstrative.  Are you seeking to admit them?
12          MR. FUNK:  I will offer what is marked Government
13  Exhibit 11.
14          THE COURT:  Mr. Peacock, do you still need to see them
15  before you agree or disagree as to the admission?
16          MR. PEACOCK:  I don't think I will have an objection,
17  but I have not looked at that.
18          THE COURT:  You may show the image.  I think it will
19  show up on the monitor for the Court.
20          MR. FUNK:  There are different images as well as
21  videos.  There is a description in the witness list, and they
22  have been marked Exhibit 11-A through 11-L -- I'm sorry, 11-M.
23          THE COURT:  You will indicate when you are showing
24  which one?
25          MR. FUNK:  Yes, Your Honor.  They are in the order in

---

1   which they appear on the compact disk.
2           THE COURT:  Okay, I see that.
3           MR. FUNK:  We will put it up on the screen as a test
4   to make sure it does not show in the gallery.
5           THE COURT:  All right.  That is a good idea.
6           MR. FUNK:  This is for the Court's review of the
7   evidence.  If you indicate to us the images, when we should
8   move on to the next one, we will move on.
9           THE COURT:  All right.
10          MR. FUNK:  There is one video where we would like the
11  Court to view the last part.  It is a brief period, it is
12  actually not the pornography, it is a credit that is part of
13  the video image.
14          THE COURT:  Okay.
15          MR. FUNK:  I don't see anything on the monitors at
16  this time.
17          THE COURT:  Is that linked to the ELMO.
18          MR. FUNK:  It is not the ELMO.
19          THE COURTROOM DEPUTY:  It was the P.C.
20          THE COURT:  That is what we were using with the ELMO.
21  Have we tried it with a computer before?
22          THE COURTROOM DEPUTY:  No.
23          MR. FUNK:  We will try connecting it to the ELMO.
24          THE COURTROOM DEPUTY:  Try the prosecution P.C.
25          MR. FUNK:  Agent Rey's desktop should appear now.

```
 1          THE COURT:  Should we bring the computer up?
 2      I can come down.
 3          MR. FUNK:  Your Honor, we'll look first at what is
 4  obtained from the PNY USB drive.
 5      The first exhibit for publication is 11-A.
 6          THE COURT:  Okay.
 7          MR. FUNK:  It is titled underscore 0110, that is the
 8  beginning of the title for the image.
 9          THE COURT:  And this was found on the Defendant's PNY
10  USB drive; is that right?
11          THE WITNESS:  Yes, ma'am.
12          THE COURT:  This is something you received from
13  someone else?
14          THE WITNESS:  The PNY drive was recovered from the
15  search of the Defendant's home.
16          THE COURT:  This is not one of C.W. or the other
17  stepdaughter.
18          Is this something he took or received, or don't you
19  know?
20          THE WITNESS:  It would be something he received.
21  BY MR. FUNK:
22  Q.  The PNY USB drive was located in the closet in the gun
23  case; is that correct?
24  A.  That is correct.
25  Q.  The next image is 11-B, a video titled Eye of the Tiger.
```

Pauline A. Stipes, Official Federal Reporter

```
 1          (Thereupon, the video was played.)
 2          MR. FUNK:  We will skip to the end.  We can go to the
 3  credits.
 4  BY MR. FUNK:
 5  Q.  The reference in the credits at the end to April and
 6  Mastodon, what is that referring to?
 7  A.  That is how the creator of this particular series referred
 8  to himself and his victim.
 9  Q.  Is there a reference in chat messages to April and
10  Mastodon?
11  A.  There are specific references to Mastodon, yes.
12  Q.  The next image, 11-C, is titled Fan Service.
13          (Thereupon, the video was played.)
14          THE WITNESS:  If you would like me to skip to the end.
15          THE COURT:  Okay.
16  BY MR. FUNK:
17  Q.  Is there a credit on the end of that as well?
18  A.  Yes, sir.
19  Q.  What is the credit?  If you'd skip to that.
20  A.  It should be coming up in a few seconds here.
21          (Thereupon, the video was played.)
22  BY MR. FUNK:
23  Q.  We are looking at a credit to all our fans, Mastodon and
24  April.  Is that the same credit that was in the Eye of the
25  Tiger?
```

Pauline A. Stipes, Official Federal Reporter

```
 1  A.  It refers to the same individuals, yes.  This is from an
 2  identified series where the offender was apprehended and the
 3  victim identified.
 4  Q.  The next one is tarapurple, a video.
 5          MR. PEACOCK:  I object to the relevance, it is
 6  cumulative.
 7          THE COURT:  I will let you respond.
 8          MR. FUNK:  This image, the video represents sadistic
 9  behavior on the part of the Defendant.  This is one of the
10  offense characteristics the Court needs to take into
11  consideration.
12          MR. PEACOCK:  That is not challenged, that enhancement
13  has not been challenged.  I haven't had a child pornography
14  case where it didn't exist.
15          MR. FUNK:  It's not merely providing a factual basis
16  for the offense characteristics, it is the totality of the
17  circumstances for what is an appropriate sentence, and we have
18  a doctor who says sadistic images contribute to the future risk
19  of reoffending.
20          The Court should view it.  You have the ability to
21  stop it at some point in time.
22          THE COURT:  I will overrule the objection.
23          THE WITNESS:  Mr. Funk, we talked about going to the
24  demonstrating of the sadistic --
25          MR. FUNK:  Yes.  May it please the Court, there is a
```

Pauline A. Stipes, Official Federal Reporter

```
 1  portion that represents the sadistic nature of the acts.
 2          THE COURT:  Okay.
 3          (Thereupon the video was played.)
 4          THE COURT:  Okay.
 5          MR. FUNK:  The next image is 11-E, prepubescent female
 6  and adult male.
 7          THE COURT:  This is found on the phone versus the USB
 8  drive?
 9          MR. FUNK:  That is correct.  Agent.
10          THE WITNESS:  I am trying to get to the image you are
11  referring to.  We move on to the LG 800.
12          MR. PEACOCK:  Objection, same objection, cumulative,
13  not relevant.  The Government established the enhancements, it
14  is just prejudicial.  That is all it is at this point.
15          THE COURT:  The Court will overrule the objection.
16          THE WITNESS:  I'm sorry, which --
17          MR. FUNK:  11-E is a video of prepubescent female with
18  adult male, one minute and 11 seconds long.
19          (Thereupon, the video was played.)
20          THE WITNESS:  Mr. Funk, do you want me to skip to the
21  end of this one?
22          (Video continued.)
23  BY MR. FUNK:
24  Q.  The next image is 11-F, labeled CAM 00209.
25          Can you explain what that is an image of, Agent?
```

Pauline A. Stipes, Official Federal Reporter

**USCA11 Case: 21-14133    Document: 42**

```
1   A.  That is an image of Mr. Harding taking a picture of himself
2   and to Mr. Harding's right is child C.W.
3   Q.  Can you determine -- or were you able to determine what --
4   within the context of the chats, whether or not the cropped
5   portion of that image was ever transmitted to another
6   individual?
7   A.  Yes.
8   Q.  Who do you believe -- based on the chat images, who do you
9   believe that image or portion of it was sent to?
10  A.  To a subject who indicated his location was in Orlando.
11  Q.  Was that an individual who is a part of the factual basis
12  for the enticement chart?
13  A.  Yes, sir.
14  Q.  Was that entire photograph sent to that other person?
15  A.  No, sir.
16  Q.  We will show you 11-G.
17      Do you believe that to be the portion sent to the other
18  person in Orlando?
19  A.  Yes.
20  Q.  What reference was made by Mr. Harding to that image when
21  it was sent?
22  A.  He made reference to the individual telling the subject
23  that was his arm and C.W.'s -- I believe he referred to it as
24  sweet ass.
25  Q.  The next image to be published is 11-H.  We have it titled
```

---

**Date Filed: 03/22/2023    Page: 121 of 155**

```
1   as Preteen Female Tied in Yellow Robe.
2       THE COURT:  Okay.
3   BY MR. FUNK:
4   Q.  The next image is 11-I, what is that?
5   A.  C.W. in a living type environment.
6   Q.  Is it a pornographic image?
7   A.  Yes.
8   Q.  Do you believe that image was transmitted?
9   A.  Yes, sir.
10  Q.  To whom?
11  A.  To the subject in Orlando with whom Mr. Harding was talking
12  about meeting and exchanging children.
13  Q.  The next image comes from the Samsung Galaxy cell phone,
14  11-J, video of a prepubescent female, oral sex on adult male.
15      (Thereupon, the video was played.)
16      THE COURT:  Mr. Peacock asked to turn it down.  You
17  can turn it down.  I can hear it.
18      (Thereupon,the video was played.)
19      MR. FUNK:  The next set of images come from those
20  posted by Michael Harding on the Kik account.
21      I will ask the agent.
22  BY MR. FUNK:
23  Q.  Where do these come from?
24  A.  These images were downloaded from our office in Wilmington.
25      THE COURT:  These are the ones posted by the
```

---

```
1   Defendant, the others were received by the Defendant?
2       THE WITNESS:  Yes.
3       THE COURT:  These were posted and shared with other
4   people?
5       THE WITNESS:  Yes.
6       THE COURT:  These are beginning with?
7       MR. FUNK:  11-K.
8       THE WITNESS:  Two images, this was the first.
9       THE COURT:  Now, is this the Defendant or something he
10  posted?
11      THE WITNESS:  This is not the Defendant.
12      THE COURT:  Okay.
13      THE WITNESS:  To be clear, the only one I have of the
14  Defendant was the one previously submitted.
15      MR. FUNK:  For the Court's reference, that is Exhibit
16  Number 9 that was physically printed out on a piece of paper.
17      THE COURT:  Okay.
18  BY MR. FUNK:
19  Q.  The next image is 11-L, one image posted on July 26, 2015;
20  is that correct, Agent.
21  A.  Yes, sir.
22      THE COURT:  Okay.
23  BY MR. FUNK
24  Q.  Next image, 11-M -- I apologize, 11-M, it is a video posted
25  to Kik on August 4, 2015; is that correct, Agent.
```

---

```
1   A.  Yes.
2       (Thereupon, the video was played.)
3       THE COURT:  Okay.
4       MR. FUNK:  That will conclude the presentation of the
5   images contained on Exhibit 11.
6       THE COURT:  Okay.
7       Okay, you may proceed.
8   BY MR. FUNK:
9   Q.  Agent, were you able to find a list of Kik chat rooms
10  joined by Michael Harding?
11      THE COURT:  I am sorry, Exhibit 11 -- over some
12  objections to relevancy and cumulative, the Court will admit
13  11, which contains all of the subparts.
14      (Whereupon Government Exhibit 11 was marked for evidence.)
15      MR. FUNK:  May I proceed, Your Honor?
16      THE COURT:  Yes.
17  BY MR. FUNK:
18  Q.  Were you able to recover a list of chat rooms that were
19  joined by Michael Harding?
20  A.  Yes.
21  Q.  Did you complete a printout of those chat rooms?
22  A.  Yes, sir.
23      MR. FUNK:  Your Honor, I will show defense counsel
24  what is marked Government Exhibit 12.
25      May I approach the witness?
```

1      THE COURT:  Yes.

2  BY MR. FUNK:

3  Q.  Agent, I am showing you Government Exhibit 12.  Do you

4  recognize what that is?

5  A.  Yes.

6  Q.  What is it?

7  A.  That is a printout of chat rooms in the Kik application, an

8  indication that Mr. Harding had joined those chat rooms.

9  Q.  Do you know how that is created on the phone?

10  A.  It's created by the application Kik and the particular

11  artifact that showed me that they were chat rooms joined that

12  were sent when the user joined the room.

13  Q.  Do you know if that represents all of the chat rooms he

14  joined or a list that remained on the phone?  Could you explain

15  that?

16  A.  Most of the data indicated to Kik is not retained by the

17  device, it has no use to retain data of this nature.  I

18  recovered a lot of it from areas in which the phone had been

19  deleted.

20     This particular list goes back to August 5, 2015, and it is

21  not a complete list because the room he was in when he posted

22  the child pornography is not included in this list.

23  Q.  What was the name of the Kik room he was in at the time he

24  posted child pornography?

25  A.  Hash tag Toddler Fuck.

---

1      MR. FUNK:  Your Honor, at this time I move into

2  evidence what is marked Government Exhibit 12.

3      MR. PEACOCK:  No objection, Your Honor.

4      THE COURT:  All right.  12 is admitted without

5  objection.

6      Is this what was filed under seal already or not?

7      MR. FUNK:  I believe the motion was filed to seal it.

8      THE COURT:  But all the attachments were --

9      MR. FUNK:  It has not been filed.

10      MR. PEACOCK:  12 needs to be sealed, Your Honor.

11      THE COURT:  Well, the Court viewed a number of -- all

12  of the chats that were -- something was filed.

13      MR. FUNK:  It was.

14      THE COURT:  That is different from what we are talking

15  about now?

16      MR. FUNK:  If I could have the agent explain the

17  difference.

18      THE COURT:  When I say something was filed, let me

19  find the docket entry.

20      Yes, Docket Entry 91, which was docketed May 11th.

21      There is a motion to seal the exhibit and the attached

22  exhibit establishes facts alleged in the PSI.  The exhibit is

23  being filed in support of the sentencing memo.

24      In any event, it goes on, sealed exhibit and it begins

25  with something called extraction report and all of the

---

1  conversation, instant messages.

2     There are 154, at least on the first one.  Maybe each

3  one has its own number.

4      Yes, the next conversation is 64, and goes on, I think

5  eight pages or so.

6      MR. FUNK:  Correct.

7      THE COURT:  Is that different from what we are talking

8  about in Exhibit 12 or the same thing?

9      THE WITNESS:  That is different.  Exhibit 12 are the

10  rooms which I was able to recover that the Defendant entered

11  within the Kik application, and the name suggests -- those are

12  the actual messages going back and forth between the parties,

13  what you have there.

14      THE COURT:  All right.

15      MR. FUNK:  I don't know whether Your Honor admitted

16  Exhibit 12.

17      THE COURT:  Yes, admitted without objection.

18      (Whereupon Government Exhibit 12 was marked for evidence.)

19  BY MR. FUNK:

20  Q.  Agent, what does that represent?

21  A.  These were the titles of the chat rooms joined by the

22  Defendant, only the ones I was able to recover.

23  Q.  Are there entries included there, are they a product of the

24  Defendant selecting those chat rooms to join?

25  A.  Yes.

---

1  Q.  What are the titles of the chat rooms that he joined or

2  attempted to join?

3  A.  Starting at the top -- all of these are preceded by a hash

4  tag, I will eliminate that.  Daddy 6, daddydaycarenude,

5  yungtightpussy, justtradenotalk, littleweenie, lilsults,

6  kinderporno3, kidvids and torpedo1.

7  Q.  Did you also in your examination of the LG D800 phone find

8  a cache of memes that were entitled pedobear?

9  A.  Yes.

10  Q.  What is a cache, and what are memes?

11  A.  The current use of the word meme refers to an image which

12  is circulated around the community on the internet, often with

13  attached wording, intended to be humorous.

14  Q.  What does cache mean?

15  A.  Cache would be an area where images or data is stored

16  temporarily by the operating system, the device that is being

17  used.

18  Q.  Does that necessarily mean it was downloaded or just that

19  it was viewed?

20  A.  It means that it is viewed.

21     Technically, it has to be downloaded so that it was on the

22  device, but does not mean it was intentionally saved.

23      MR. FUNK:  Your Honor, I show defense counsel what is

24  Exhibit 13.

25      THE COURT:  Okay.

```
 1              MR. FUNK:  May I approach the witness?
 2              THE COURT:  Yes.
 3    BY MR. FUNK:
 4    Q.  Agent, I am showing you what is marked Government Exhibit
 5    13.  Do you recognize what that is?
 6    A.  Yes, sir.
 7    Q.  What is it?
 8    A.  It is a printout of the Pedobear images recovered from the
 9    LG phone.
10              MR. FUNK:  I move in 13.
11              THE COURT:  Any objection?
12              MR. PEACOCK:  No.
13              THE COURT:  Admitted.
14         (Whereupon Government Exhibit 13 was marked for evidence.)
15              MR. FUNK:  Your Honor, for publication, I would ask
16    you to read what is on the document rather than reading it out
17    loud.
18              THE COURT:  Okay.
19    BY MR. FUNK:
20    Q.  In the chat messages that were provided, can you outline
21    approximately how many chats were on the phone and how many
22    were printed out into an extraction report?
23    A.  Off the top of my head, I believe over 130 chats that I was
24    able to recover from the phone.  There were, I believe, 78
25    chats that I bookmarked for inclusion in the computer forensic
```

```
 1    report.
 2    Q.  Did the Defendant proclaim an interest in the prepubescent
 3    children in the chat room with other individuals?
 4    A.  Yes.
 5              MR. FUNK:  That is all I have, thank you.
 6              THE COURT:  Okay.  Cross-examination.
 7              MR. FUNK:  Your Honor, if I might, I apologize.
 8    When we were here last, we made reference to the chat
 9    conversation under seal.  We intended to mark them Exhibit 10.
10              I offer that into evidence for the record at this
11    time.
12              THE COURT:  Any objection?
13              MR. PEACOCK:  No, ma'am.
14              THE COURT:  10 is admitted without objection.
15         (Whereupon Government Exhibit 10 was marked for evidence.)
16              MR. PEACOCK:  No questions, Your Honor.
17              THE COURT:  All right.  Thank you very much.  You can
18    step down.
19              We will take a 15 minute break and we will be back a
20    few minutes after 11:00 o'clock.
21              (Thereupon, a brief recess was taken.)
22              THE COURT:  You may be seated.
23              Government, ready to call your next witness?
24              MR. KILLINGER:  The Government calls Ashley Harding.
25              ASHLEY HARDING, GOVERNMENT'S WITNESS, SWORN
```

```
 1              THE COURTROOM DEPUTY:  State your name and spell your
 2    last name.
 3              THE WITNESS:  Ashley Harding, H-A-R-D-I-N-G.
 4              THE COURT:  Counsel may proceed.
 5                        DIRECT EXAMINATION
 6    BY MR. KILLINGER:
 7    Q.  Is it all right if I refer to you as Ashley during my
 8    direct examination?
 9    A.  Yes.
10    Q.  Can you tell us how old you are, please?
11    A.  I am 29.
12    Q.  Speak into the microphone so the Court Reporter can
13    understand everything you are saying.
14         Where were you born?
15    A.  I was born in Gainesville, Florida.
16    Q.  And where were you raised?
17    A.  Vero Beach.
18    Q.  What is your mother's name?
19    A.  Wilma Stevens.
20    Q.  Your father's name?
21    A.  James Stevens.
22    Q.  Have you ever been married?
23    A.  Yes.
24    Q.  When were you first married?
25    A.  I was first married in October of 2006.
```

```
 1    Q.  And who did you marry?
 2    A.  Chris Williams.
 3    Q.  Where were you living when you married Chris Williams?
 4    A.  In Vero.
 5    Q.  Did you and Chris have any children together?
 6    A.  Yes, we had two children, two daughters.
 7    Q.  What are their initials?
 8    A.  C.W. and H.W.
 9    Q.  When was C.W. born?
10    A.  C.W. was born in January of 2006.
11    Q.  And when was H.W. born?
12    A.  She was born in December of 2009.
13    Q.  Was Chris in the military when you married him?
14    A.  He was not in the military when I married him.  He joined
15    the military after we had already been married.
16    Q.  Okay.
17         And what branch of the military was that?
18    A.  The Army.
19    Q.  Did you eventually get a divorce from Chris Williams?
20    A.  Yes, I did.
21    Q.  When was that?
22    A.  I believe that was October of 2012.
23    Q.  And who had custody of C.W. and H.W. when you and Chris
24    were divorced?
25    A.  We shared custody, however, he was not in the states so I
```

USCA11 Case: 21-14133   Document: 42   Date Filed: 03/22/2023   Page: 124 of 155

```
 1   had the children the majority of the time.
 2   Q.  And when you were married to Chris, where did you live?
 3   A.  In Vero Beach.
 4   Q.  In a house or an apartment?
 5   A.  We went from an apartment to renting a house to owning a
 6   house.
 7   Q.  Okay.
 8       And what happened to that house after you and Chris
 9   divorced?
10   A.  It was originally foreclosed on.  Then we settled and sold
11   it and split the rest.
12   Q.  Did you get married after you and Chris divorced?
13   A.  Yes, I did.
14   Q.  Who did you marry?
15   A.  Michael Harding.
16   Q.  Do you see Michael Harding in the courtroom today?
17   A.  Yes.
18   Q.  Point him out, please.
19   A.  In the orange jump suit.
20           MR. KILLINGER:  For the record, she identified the
21   Defendant.
22           THE COURT:  The record so notes.
23   BY MR. KILLINGER:
24   Q.  When did you and Michael Harding get married?
25   A.  We got married in May of 2014.
```

```
 1   Q.  When did you first meet Michael Harding?
 2   A.  I met Michael in 2008, at a mutual friend's party.
 3   Q.  When did you and Michael Harding get closer together before
 4   you got married?
 5   A.  July of 2011.
 6   Q.  Where were you living when you first started dating Michael
 7   Harding?
 8   A.  In Vero.
 9   Q.  In the house?
10   A.  In the house a little bit and I moved back in with my
11   parents in Vero Beach as well.
12   Q.  That is where your parents live now?
13   A.  Yes.
14   Q.  You are living there with them now, aren't you?
15   A.  Yes.
16   Q.  Did you eventually move in with Michael Harding?
17   A.  I did.
18   Q.  When was that?
19   A.  I would say October 2011.
20   Q.  And when you moved in with Michael Harding, where were you
21   living?
22   A.  At an apartment in Ft. Pierce.
23   Q.  And where were C.W. and H.W. living?
24   A.  They were with me and also moved with me to the apartment
25   in Ft. Pierce.
```

```
 1   Q.  Did you and Michael Harding eventually get married?
 2   A.  Yes.
 3   Q.  I think you told us that.  That was May 31, 2014?
 4   A.  Correct.
 5   Q.  Where was Michael Harding working when you and your
 6   children first moved in with him?
 7   A.  The Ft. Pierce Police Department.
 8   Q.  And were you working?
 9   A.  Yes.
10   Q.  Where were you working?
11   A.  I was working in Vero Beach at a radiology facility as a
12   receptionist.
13   Q.  Who was taking care of C.W. and H.W. while you and Mr.
14   Harding worked?
15   A.  C.W. was in school, she would go there during the day.
16   H.W., my grandmother took care of her for a little bit and then
17   she went to a preschool in Ft. Pierce close to our apartment.
18   Q.  All right.  And you told us that Michael Harding was
19   working for the Ft. Pierce Police Department.  What kind of
20   hours did he work?
21   A.  He worked midnights.
22   Q.  What is the midnight shift, if you know?
23   A.  As far as I remember, 10:00 to 8:00, 10:00 p.m. to 8:00
24   a.m.
25   Q.  Who picked up C.W. from school?
```

```
 1   A.  On most cases, Michael did.
 2   Q.  And what kind of arrangement did you have for H.W. to be
 3   picked up when she was in preschool?
 4   A.  I would pick her up after I got off work in Vero.
 5   Q.  Michael didn't pick up H.W.?
 6   A.  Occasionally he did.
 7   Q.  Occasionally.  Who did it the most?
 8   A.  I did.
 9   Q.  Where was C.W.'s school in relation to the apartment where
10   you lived?
11   A.  C.W.'s school was about five minutes away.
12   Q.  What time did H.W. -- what time did the classes, I guess,
13   or school end?
14   A.  Preschool, any time after 3:00 you could pick them up,
15   until 6:30, but I would drop her off at 6:30 in the morning, so
16   I thought it made more sense to pick her up a little earlier.
17   That is a long day for a little kid.
18   Q.  And did you ask on occasion Michael Harding to pick up
19   H.W.?
20   A.  I did.
21   Q.  What was his response?
22   A.  Sometimes he would be okay with it, other times it was an
23   issue.  He often said she is just too difficult to deal with,
24   she is a difficult child.  We kind of agreed he would pick up
25   C.W., and I would pick up H.W.
```

**USCA11 Case: 21-14133   Document: 42**

```
1    Q.  About what time would Michael pick up C.W. from her school?
2    A.  When she got out at 3:00 o'clock, 3:15.
3    Q.  And from that 3:00 or 3:15, whenever they got home, until
4    you got home, was Michael Harding watching C.W.?
5    A.  Yes.
6    Q.  Now, did you and Mr. Harding eventually have a child
7    together?
8    A.  Yes, we did.
9    Q.  When did you get pregnant?
10   A.  I got pregnant in June 2014.
11   Q.  And when was your younger child, I guess at this point,
12   born?
13   A.  March 11, 2015.
14   Q.  You just have the three girls?
15   A.  Yes.
16   Q.  The younger one is a girl, right?
17   A.  Yes.  Yes.
18   Q.  Okay.
19       Now, did you and Michael Harding and your family, in
20   particular C.W. and H.W., move into a house?
21   A.  Yes, we did.
22   Q.  Where was that?
23   A.  That was in Port St. Lucie.
24   Q.  When did you move into that house?
25   A.  We moved into the house at the end of September, early
```

**Date Filed: 03/22/2023   Page: 125 of 155**

```
1    October of 2014.
2    Q.  And was Michael Harding still working for the Ft. Pierce
3    Police Department at that time?
4    A.  No.  He was working for Port St. Lucie.
5    Q.  When did he start working for Port St. Lucie?
6    A.  I want to say a year after we started dating, so, 2012.
7    Q.  What were his work hours when he worked at Port St. Lucie?
8    A.  At first, evenings, I think from 3:00 o'clock until 2:00
9    a.m., but then went back to midnight.
10   Q.  Was it the same house?
11   A.  Uh-hum.
12   Q.  10:00 to 8:00 a.m.?
13   A.  Yes.
14   Q.  Did you work full time when you were pregnant?
15   A.  I did.  Yes.
16   Q.  And again, what were your work hours?
17   A.  8:30 to five o'clock.
18   Q.  Was that Monday through Friday?
19   A.  Monday through Friday.
20   Q.  Now, did C.W. and H.W. have to change schools when you
21   moved from Ft. Pierce to Port St. Lucie?
22   A.  Yes, they did.
23   Q.  What arrangements did you and Michael have to pick the
24   children up at that point?
25   A.  Once we moved to Port St. Lucie, I was pregnant with our
```

```
1    daughter, and we moved to Savannah Ridge, Port St. Lucie, and I
2    picked them up at that point.
3    Q.  Was that an elementary school?
4    A.  Yes.
5    Q.  After your younger daughter was born, did you go back to
6    work?
7    A.  I did, in September, and I started working from home, which
8    is what I do now.
9    Q.  From March 2015 to September, you were not working?
10   A.  I was not working.
11   Q.  And were you at home all the time after that?
12   A.  Yes.
13   Q.  Did you notice any change in Michael's -- Mr. Harding's
14   behavior after your younger child was born?
15   A.  I did.
16   Q.  What was that?  Can you describe that?
17   A.  The best way I can describe it is more distance between he
18   and I in our relationship.
19       I felt more overwhelmed, now I had three children, and I --
20   distance is the best way I can describe it.
21   Q.  In addition to the fact that you were at that point home
22   all the time?
23   A.  Right.
24   Q.  Did Michael Harding take any time off from work when the
25   baby was born?
```

```
1    A.  He did.
2    Q.  How much time?
3    A.  I believe it came out to about two weeks.
4    Q.  So, you have known Michael Harding first as girlfriend,
5    fiancee' and his wife, since 2011?
6    A.  Yes.
7    Q.  And do you remember what day it was he got arrested?
8    A.  Yes.
9    Q.  When was that?
10   A.  September 23, 2015.
11   Q.  I want to ask you a few questions about Michael Harding's
12   drug use, including alcohol.
13   A.  Okay.
14   Q.  Did Michael Harding use drugs?
15   A.  As far as I know, he did have prescription drugs prescribed
16   to him.  I didn't feel that he was abusing them, I didn't
17   notice that he was abusing them.  He took them as prescribed.
18   Q.  Do you recall what kind of drugs they were?
19   A.  I know he had Klonopin for anxiety and hydrocodone as well
20   for headaches, and after his shoulder surgery, he was
21   prescribed them for the pain.
22       Like I said, as far as I knew, he took them the way he was
23   supposed to.
24   Q.  Did you feel that Michael Harding was abusing drugs,
25   prescription drugs?
```

USCA11 Case: 21-14133    Document: 42    Date Filed: 03/22/2023    Page: 126 of 155

1   A.  I did not.

2   Q.  Okay.

3       Did you feel Michael Harding was abusing alcohol?

4   A.  I did not.

5   Q.  Was he a good worker?

6   A.  As far as I know from his co-workers and everything, they

7   enjoyed working with him, he was well-known.

8   Q.  Would he usually call in sick or take time off, not want to

9   go to work?

10  A.  If he did, it was to spend time with the family.

11  Q.  How would you describe your relationship with Michael

12  Harding up to the time your younger child was born?

13  A.  Almost perfect.

14  Q.  Did there come a time you and Michael Harding got a camping

15  tent?

16  A.  Yes.

17  Q.  When was that?

18  A.  It was before the baby was born, maybe around

19  Christmastime, and the reason we got the tent is a lot of times

20  my dad would take my children out in his backyard and we would

21  go camping, and it is something they enjoyed.

22      Michael brought it home one day saying the new baby is

23  coming, so it would be a good idea to have that one-on-one time

24  with the girls so they don't feel left out.  It is hard with a

25  new baby coming.

1   Q.  Michael Harding was the one who purchased the tent?

2   A.  Yes.

3   Q.  Was this a new tent that he purchased or one he got from

4   your father?

5   A.  It was a new tent.

6   Q.  Do you remember what color it was?

7   A.  I would say dark red and gray, tan.

8   Q.  Did you and Michael Harding ever use that tent?

9   A.  He and I did not.  I was pregnant.  I didn't want any part

10  of camping.

11  Q.  How about Michael Harding with C.W. or H.W.?

12  A.  Yes.

13  Q.  Can you describe that to the Court?

14  A.  Yes, maybe on three occasions that I definitely know, it

15  would be weekends, and he wouldn't have to work, so he would

16  say, you know, let me do a camp out with the girls.

17      They wanted to do it, and they would set the tents up on

18  our back porch or our backyard, and we hooked up the laptop so

19  they could watch movies, and still kind of camp with

20  technology.  The girls seemed to enjoy it.

21      The younger one always came in around midnight.  She always

22  said she was afraid.

23  Q.  That was H.W.?

24  A.  H.W. would come in and get in bed with me.

25  Q.  And would C.W. spend the rest of the night in the tent?

1   A.  Yes, uh-hum.  There is one occasion when she didn't, and

2   she said it was just too hot outside.

3   Q.  Now, did you and Michael Harding have cell phones?

4   A.  Yes.

5   Q.  Did you each have your own cell phone?

6   A.  Yes.

7   Q.  Who was responsible for buying and hooking up the cell

8   phones?

9   A.  Michael was.

10  Q.  Did you have a computer in the house?

11  A.  Yes.

12  Q.  What kind of computer?

13  A.  MacBook Pro.

14  Q.  Just the one computer?

15  A.  Just the one.

16  Q.  Did you and Michael share that computer?

17  A.  Yes.

18  Q.  Did you ever use Michael Harding's cell phone?

19  A.  On occasion if I needed it, but I usually always had mine.

20  Q.  What was Michael Harding's attitude towards you using his

21  cell phone?

22  A.  That was off limits.

23  Q.  Off limits?

24  A.  He would always say I could go on there if I wanted.

25  Usually, if I grab for the phone, he would have to go on there

1   first even though I knew the pass code to get on.  It would

2   seem like he was hiding something which put me under the

3   impression that he was being unfaithful.

4   Q.  So, you thought maybe he was texting or talking to other

5   women?

6   A.  Right.  Which I looked into myself and never found anything

7   on that route.

8   Q.  Did you pretty much respect his privacy and his cell phone?

9   A.  I did.

10  Q.  And who was your service provider for the cell phone, do

11  you recall?

12  A.  AT&T.

13  Q.  Was there ever discussions or an issue about the amount of

14  data being used on the cell phones?

15  A.  Um-m-m, a little bit after the baby was born, I noticed

16  that the data, a lot of it had been used and that was a little

17  strange to me because I was always at home, so I would use

18  wifi.

19      When I talked to Michael about it, he would say with him

20  working midnights, if it is slow, or whatever, he would watch

21  movies.  It made sense.

22  Q.  Okay.

23      I would like you to think back to September 22nd, last

24  year.

25      What happened that day?

1    A.   That was the day he was arrested.

2    Q.   Were you at home?

3    A.   Yes, I was.

4    Q.   Can you describe for the Court what happened?  Was it early

5    in the morning?

6    A.   Yes.

7    Q.   Describe for the Court what happened.

8    A.   It was around the same time Michael would normally get off

9    work, and there were a few instances where he forgets his keys.

10   I heard a knock at the door and I told C.W. to let your dad in.

11   They refer to him as dad.

12        I told her to let your dad in, and Michael came in and

13   said, Ashley, I need you to come over here, and however many

14   agents followed him in.

15        I was currently getting the two daughters ready for school.

16   So, the agents kept us spread out around the house, were

17   looking in rooms, and to keep the girls calm, I kept getting

18   them ready, and H.W. remembers a letter being put on her door,

19   and it was a D, and I told her that is because you are the

20   daughter, D is for daughter, and then I took them to school.

21        I didn't really ask any questions, with the girls being

22   there, I had no idea what was going to be said.

23   Q.   Did the girls go to school that day?

24   A.   They did.

25   Q.   Who took them to school?

---

1    A.   I took them to school.

2    Q.   What did you do after you dropped them off?

3    A.   As soon as I dropped them off, I came back to the house and

4    tried to get as much information as I could.  I really had no

5    idea what was going on.

6    Q.   Did you have an opportunity to speak with Michael Harding

7    while he was still at the house?

8    A.   Yes, I did.

9    Q.   Okay.

10        What did you ask him, and what did he say?

11   A.   We went outside and I asked him what was going on, and he

12   basically says that he didn't want to involve me, but he has

13   had a problem since he was young, and when I asked him --

14   because I had known about -- before we went outside, I had

15   known what the agents were looking for, and I asked him, these

16   type of videos and things like that, how old are these -- is it

17   teen-agers, what is going on?  He was like, well, no, ten and

18   those type of ages.

19        At that point, it crossed my mind and I asked him if he

20   ever hurt the children in any way, and he said no, he loved

21   them.  He loved them more than anything, and he loved me and he

22   would never do anything to hurt them, and at the end of our

23   conversation, he just said, you are going to leave, you are

24   going to call your mom, you are going to leave and I am not

25   coming back.

---

1    Q.   And at some point, did the agents take him away?

2    A.   Yes.

3    Q.   And what did you do after that?

4    A.   I called his mother and I called my mother for them to come

5    over.

6        I didn't want to go over what was going on over the phone,

7    I asked them to meet at the house so we could talk about what

8    was going on.

9    Q.   Okay.

10       Now, did Michael Harding have guns in the house?

11   A.   Yes.

12   Q.   Okay.

13       In addition to a service revolver?

14   A.   Yes.

15   Q.   How many guns, do you know?

16   A.   I can guess about five.

17   Q.   And were these guns in cases?

18   A.   Yes.  As far as I know, they were in cases up high because

19   we did have the children.

20   Q.   Okay.

21       And where were the guns -- well, strike that.

22       When the agents went through and searched your house, they

23   took some things and moved things around?

24   A.   Right.

25   Q.   Where were the guns after they finished searching the

---

1    house?

2    A.   After they finished searching, they were laid out on my

3    sink in the master bedroom.

4    Q.   On the vanity?

5    A.   Yes.

6    Q.   What happened to the guns?

7    A.   Those guns, we were told they were all checked out,

8    unloaded, and saved.  We bagged them up and brought them along

9    with a lot of my other belongings to my house.

10   Q.   And who helped you bag them up?

11   A.   My dad and my mom.

12   Q.   So, whatever guns were left in the house were taken over to

13   your mom and dad's house?

14   A.   We put everything in the garage to go through.  Eventually,

15   we were trying to get everything out of the house.

16   Q.   Did your mom or dad or you say anything on the 22nd of

17   September about the tent?

18   A.   Yes.  My dad asked me if I wanted him to grab the tent, and

19   I said that is irrelevant, I don't care about the tent,

20   whatever, just get the stuff we need, and we can always come

21   back.  Let's get over there, get the girls stable.  I told him,

22   don't worry about it.

23   Q.   All right.  Again, another question on the tent.

24       What kind of bedding or pillows or what did they sleep on

25   when they were inside the tent?

1    A.  We had a lot of comforters, and one of the comforters was

2    like the oldest one, so they would use that to put over other

3    blankets as cushioning to sleep on.

4    Q.  Now, who picked up H.W. and C.W. from school on the 22nd?

5    A.  I did.

6    Q.  Did you have any conversations with them?

7    A.  I did.

8    Q.  What did you tell them?

9    A.  In the car ride home I told them -- we were still referring

10   to him as dad -- I said your dad is in trouble, he was doing

11   something he shouldn't have been doing, and he is going to have

12   to go to jail, but we are going to be okay, and we are going to

13   go over to my parents' house and everything will be fine, and

14   they started crying.  They were very upset.

15   Q.  Now, did you talk to the girls together or kind of

16   separately?

17   A.  At that point in the car, that is all I said in the car to

18   them.

19   Q.  That was the conversation in the car?

20   A.  Right.

21   Q.  How about when you got back to the house, did you have

22   further conversation with them?

23   A.  Yes, I took C.W. into her room, because she was older, I

24   explained to her, I said your dad had pictures of people

25   inappropriately without their clothes on, and some of them were

1    kids, and some of them were kids that are close to your age.

2         I said, did you ever get that feeling in your stomach like

3    a weird feeling, did you ever feel uncomfortable ever around

4    your dad?  And she said, yes, all the time.  And then she got

5    hysterical, and after I calmed her down, I told her, you know,

6    you can tell me anything, and that is when she started

7    describing to me a few things that had happened between Michael

8    and her.

9    Q.  And did you ask, or did she tell you why she hadn't told

10   you about this before?

11   A.  She was afraid.

12   Q.  Did you have any discussions privately with H.W. on the

13   22nd?

14   A.  Not with -- no, I did not.

15   Q.  And on the 22nd of September, 2015, how old was H.W.?

16   A.  H.W. was five.

17   Q.  And C.W.?

18   A.  Nine.

19   Q.  What were some of the things that C.W. did tell you on the

20   22nd?

21   A.  On that day she told me that when I would go take a nap

22   with H.W., that Michael would ask her to come in the living

23   room with him, or in the bedroom with him, and she said he

24   would take his clothes off and sit beside her.  And I said

25   okay, did anything else happen?  And at first, she was hesitant

1    and didn't want to say anything, but then she said he would

2    touch himself and ask her to touch him as well.

3         At that point, she said she would say no to him, and that

4    is all she really told me at that point.

5    Q.  Now, when C.W. told you these things, what was your

6    reaction, or how did you react, what did you do?

7    A.  Well, I walked out of the room calmly and then I went

8    hysterical, and I was screaming and crying and vomiting, and I

9    called Agent Rey because I didn't know what else to do, and she

10   was telling me things and I figured someone needed to interview

11   or intervene as soon as possible because she was opening up to

12   me.

13   Q.  Did you eventually get in contact or were you contacted by

14   a detective from the Port St. Lucie Police Department?

15   A.  Yes.

16   Q.  Who was that?

17   A.  Sheila LaGrega.

18   Q.  That same day?

19   A.  Yes.

20   Q.  That must have been late afternoon?

21   A.  Yes.

22   Q.  Or early evening?

23   A.  Yes.

24   Q.  What did you do after Sheila LaGrega got to your house?

25   A.  She spoke with me a little bit, I gave her a brief

1    description of what was going on and what (redacted) -- sorry,

2    C.W. had told me, and she explained to me that if it was okay,

3    that we would go back to the police station and do some

4    interviews and just see what the girls have to say.

5         And so, that is what we did.

6    Q.  Was that a pretty late night back at the police station?

7    A.  Yes, we were there for hours.

8    Q.  And did Detective LaGrega interview C.W. and H.W. that

9    night?

10   A.  Yes, she did.

11   Q.  Were you present when she was interviewing the children on

12   the 22nd?

13   A.  I wasn't present in the room with C.W.  With H.W. I was.

14   Q.  Now, at some point after September 22nd, and after the

15   first interviews, did C.W. or H.W. come to you and tell you

16   other things about what Michael Harding had done to them?

17   A.  Yes.

18   Q.  Do you recall when that was?

19   A.  Um-m-m, I know it was part of that same week, maybe the

20   weekend, but I had explained to the girls that if anything came

21   up, just come talk to me and I will call Sheila, and we can

22   talk about it.

23        You know, sometimes you might remember things, especially

24   to the younger one -- I'm sorry, I am trying to think --

25   Q.  Let me ask you a question.

```
 1        That was sometime after the 22nd?
 2   A.  Right.
 3   Q.  You think it was after that weekend?
 4   A.  Yes.
 5   Q.  That would have been the 25th, 26th, 27th?
 6   A.  Uh-hum.
 7   Q.  And after any of these other disclosures were made to you,
 8   did you call Sheila LaGrega?
 9   A.  Yes.
10   Q.  When was that?
11   A.  Any time I heard anything or anything came up, I called
12   Sheila.
13   Q.  As a result of that, did you bring the two children in for
14   additional interviews?
15   A.  Yes.
16   Q.  Again, if you remember -- and if you don't, that is fine --
17   do you recall anything that H.W. specifically told you in
18   reference to what Michael had done to her on either the 25th,
19   26th or 27th?
20   A.  I'm trying to remember if she told me this one bit of
21   information on that day or if it was after that day because it
22   all kind of came together.
23        She --
24   Q.  Regardless of when it was, what did she tell you?
25   A.  She did say something about a time in the apartment that he
```

---

```
 1   was giving her a shower and she basically said that he made her
 2   touch him, and she explained it as he went to the bathroom on
 3   her and told her to clean it up before your mom gets here, and
 4   don't tell your mom.
 5   Q.  Did H.W. eventually provide information about anything that
 6   had to do with the tent?
 7   A.  Yes.
 8   Q.  Do you recall when that was?  Was that that same period?
 9   A.  Around the same time, yes.
10   Q.  What did she tell you about that?
11        MR. PEACOCK:  Your Honor, I object to the hearsay
12   nature of this line of testifying.
13        THE COURT:  Any response?
14        MR. KILLINGER:  Hearsay is admissible, Judge.
15        MR. PEACOCK:  It is admissible, but there is also a
16   confrontational issue.
17        THE COURT:  I will overrule the objection and allow
18   the testimony.
19        MR. PEACOCK:  The confrontation clause as well.
20        THE COURT:  Yes.
21        MR. KILLINGER:  It is difficult, I know this is
22   difficult, we already had testimony.
23   BY MR. KILLINGER:
24   Q.  Suffice it to say one of the incidents she talked to you
25   about had to do with the tent?
```

---

```
 1   A.  Yes.
 2   Q.  When you learned something may have happened involving that
 3   tent, what did you do?
 4   A.  The first thing I did is I contacted Sheila and also, at
 5   that same time, went back to the house to find the tent.
 6   Q.  Was it there?
 7   A.  No.
 8   Q.  And when you left the house on the 22nd of September, did
 9   you lock it?
10   A.  Yes.
11   Q.  Who had access to that house between September 22nd and the
12   time you went back to find the tent and found it missing?
13   A.  The only person besides myself was Michael's mom.
14   Q.  Do you know for a fact she did go to the house?
15   A.  I know she definitely went back to the house.
16   Q.  Now, was there ever any information that you learned that
17   had to do -- that involved a screwdriver?
18   A.  Yes.
19   Q.  Who did that involve?
20   A.  H.W.
21        MR. PEACOCK:  May I have a standing objection to this?
22        THE COURT:  Yes.
23   BY MR. KILLINGER:
24   Q.  And can you tell us about any incidents that happened at
25   your parents house when -- did you eventually start going
```

---

```
 1   through the boxes and bags of things?
 2   A.  Yes.
 3   Q.  Okay.
 4        Let's talk first about, did you find or did somebody show
 5   you a gun case that had some -- what I refer to as sex toys in
 6   it?
 7   A.  Yes.
 8   Q.  Who found that?
 9   A.  My mother.
10   Q.  Okay.
11        Did she ask you whether they were yours?
12   A.  Yes, she did.
13   Q.  Were they?
14   A.  No.
15   Q.  What were they?
16   A.  They were three small -- I want to say a vibrator, I don't
17   know what to refer to the other ones as, they were small, and I
18   believe two pink and one purple.
19        MR. KILLINGER:  May I approach the witness, Your
20   Honor?
21        THE COURT:  Yes.
22   BY MR. KILLINGER:
23   Q.  I show you what is in evidence as Government Exhibit 8?
24   A.  Yes.
25
```

```
 1   Q.  Do you recognize the items in that picture?
 2   A.  Yes.
 3   Q.  What is it?
 4   A.  The gun, gun case and sex toys.
 5   Q.  Is that Michael Harding's gun, or one of them?
 6   A.  Yes.
 7   Q.  So, what did you do, if anything, with those three items
 8   that you just identified after your mom and you found them?
 9   A.  I called Sheila, we zipped them back up, put them in a bag
10   and we took them to Sheila the first chance we could get.
11   Q.  Now, did there come a time when you and your children were
12   living back at your mom and dad's house in Vero that something
13   happened with a screwdriver?
14   A.  Yes.
15   Q.  What was that?
16   A.  We were all at the house.  My mom was going through boxes
17   that were in the garage, bringing them in, and a lot of the
18   tools that we had brought from my house to my parents' house
19   were kind of laid out.
20       This one specific tool, my mom just came in and she is
21   like, is this from your house, this screwdriver?
22       And H.W., in front of everyone, screamed and said that's,
23   that's what --
24       MR. PEACOCK:  Same objection.
25       THE COURT:  Overruled.
```

---

```
 1       THE WITNESS:  She said that's what daddy -- Michael
 2   used to hurt me with.
 3   BY MR. KILLINGER:
 4   Q.  And what did you do with the screwdriver?
 5   A.  Put it in a ziplock bag and brought it to Sheila.
 6   Q.  Let me show you Government Exhibit 14.
 7       Take a look at Government Exhibit 14 and tell me if you can
 8   identify what is depicted in the photograph.
 9   A.  Yes, that is the screwdriver that H.W. --
10       MR. KILLINGER:  I move Government Exhibit 14 into
11   evidence.
12       THE COURT:  Any objection?
13       MR. PEACOCK:  Relevance, based on the hearsay
14   objection I made before.
15       THE COURT:  Overruled.  14 is admitted.
16       (Whereupon Government Exhibit 14 was marked for evidence.)
17   BY MR. KILLINGER:
18   Q.  Is Exhibit 14 one of the screwdrivers, or one of the set of
19   tools that were at your house in Port St. Lucie?
20   A.  Yes, those were only ours.
21   Q.  Now, Ashley, did there come a time when Agent Rey contacted
22   you and told you that he would like you to look at a particular
23   image?
24   A.  Yes.
25   Q.  Okay.
```

---

```
 1       And did you look at that image?
 2   A.  I did.
 3   Q.  Where was that?
 4   A.  At the Homeland Security in Ft. Pierce.
 5   Q.  And was Agent Rey present?
 6   A.  Yes, he was.
 7   Q.  I am going to show you very briefly -- you don't have to
 8   look at it if you don't want, it is already in evidence --
 9   Government Exhibit 9.
10       Is that the image you looked at?
11   A.  Yes.
12   Q.  Is that C.W.?
13   A.  Yes, it is.
14   Q.  Do you recognize Michael Harding's penis in that picture?
15   A.  I do.
16   Q.  Ashley, if you could take a minute, as long as you are here
17   on the witness stand, would you tell the judge how these
18   incidents have changed your life and your children's life and
19   your mother's life?
20   A.  I wrote something.  Am I able to read that or just a
21   brief --
22   Q.  Um-m-m, you can read it now or you can allocute later on.
23   If she has it --
24       THE COURT:  If you are comfortable reading it now,
25   that is fine.
```

---

```
 1       THE WITNESS:  Okay.  It is kind of long.
 2       THE COURT:  Okay, take your time.
 3       THE WITNESS:  All right --
 4       THE COURT:  Is it easier for you to stand there and
 5   look at me or are you okay?
 6       THE WITNESS:  I am okay.
 7       I wanted to speak today on behalf of my children and
 8   to explain why I ultimately feel Michael Harding should spend
 9   the rest of his life in prison.  When Michael and I began our
10   relationship, I was a single mother with two young daughters.
11   Michael seemed like the perfect partner and father figure.  He
12   gained my trust with ease and showed his affection, care and
13   love for my daughters.
14       He always talked about wanting a big family and he
15   helped to support my girls and I.  We eventually got married
16   and had our first child together.  We had the ideal family and
17   complete relationship, or that is what I thought.
18       When Michael came home that day in September
19   accompanied by Homeland Security I had no reason to ever
20   speculate that he could have hurt my children in any way.  I
21   was in shock and --
22       (Pause.)
23       I was in shock and couldn't fathom what could have
24   possibly happened.  I married this man thinking he was the
25   perfect father, friend and partner.  But as the day went on, I
```

1  was beginning to realize I had been sharing my life with a
2  monster.  My daughters, along with myself, have done nothing to
3  deserve what he has put my family through.
4       Michael was the provider for our household.  We lost
5  everything.  The material possessions serve no value to me,
6  it's the loss of trust and the arrival of fear that we have had
7  to experience since this has come to light.
8       Both of my daughters, along with myself, are in
9  therapy and will need to continue this healing process.  He
10  ruined the definition of trust.
11       My daughters are in constant fear of everyone,
12  especially men and police officers.  They sleep with me many
13  nights after having nightmares and being too afraid to sleep.
14  He ruined many years of my daughters' childhood and stole their
15  innocence that can never be replaced.  They will be affected by
16  Michael's actions for the rest of their lives.
17       He left my daughter with the only vision of a father
18  is that of someone who uses them and hurts them, someone that
19  isn't safe.  My youngest daughter will grow up without a father
20  as well.
21       Michael used his position as a police officer to abuse
22  and exploit children.  He used this power to gain respect and
23  trust and to further hide his true demeanor.  He had a sick
24  plan and he targeted me as a single mother.
25       People that are no longer in my life and daughters'

---

1  life are the result of Michael Harding's actions.  Those
2  people, the ones supporting Michael, the ones that called my
3  daughters liars, these people will never ever get close to my
4  children.  They will never get the opportunity to get to know
5  my daughters.  Supporting this man who he preyed on my children
6  is disturbing.
7       My worst nightmares are real.  I live with unbearable
8  guilt that I could not fulfill the duty I had as a mother which
9  was to protect my children and to keep them from being harmed.
10  He tried to destroy the special bond that I share with my
11  daughters.  Our lives have been turned upside down and will
12  never be the same again.
13       Michael Harding was fully aware and is still aware of
14  his actions.  I do not believe for one second he had any doubt
15  about what he was doing.  He passed numerous polygraphs and
16  psych exams.  He is a monster and he should have to spend the
17  rest of his life behind bars without an opportunity to ever
18  abuse or take away anyone else's innocence.  He stole something
19  from my children and my family that can never be replaced.
20       MR. KILLINGER:  No further questions.
21       THE COURT:  Thank you.  Any cross-examination?
22       MR. PEACOCK:  One minute, Your Honor.
23       THE COURT:  Okay.
24       MR. PEACOCK:  Briefly, Judge.
25       THE COURT:  Okay.

---

1       MR. KILLINGER:  Judge, may I approach the witness
2  briefly?
3       THE COURT:  Yes.
4            CROSS-EXAMINATION
5  BY MR. PEACOCK:
6  Q.  Do you need to take a break?
7  A.  I am okay.
8  Q.  You are okay.  If you do, just let me know.
9       I am going to ask you a few things about what you testified
10  here so we can clarify those matters.
11       You indicated that Michael didn't like to pick up H.W. from
12  day care?
13  A.  Correct.
14  Q.  How old was she during this time period?
15  A.  She was anywhere from four, five, six.
16  Q.  Okay.
17       Often Michael would -- this would be after one of his
18  shifts as a police officer; is that right?
19  A.  Right, after he would get off in the morning.
20  Q.  And he often would want to sleep after his shift as a
21  police officer, correct?
22  A.  Correct.
23  Q.  And H.W. couldn't be left alone by herself because she was
24  so young, correct?
25  A.  No, not by herself, but with her sister being present, and

---

1  only having about an hour before I got home, they were fine
2  together.
3  Q.  No, I understand, but one of the reasons he wasn't
4  comfortable was going to sleep and leaving them alone, that is
5  one of the reasons he didn't want to have H.W -- to pick her
6  up?
7  A.  When I would return home and he had C.W., he was always
8  wide awake.
9  Q.  So, he didn't sleep after he got home from his shift?
10  A.  I'm sure he did.  As far as I know, when I got home, he was
11  wide awake with C.W.
12  Q.  Never sleeping?
13  A.  Occasionally.
14  Q.  Now, you indicated you didn't know that Michael was abusing
15  pills; is that right?
16  A.  As far as I know, he didn't look like he was abusing pills.
17  Q.  Did you know he was using marijuana?
18  A.  Yes, I did.
19  Q.  And that is not legal, correct?
20  A.  Correct.
21  Q.  Was he abusing marijuana?
22  A.  If that is the definition, I guess that would be correct.
23  Q.  Did you use marijuana with him?
24  A.  I have before, yes.
25  Q.  More than one time, correct?

1 A. Yes.
2 Q. How about prescription pills, did you use those with him?
3 A. I have before, yes.
4 Q. More than one time?
5 A. Yes.
6 Q. That would be abuse, wouldn't it?
7    Were you using them for a medical condition?
8 A. No.
9 Q. And how about alcohol, he was using alcohol, a fair amount,
10 before the time he was arrested, correct?
11 A. Socially?
12 Q. Yes.
13 A. Maybe once a week, twice a week.
14 Q. Sometimes drinking to excess?
15 A. I guess, if you --
16 Q. Now, after the search -- that was the 22nd?
17 A. Yes.
18 Q. After the search on the 22nd, you left the house, correct?
19 A. I did.
20 Q. And you went to your parents' place I think you said?
21 A. Right.
22 Q. Now, at some point, though, you came back to the house,
23 right?
24 A. Right.
25 Q. And you were understandably upset?

1 A. Yes.
2 Q. And you got a bunch of his possessions and threw them in
3 the pool, correct?
4 A. Yes.
5 Q. In fairness, it was a crazy time?
6 A. Yes.
7 Q. You weren't trying to keep track of the tent in the garage
8 at the time, correct?  That wasn't your primary concern, was
9 it?
10 A. No.
11 Q. At that point, you probably didn't even know you had a tent
12 in the garage?
13 A. I did know we had a tent in the garage.
14 Q. Well, you weren't thinking about it, right?
15 A. Not at that moment.
16 Q. And you don't know what happened to the tent?
17 A. I know the tent was in the garage, and when I returned, the
18 tent was not in the garage.
19 Q. Well, there were a lot of things that were taken out of the
20 house, weren't there?
21 A. Yes.  Items that I knew about.
22 Q. Okay.
23    When was the last time the tent was used?
24 A. The last time the tent was used was the day before -- let's
25 see, April 10th of 2015.

1 Q. The day before April 10?
2 A. No.  I was going to say the day before I had to take our
3 younger daughter in and realized she had to have heart surgery,
4 that was the last time the tent was used.
5 Q. How often had it been used before that?
6 A. Maybe three, four times.
7 Q. And it was purchased when?
8 A. It was purchased right before Christmas, or right after
9 Christmas.
10 Q. But it wasn't used between April and September?
11 A. No.
12 Q. Now, at some point, Detective LaGrega came back to the
13 house and searched for knives and tools, correct?
14 A. Right.
15 Q. And didn't find any, right?
16 A. Correct.
17 Q. Were you with her?
18 A. Yes, I was.
19 Q. Is it your testimony that those tools had been moved from
20 the house before that?
21 A. Yes.
22 Q. And you told her that right then and there, correct?
23 A. I did, but I also told her we had a common junk drawer in
24 the kitchen.  I said we could always look in there.  I didn't
25 think to look in there before, it was a drawer we tossed

1 everything in.
2 Q. So, then, did you and Detective LaGrega -- where had the
3 knives and screwdrivers been moved to, your parents' house?
4 A. Yes.
5 Q. Did you and Detective LaGrega go to your parents' house and
6 get the screwdrivers and knives?
7 A. No, we did not.
8 Q. Why not?
9 A. I'm not sure.
10 Q. You told her right then and there, though, correct, that
11 the screwdrivers were at your parents' house?
12 A. Right.
13 Q. She didn't want to go get them?
14 A. Maybe I told her I would bring them to her.  No, she did
15 not come to my house to get them.
16 Q. When was this, right after the 22nd?
17 A. Sometime thereafter.
18 Q. Within a week?
19 A. Within a week.
20 Q. And so, did you go to your parents' house and get the tools
21 and knives and take them to Detective LaGrega?
22 A. Yes, I got everything that we spoke about.
23 Q. When did you do that?
24 A. I'm not really sure.
25 Q. Was it within a month after this?

1    A. It was before within a month.

2    Q. Okay.

3       And did Detective LaGrega give you those items back?

4    A. No. She has them all.

5    Q. Yet it was your testimony that H.W. identified the

6    screwdriver?

7    A. Let me back up here.

8       H.W. identified the screwdriver at my house. That next day

9    I brought that to Sheila LaGrega.

10   Q. Okay.

11      What she was looking for in the house was, in H.W.'s

12   interview, she mentioned something about a knife. That is when

13   I brought Sheila LaGrega over to my house to see what she was

14   talking about.

15      At that point, H.W. had not said anything about that

16   screwdriver. That happened after the fact. That is why Sheila

17   would not go to my parents' house, that wouldn't make any

18   sense.

19   Q. Okay.

20      Just so we are clear, when was the incident when H.W.

21   identified the screwdriver?

22   A. That was maybe two weeks after all of this, after she had

23   already had interviews with Sheila.

24   Q. Now, when was it that Detective LaGrega and yourself

25   searched the house for the tools and the screwdriver?

---

1    A. I would say maybe a few days after the interview she said

2    that (redacted) -- sorry, H.W. drew a picture of a knife and a

3    screwdriver.

4       At that point, H.W. hadn't said anything about it. She had

5    just drew those.

6    Q. You were there when H.W. did that?

7    A. I was not there when she actually drew that picture. I was

8    there for most of the interview. There were times when I

9    stepped out.

10   Q. And when was that interview?

11   A. There were a couple of interviews. There was one on the

12   22nd.

13   Q. When was the next one?

14   A. Maybe a few days after that. I believe there were three in

15   total.

16   Q. Were they all at the Port St. Lucie police station?

17   A. Yes.

18   Q. Were you present for all three interviews of H.W.?

19   A. Yes, I was present, but I wasn't always in the room with

20   her.

21   Q. Now, did you see those drawings that night?

22   A. Briefly, I did see those drawings.

23   Q. That was on the 22nd?

24   A. Yes. I believe so.

25   Q. And you saw one of the drawings was of a screwdriver?

---

1    A. I did, but I didn't -- it is a kid's drawing. I knew we

2    had most of the stuff at my house. I just figured we did leave

3    some stuff at my old house, so I told her we could go over

4    there and see what we have. She could take whatever she

5    thought might be relevant.

6    Q. But she didn't want to do that?

7    A. She didn't see anything that was --

8    Q. Now, you said you went -- you took the screwdriver to

9    Detective LaGrega after H.W. made that spontaneous comment?

10   A. Right.

11   Q. And when was that? Do you know the date?

12   A. I don't know the date exactly. This was all a big --

13   Q. Right, I understand.

14      Can you estimate?

15   A. I would say it was probably a week after all of this

16   happened.

17   Q. A week after, okay.

18       MR. PEACOCK: Thank you, ma'am.

19       THE COURT: Anything further?

20       MR. KILLINGER: If I may, Your Honor, I want to look

21   at one of the exhibits for redirect.

22              **REDIRECT EXAMINATION**

23   BY MR. KILLINGER:

24   Q. Ashley, you said on one of the interviews that H. W. drew

25   pictures, you looked at them briefly?

---

1    A. Yes.

2    Q. And is that -- at the time the pictures were drawn, you

3    referenced she also drew pictures of a screwdriver?

4    A. Yes.

5    Q. Is that the first time you had any idea a screwdriver might

6    have been involved?

7    A. Yes. She didn't mention anything else about it, she just

8    drew it. It wasn't until that night that she came out with it.

9    Q. I am going to show you what is in evidence as Government

10   Exhibits 5, 6 -- 3, 5 and 6, and ask you to take a look at

11   Government Exhibit 5.

12   A. Okay.

13   Q. What is the date on the top of that piece of paper there?

14   A. September 29, 2015.

15   Q. So, the 29th of September?

16   A. Okay.

17   Q. All right. Is there a picture or one or more pictures of a

18   screwdriver in those drawings?

19   A. Can I go through them?

20   Q. Yes.

21   A. Okay, I'm sorry. I'm guessing this would be it. I mean --

22   yes, I see the knife and that looks like it would be a

23   screwdriver.

24   Q. Okay.

25       H.W. -- is that her drawing? That is her handwriting?

1    A.   Yes.

2    Q.   That is not C.W.?

3    A.   No.

4    Q.   All right.  Now, was it before, if you know, was it before

5    or after the 29th, that Detective LaGrega came over to your

6    house and was looking through your junk drawer at various

7    things?

8    A.   I'm going to say it is after because looking at the

9    drawings, I'm guessing that is why she wanted to come over, to

10   see if she could see anything that the girls drew.

11   Q.   Now, after you -- after the incident happened at your

12   parents' house with H.W. regarding the screwdriver, did you

13   also take down to Detective LaGrega one of the comforters,

14   whatever it was that you described they used in the tent?

15   A.   I did.  Mainly because maybe the print would show up on a

16   photograph if a photograph was taken or something, and I didn't

17   have the tent to present.  I did, I brought that down to her as

18   well.

19   Q.   All right.

20        MR. KILLINGER:  Nothing else, Judge.

21        THE COURT:  Okay, all right.  Thank you very much, you

22   may step down.

23        The Government still has Mr. Walker, 15 minutes

24   direct, no cross, and Mrs. Stevens --

25        MR. KILLINGER:  Your Honor, the Government is not

1    going to call Mrs. Stevens.

2        THE COURT:  Is Mr. Walker going to be called?

3        MR. FUNK:  He will, he will be brief.  May we call him

4    now?

5        THE COURT:  Yes.  That is the Government's last

6    witness?

7        MR. FUNK:  It is.

8        MR. PEACOCK:  Your Honor, I don't anticipate cross.

9    In the event something comes up --

10       THE COURT:  That is fine.

11       WAYNE WALKER, GOVERNMENT'S WITNESS, SWORN

12       THE WITNESS:  Wayne Walker, W-A-Y-N-E, W-A-L-K-E-R.

13                    **DIRECT EXAMINATION**

14   BY MR. FUNK:

15   Q.   Where do you work?

16   A.   I am employed with the Indian River Crime Lab.

17   Q.   How long have you been employed there?

18   A.   I started in October 2014.

19   Q.   What do you do for them?

20   A.   I am a criminologist in the biology section.

21   Q.   What does it mean to be a criminologist and what are your

22   duties?

23   A.   I examine evidence for blood, semen or saliva.  I try to

24   develop a DNA profile.  I compare it to any known standards I

25   have.  If I have matches, I perform a statistic, how common or

1    rare that profile is, and I write a report of my results, and

2    if need be, testify.

3    Q.   How many years have you been doing that?

4    A.   Prior to being employed with the Indian River Crime Lab, I

5    was with the Florida Department of Law Enforcement for seven

6    years.  The first year and a half I was a forensic -- I was

7    cleaning the lab ordering products, and then I was a crime

8    analyst, basically the same as a criminologist.

9        It was a year and a half training program, and a crime

10   laboratory analyst doing case work for four years.

11   Q.   Did you do any case work on United States of America versus

12   Michael Harding?

13   A.   Yes, I did.

14   Q.   What did you do in that case, generally?

15   A.   I examined some pieces of evidence and compared it to

16   standards that I was given.

17   Q.   Did that include a sex toy or sex toys, as well as a

18   blanket submitted for your evaluation?

19   A.   Yes.

20   Q.   Did you do a comparison between a standard of C.W. and sex

21   toys that were located -- that were located by law enforcement?

22   A.   Yes, I did.

23        MR. FUNK:  May I approach the witness?

24        THE COURT:  Yes.

25

1    BY MR. FUNK:

2    Q.   I am going to show you what is Exhibit Number 7.  Do you

3    recognize what that is?

4    A.   Yes, I do.

5    Q.   What is it?

6    A.   This was our Exhibit Number 16, which was two oral swabs.

7    Q.   Who were the oral swabs from -- let me ask the leading

8    question.  Were the oral swabs from an individual named C.W.?

9    A.   Yes, they are.

10   Q.   Was it those swabs which you used to compare to DNA found

11   on pieces of evidence in the case?

12   A.   Yes.

13   Q.   Did some of that evidence include sex toys?

14   A.   Yes, it did.

15       MR. FUNK:  Your Honor, I am going to show defense

16   counsel what is marked Government Exhibit 15.

17       MR. KILLINGER:  Your Honor, that is going to be added

18   to the exhibit list.

19       THE COURT:  Yes, I see that.

20       MR. FUNK:  May I approach the witness?

21       THE COURT:  Yes.  What is 15?

22       MR. FUNK:  15 is an image of sex toys.

23       THE COURT:  Okay.

24       MR. FUNK:  For the record, I am showing the witness

25   what is marked Government Exhibit 15.

1     *THE COURT:* Okay.

2 BY MR. FUNK:

3   *Q.* Do you recognize this?

4   *A.* Yes, I do recognize this photo.

5   *Q.* What is that?

6   *A.* This is a photo of what is our Exhibit 001 of the sex toys.

7   *Q.* Were you able to find a complete DNA profile on the tip of

8 the pink butt plug, as described in your report?

9   *A.* Yes, I did.

10   *Q.* What does it mean to be a complete female DNA profile?

11   *A.* So, of all of the areas of the DNA, we are testing 15 areas

12 and I developed markers at all 15 of the areas, and the profile

13 was consistent with being a female profile.

14   *Q.* Were you able to compare DNA taken from that sex toy to

15 C.W.'s standard?

16   *A.* Yes, I did.

17   *Q.* What was the conclusion you had as to whether or not they

18 were from the same individual?

19   *A.* They did match, they are from the same individual, and to a

20 reasonable degree of scientific certainty, in the absence of

21 identical twins, C.W., who is our 16, is the source of the DNA

22 profile obtained from the tip of the pink plug.

23   *Q.* Did you do any DNA analysis of a blanket that was

24 submitted?

25   *A.* Yes, I did.

---

1   *Q.* Were you able to get a profile from the blanket?

2   *A.* Yes, I did.

3   *Q.* What kind of cells were there found on the blanket?

4   *A.* There were three stains that were semen stains, and it was

5 from two of the three stains in the sperm cell fraction of the

6 samples I took, I developed a male DNA profile.

7   *Q.* Was there ever a standard of Michael Harding submitted to

8 the lab?

9   *A.* No, there was not.

10   *Q.* Were you able to compare the semen stain, DNA profile from

11 the semen stain to DNA that was obtained from the sex toys?

12   *A.* Yes, I did.

13   *Q.* What was the conclusion you drew from that comparison?

14   *A.* There was a -- from the control of the purple vibrator I

15 obtained a partial profile, and this was consistent with the

16 sperm cell fraction found in stains A and B.

17   *Q.* Did you produce a statistic with regard to that conclusion?

18   *A.* I did not.

19   *Q.* Do you know the probability that there would be between

20 those being from the same person?

21   *A.* Not just off the top of my head.

22   *Q.* But are they consistent with being the same person?

23   *A.* Yes, they are.

24     *MR. FUNK:* That is all I have.

25     *MR. PEACOCK:* I object to that last conclusion.  There

---

1 is not a foundation laid that this witness can make that

2 determination.

3     *THE COURT:* I will allow you, if you want, to

4 cross-examine on that issue.

5     *MR. FUNK:* Thank you, Your Honor.

6     *THE COURT:* Okay.  Do you want to cross-examine?

7     *MR. PEACOCK:* Yes, ma'am.

8     *THE COURT:* Okay.

9         **CROSS-EXAMINATION**

10 BY MR. PEACOCK:

11   *Q.* How many points of comparison did you find between the

12 blanket stain and the sex toy?

13   *A.* Nine areas.

14   *Q.* Nine areas.

15   That is not enough for you to make a conclusion, is it?

16   *A.* It is enough for me to say they are consistent, the nine

17 areas are the same.

18   *Q.* There is quite a few more than nine areas, correct, that

19 you normally look for to make a comparison?

20   *A.* We test 15, and if I had a standard, I would do that

21 comparison too.

22   *Q.* You need 15 just to be valid, correct?

23   *A.* No.  Even if I had one area, if I had a standard, I could

24 give a statistic for what the frequency of that match would be.

25   *Q.* Okay.

---

1     You don't have any frequency here today?

2   *A.* No.

3   *Q.* And you were not asked to determine one?

4   *A.* No.  I never got a standard to do any type of testing to do

5 that comparison.

6   *Q.* As we sit here today, you can't give the Court any

7 statistical odds on this comparison, can you?

8   *A.* For this one, no.

9   *Q.* All you can say is that there are some markers that are

10 consistent between the two?

11   *A.* That is correct.

12   *Q.* And that happens frequently in DNA analysis, correct?

13   *A.* It really depends, but, yes.  So, some markers can be, but

14 as you continually test different areas and do more

15 comparisons, just the random chance of them being the same is

16 less, less, less, less.

17   *Q.* That wasn't done in this case, correct?

18   *A.* Correct.

19     *THE COURT:* Anything further?  Redirect.

20         **REDIRECT EXAMINATION**

21 BY MR. FUNK:

22   *Q.* What is the statistical calculation for the comparison

23 between C.W.'s standard and that of the profile that was

24 located on the tip of the sex toy?

25     *MR. PEACOCK:* That is outside the scope of cross.  We

1  were comparing the blanket stain with the sex toy stain.  We

2  did not cross regarding the C.W. comparison.

3      THE COURT:  I sustain the objection.

4      MR. FUNK:  Your Honor, that is all the questions,

5  thank you.

6      THE COURT:  All right.  Thank you very much, you may

7  step down.

8  So, the Government has now presented all of its

9  witnesses?

10     MR. FUNK:  Yes.

11     THE COURT:  Is the defense calling Julie Harding and

12 Elizabeth Perry?

13     MR. PEACOCK:  Yes.  I would appreciate a break.

14     THE COURT:  We will take a break.  All right.  So,

15 would an hour break be sufficient for everyone?  We will be

16 back at 1:30.

17     MR. FUNK:  Yes, Your Honor.

18     THE COURT:  We will be in recess until 1:30.

19 Do we have all Government exhibits up there?

20     MR. KILLINGER:  Yes, Your Honor.

21     THE COURT:  Okay.

22     MR. KILLINGER:  Except the DVD with the child

23 pornography.

24     THE COURT:  Okay.

25     *(Thereupon, a short recess was taken.)*

1      THE COURT:  All right.  You may be seated.  Okay.

2  We will now hear from the defense witnesses.  Who

3  would you like to call first?

4      MR. PEACOCK:  That will be Julie Harding, Your Honor.

5  Before we do that, I would like to renew the motion to

6  seal the exhibits in the case.

7  There won't be any defense exhibits.  I think all the

8  exhibits are in.

9      THE COURT:  Right.  I thought a motion had been filed.

10     MR. KILLINGER:  Docket Entry 100, the order.

11     MR. PEACOCK:  We are good to go.  They are sealed.

12     MR. KILLINGER:  I may have to duck out of here.  Mr.

13 Funk is capable of concluding the hearing.  It is an

14 appointment that I have to keep.

15     THE COURT:  Thank you for letting me know.

16     JULIE HARDING, DEFENSE WITNESS, SWORN

17     THE COURTROOM DEPUTY:  State your name and spell your

18 last name, please.

19     THE WITNESS:  I am Julie Harding, H-A-R-D-I-N-G.

20     THE COURT:  Okay.

21              **DIRECT EXAMINATION**

22 BY MR. PEACOCK:

23 Q.  Mrs. Harding, do you know Michael Harding?

24 A.  Yes.  He is my son.

25 Q.  And is he your son by birth?

1  A.  I gave birth to him, yes.

2  Q.  When was that?

3  A.  December 9, 1987.

4  Q.  Where did you give birth to Michael?

5  A.  Hollywood, Florida, Memorial Hospital.

6  Q.  Now, did Michael ever know his father?

7  A.  No, sir.  His father was murdered when I was six months

8  pregnant.

9  Q.  Where were you?

10 A.  I was living in Manhattan and his father was murdered in

11 Queens.

12 Q.  After that time, did you remain in New York?

13 A.  I did not.  I came back eight months pregnant to Hollywood,

14 Florida.

15 Q.  Where you said you had him in Hollywood?

16 A.  Yes, sir.

17 Q.  Now, during that period of time, were you the sole source

18 of support financially for Michael?

19 A.  I was, sir, yes.

20 Q.  Were you also raising him as a single parent?

21 A.  Yes, I was.

22 Q.  So, you were working during that time period?

23 A.  Yes, sir.

24 Q.  And what occupations did you have during that time period?

25 A.  I worked in the day, office jobs, and in the evening,

1  bartending, and the weekends.

2  Q.  And you bartended.  What type of enterprise did you bartend

3  in?

4  A.  Gay clubs and strip clubs in Miami and Fort Lauderdale.

5  Q.  Did that involve long hours?

6  A.  Extremely long.

7  Q.  Would you get home very, very late or in the early morning

8  hours?

9  A.  Yes, sir.

10 Q.  Working two jobs like that, were there times when you

11 weren't able to come home at all?

12 A.  Yes, sir.

13 Q.  When you had to leave to work, where would you leave

14 Michael?

15 A.  Various friends.

16 Q.  Would you sometimes leave him overnight?

17 A.  Yes, sir.

18 Q.  Often?

19 A.  Yes, sir.

20 Q.  Would you sometimes leave him for days at a time?

21 A.  Yes, sir.

22 Q.  Was this from the time that he was an infant?

23 A.  Yes, sir.

24 Q.  Was this something you had to do to preserve your home?

25 A.  Working two jobs, yes.  Not leaving him for days at times,

```
 1   no.
 2   Q.  Let's say between the times when Michael was one and ten,
 3   did you struggle with drug addiction?
 4   A.  Yes, sir.
 5   Q.  What types of drug addiction did you struggle with?
 6   A.  Cocaine.
 7   Q.  Did that affect your ability to take good care of Michael?
 8   A.  The weekends were the worst for me.  During the week I got
 9   up and took him to school, organized sports.  During the
10   weekend is when I felt it.
11   Q.  This is when you would be absent?
12   A.  Yes.
13   Q.  This is during the time you worked two jobs?
14   A.  Yes.
15   Q.  Did you also struggle with alcohol?
16   A.  Yes, they went hand in hand.
17           THE COURT:  What did you say?
18           THE WITNESS:  They went hand in hand, alcohol and
19   drugs.
20   BY MR. PEACOCK:
21   Q.  What time period did you struggle with addiction?
22   A.  My addiction, probably 15 years old.
23   Q.  Lasting until when?
24   A.  I stopped doing drugs in 2006.
25   Q.  Would you say in excess of 25 years?
```

```
 1   A.  Yes.
 2   Q.  How old would Michael have been in 2006?
 3   A.  That is when we moved up here, about 17.
 4   Q.  Almost an adult?
 5   A.  Yes.
 6   Q.  Throughout this childhood, you had a struggle with alcohol
 7   and cocaine?
 8   A.  I did.
 9   Q.  Now, at some point, did you move up to this area?
10   A.  I did, yes.  We moved up Michael's last year of high
11   school, the end of 2005, 2006.
12   Q.  Was it the beginning of the last year of high school or
13   middle?
14   A.  In the middle.
15   Q.  Was it difficult for Michael?
16   A.  It was extremely difficult.
17   Q.  Why did you do that?
18   A.  His grandpa was dying of cancer, and he and my mother lived
19   here alone.  I didn't want my mother to be alone, so we moved
20   up here.
21   Q.  Did Michael enroll in school here?
22   A.  He did.
23   Q.  How did it work out?
24   A.  It did not work out too well.
25   Q.  What do you mean by that?
```

```
 1   A.  He dropped out.
 2   Q.  He did not finish 12th grade?
 3   A.  He did not.
 4   Q.  Do you know how he obtained his high school diploma?
 5   A.  I do.  He went to IRSC in the adult education program.
 6   Q.  At this point in Michael's life were you somewhat estranged
 7   from him, had you grown distant?
 8   A.  Yes, sir.
 9   Q.  How would you describe Michael as a teen-ager?  Was he an
10   outgoing person with tons of friends or a solitary individual
11   and somewhat reclusive?
12   A.  Down south he had more friends than up here.  He did get a
13   nice group of friends when he moved up here.
14   Q.  How would you describe him, outgoing or solitary?
15   A.  He was outgoing with his friends, more solitary with me.
16   Q.  With you.  What happened to your relationship with him?
17   A.  I'm not too sure.  I met somebody and moved out and left
18   him when he was about 18 or 19, and he stayed by himself for a
19   couple of years.
20   Q.  Did he not get along with that person?
21   A.  They got along.
22       I moved out of the house and left him in the house.
23   Q.  Okay.
24       Now, have you learned that Michael was sexually abused as a
25   child?
```

```
 1   A.  I have, sir.
 2   Q.  How did you learn that?
 3   A.  Through an ex-girlfriend of his.
 4   Q.  Did you know that before?
 5   A.  No, sir.
 6   Q.  Do you know when that took place?
 7   A.  Personally, I don't know when it took place.  I heard when
 8   he was a child.
 9   Q.  Was that during the time period when he was left with other
10   people?
11   A.  Yes, sir.
12   Q.  So, to your understanding, did Michael totally internalize
13   that?
14   A.  Oh, yes.
15   Q.  Now, you indicated that Michael got his GED at Indian River
16   State College?
17   A.  Yes, sir.
18   Q.  Did he pursue further education?
19   A.  He did.
20   Q.  What did he do?
21   A.  He got his AS in criminal justice.
22   Q.  His Associates Degree?
23   A.  Oh, yes.
24   Q.  Did he attend the Police Academy?
25   A.  He did.  He went through the fast track program and
```

1  completed them both at the same time.
2  Q.  Did he become a police officer?
3  A.  At 20 years old, yes.
4  Q.  Was that a proud moment for the family?
5  A.  Oh, extremely.
6  Q.  Now, were you aware, obviously, when he married Ashley
7  Harding?
8  A.  Yes.
9  Q.  Was that a happy moment, also?
10 A.  Oh, sure.
11 Q.  When they had a child, was that a happy moment?
12 A.  One of the best in my life, yes.
13 Q.  When they bought a house, was it a happy moment?
14 A.  Very.  I was so happy for all of them.
15 Q.  Did you know that Michael had psychological or psychiatric
16 counseling back in 2010?
17 A.  No.
18 Q.  He kept that to himself?
19 A.  Yes.
20 Q.  Did you know he struggled with problems with pharmaceutical
21 drugs?
22 A.  I didn't know he struggled with it.  I knew the anxiety and
23 depression, I knew of that.
24 Q.  Did you know he abused marijuana and alcohol?
25 A.  No, sir.

Pauline A. Stipes, Official Federal Reporter

---

1  Q.  Has this case had an effect on your family?
2  A.  Oh, yes, it has.
3  Q.  And what kind of effect has it had?
4  A.  I've lost my son, I lost my granddaughter.  It's destroyed
5  our family.
6  Q.  Has it basically taken a 180 degree turn from where you
7  thought it was?
8  A.  Oh, yeah, sure has.
9      He was on top of the world.  He had the world at his
10 fingertips.
11 Q.  Now, you sat through the hearing last Monday and you sat
12 through the hearing today.
13     In your mind, are there still redeemable qualities in
14 Michael Harding?
15 A.  Oh, of course there are.
16 Q.  Does he have the support of family and friends?
17 A.  He has a lot of the support and love of family and friends,
18 he sure does.
19     MR. PEACOCK:  No further questions.
20     THE COURT:  Cross-examination.
21     MR. FUNK:  No, Your Honor, thank you.
22     THE COURT:  Okay, thank you very much, you may step
23 down.
24     THE WITNESS:  Thank you, Your Honor.
25     MR. PEACOCK:  Elizabeth Perry, Your Honor.

Pauline A. Stipes, Official Federal Reporter

---

1      THE COURT:  Okay.
2      (Witness sworn).
3      THE WITNESS:  My name is Elizabeth Perry, P, as in
4  Peter, E-R-R-Y.
5              DIRECT EXAMINATION
6  BY MR. PEACOCK:
7  Q.  Mrs. Perry, pull that microphone down to make yourself
8  comfortable.
9  A.  Thank you.
10 Q.  Mrs. Perry, do you know Michael Harding?
11 A.  Yes.
12 Q.  How do you know him?
13 A.  He is my nephew.  He is my niece's son, he is my grand
14 nephew.
15 Q.  Have you known him all his life?
16 A.  Yes.
17 Q.  Have you known him since -- have you known his mother all
18 her life?
19 A.  Yes.
20 Q.  So, are you aware of the fact of his father being murdered?
21 A.  Yes.  His mother was living with me at the time in New
22 York, at the time, and actually she was staying with a
23 girlfriend the night his father was murdered, and she called me
24 at one o'clock in the morning.  I was well aware of it, went to
25 the funeral.

Pauline A. Stipes, Official Federal Reporter

---

1  Q.  Were you working when you were in New York?
2  A.  Yes.
3  Q.  What is your occupation?
4  A.  I was an actress, theater mainly.
5  Q.  And you have been an actress for your career?
6  A.  All my life.
7  Q.  All right.  Now, at some point, Julie Harding left and
8  moved back to Hollywood, Florida?
9  A.  Yes.
10 Q.  Did you stay in touch with Julie?
11 A.  Always.
12 Q.  Did you stay in touch with your sister?
13 A.  Very much.
14 Q.  Okay.
15     Are you comfortable in describing the family situation from
16 the time of Michael's birth up until now?
17 A.  Oh, yes.
18 Q.  Okay.
19     When Michael was an infant, what was your observations
20 about how Julie Harding was raising him?
21 A.  I was always worried.
22     I visited as often as I could when she moved to Florida.  I
23 kept up with them from New York until 2000, when I moved down
24 here and I spent more time with them.
25     I was concerned because I knew Julie had problems and was

Pauline A. Stipes, Official Federal Reporter

```
 1   not home as much as she would like to be, and as much as the
 2   boy needed his mother.
 3        I was comforted by the fact that he had a grandmother and
 4   grandfather who loved him very much and could pick him up and
 5   give him times of enjoyment, but I was concerned.
 6   Q.  When you said Julie had problems, what specifically were
 7   you referring to?
 8   A.  Well, as she said, she had a drug problem, drug and
 9   alcohol.
10   Q.  Was that a concern shared by the other members of your
11   family?
12   A.  Yes.
13   Q.  Did you all try to do what you could to assist her in
14   raising Michael?
15   A.  Anything we could, yes.
16   Q.  Are you aware there were frequently times when he was left
17   with other people, nonfamily members, for days at a time?
18   A.  Yes, I was aware of that and worried.
19   Q.  Do you know if there were efforts to intercede on the part
20   of members of the family?
21   A.  All of us, all of us tried to help with the drug problem,
22   guide her to help, to resources for help, and everyone tried to
23   help the boy, but, you know, you couldn't be there every
24   second.  We were all worried about him.
25   Q.  In your opinion, was he a lonely child?
```

---

```
 1   A.  I felt he was a lonely solitary child.
 2   Q.  Were you able to spend time with him as he was growing up?
 3   A.  Yes, not as much time as I wished to, because I enjoyed
 4   being with him.  On my visits, I would spend time with him.  We
 5   had some private times, too, I would take him to the store or
 6   whatever.
 7   Q.  How did he feel about never knowing his father?
 8   A.  Well, it was not something we discussed at any length
 9   because I never knew how much he knew.
10        His father was murdered.  I didn't know if he knew in the
11   way which his father had died.
12        I do recall the first time I was aware of the depth of his
13   sadness was when we were alone, sitting on the beach, and I
14   think he was not quite three, but he could talk.  We were
15   sitting very quietly and all of a sudden he said, my daddy is
16   dead.
17        And I hesitated, and I said my daddy is dead, too, but I am
18   luckier than you are, because I got to know my daddy.
19        He was very quiet, and he looked up at the sky and he said,
20   my daddy is up there with the angels.  It was very sad.
21   Q.  Did you see that sadness expressed in other ways by Michael
22   over the years?
23   A.  Yes.  I can't quote any explicit times, but I was aware of
24   how sad he was.
25        My sister's husband, his grandpa, substituted in a way for
```

---

```
 1   his lack of a father.  My sister and her husband were often
 2   with him, helping him as much as they could to have a good,
 3   normal, happy childhood.
 4   Q.  Now, when you heard about these charges, did that take you
 5   by surprise?
 6   A.  Very much so.  It has been a shock to all of us.
 7   Q.  And is it totally out of character for what you know of
 8   Michael?
 9   A.  Absolutely.
10   Q.  Do you feel that Michael has redeeming qualities?
11   A.  Michael through all his childhood was always intelligent,
12   respectful, loving, kind.
13        I have never seen any cruelty in him.  He is gifted at this
14   time in his life.  I am well aware of what a good writer he is
15   and how he wishes to educate himself further.
16        He is profoundly sad and in the effort within his
17   situation, he is trying very hard to restore himself, to
18   rehabilitate, and I believe he can.  I am praying for all the
19   help he can get to recuperate within himself, regain his
20   self-respect and find a way to forward himself whatever the
21   situation.
22        I believe he is a wonderful person and I believe that that
23   other aspect of him is completely arbitrary to who he is, and I
24   believe Ashley's first impression of him when she met him was
25   the correct one.
```

---

```
 1        I think this is an aberration, and I would love to have him
 2   have some kind of rehabilitation.
 3        MR. PEACOCK:  Very well.  Thank you, ma'am.  Thank
 4   you, Your Honor.
 5        THE COURT:  Thank you.  Any further questions?
 6        MR. FUNK:  No, Your Honor.
 7        MR. PEACOCK:  You can come down.
 8        THE COURT:  You may step down.
 9        Does that conclude defense's evidence?
10        MR. PEACOCK:  Yes.
11        THE COURT:  Government?
12        MR. FUNK:  Yes.
13        THE COURT:  At this point, the Court will entertain
14   defense argument and the Government.
15        I know the defense filed a motion for downward
16   variance.  You can incorporate the argument of the motion into
17   any argument on behalf of the Defendant, and, of course, Mr.
18   Harding has an opportunity to address the Court as well if he
19   wishes to do so, although not required to.
20        MR. PEACOCK:  Do you want me to proceed, Your Honor?
21        THE COURT:  Yes.
22        MR. PEACOCK:  Your Honor, I would like to elaborate on
23   some of the arguments on the motion for downward variance.
24        THE COURT:  Okay.
25        MR. PEACOCK:  These guidelines before Your Honor are
```

1   the tail wagging the dog.
2          The guidelines that are driving the calculation are
3   the child porn guidelines, and that is important because the
4   Sentencing Commission has acknowledged that those guidelines
5   are no longer reflective of what the true activity of a child
6   porn defendant is.
7          The Sentencing Commission has acknowledged that the
8   enhancement factors in 2G2.2 are excessive, and that they no
9   longer reflect the true factors which support enhancement under
10  the guidelines, and they encourage Congress to change the laws.
11         As the Court is, I am sure, aware, the Protect Act
12  from 2003 prevents the Sentencing Commission from changing the
13  Sentencing Guidelines with respect to child pornography without
14  Congress' express approval.
15         Consequently, we end up with a guideline range driving
16  the total offense level just from the child porn guidelines.
17         Arguably, the much more serious counts involve the
18  production and enticement, which have a lower guideline range
19  than the child pornography guidelines.
20         For that reason, it is clear that this guideline
21  computation is arbitrary, and does not reflect the conduct of
22  the Defendant in this case.
23         Secondly, Your Honor, as the Court is well aware,
24  under 3553(a), this Court must also evaluate the
25  characteristics of the Defendant in arriving at an appropriate

1   sentence.
2          I suggest to you that while the crime is indeed very
3   serious, and even reprehensible, Mr. Harding, on the other
4   hand, has demonstrated some very redeeming characteristics
5   which should mitigate this Court's sentence under these
6   circumstances.
7          As I pointed out in my memorandum, Mr. Harding, as we
8   just heard, grew up without a father, never knew his father.
9   His father was murdered before he was born.  He basically
10  raised himself much of the time, Your Honor.
11         His mother was trying to do the best she could.  She
12  had a severe drug addiction and alcohol addiction.  She worked
13  as a cocktail waitress in strip bars, often times not home for
14  several days in a row, and Michael was passed off to friends,
15  whoever could take him, and when he got older, he took care of
16  himself for days at a time.
17         He did not have a male figure in his life and, quite
18  frankly, he didn't have a total mother figure in his life,
19  either.
20         Now, I'm not here to belittle Julie Harding, she has
21  been incredibly supportive of him.  I understand how much she
22  loves him, but the truth is the truth.  This guy didn't have
23  much growing up, didn't have those characters in his upbringing
24  that would teach him the difference between right or wrong.
25         Somehow, though, even after dropping out of high

1   school in the middle of 12th grade, Michael Harding redeemed
2   himself in many ways.
3          He got his GED at Indian River State College.  He
4   enrolled in criminal justice there, he received the degree
5   early, went the to the Police Academy at the same time,
6   graduated, became a police officer, and ultimately became
7   police officer of the year in Ft. Pierce because of his
8   outstanding contribution to society.
9          He has done a lot of good for a lot of people.
10         That doesn't forgive him for what he has done in this
11  case, but it does mitigate to a large degree what he has done
12  in this case, which we're not talking here about a sentence of
13  probation or five years or whatever.
14         I know the sentence is going to be long, I know that.
15  We are talking about the difference between life in prison with
16  no chance at redeeming one's self or a term of years where,
17  somewhere down the line, he could possibly get out and redeem
18  his life.
19         We heard from Dr. Brannon that the risk assessment
20  falls way off after somebody is 55.  We also know in the
21  Federal prisons there is very good, very high quality sex
22  offender treatment, and so he has these options.  He has this
23  ability to take advantage of these.
24         What we are asking is that at some point Your Honor
25  allow him to be able to rejoin society.  We are not asking you

1   for some minimal sentence, I realize that is not realistic, but
2   we are asking you for a sentence that at some point allows him
3   to rejoin society.
4          I have tried throughout this case -- as the Court
5   knows, there is a State case pending, and I am assuming the
6   State will proceed with it immediately after he is done with
7   this.
8          I have tried all the way back to pretty much the
9   inception of the case to get some sort of joint resolution, but
10  that has not been accepted, and that is fine.  That is the
11  Federal Government's and State Government's prerogative, but it
12  is not lack of Mr. Harding trying to do so.
13         One thing that does concern me is that if Your Honor
14  gives him life in prison, in this instance that will make a
15  trial in the State case a foregone conclusion.  That means a
16  trial will definitely happen in the State case.
17         I think that is something that people need to think
18  about very carefully.  It won't be a pleasant trial.  It will
19  be ugly, and that is just the nature of those charges, and C.W.
20  and H.W. will have to testify probably more than once, I would
21  think.
22         I hope that people have thought this through when they
23  are asking for a life sentence, because if Mr. Harding gets
24  life here, there will be no reason to make any kind of
25  concession once he gets to State Court, and I think that is an

1  important consideration.

2          Your Honor, I want to make sure I am not missing any

3  points.

4          For those reasons, Judge, we ask that you reject the

5  sentencing guideline.  We ask you make a variance down from the

6  360 to life guideline range, which I believe is a one level

7  reduction, unless I am incorrect.

8          Is that correct, Mr. Cooley?

9          It would be a one level variance, and I ask you to

10  sentence him at the low end of the guideline range.

11          I believe Mr. Harding does want to make a statement to

12  the Court.

13          THE COURT:  Okay.

14          MR. PEACOCK:  If I may have one minute with him.

15          THE COURT:  Yes.

16          MR. PEACOCK:  Do you want me to do that now or after

17  the Government?

18          THE COURT:  He can do that now and I will have Mr.

19  Harding sworn and we can turn it over to the Government.

20          MR. PEACOCK:  Yes, ma'am.

21          (Thereupon, the defendant was duly sworn.)

22          THE DEFENDANT:  Good afternoon, Your Honor.

23          THE COURT:  Good afternoon.

24          THE DEFENDANT:  Looking back at my life, I am not sure

25  how I made it as far as I did.  I never knew the love of a

                Pauline A. Stipes, Official Federal Reporter

---

1  father because he was tragically murdered before I was born.

2          As a single parent, my mother gave her best effort to

3  support us.  Despite working two jobs, we found ourselves

4  living in poverty.

5          From my earliest recollections, my mother struggled

6  with her own demons in the matter of drug abuse which she

7  battled for many years.

8          It wasn't uncommon for me at an early age to find

9  myself alone unsupervised for a night or even a weekend.  I

10  would be left with the responsibility of taking care of myself

11  and when my mother would eventually return home, often times I

12  would take care of her as well.

13          On other occasions, I would spend the night with a

14  babysitter or I would be taken to a friend's house with a

15  sleepover.

16          It was during some of the sleepovers that my friend's

17  older brother would sexually molest me, while other times my

18  friend's parents would sexually abuse me.

19          Excuse me.

20          His parents would abuse both of us, and have us

21  perform sexual acts on each other.

22          Yet, in spite of my precarious upbringing, I was able

23  to overcome that, and I was extremely proud of the life I was

24  building.

25          My world was filled with a loving family and generous

                Pauline A. Stipes, Official Federal Reporter

---

1  friends.  I was truly blessed, and I was excited to see what my

2  future had in store.

3          Of course, however, my life has been irreparably

4  damaged due to my own actions.

5          I deeply regret every picture and video I ever viewed

6  or possessed and my heart breaks truly for each victim who was

7  harmed and ultimately exploited as a result of that material.

8  I am continually stricken with intense feelings of guilt,

9  shame, regret and remorse because of my selfish behavior.

10          The situation has caused untold amounts of pain and

11  grief to my dearest family, to my wife and all of her family

12  and to every one of my friends and my community.

13          I pray that one day I may be afforded the opportunity

14  to make amends to those people my decisions affected.

15          Finally, Your Honor, I humbly ask you that the Court

16  may show mercy so that one day many years from now I may be

17  given a second chance at life in order to redeem myself.

18          Thank you, Your Honor.

19          THE COURT:  Thank you.

20          Okay, Government.

21          MR. FUNK:  It's a remarkable thing to step into the

22  world the Defendant lived in, to see the pictures that he

23  sought for the gratification of himself as well as others, to

24  see the videos and the moving words of victims that are in the

25  videos, and read the chats and the words of the Defendant, as

                Pauline A. Stipes, Official Federal Reporter

---

1  well as the other offenders, to know what they think, what

2  satisfies them, what their desire might be.

3          The most troubling thing aside from -- obviously, the

4  videos are shocking, but the ultimate indifference and lack of

5  empathy they have for the children.

6          There are statements that the Defendant made about

7  braking the hymen of a nine year old and how once that was

8  done, you could have intercourse with her.

9          There are statements in there, videos you saw where

10  clearly there is a sex toy getting forced into a young girl who

11  is eight or ten years old.  There are things you can't get out

12  of your head by looking at them.

13          We have the luxury, you do and I do, of turning it

14  off.  Still it is hard to get out of your head.

15          You have to imagine the experience surrounding those

16  videos, images.  We see the still image of a young girl who is

17  hog tied, and it is shocking.  I ask:  Why in the world would

18  something like that happen?  You are able to hear that or read

19  it in the text messages of the Plaintiff.  Quite plainly, he is

20  sexually gratified by seeing things like that.

21          The gratification and motive to do this isn't in and

22  of itself wrong, it is the choice he has to know that it is so

23  wrong, that it is illegal.  It is that indifference to their

24  suffering, to the standards we have as society, that is what is

25  so wrong about this case, and what is so wrong about the

                Pauline A. Stipes, Official Federal Reporter

1   actions of the Defendant.

2       You have to have empathy for the victims.

3       From the standpoint of the victim, you can only

4   imagine when he is left to take care of a nine year old girl

5   and she knows at that moment she is at home alone with him, he

6   is going to take his clothes off and he is going to try to have

7   sexual contact with her, how out of control she must feel, how

8   deceived she must feel.

9       As you read in the victim statements, the children

10  depicted in the videos and still images, how out of control to

11  control someone so precious to themselves, so intimate to their

12  being, the disgust they must feel, the dread they must feel,

13  the lying they know that goes on to family members,

14  manipulation of the Defendant to get them to lie to family

15  members.

16      To compare those memories to those of good memories of

17  childhood, some people are so fortunate to remember things like

18  a trip to Orlando, to go to the Magic Kingdom in Orlando.

19      That wasn't the trip that Michael Harding intended for

20  C.W. to go on.  It wasn't for her, it was for him.  As much as

21  he was responsible for caring for her and protecting her, what

22  Ashley Harding expected him to do because he was a law

23  enforcement officer, the trust she had in him, he violated

24  that.

25      I still can't figure out why someone who is upset and

---

1   cries and shows emotion at being the victim of abuse would have

2   so much lack of empathy for the girls in those videos and for

3   his own stepdaughters.

4       How he would continue to violate the law by

5   transmitting those images, by perpetuating this sort of

6   gratification other people get from this is morally wrong.  I

7   don't know the answer to that.

8       I do know he is well aware of what the law is.

9       You see in those chats he talks about people getting

10  caught, talks about them going away.  He shows how he is upset

11  that someone can no longer produce those images that you saw.

12  We showed the mastodon video, that is the video where another

13  person says, God bless mastodon.  He is up to date and keeps

14  track of whether or not that person has been incarcerated.

15      The specific offense characteristics are as

16  aggravating as they could possibly be.  These images are

17  unmistakably child pornography.

18      There are some cases where you see a person who comes

19  in in their mid 20's, and they have a 15 year old, the 15 year

20  old is in a somewhat suggestive pose, sometimes it is hard to

21  call.  Maybe they are too old, it is not sexual, there is a

22  border.  In this case, there is no question when you look at

23  the images, and no question in the mind of the Defendant when

24  he was looking at them, that they were prepubescent children

25  being victimized.  They are sadistic.

---

1       His acts against his own children are sadistic in the

2   manner which they are carried out because of their small frame,

3   the objects that are inserted into them, that is sadistic.

4       The amount of images is remarkable.  Cataloging the

5   images is remarkable, the type of images.

6       He has been looking at the images for over eight

7   years.  They involve all kinds of sex acts, and for someone who

8   has not seen it before, you can only describe it as hard core

9   pornography with a five year old.

10      He uses the computer.  Sometimes defense counsel make

11  an issue of the use of the computer, the anonymity.  Had it not

12  be for Brian Rey and Homeland Security Investigations, and but

13  for a couple of mistakes on the Defendant's part, he would

14  still be doing this today.

15      I don't think you can look at the chats without

16  knowing that to be true, that the abuse stopped to the children

17  and viewing the distribution of pornography stopped the day he

18  was arrested.  There's nothing in the chats or anywhere else

19  indicates he was going to stop what he was doing.

20      The computer gives him the ability to do that.

21      There is tour browsers, the Defendant refers to the

22  dark web, pseudonyms, Drop Box, he has an extensive collection

23  and he is willing to share.

24      For over four years he participated in a pattern of

25  behavior of sexual abuse against his own children, the ones

---

1   that Ashley Harding entrusted him to take care of.

2       He had the ability to control his urges.  He had the

3   ability to not be caught but for the two mistakes that he made.

4       I am reluctant to say what those are, only because I

5   know there are other people out there.

6       They may not be in the courtroom today, but to have

7   that information out there, some day there will be a dark web

8   that is so dark that law enforcement won't be able to find the

9   people who abuse children.

10      The only deterrence comes from sending a message, a

11  general deterrence to the community to know they face life

12  imprisonment, to give them the fear that Brian Rey is sitting

13  on a computer in a chat room where they exchange pornography to

14  know that that boogie man is going to be there to hopefully

15  convince them that they should not be doing these unlawful acts.

16      Look at the general characteristics in sentencing.

17  This is not isolated, this is calculated, premeditated,

18  sophisticated.

19      His remorse in light of all the chats that you see can

20  only be characterized as regret for getting caught.

21      He caused harm to the children in his life.  He caused

22  emotional harm to the children portrayed in the pornography in

23  a way that he perpetuated that sort of victimization.

24      As you saw on the victim impact letters, those

25  experiences forever will live on for the gratification of other

1  people.

2          He goes so far in encouraging other people to offend

3  that when someone asks him or remarks to the effect of how

4  lucky he is, he has children in the house to abuse, he

5  encourages that other person to go out and find a single mother

6  of his own.

7          He says you should get a little girl of your own to

8  train, it is the most amazing experience.  There are thousands

9  of single moms out there, go for it.

10         The other person asks, what age should I start?  He

11 said, five, it worked for me.

12         He obviously harmed his wife, his marriage, his

13 new-born child who is going to be without a father.

14         He is, and you will look and see that in the chat

15 messages, he is the initiator about the child swapping.  It's

16 not an idea he indulged that someone put forward; it is an idea

17 he put forward to other people.  There are at least two chat

18 conversations where he mentions that.

19         One is where he ended up getting charged with

20 enticement.  In that they carry on in two separate and distinct

21 conversations, the first one is graphic, sexual, meant to

22 arouse and gratify each other in the conversation.

23         The second part of it is cold and calculated,

24 nonsexual, how they are going to meet, what their plan is for a

25 cover story.

1          They exchange images, discussions about trust, phone

2  conversations.  We don't have phone conversations, but you can

3  see them referred to in the chat messages.

4          That is indifference to the feelings of C.W., so

5  incredibly indifference.

6          He deserves to be treated with that sort of

7  indifferences, what is his just desserts as far as the pain he

8  caused other people.

9          In a way to serve justice is the Court to -- it can't

10 fall on completely deaf ears the fact that he has had

11 difficulty in his upbringing, but when some things are so wrong

12 and they are so indifferent to the suffering of other people,

13 he does not deserve -- it is not just to listen to him.

14         Over 90 victims in this case, from 20 countries around

15 the world, on some days were at home when their offender came

16 in the room or someone was away and had to deal with the

17 prospect of engaging in these acts.

18         He has no sympathy for them.  In fact, it is

19 interesting to see in these images there is never a perspective

20 of the victim.

21         You have a point of view or perspective for the

22 offender, as you saw on the videos, where some child is sitting

23 on top of him, or you have this voyeuristic viewpoint.

24         The very least they ever talk about in the chats is

25 the sexual gratification that the children may have, which at

1  the very best, is just remarkably callus to think that a child

2  who says no, I don't want to do that, or that smells, I don't

3  want to do that, to think that in some way is doing something

4  good for them is just, just unbelievable.

5          He went beyond in the distribution of the pornography

6  to encourage other people to produce pornography so they could

7  exchange it.

8          He had high regard for child pornographers.  He knew

9  about the different child pornographers, the different series

10 of what they produced.

11         Now, the discussion, it does not follow, absolutely

12 does not follow that the Court should take into consideration

13 the State Court case.

14         This is your decision to make.  It is for you to

15 decide, and if you impose a life sentence, there is no logical

16 consequence of how that is going to necessarily effect the

17 resolution of the State case.

18         His risk is high.  From all the different types, all

19 the aggravating factors of the types of pornography, hands-on

20 offending that he did, Dr. Brannon, their own expert, says

21 those are factors that will contribute to his risk of

22 reoffending.

23         Incarceration is deprivation of pleasure.  You

24 sentence victims to deprivation of pleasure for life.  In

25 relationships, memories, he did one of the greatest moral

1  wrongs, to cause harm to your own stepdaughter, to cause her to

2  be abused by someone else for your own sexual gratification.

3          People talk about using another person for a means to

4  an end.  What could possibly be worse than offering up your own

5  child that is entrusted to you to have sex with some random

6  person?

7          The 3553 factors require a sufficient sentence but not

8  greater than necessary to address all the factors.  The

9  sentence needs to be sufficient but not greater than necessary.

10         There is a calculation, the calculation is life.

11 While the Court is not bound by that because you do have your

12 discretion, there is no reason to vary from that guideline

13 range.

14         There is no factual reason, there is no legal reason,

15 there is no moral reason to sentence him to anything but life

16 in prison.

17         Regardless of the guidelines themselves, all the

18 aggravating factors in this case support a term of life

19 imprisonment.

20         He should spend the term of life.  He should have a

21 deprivation, in reference to the age of the children, that will

22 actually be less of a time period than what he subjected them

23 to.

24         These children, five years old, nine years old,

25 hands-on victims, have the remainder of their life, the

1　pleasure they may have in their relationships, living with
2　anxiety, memory of the loss of control.  He deserves to get
3　life because it is right, it is just and because all the facts
4　in this case support that sentence.
5　　　　Thank you.
6　　　　THE COURT:  Anything further from defense?
7　　　　MR. PEACOCK:  Yes.
8　　　　Your Honor, that might be have been compelling if
9　there weren't guidelines in this case.
10　　　　There are Sentencing Guidelines in this case that were
11　promulgated by the United States Sentencing Commission.  It is
12　widely accepted the guidelines on child pornography and child
13　sex sentences are extremely harsh.
14　　　　Mr. Funk made no mention whatsoever of the Sentencing
15　Commission 2012 report on child pornography guidelines.  He
16　totally avoided that.  And then he had the temerity to stand
17　here and tell you there is no legal reason why the Court should
18　not vary downward.
19　　　　The Sentencing Commission itself said the Sentencing
20　Guidelines are too high.
21　　　　We are not asking you to make a wholesale variance
22　downward.  We are asking for one level in light of the
23　Sentencing Commission saying these guidelines are not well
24　founded.
25　　　　THE COURT:  To be clear, the report speaks to child

Pauline A. Stipes, Official Federal Reporter

---

1　pornography only, and not to the other aspects of this
2　Defendant's case, enticement, sexual aspects of the children.
3　I want to be clear on that.
4　　　　MR. PEACOCK:  It also encompasses other sex offenses,
5　those offenses concerned with the Protect Act of 2003.
6　　　　THE COURT:  You are saying the 2012 report that speaks
7　to the guidelines as being too high speak to the kind of
8　offenses that we have in this case separate from the child
9　pornography?
10　　　　MR. PEACOCK:  No.
11　　　　THE COURT:  Just the child pornography.
12　　　　MR. PEACOCK:  The point I am relying on speaks to the
13　child pornography sentences that are too high.
14　　　　The Commission has not said the enticement or
15　production guidelines are too high, but they are lower in this
16　case than the child pornography guidelines.
17　　　　Mr. Funk must have spent 15 minutes talking about the
18　enticement part of this case, and that is important.  I'm
19　not -- it is reprehensible.
20　　　　We are not arguing that.  We are way past more than
21　half of what he argued to this Court.
22　　　　As reprehensible as the enticement charge is, the
23　guidelines are lower than the child pornography guidelines.
24　　　　He did not mention that because he is going to ask the
25　Court for an upward variance.  Because he has the out of fact

Pauline A. Stipes, Official Federal Reporter

---

1　child pornography guidelines, he doesn't have to do that.
2　　　　The guidelines take into account the parent, a person
3　with custody.  That is not something that fell through the
4　cracks, that is taken into account in the guidelines.
5　　　　This is not a sophisticated offense.  Mr. Harding does
6　not have an unusual amount of child pornography.  In my
7　experience, he's somewhere in the middle in that regard.
8　　　　He doesn't have any kind of file sharing or whatever,
9　he is in his chat room.
10　　　　It is pretty clear what he is doing.  As soon as this
11　agent sees him in Delaware, he knows what he is doing.  It took
12　about two days to figure out who he was and where he was.
13　　　　And last, Judge, the State case is important.  I think
14　it is extremely cavalier of the Government without much
15　forethought to put these little girls in that position, because
16　I do seriously suggest that if Mr. Harding receives a life
17　sentence there will be no motivation whatsoever for him to
18　resolve the State case.
19　　　　Yes, okay, the State could dismiss its case.  Knowing
20　this circuit, I honestly don't see that happening.  And that is
21　a very serious matter because they would have to go through
22　deposition, they would have to go through testimony at trial,
23　they would be at an age where that would be incredibly
24　difficult, and that would be very unfortunate.
25　　　　I think that is going too far to get the pound of

Pauline A. Stipes, Official Federal Reporter

---

1　flesh, and I think that a term of years is going to be more
2　than you need to satisfy this Court's concerns in this case.
3　Thank you.
4　　　　THE COURT:  Okay, thank you.
5　　　　Okay, has everyone been heard?  Defense have you been
6　heard in full?
7　　　　MR. PEACOCK:  Yes.
8　　　　THE COURT:  Government?
9　　　　MR. FUNK:  Yes.  Thank you.
10　　　　THE COURT:  We will take a recess.  And I would say
11　stay close by, I can't tell you how long the recess will be.
12　　　　It could be longer than half an hour, but not longer
13　than an hour, and we will return.
14　　　　(Thereupon, a short recess was taken.)
15　　　　(Thereupon, trial reconvened after recess.)
16　　　　THE COURT:  Okay, please be seated.
17　　　　We will wait for the Defendant.  Okay.
18　　　　We are now at the stage of the proceeding where the
19　Court is going to pronounce the sentence.  The Court has
20　considered the statements of all parties, the Pre-Sentence
21　Report which contains the advisory guidelines and statutory
22　factors set forth in 18 United States Code, Section 3553(a).
23　　　　It is the finding of the Court that the Defendant is
24　not able to pay a fine.
25　　　　The 35353 factors include subsection A, the factors to

Pauline A. Stipes, Official Federal Reporter

```
 1   be considered in imposing a sentence.  The Court shall impose a
 2   sentence sufficient but not greater than necessary to comply
 3   with the conditions set forth in paragraph two of the
 4   subsection.
 5          The Court in determining the particular sentence shall
 6   consider, one, the nature and circumstances of the offense and
 7   history and characteristics of the Defendant; two, the need for
 8   the sentence imposed, A, to reflect the seriousness of the
 9   offense, promote respect for the law and provide just
10   punishment for the offense, supply adequate deterrence of
11   criminal behavior, protect the public, and provide the
12   Defendant with needed training and care in the most effective
13   manner.
14          Three, the kinds of sentences available; four, the
15   kinds of sentence and the sentencing range established for the
16   applicable category of the offense committed and the applicable
17   category of defendant as set forth in the guidelines issued by
18   the Sentencing Commission 994(a)(1), Title 28 United States
19   Code.
20          The Court is also to consider any pertinent policy
21   statements issued by the Sentencing Commission pursuant to
22   994(a)(2), Title 28 United States Code, subject to any
23   amendment made by the policy statement by an act of Congress
24   and the need to avoid unwarranted sentence disparities with
25   similar records who have been found guilty of similar conduct
```

Pauline A. Stipes, Official Federal Reporter

```
 1   and the need to provide restitution for any offense.
 2          Those are the guidelines and factors the Court must
 3   consider in considering the appropriate sentence to impose on
 4   Michael Harding here today.
 5          First, the Court is going to summarize the evidence
 6   that it has heard and considered in its consideration of the
 7   sentence today.
 8          We have all of the documentary evidence that has been
 9   admitted into evidence, which includes Exhibits 1 through 15 of
10   the Government.
11          In addition, the Court has considered the Docket Entry
12   103, notice of filing the victim impact statements and the
13   exhibits, which I believe also appear on the exhibit list, but
14   those that appear at Docket Entry 91.2, the chat conversations
15   which appear at Docket Entry 91.2, as a sealed exhibit.
16          The Court heard testimony from a number of witnesses.
17   The Court heard testimony from Sheila LaGrega, assigned to the
18   criminal division of the Port St. Lucie Police Department,
19   investigates persons crimes, including sexual batteries.
20          On 9/22/15, she became involved in allegations of
21   sexual abuse of C.W. and H.W. and was asked to conduct
22   interviews and met with the mother, Ashley.
23          During the first interview, C.W. said the Defendant
24   had asked her to put his hand on his penis and wanted her to
25   take off her clothes and lay with him naked.  His clothes were
```

Pauline A. Stipes, Official Federal Reporter

```
 1   off and he put her hand on his penis and move it around.  She
 2   did not do that.  This occurred in the living room and bedroom
 3   in their house.
 4          On 9/29/15, C.W. was interviewed again, still
 5   uncomfortable.  Ms. LaGrega gave her note paper and dolls to
 6   make things easier.  C.W. disclosed she would be in the living
 7   room and the Defendant, Mr. Harding, would take his clothes off
 8   and put a blanket over him.  She did not say anything because
 9   she thought she would get in trouble.  He moved her hand over
10   his penis.  He had tissues and Mr. Harding used them to wipe
11   himself off.
12          She said he touched her on her privates and her butt,
13   and digitally penetrated her vaginally and anally, put her
14   mouth on his penis.  She said something came out.  He put his
15   penis in her privates a "few times" and she said it hurt.  She
16   said he did it a little bit.  She put her hand on his penis.
17   Mr. Harding would have her move her hand and around what came
18   out went on her hand went on her hand.
19          He penetrated her anally with his fingers and she said
20   it happened a few times.
21          H.W. spoke about sleeping in a tent with the
22   Defendant.  He took his clothes off and her clothes off.  He
23   told her to lay down or he would smack her.  He came into the
24   tent with a screwdriver, hammer and silver knife.  He put the
25   handle portion of the screwdriver into her vagina and butt.
```

Pauline A. Stipes, Official Federal Reporter

```
 1   She said he took pictures of her in the tent and said he was
 2   going to show Ashley Harding.  H.W. said she was scared.
 3          The witness testified about other things, but these
 4   are pertinent parts the Court has taken note of, as it has of
 5   the other witnesses.
 6          The Government presented Danitza Byrd who works for
 7   the Port St. Lucie Police Department crime scene unit, and was
 8   involved in the investigation and she took swabs from C.W. and
 9   H.W.
10          Special Agent Brian Rey testified, he works for the
11   Department of Homeland Security, and he issued subpoenas and
12   search warrants.  He did a forensic exam of the Defendant's
13   electronic devices, did a search of the residence, found the
14   gun with the case and sex toys and a thumb drive which he was
15   authorized to take as part of the warrant.
16          He found chat messages from the phone conversation
17   view.  Images of C.W. were transmitted that were not disclosed.
18   One was a Skype portion of the chat.  It is an image that was
19   modified to include a side-view of C.W., and there was a quote
20   along with that, "that's my elbow and her sweet ass."
21          Special Agent Rey found the full image.  That image
22   was presented to the Court, it was of C.W., and an additional
23   image was sent of C.W. in the living room.
24          Special Agent Rey informed the Court through his
25   testimony about the known offender Mastodon and a series of
```

Pauline A. Stipes, Official Federal Reporter

```
 1   child pornography produced to entertain others, the April blond
 2   series, the Tara series.  He explained the chats occurred over
 3   a period of time from 3/25/15 to 9/22/15, approximately 70
 4   separate chat sessions, and yet these were only a small number
 5   provided to the Court.
 6           Images were sent to the National Center of Missing and
 7   Exploited Children of all of the images submitted,
 8   approximately 94 separate images, 94 separate victims, 94
 9   separate offenders.  20 separate countries including the U.S.
10   represent where the images came from.
11           One of the earliest images was from March 6, 2008,
12   that was found on Mr. Harding's electronic devices.  There were
13   other images and videos that covered a time from 2008 through
14   the date of the seizure.
15           He found an image of C.W. on the telephone, the LGD
16   800 cell phone.  The video had been created and this was a
17   thumb nail image created from the video.
18           Special Agent Harding spoke about the drop -- Special
19   Agent Rey spoke about how Mr. Harding used the Drop Box to view
20   child pornography, how he organized the child pornography, how
21   he categorized the child pornography, kept it on the thumb
22   drive, had a folder called Kik.  Videos were created on the
23   phone, and he posted videos on the Kik website.
24           He reviewed sexual child exploitation material, that
25   is, Special Agent Rey, with the Government counsel to select
```

```
 1   certain demonstrative images which were shown to the Court and
 2   viewed by the Court, and they all appear at Exhibit 11, and all
 3   of the subsections of Exhibit 11 which the Court viewed in
 4   camera with counsel in the courtroom.
 5           Exhibit 12 reflected the printout of the chat rooms
 6   and the Kik application that indicated Mr. Harding had joined
 7   chat rooms.  And the Kik room that he was in came under the
 8   name hash tag toddler fuck.
 9           There is a list of all of the chat rooms that Mr.
10   Harding joined, all of which have been presented in court.
11           Ms. Ashley Harding testified next with respect to
12   questions that had been raised about Mr. Harding's drug
13   addiction that were put into evidence by Dr. Brannon, and the
14   Court will get to Dr. Brannon in a moment.
15           It was Ms. Harding's observation that the Defendant
16   took certain prescribed drugs, Klonopin and hydrocodone, that
17   he took them in a way he was supposed to, to the best of her
18   acknowledge and observation.  She did not feel he was abusing
19   prescription drugs or alcohol.
20           She spoke about an almost perfect relationship that
21   she thought she had with Mr. Harding until the baby was born
22   and noticed distance in the relationship beginning at that
23   period of time.
24           She trusted him, she trusted him as a husband and as a
25   father to her two stepchildren, who called Mr. Harding dad,
```

```
 1   and, of course, spoke about his position in the community as
 2   one of a police office in which the community ought to be able
 3   to have trust and respect.
 4           Ms. Harding did talk about the tent that has been the
 5   subject of testimony and evidence in this matter, that he would
 6   do camp outs with the girls.  C.W. spent the rest of the night
 7   in the tent, and H.W. would come in.  Only on one occasion did
 8   C.W. not stay the whole night.
 9           They did share a computer, although Mrs. Harding was
10   made to understand that Mr. Harding's phone was off limits
11   until he could manipulate it, presumably to prevent
12   Mrs. Harding from seeing things on the cell phone, which we
13   have come to learn that is where some of the images were
14   stored.
15           On 9/22/15, the day of the arrest, Mr. Harding told
16   Mrs. Harding that he never hurt the children and that he loved
17   them and her and he would never do anything to hurt her.
18           He had about five guns in the house.  They were all
19   taken to her parents' house.  The children were very upset when
20   they learned what happened to their father, that is not their
21   biological father, but the person they have come to know as
22   dad, Mr. Harding.
23           When Mrs. Harding took C.W. into the room, she said
24   she felt uncomfortable around Mr. Harding all the time, and
25   became hysterical.  She described a few of the things she did
```

```
 1   with Mr. Harding and she had been afraid to tell her mom in the
 2   past.
 3           At the time of Mr. Harding's arrest, C.W. was five,
 4   H.W. was nine, and Mrs. Harding spoke to the Court about some
 5   of the things that C.W. and H.W. told her that Mr. Harding had
 6   done to them, which was consistent with the testimony that
 7   Sheila LaGrega gave the Court and what she learned through her
 8   interviews with C.W. and H.W.
 9           The Court heard from Wayne Walker, who is from the
10   Indian River Crime Lab, and he spoke about examining certain
11   pieces of evidence, including the sex toy and blanket submitted
12   for examination.
13           With respect to the sex toy, which Exhibit 15 is a
14   photo of the sex toy, he did find a complete DNA female
15   profile.  He developed a profile at all 15 markers, compared it
16   to C. W.'s standard, and he concluded that they matched and
17   they are from the same individual.
18           With respect to the blanket, he did obtain a profile,
19   there were three semen stains.  There was never a standard that
20   Mr. Harding submitted to the lab, but he did provide a profile
21   from the purple vibrator and stains on the blanket, and they
22   were consistent with the same person.
23           Now, Mr. Brannon was qualified to testify.  He did
24   evaluate Mr. Harding to assess whether there are any
25   psychological issues.  He conducted a psychological examination
```

on 12/30/15.  He received background forms, psychological
testing, spoke to Ms. Harding's mother.  He spoke about the
different tests and measures that he used and he ultimately
concluded that Mr. Harding reported numerous symptoms of
depression and anxiety and indications of possible
post-traumatic stress.

He did report the chronic and severe abuse of
marijuana and alcohol.  The psychological testing, prior
treatment records and an interview with Mr. Harding's mother
were consistent with Mr. Harding's self-reported symptoms.

The test and test scales designed for distortion do
not reveal malingering according to Dr. Brannon.

He noted if Mr. Harding's self report regarding
childhood sexual abuse is accurate as presented, it is likely a
contributing factor at the time of his alleged offenses, and
moreover, Mr. Harding's apparent addictions to pornography and
marijuana likely impaired his judgment and ability to control
impulses at the time of the alleged offenses.

Based upon information available at the time of the
assessment, Dr. Brannon felt Mr. Harding would be an
appropriate candidate for weekly counseling sessions and sex
offender groups, and he would benefit from participation in
group meetings several times a week to address the addiction to
drugs and alcohol, and indicated Mr. Harding did not display
factors that would prevent him from treatment services as

outlined above.

Now, Dr. Brannon was really not retained nor did he
give testimony specific to Mr. Harding's risk factor and
likelihood of reoffending.

He spoke generally about persons convicted of sexually
abusing children and did say the most salient factor in terms
of frequency of engaging in violent and sexual behavior, and
the age of 55 is where you see a desistance or drop off in
particular sex crimes, and the only exception is if the person
has psychopathic disorder.

And much was discussed on examination and on
cross-examination as to whether Mr. Harding suffers from any
psychopathic disorder to suggest that perhaps this 55 year old
desistance or drop off might not be applicable as that was
simply a general statement, and the Government queried and
examined Dr. Brannon on that, and through the examination, Dr.
Brannon acknowledged that a number of the factors that were
evident -- are evident in this case based on the behavior of
Mr. Harding are the kinds of factors that one might see in
someone who has a psychopathic disorder.

The Court is not reaching any conclusion as there has
been no expert ultimate opinion on whether or not Mr. Harding
has a psychopathic disorder.  The Court simply raises it and
notes that he does include that as an exception to the 55 year
old, and a number of the factors that were brought up on

cross-examination that would be indications of such a disorder,
including interest in younger children, under the age of five,
bondage, a primary interest in prepubescent children.

Any time there is touching, that increases the risk of
reoffending.

The offer to exchange children, that is the testimony
or evidence that has been put into evidence, evidence that has
been put into the record from the chat messages with Mr.
Harding.  Communicating with a third person about exchanging
C.W. with this other person's daughter for sexual activity,
abuse, gratification are also factors, according to Dr.
Brannon, that would pose a risk of future reoffending.

The fact that the majority -- the quantity of the
child pornography is a factor of future offending.

Sadistic behavior is an indicator of future
reoffending.

He spoke about one criteria, anti-social personality,
including self direction and goal setting.  He did acknowledge
goal setting matches swapping children with another person, an
anti-social lack of empathy, remorse for hurting another
person.  He said a pattern over four years of child abuse would
be a factor contributing to a diagnosis of anti-social
behavior.

He did acknowledge it needed to be begun before 15
years of age, and needed to be a history and pattern, and he

was not aware of any -- he concluded there was no indication
that Mr. Harding had the inability to appreciate or understand
the criminal nature of his offense, and the Court knows through
reading the chat messages that Mr. Harding did communicate with
others in acknowledging the risks of getting caught.

In fact, he, as a law enforcement officer, probably
knows that better than a non law enforcement person engaging in
these activities.

The Court heard from Julie Harding, and Julie Harding
is Mr. Harding's mother.  She explained how Mr. Harding's
father was murdered before he was born, and described the
difficulties she has had in her life and the impact that those
difficulties surely have had on Mr. Harding in terms of his
upbringing, not having a father, not having a mother most of
the time.

She was either working two jobs, coming home late, not
coming home at all, abusing drugs and/or abusing alcohol.

We learned from Mrs. Harding, and from Mr. Harding
when he spoke to the Court, Mrs. Harding wasn't aware of this
at the time, when Mr. Harding was staying with other friends
during these periods when Mrs. Harding was absent, that he has
been sexually abused and he was sexually abused by a friend's
older brother as well as the friend's parents, and that from
the way that Mr. Harding described that, he was emotional and
surely the Court can understand that if in fact that occurred,

```
 1   that would have been a very emotional and traumatic experience
 2   for Mr. Harding.
 3           Despite that, however, and despite having dropped out
 4   of high school when he moved to this area in his last year of
 5   high school, he seemed to have overcome certain challenges.  He
 6   went to the Indian River local college.  He got a degree, went
 7   on to get his Associate Degree in criminal justice, completed
 8   the Police Academy, did that all at the age of 20 years old.
 9           Mrs. Harding was proud of her son, Mr. Harding, as Mr.
10   Harding seems to be proud of those accomplishments.
11           She was not aware of the psychological counseling Mr.
12   Harding sought, but she was aware of anxiety and depression.
13   She did not know he used alcohol and marijuana.
14           We heard from Elizabeth Perry, who spoke of her
15   knowledge of Mrs. Julie Harding and the difficulties and
16   challenges she has had and knowledge of Michael Harding, what
17   he has been through.  She commented that he was intelligent,
18   respectful, loving and kind.  He is sad, trying to restore
19   himself.  Mrs. Perry believes he can, and she thinks his
20   behavior was an aberration.
21           In considering the nature and circumstances of the
22   offense, the Court notes that the Defendant on multiple
23   occasions sexually abused his two stepchildren, C.W. and H.W.,
24   ages five and eight, who were in his care.
25           He also attempted to provide one of those children,
```

```
 1   C.W., to another pedophile to be sexually abused for the
 2   purpose of gaining access to innocent children.
 3           The Defendant, Mr. Harding, intended to sexually
 4   abuse.  In his text messages, he graphically described the acts
 5   he performed on C.W.  On multiple occasions he subjected the
 6   two children to oral and anal sex acts.  The acts were sadistic
 7   both because of the nature of the acts and because the acts
 8   were performed on children of such young age and such small
 9   frames.
10           To memorialize his act, he chose to videotape H.W.
11   performing oral sex on him.  He regrettably erased the video
12   because he was afraid of getting caught.
13           He interacted -- Mr. Harding interacted with other
14   pedophiles online, he encouraged them to sexually abuse young
15   children.  The encouragement was accomplished through chat
16   messaging and distribution of child pornography.  He engaged in
17   conversation was other pedophiles in which the topic was sexual
18   abuse committed on prepubescent children.  The conversations
19   and encouragement demonstrated to other people that he was
20   accepting, condoning their behavior, and the conversations also
21   served to arouse the sexual desire of other men to have sex
22   with prepubescent children.
23           Mr. Harding explained and was told by another person
24   with whom he was communicating that he was lucky because he was
25   married to a woman who had two children, and was considered
```

```
 1   lucky because of that, because he could perform sexual acts
 2   with the children in the home, and appeared to give advice to
 3   other offenders or potential offenders or chat room partners
 4   how they can go and find single women with children because
 5   that would make it easier for them to prey upon innocent young
 6   victims.
 7           Mr. Harding's distribution of child pornography
 8   further victimized the children in the videos.  Images
 9   distributed on the internet do have the potential of lasting
10   forever.  The children in the images do live with for the
11   remainder of their life someone is trading for personal
12   gratification images of what has to be one of the worst, if not
13   the worst experiences in their life.
14           The child pornography ranged from offensive to
15   patently disturbing, depictions of the genitals, grade age
16   girls orally and vaginally penetrated with objects, fingers and
17   penises.  Some of the images were purely sadistic.
18           With respect to the history and characteristic of the
19   Defendant, the Court has encompassed that in recounting the
20   testimony of Michael Harding and the experiences that he had
21   growing up and that of Mrs. Julie -- Ms. Julie Harding.
22           That is where the Court has gleaned most of what it
23   could, including the report from Dr. Brannon of the history and
24   characteristics of Mr. Harding.
25           The Court must consider the need for the sentence
```

```
 1   imposed to reflect the seriousness of the offense.
 2           I don't think anyone who has been listening for the
 3   past two days can dispute that Mr. Harding's offenses were of a
 4   extremely serious nature.  I can only hope that Mr. Harding now
 5   realizes that.
 6           The quality and quantity of the harm inflicted by
 7   virtue of the type of sexual abuse inflicted on the
 8   stepchildren and quantity of videos, images, chat discussions
 9   that he received, possessed and distributed all speak to the
10   seriousness of the offense and the need for the sentence
11   imposed to reflect the seriousness.
12           Ms. Ashley Harding left to care -- is now left to care
13   for three children.  The children and their mother are now
14   fearful and untrusting of other people.  For Mrs. Harding and
15   her children to trust another man to be around her children may
16   never happen in her lifetime.
17           The child that you have fathered, Mr. Harding, will
18   grow up now without a father figure.
19           The -- your arrest and conviction no doubt tarnished
20   the perception of law enforcement in the community, and this
21   case and your acts will be in the mind of the public when they
22   see police officers.
23           Now, I did want to speak to the issue that Mr. Peacock
24   has raised with respect to the Sentencing Commission and the
25   report in 2012.
```

The Court has familiarized herself with it.

As the Court has come to understand, the report is a result of a multi-year study by the Commission and compliments and expands on the Commission's s 2009 report, the history of the child pornography guidelines.

The focus of this is 2G2.2 of the guidelines and the current guideline for non-production offenses, such as possession, receipt, transportation and distribution of child pornography, the four primary offense types, and the purpose is to contribute to Congress and the stake holders in the criminal justice system how Federal pornography offenders are sentenced, incarcerated and supervised in re-entry to the community.

The key findings were that child pornography results end up in indelible harm to the victims in production and non-production offenses.  The current non-production guideline warrants revision in view of its outdated and disproportionate enhancement related to an offender's collective behavior as well protect communities from sexually dangerous behavior.

A revised guideline that more fully accounts for the full range of the offender's collecting behavior, degree of involvement in a child pornography community and sexual behavior would better promote sentences and statutory purposes of sentencing, and the Commission reflects that Congress may want to revise the penalty structure in distribution offenses in newer and older technologies used by offenders to distribute

---

child pornography.

The Commission recommends to consider amending the notice and restitution statutes for victims involving child pornography.

The Court would note it has listened to what you said, Mr. Peacock, in terms of what the Sentencing Commission is considering, but it does see a distinction.

The emphasis is on non-possession distribution type charges, and Mr. Harding, in this case, is charged in Counts 1 to 3 with distribution of child pornography, in violation of 18 United States Code, 2252(a)(2) and (b)(1), Count 4, possession of child pornography, in violation if 2252(a)(4)(B) and (b)(2), Count 5, attempt to coerce and entice a minor to engage in sexual activity, in violation of 18 United States Code, 2422 (b), and Count 6, production of child pornography, in violation of 18 United States Code, 2251(a)(e).

This 2012 report may speak to certain of the counts that Mr. Harding is charged with.  The Court does not construe the report as speaking to particularly Counts 4 through 6 of the indictment against Mr. Harding, but understands what you were trying to communicate to the Court and wants you to understand, on behalf of Mr. Harding, that the Court has taken that into consideration in its overall contemplation of the appropriate sentence.

No doubt the sentence imposed, as 35353 tells us,

---

must -- sentence must be imposed to promote respect for the law.

It is certainly the case that the sentence must not only signal to Mr. Harding, but to others, that these types of offenses are simply not tolerated, and that there are laws that must be abided by and consequences if those laws are violated. Sentencing is one component of how a Court reinforces the need to have that respect for the law and as a law enforcement officer, I know you, Mr. Harding, would understand that.

The sentence must provide just punishment for the offense.

Now, the Government spoke to this, and it was also included in the sentencing memorandum, that there is the consideration for what is referred to as the just desserts concept which carries the need for retribution, make the punishment fit the crime, and need not to punish, but punish justly.

One of the cases by the Government, United States versus Pew, 515 F.3d, 1197, an Eleventh Circuit 2008 case, the Eleventh Circuit quoted the Senate report regarding this provision.

The purpose of the just desserts concept should be reflected clearly in all sentences.  It is another way of saying the sentence should reflect the gravity of the Defendant's conduct from the public standpoint, the sentence

---

should be of a type and length that would adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing reoccurrence of the offense.

From the Defendant's standpoint, the sentence should not be unreasonably harsh under all circumstances of the case and should not differ from the sentence given to other similarly situated Defendants convicted of a similar offense under similar circumstances.

When child pornography is produced in conjunction with sexual abuse of children, as it was, the harm to the child victim is magnified and perpetuated.

Because punishment should fit the crime, the more serious the conduct, the greater the need for retribution and the longer the sentence should be.  The seriousness -- it follows that the greater the harm, the more serious the crime and longer the sentence should be for the punishment to fit the crime.

The sentence must afford adequate deterrence to criminal conduct, that speaks in conjunction with the other factors, and need to promote respect for the law, and the Court has to weigh that factor as well.

It has been suggested to the Court that with the greater enhancements in technology and different servers, and going into darker rooms, that it has become increasingly more

1 difficult to find persons who are engaging in child pornography
2 and sexual abuse, as evidenced by chat messaging and exchanging
3 of pictures and videos, and it becomes, in the Court's opinion,
4 ever more important when persons are discovered and found and
5 arrested and charged and ultimately sentenced, that that
6 sentence be used in part as one of the factors to not only
7 deter the Defendant in this particular case, but particularly,
8 given the nature of this crime and difficulty in finding
9 criminals who engage in this kind of activity, a general
10 deterrence as to other criminal activity.
11       Then there is a need to protect the public from
12 further crimes of the Defendant.
13       As the Court spoke to, Mr. Harding's chat messages
14 demonstrate abusing children was deeply engrained in who he
15 was, who he is, or who he was during this period of time.
16       The data found on Mr. Harding's electronic devices
17 indicate that he has been collecting and viewing child
18 pornography since 2008, actively abusing prepubescent children
19 for years, no indication that he was going to stop.
20       All we know is Special Agent Rey's discovery of what
21 was going on brought an end to it.  That is all we know.
22       When the Court considered the need to protect the
23 public from further crimes of the Defendant, while the Court is
24 not going to go through all 53 pages of Docket Entry 103, which
25 is the notice of filing victim statements, the Court is going

---

1 to highlight a few portions that seem to strike the Court as
2 speaking as poignantly as can be spoken about the need to
3 protect the public from further crimes of the Defendant.
4       One such passage comes from page seven of 53 at Docket
5 Entry 103 and it is entitled -- it has a caption that says A
6 Mother's Fear.  Every parent knows that there are individuals
7 out there they desperately want to keep their children away
8 from, the sadistic predators, the merciless fiends that would
9 prey on young lives.  Each horrific tragic tale that appears in
10 the paper brings, not my child, please, not my child.  My
11 daughter has already suffered so much -- this is written by the
12 mother of a victim in the photos and/or videos.
13       My daughter has already suffered so much, it seems an
14 outrage that anyone would put her at further risk, but then
15 there is the cold reality, who bothers to risk prison to
16 acquire pictures of a child being tortured and abused?  Exactly
17 the type of fiend a parent fears.
18       Certainly the people who pass on the pictures know
19 they are exposing the children in them to the risk of being
20 further victimized, but it must not matter to them.
21       The more widely distributed the pictures become, the
22 larger the audience, the greater chance they fall into the
23 hands of fiends.  The suffering is not enough.  Who wants to
24 follow up with a more personal relationship?  I do not want my
25 daughter viewed by friends as a victim.  I do not want to have

---

1 her worry if she sees a flash of recognition, they may
2 recognize her not as a person, but a person of abuse.
3       On page eight of 103, I believe it is from the same
4 victim, the same mother.  Under the subheading Responsibility,
5 she says, I can find no words to express the fury I feel at
6 those who participate in this evil or my scorn for any attempt
7 to minimize the responsibility by feeble claims that the crime
8 was victimless.
9       My daughter is a real person, she was horribly
10 victimized to provide this source of entertainment.  She is
11 exploited anew each and every time her suffering is copied,
12 traded or sold.  While the crime is clearly conscienceless, it
13 is hardly victimless.
14       I asked my daughter what she wanted most to ask of the
15 judge.  Her request, please don't let them pretend no one is
16 getting hurt.
17       She had some words for the Defendant as well.  Don't
18 you know no one should do that to a little girl, don't you know
19 it hurts?
20       The chat messages, in the Court's opinion, demonstrate
21 that Mr. Harding was unable to abide by the law.  He chose to
22 view and distribute child pornography while he was not only
23 employed as a police officer, but while he was on duty.
24       He had a -- has a pervasive and deep seeded attraction
25 to prepubescent girls.  He specifically stated in one of the

---

1 text messages that he is attracted to girls in the prepubescent
2 age range.
3       The Court also, in considering the need to avoid
4 unwarranted sentencing disparities, does take note of the
5 Government sentencing memorandum, and in particular, on pages
6 15 to 18 of the Government's sentencing memorandum, the
7 Court -- the Government presents the Court with quite a bit of
8 case law that would suggest to the Court that the range of
9 sentence under the guidelines for this defendant, Mr. Harding,
10 would not present sentencing -- a sentencing disparity.
11       So, this is what the Court has considered, this is the
12 evidence, this is how the Court has applied and considered the
13 evidence in the context of all of the factors the Court must
14 consider in imposing a sentence on you, Mr. Harding.
15       And based on all of the factors and the case law and
16 the argument and the evidence and the briefing and the
17 testimony, the Court reaches the conclusion that it is the
18 judgment of this Court that you, Mr. Michael Edwin Harding, are
19 committed to the Bureau of Prisons to be imprisoned for life.
20       The term consists of 240 months as to Counts 1 through
21 4, life as to Count 5, and 360 months as to Count 6, all to be
22 served concurrently.
23       It is further ordered that, pursuant to 18 United
24 States Code, 3664(d)(5), that the victims' losses are not yet
25 ascertainable, therefore the Court shall set a date for the

```
 1   final determination of the victims' losses, not to exceed 90
 2   days after sentencing.
 3          Upon release from imprisonment, Mr. Harding shall be
 4   placed on supervised release for a term of life on Counts 1
 5   through 6, all such terms to run concurrently.
 6          Within 72 hours of release from the custody of the
 7   Bureau of Prisons, the Defendant shall report in person to the
 8   Probation Office in the district to which the Defendant is
 9   released.  While on supervised release, the Defendant shall not
10   commit any crimes, shall be prohibited from possessing a
11   firearm or other dangerous devices, shall not possess a
12   controlled substance, shall cooperate in the collection of DNA
13   and comply with the standard conditions of supervised release,
14   including the following special conditions:
15          Mr. Harding shall not possess or use any data
16   encryption technique or program.  He shall not possess or use
17   any computer except with the prior approval of the Court, may
18   use a computer in connection with authorized employment.
19          Mr. Harding shall permit third party disclosure to any
20   employer or potential employer concerning any computer related
21   restrictions imposed upon Mr. Harding.
22          Mr. Harding shall participate in an approved mental
23   health treatment program.  Mr. Harding shall contribute to the
24   cost of services rendered based on ability to pay or third
25   party payment.
```

```
 1          Mr. Harding shall participate in an approved treatment
 2   program for drug and/or alcohol abuse and abide by all
 3   supplemental conditions of treatment.  Participation may
 4   include inpatient and outpatient treatment.  Mr. Harding shall
 5   contribute to the cost of services rendered based on ability to
 6   pay or availability of third party payment.
 7          Mr. Harding shall have no personal mail, telephone or
 8   computer contact with children or minors under the age of 18
 9   years or with any victim.
10          Mr. Harding shall not be involved in any children's or
11   youth organization.
12          Mr. Harding shall participate in a sex offender
13   treatment program to include psychological testing and
14   polygraph examination.  Participation may include inpatient or
15   outpatient treatment as deemed necessary by the treatment
16   provider.  Mr. Harding shall contribute to the costs of
17   services rendered based on ability to pay or availability of
18   third party payment.
19          Mr. Harding shall not buy, sell, exchange, possess,
20   trade or produce visual depictions of minors or adults engaged
21   in sexually explicit conduct.  He shall not correspond or
22   communicate in person, by mail, telephone or computer with
23   individuals or companies offering to buy, sell, trade, exchange
24   or produce visual depictions of minors or adults engaged in
25   sexually explicit conduct.
```

```
 1          Mr. Harding shall submit to the United States
 2   Probation Officer conducting periodic unannounced searches of
 3   the Defendant's person, property, house, residence, vehicles,
 4   papers, computers, other electronic communication or data
 5   storage devices or media, including retrieval and copying of
 6   all data from the computer and any external or internal
 7   peripherals and effects at any time, with or without warrant by
 8   any law enforcement or Probation Officer with reasonable
 9   suspicion concerning unlawful conduct or a violation of a
10   condition of probation or supervised release.
11          The search may include the retrieval and copying of
12   all data from the computers and any external and internal
13   peripherals to ensure compliance with other supervision
14   conditions and/or removal of such equipment for the purpose of
15   conducting a more thorough inspection; and to have installed on
16   Mr. Harding's computers, at Mr. Harding's expense, any hardware
17   or software systems to monitor his computer use.
18          Mr. Harding shall comply with the requirements of the
19   Sex Offender Registration and Notification Act, 42 U.S.C.
20   Section 16901, as directed by the Probation Officer, the Bureau
21   of Prisons or any state offender registration agency in which
22   he resides, works, is a student, or was convicted of a
23   qualifying offense.
24          It is further ordered that Mr. Harding shall pay
25   immediately to the United States a special assessment of $100
```

```
 1   for each of Counts 1 through 6, for a total of $600.
 2          Implicit in the Court's sentencing, but the Court will
 3   state explicitly, the motion for downward variance is denied.
 4          The Court took into account all of the factors that
 5   the defense raised in suggesting to the Court that it should
 6   vary downward from what the guidelines tell the Court is the
 7   appropriate sentence.
 8          Defense focused primarily on Mr. Harding's background.
 9   The Court addressed that.  The Court takes note of certain
10   difficulties and traumas in his background.
11          The Court took into account Dr. Brannon's testimony
12   and the risk factors involved in reoffending and the age limits
13   he has spoken about and I realize he spoke in a general way and
14   not a specific way, and the Court evaluated the arguments of
15   the Sentencing Commission's report in 2012 about child
16   pornography guidelines.
17          All of the other bases that the Court has relied upon
18   to deny the motion for downward variance are those the Court
19   has just set forth in its pronouncement of the sentence.
20          So the total -- therefore, the total sentence is life
21   imprisonment, life supervised release and a $600 special
22   assessment.
23          Now that sentence has been imposed, does Mr. Harding
24   or counsel object to the findings of fact and the manner in
25   which the Court announced?
```

```
 1        MR. PEACOCK:  Yes, ma'am.  Do you want me to state
 2   those in particularity?
 3        THE COURT:  I defer to you.
 4        MR. PEACOCK:  As I noted in my motion for downward
 5   variance, it is the defense's position the guideline range
 6   which the Court relied on heavily in this case is arbitrary and
 7   excessive for the reasons I laid out, actually being criticized
 8   by the Sentencing Commission itself in this case.
 9        Beyond that, Your Honor, I think the sentence the
10   Court has imposed is substantively unreasonable under the
11   circumstances and going to the maximum sentence possible is not
12   warranted in this case.
13        Those are our objections.
14        THE COURT:  Okay.
15        Does the Government have any objections?
16        MR. FUNK:  No.
17        THE COURT:  Mr. Harding, you have a right to appeal
18   the sentence imposed.  Any Notice of Appeal must be filed
19   within 14 days of the entry of the judgment.  If you are unable
20   to pay for the cost of appeal, you may appeal in forma
21   pauperis.
22        MR. PEACOCK:  Your Honor, if I may.
23        THE COURT:  Yes.
24        MR. PEACOCK:  My notes reflected different facts other
25   than what the Court announced at sentencing.  For the record, I
```

```
 1   would reserve a procedural reasonableness based on the factual
 2   differences.
 3        THE COURT:  Do you want to articulate the factual
 4   differences?
 5        MR. PEACOCK:  There are numerous ones.  If the Court
 6   wants me to elaborate, I certainly can.
 7        THE COURT:  I think if you want to make a record of
 8   what those factual differences are, that you should put them on
 9   record.
10        MR. PEACOCK:  Sure.
11        Among those, Your Honor, I think the Court said that
12   the first time that C.W. relayed the events that occurred, that
13   she said that Mr. Harding put her hand over his penis, which I
14   don't think is accurate.
15        As I recall the testimony, it was that she said he put
16   his own hand there, and she remained on the other end of the
17   couch.
18        Secondly, Your Honor indicated that Ashley Harding was
19   unaware that Mr. Harding was abusing drugs, but she testified
20   herself that she abused drugs with Mr. Harding on several
21   occasions.  So, I just don't think that is an accurate
22   conclusion.
23        Your Honor, in regard to Dr. Brannon's testimony, the
24   Court referred to the risk falling off at age 55 unless the
25   Defendant had some kind of psychopathic disorder.
```

```
 1        I don't think that is what Dr. Brannon said.  I think
 2   what was addressed was an anti-social personality disorder, and
 3   for the record, Dr. Brannon concluded that Mr. Harding does not
 4   have anti-social personality disorder, he may have some of the
 5   characteristics.
 6        Also, Dr. Brannon concluded that Mr. Harding had many
 7   characteristics which indicated a respect for society and
 8   ability to operate in society.
 9        Your Honor, at one point, mentioned a pattern of child
10   abuse over a period of four years.  I don't think there is any
11   support in the record for that.  As best I can establish, the
12   earliest the record goes back in that regard would be 2014,
13   which by my accounting would be one year.
14        Your Honor did not include the letters provided on
15   behalf of Mr. Harding, which I had filed and submitted on his
16   behalf.
17        THE COURT:  Yes, the Court has -- the Court at the
18   very inception of the proceeding on the 16th, when we commenced
19   the hearing, the sentencing --
20        MR. PEACOCK:  Yes, I know you acknowledged receiving
21   them.
22        THE COURT:  The Court read all of those letters.
23        The letters the Court received and reviewed included
24   letters from Julie Harding dated April 28, 2016, and of course
25   we had Julie Harding here to testify.  And Elizabeth Perry as
```

```
 1   well, and Elizabeth Perry was here to testify.
 2        And there was a letter from Judith Sohr, as best I
 3   can -- Sohr, S-O-H-R, April 29, 2016, and from Christina Stein,
 4   March 28, 2016, Michael Sohr, April 10, 2016, Doug Stefano, Sue
 5   Ann Pastano, MaryJo Jennings, Ellen Brushwinger, Kathleen
 6   Olson, George Olson, September 26, 2015, and there are a number
 7   of others.
 8        The Court has considered each of these letters as
 9   well.  I neglected perhaps -- and the newspaper articles that
10   spoke to Mr. Harding and his background as a police officer,
11   and state publications, being officer of the year, his
12   graduation, and you are correct that the Court overlooked in
13   today's pronouncement that it had considered it, but the Court
14   has considered that and just neglected to bring that up.
15        MR. PEACOCK:  Finally, Your Honor, I would just voice
16   that I had a continuing objection against the hearsay nature of
17   the evidence in this case and any confrontation clause
18   requirements.
19        We basically got secondhand information from
20   individuals who are nine and five respectively, and I don't
21   think that is sufficient for the Court to rely on to impose
22   such a severe sentence.
23        THE COURT:  Okay, I think you made that as to
24   Mrs. Harding's testimony.  Did you make those as to Detective
25   LaGrega?
```

1        *MR. PEACOCK:*  I don't believe I did, Your Honor, but I

2  would ask the Court to give that consideration and that I think

3  the Court is giving it too much weight.

4        *THE COURT:*  Okay.

5        The only response -- and I appreciate you putting your

6  comments on the record, they are part of the record -- is that

7  the Court, in trying to do its best over two days worth of

8  testimony, to jot its notes and be able to recap and summarize

9  its notes from each and every witness, acknowledges that -- and

10  I think beginning with Sheila LaGrega, that I may have

11  misspoken as to what took place on the first day versus another

12  day in terms of what C.W. told her as to whether Mr. Harding

13  put his own hand on his penis, and on another occasion whether

14  he had C.W. put her hand on his penis.

15        The Court recognizes that it may have spoken maybe too

16  generally about which conversation took place and when and what

17  happened, but -- with respect to Dr. Brannon, the Court

18  acknowledges what he did say and what he didn't say.

19        The Court may have -- when he spoke about psychopathic

20  disorder, he then went on to talk about anti-social behavior.

21        So, while the Court perhaps may have misused certain

22  words, it doesn't change your objections, but I want you at

23  least to know that the Court thoroughly understands the essence

24  of what every witness has said, does not -- did not

25  fundamentally miss in its own opinion any fundamental point

1  made by any of the witnesses, weighed each and every bit of

2  evidence carefully and with great difficulty, and was speaking

3  at such length about what the Court considered because it is

4  such a significant sentence.

5        I want everyone to know why the Court imposed the

6  sentence that it did, and in doing so without the benefit of a

7  full transcript in front of me, rather the notes I had taken

8  along the way, did its best effort to summarize, but believes

9  each and every witness was heard and listened to and weighed as

10  part of the 3553 factors that the Court had to consider in

11  making its decision to impose a sentence.

12        *MR. PEACOCK:*  Your Honor, finally, if I may, I would

13  ask the Court make this sentence concurrent to any sentence in

14  the State of Florida, St. Lucie County, and that is 15-CF-2947,

15  as is read in paragraph 46 of the PSI.

16        This will have a great effect on Mr. Harding's

17  security rating if it is not.

18        *THE COURT:*  Which paragraph?

19        *MR. PEACOCK:*  Paragraph 46.

20        *THE COURT:*  Does the Government have a position on

21  that?

22        *MR. FUNK:*  I don't think the State Court could be

23  bound by this Court saying it should run concurrently.  I don't

24  believe it would be appropriate to run concurrently.

25        The offenses are what you take into consideration.

1  The specific offense characteristics that include the sexual

2  battery, he is charged in separate courts with separate

3  offenses, it is not appropriate to be concurrent.

4        *MR. PEACOCK:*  Under Federal law, I believe jeopardy

5  would attach.  That conduct has been used as a specific

6  enhancement in his case.  That is appropriate where it is

7  concurrent.

8        *THE COURT:*  He hasn't been sentenced in State Court

9  yet.  If he had already been sentenced, I could see

10  entertaining a request to make it concurrent.

11        *MR. PEACOCK:*  You could do it to make it concurrent to

12  that case.

13        *THE COURT:*  What other requests are being made?

14        *MR. PEACOCK:*  I would like a recommendation that he be

15  housed as close as possible to this area.

16        *THE COURT:*  South Florida?

17        *MR. PEACOCK:*  Yes, ma'am.

18        *THE COURT:*  The Government's position on that.

19        *MR. FUNK:*  No objection where he is housed.

20        *THE COURT:*  The Court will make a recommendation that

21  Mr. Harding be housed in a facility, if possible, in South

22  Florida.

23        Mr. Harding, it is the ultimate decision and

24  responsibility of the Bureau of Prisons to be determined where

25  you are placed.

1        My recommendation will be a factor considered in the

2  context of all factors where they place inmates.

3        As to the request for the Court to make this sentence

4  concurrent with a State sentence that has not been imposed yet,

5  the Court is going to abstain from doing that.

6        The Court will limit its ruling and imposition to that

7  which is before it and can really only consider, and it was

8  quite a bit.

9        I am most comfortable imposing a sentence as relates

10  to what has occurred before this Court.

11        *MR. PEACOCK:*  Your Honor, in the event you are not

12  aware, by doing that you are making it consecutive under the

13  statute.

14        The way BOP considers these sentences, they treat

15  something you don't make concurrent as consecutive.  I don't

16  think under the circumstances that is warranted.

17        That will mean his security rating in the Federal

18  custody will rise because he has a pending sentence from State

19  Court from another jurisdiction and it is just piling on more

20  and more.  I just don't see that is appropriate, Your Honor.

21        *THE COURT:*  And what exactly -- rearticulate what your

22  position is and why, why you object to it.

23        *MR. FUNK:*  He is being charged in separate courts with

24  separate offenses.  While the Government can put forward facts

25  of the offenses which are charged in State Court, he is not

1 charged with sexual battery here, and it is not appropriate

2 under the circumstances to essentially negate a sentence in

3 State Court by saying it is automatically going to run

4 concurrent.

5     THE COURT:  What are the charges in State Court?

6     MR. FUNK:  The charges pending, I don't know if it is

7 warranted now, two counts of sexual battery, a mandatory life

8 sentence, and the victims listed are C.W. and H.W.

9     THE COURT:  Having considered the positions put forth

10 by both sides, the Court is going to adhere to the position not

11 making it concurrent, not affirmatively saying it is

12 concurrent.

13     MR. PEACOCK:  All right.

14     THE COURT:  Anything further?

15     MR. FUNK:  Yes, Your Honor.

16     Is the Court incorporating into the judgment and

17 commitment the preliminary order of forfeiture, March 2nd,

18 2016, Docket Entry 807?

19     THE COURT:  Docket Entry 80, preliminary order of

20 forfeiture as to Michael Edwin Harding, and that includes the

21 PNY attached thumb drive, serial number indicated, one Lexar

22 model JD Mercury thumb drive with the serial number associated

23 with it, one LGD800 cell phone with the serial number

24 associated with it.  This is in paragraph two of the

25 preliminary order of forfeiture, subsection D.

Pauline A. Stipes, Official Federal Reporter

1 Samsung SMG and -- G 9, rather, cellular telephone

2 with the serial number associated with it.

3     The Court does incorporate the order of forfeiture,

4 and asks the Government provide a forfeiture order within the

5 next three days.

6     Anything further?

7     MR. FUNK:  For the issue of restitution, we need a

8 court date if that is necessary.

9     THE COURT:  Is that something we want to get back to

10 counsel with, Lakeshia?

11     THE COURTROOM DEPUTY:  Yes, please.

12     THE COURT:  That needs to take place within 90 days.

13 What is the likelihood that the hearing will proceed?

14     MR. FUNK:  I think there is a low likelihood.

15     MR. PEACOCK:  I think there is a real good likelihood.

16     THE COURT:  We'll endeavor to give you the date, and

17 keep us apprized if the date is no longer needed or the hearing

18 is not necessary.

19     Anything further?

20     MR. FUNK:  No.  Thank you.

21     MR. PEACOCK:  Thank you.

22     THE COURT:  I thank you.

23     I do -- as difficult as it might seem to hear from me,

24 Mr. Harding, and I understand if it falls on deaf ears, but I

25 do wish you well.  I hope you find the ability to get treatment

Pauline A. Stipes, Official Federal Reporter

1 and rehabilitation through the services that are afforded you.

2     You have the support of your family, and that is very

3 important.  I want to acknowledge and thank your family and

4 friends of family for coming.

5     Just as I want to acknowledge having Mrs. Harding,

6 Ashley Harding, here and those who may have come to support

7 her, and wish you and your family well on a going forward

8 basis, and you get all of the support and services you need to

9 work through what you have been through.

10     I thank counsel for their patience and thoroughness in

11 putting together all of the information for the Court to

12 consider in this sentencing.

13     So, thank you.

14     (Thereupon, the proceedings concluded.)

15                    * * *

16     I certify that the foregoing is a correct transcript

17 from the record of proceedings in the above matter.

18

19     Date: June 5, 2016

20         /s/ Pauline A. Stipes, Official Federal Reporter

21             Signature of Court Reporter

22

23

24

25

Pauline A. Stipes, Official Federal Reporter

## CERTIFICATE OF SERVICE

I hereby certify that two copies of the foregoing Supplemental Appendix for the United States were mailed to the Court of Appeals via Federal Express this 22nd day of March 2023, and that, on the same day, the foregoing appendix was filed using CM/ECF and served via CM/ECF on: Richard Carroll Klugh Jr, Esq., counsel for Michael Harding.

s/ *Jacob Koffsky*
Jacob Koffsky
Assistant United States Attorney

*ms*